Eric H. Gibbs (SBN 178658)
Andre M. Mura (SBN 298541)
Amanda M. Karl (SBN 301088)
Jeffrey B. Kosbie (SBN 305424)
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, California 94612
(510) 350-9700 (tel.)
(510) 350-9701 (fax)
ehg@classlawgroup.com
amm@classlawgroup.com
amk@classlawgroup.com
jbk@classlawgroup.com

Jennifer D. Bennett (SBN 296726)
Neil K. Sawhney (SBN 300130)
**GUPTA WESSLER PLLC**
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 573-0336
jennifer@guptawessler.com
neil@guptawessler.com

*Attorneys for Plaintiffs and the Proposed Class*

[Additional counsel on signature page]

# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

CAT BROOKS and RASHEED SHABAZZ, individually and on behalf of all others similarly situated,

　　　　　Plaintiffs,

　　v.

THOMSON REUTERS CORPORATION,

　　　　　Defendant.

Case No. 3:21-cv-1418-EMC

**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS AND MOTION TO STRIKE**

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................................... 1

FACTS ......................................................................................................................................... 1

ARGUMENT ............................................................................................................................... 3

I.   The complaint sufficiently alleges that Thomson Reuters' nonconsensual sale of
Californians' identities violates the Unfair Competition Law. ........................................ 3

A.   Thomson Reuters' conduct is unlawful................................................................. 3

B.   Thomson Reuters' practices also violate the UCL because they are unfair. ....... 7

C.   This Court may award equitable relief because there is no adequate and
complete remedy at law. ..................................................................................... 10

II.   Plaintiffs properly plead their common law right of publicity claim. ........................... 11

III.   Plaintiffs properly plead unjust enrichment as a standalone claim............................... 12

IV.   Federal law does not shield Thomson Reuters from liability for its misconduct.......... 12

A.   The First Amendment is no obstacle to Plaintiffs' claims. ................................ 12

B.   The Communications Decency Act does not shield Thomson Reuters from
liability for creating and selling CLEAR profiles of Californians. .................... 16

C.   Federal copyright law does not bar Plaintiffs' claims. ....................................... 20

V.   The Court should deny Thomson Reuters' anti-SLAPP motion................................... 21

A.   Plaintiffs' suit is exempt from the anti-SLAPP statute under its public-interest
exception. ............................................................................................................ 21

B.   Thomson Reuters' sale of private information does not qualify as "protected
activity" under the anti-SLAPP law. .................................................................. 23

C.   There is a reasonable probability Plaintiffs will succeed on their claims. .......... 25

CONCLUSION ......................................................................................................................... 25

PLAINTIFFS' OPPOSITION TO MOTIONS TO DISMISS AND STRIKE
Case No. 3:21-cv-1418-EMC

# TABLE OF AUTHORITIES

Page(s)

Cases

*Andino v. Apple, Inc.*,
    2021 WL 1549667 (E.D. Cal. Apr. 20, 2021) ........................................................................ 11

*Astiana v. Hain Celestial Grp., Inc.*,
    783 F.3d 753 (9th Cir. 2015) ................................................................................................ 12

*Barnes v. Yahoo!, Inc.*,
    570 F.3d 1096 (9th Cir. 2009) .............................................................................................. 19

*Barrett v. Rosenthal*,
    40 Cal. 4th 33 (2006) ............................................................................................................ 24

*Blanchard v. DIRECTV, Inc.*,
    123 Cal. App. 4th 903 (2004) ................................................................................. 21, 22, 23

*Bruton v. Gerber Prod. Co.*,
    703 F. App'x 468 (9th Cir. 2017) ......................................................................................... 12

*Burton v. Wolf*,
    803 F. App'x 120 (9th Cir. 2020) ......................................................................................... 15

*Callahan v. Ancestry.com Inc.*,
    2021 WL 783524 (N.D. Cal. Mar. 1, 2021) ......................................................................... 20

*Carafano v. Metrosplash.com, Inc.*,
    339 F.3d 1119 (9th Cir. 2003) .............................................................................................. 20

*Club Members for an Honest Election v. Sierra Club*,
    45 Cal. 4th 309 (2008) .......................................................................................................... 22

*Comedy III Prods., Inc. v. Gary Saderup, Inc.*,
    25 Cal. 4th 387 (2001) ............................................................................................................ 6

*ComputerXpress, Inc. v. Jackson*,
    93 Cal. App. 4th 993 (2001) ................................................................................................ 24

*Cross v. Facebook, Inc.*,
    14 Cal. App. 5th 190 (2017) ............................................................................................... 4, 5

*De La Torre v. CashCall, Inc.*,
    5 Cal. 5th 966 (2018) .............................................................................................................. 9

*Doe v. Internet Brands, Inc.*,
   824 F.3d 846 (9th Cir. 2016) ............................................................................ 17, 18

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
   472 U.S. 749 (1985) ................................................................................................ 13

*Eastwood v. Super. Ct.*,
   149 Cal. App. 3d 409 (1983) ..................................................................................... 5

*Ebeid v. Facebook, Inc.*,
   2019 WL 2059662 (N.D. Cal. May 9, 2019) ............................................................ 20

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*,
   521 F.3d 1157 (9th Cir. 2008) ................................................................... 17, 18, 19

*Fairfield v. Am. Photocopy Equip. Co.*,
   138 Cal. App. 2d 82 (1955) ....................................................................................... 3

*Fed. Trade Comm'n v. Accusearch Inc.*,
   570 F.3d 1187 (10th Cir. 2009) ............................................................................... 20

*Fraley v. Facebook, Inc.*,
   830 F. Supp. 2d 785 (N.D. Cal. 2011) .......................................................... 7, 9, 14

*Garretson v. Post*,
   156 Cal. App. 4th 1508 (2007) ................................................................................ 25

*Hart v. TWC Prod. & Tech. LLC*,
   --- F. Supp. 3d ---, 2021 WL 1032354 (N.D. Cal. Mar. 17, 2021) ........................... 12

*Hartford Cas. Ins. Co. v. J.R. Mktg., L.L.C.*,
   61 Cal. 4th 988 (2015) ............................................................................................ 12

*Hill v. Nat'l Collegiate Athletic Ass'n*,
   7 Cal. 4th 1, 25 (1994) .............................................................................................. 8

*HomeAway.com, Inc. v. City of Santa Monica*,
   918 F.3d 676 (9th Cir. 2019) ................................................................................... 17

*Huntingdon Life Scis., Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.*,
   129 Cal. App. 4th 1228 (2005) ................................................................................ 24

*IMDB.com Inc. v. Becerra*,
   962 F.3d 1111 (9th Cir. 2020) ........................................................................... 13, 14

*In re Anthem, Inc. Data Breach Litig.*,
   162 F. Supp. 3d 953 (N.D. Cal. 2016) ...................................................................... 9

iii

*In re Burke,*
   2019 WL 6332370 (B.A.P. 9th Cir. Nov. 25, 2019)................................................................ 12

*In re Carrier IQ, Inc.,*
   78 F. Supp. 3d 1051 (N.D. Cal. 2015) ...................................................................................... 8

*Inland Oversight Comm. v. Cty. of San Bernardino,*
   239 Cal. App. 4th 671 (2015).................................................................................................. 22

*Jurin v. Google Inc.,*
   695 F. Supp. 2d 1117 (E.D. Cal. 2010)................................................................................... 20

*Lemmon v. Snap, Inc.,*
   --- F.3d ----, 2021 WL 1743576 (9th Cir. May 4, 2021)........................................................ 18

*Low v. LinkedIn Corp.,*
   900 F. Supp. 2d 1010 (N.D. Cal. 2012) ................................................................................. 12

*Lozano v. AT & T Wireless Servs., Inc.,*
   504 F.3d 718 (9th Cir. 2007)................................................................................................... 7

*Lukis v. Whitepages Inc.,*
   454 F. Supp. 3d 746 (N.D. Ill. 2020)...................................................................................... 20

*Lukis v. Whitepages Inc.,*
   2020 WL 6287369 (N.D. Ill. Oct. 27, 2020) .......................................................................... 13

*Luna Distrib. LLC v. Stoli Grp. (USA), LLC,*
   2018 WL 5099277 & n.9 (C.D. Cal. July 10, 2018)............................................................... 12

*Major v. Silna,*
   134 Cal. App. 4th 1485 (2005)................................................................................................ 23

*Makaeff v. Trump Univ., LLC,*
   715 F.3d 254 (9th Cir. 2013)................................................................................................... 21

*Maloney v. T3Media, Inc.,*
   853 F.3d 1004 (9th Cir. 2017)................................................................................................. 21

*Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC,*
   141 S. Ct. 13 (2020)................................................................................................................. 17

*Maxcrest Ltd. v. United States,*
   2016 WL 6599463 (N.D. Cal. Nov. 7, 2016) ......................................................................... 11

*McKell v. Wash. Mut., Inc.,*
   142 Cal. App. 4th 1457 (2006)................................................................................................ 8

iv

*MCSi, Inc. v. Woods,*
290 F. Supp. 2d 1030 (N.D. Cal. 2003) ................................................................ 24

*Meyer v. Portfolio Recovery Assocs., LLC,*
707 F.3d 1036 (9th Cir. 2012) ............................................................................... 11

*Miller v. Collectors Universe, Inc.,*
159 Cal. App. 4th 988 (2008) .................................................................................. 6

*Motschenbacher v. R. J. Reynolds Tobacco Co.,*
498 F.2d 821 (9th Cir. 1974) .................................................................................. 14

*Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville,*
896 F.2d 1283 (11th Cir. 1990) ............................................................................. 11

*New.Net, Inc. v. Lavasoft,*
356 F. Supp. 2d 1090 (C.D. Cal. 2004) ................................................................ 24

*Pangilinan v. Downey Sav. & Loan Ass'n,*
2011 WL 2837587 n.1 (N.D. Cal. July 18, 2011) ................................................... 7

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.,*
413 U.S. 376 (1973) ............................................................................................... 16

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress,*
890 F.3d 828 (9th Cir. 2018) .................................................................................. 25

*Reid v. Johnson & Johnson,*
780 F.3d 952 (9th Cir. 2015) ................................................................................... 7

*Rogers v. Lyft, Inc.,*
452 F. Supp. 3d 904 (N.D. Cal. 2020) ................................................................... 11

*San Diegans for Open Gov't v. Har Constr., Inc.,*
240 Cal. App. 4th 611 (2015) ................................................................................ 21

*Schroeder v. Volvo Grp. N. Am., LLC,*
2020 WL 6562242 (C.D. Cal. Sept. 3, 2020) ........................................................ 21

*Perfect10, Inc. v. Google, Inc.,*
2010 WL 9479060 (C.D. Cal. July 30, 2010) .......................................................... 4

*Sonner v. Premier Nutrition Corp.,*
971 F.3d 834 (9th Cir. 2020) .................................................................................. 10

*Stewart v. Rolling Stone LLC,*
181 Cal. App. 4th 664 (2010) .............................................................................. 3, 5

v

*Sunward Corp. v. Dun & Bradstreet, Inc.*,
  811 F.2d 511 (10th Cir. 1987) ................................................................................. 13

*Tourgeman v. Nelson & Kennard*,
  222 Cal. App. 4th 1447 (2014) ........................................................................... 22, 23

*Trans Union Corp. v. F.T.C.*,
  267 F.3d 1138 (D.C. Cir. 2001) ........................................................................ 13, 14

*U.S. Dep't of Def. v. Fed. Lab. Rels. Auth.*,
  510 U.S. 487 (1994) .............................................................................................. 15

*U.S. Dep't of Just. v. Reps. Comm. For Freedom of Press*,
  489 U.S. 749 (1989) .............................................................................................. 15

*U.S. Dep't of State v. Ray*,
  502 U.S. 164 (1991) .............................................................................................. 15

*United States v. Aguilar*,
  782 F.3d 1101 (9th Cir. 2015) ................................................................................ 24

*White v. Samsung Elecs. Am., Inc.*,
  971 F.2d 1395 (9th Cir. 1992) ............................................................................... 3, 4

*Wilbanks v. Wolk*,
  121 Cal. App. 4th 883 (2004) ................................................................................. 24

*Wu v. Sunrider Corp.*,
  2017 WL 6880087 (C.D. Cal. Oct. 10, 2017) ......................................................... 12

*Zeiger v. WellPet LLC*,
  2021 WL 756109 (N.D. Cal. Feb. 26, 2021) ........................................................... 10

Statutes

17 U.S.C. § 102(a) ...................................................................................................... 20
47 U.S.C. § 230 .................................................................................................... *passim*
Cal. Bus. & Prof. Code §§ 17200 .................................................................................. 3
Cal. Civ. Code § 1798.135(a)(1) ................................................................................... 9
Cal. Civ. Code § 1798.150(c) ....................................................................................... 9
Cal. Civ. Code § 1798.175 ............................................................................................ 9
Cal. Civ. Code § 3344 ......................................................................................... 6, 7, 9
Cal. Civ. Proc. Code § 425.16 .............................................................................. 23, 24
Cal. Civ. Proc. Code § 425.17 .............................................................................. 21, 22

PLAINTIFFS' OPPOSITION TO MOTIONS TO DISMISS AND STRIKE
Case No. 3:21-cv-1418-EMC

Rules

Fed. R. Civ. P. 15(a)(2) ....................................................................................... 25

Regulations

Cal. Code Regs, tit. 11, § 999.315(a) ............................................................. 9, 10

Other Authorities

*A Taxonomy of Privacy*,
     154 U. Pa. L. Rev. 477 (2006) ...................................................................... 26

S.B. 613, 1983–84 Reg. Sess. (Cal. 1983) ......................................................... 6

PLAINTIFFS' OPPOSITION TO MOTIONS TO DISMISS AND STRIKE
Case No. 3:21-cv-1418-EMC

**INTRODUCTION**

Thomson Reuters makes its money by selling Californians' identities. The company procures detailed personal information about millions of Californians from a vast array of sources, uses that information to create dossiers about individual people, and sells these dossiers to its customers—all without the knowledge, let alone consent, of those whose identities it sells.

Thomson Reuters' dossiers purport to define who we really are. They promise to make identity CLEAR—hence the product's name. Take Cat Brooks, a Black civil rights activist, who has been targeted by white supremacists. Because of concerns about her safety, Ms. Brooks tries to ensure that her personal information is unavailable. But Thomson Reuters sells its customers a detailed dossier on Ms. Brooks—including information not just on Ms. Brooks but her family. Or take Rasheed Shabazz. Mr. Shabazz is also a civil rights activist who fears retaliation because of his work. Yet, without his consent, Thomson Reuters sells its customers a detailed—and inaccurate—dossier on him. Not only does Thomson Reuters sell his address and phone number and partial social security number; not only does it provide information on his employment and his "associates"; it says Mr. Shabazz is divorced (he's not) and that he's been sued for failing to pay child support (he hasn't).

California law has long prohibited the sale of Californians' identities without their consent. But that is precisely what Thomson Reuters does. And, contrary to the company's assertions, nothing about its exploitation of the personal information of millions of Californians is protected by federal law. Its motion to dismiss should be denied.

**FACTS**

Thomson Reuters is a data broker. It has amassed a vast trove of personal information about millions of Californians, a trove of information it updates in real time. Compl. ¶¶ 2, 17. The company then uses that information to create detailed cradle-to-grave dossiers on each person, which it sells to its private customers without the consent—or, in most cases, even knowledge—of those whose personal information it exploits. *Id.* ¶¶ 2–3. In other words, Thomson Reuters profits by selling the identities of Californians to those willing to pay for them.

The company boasts that the personal information it sells includes information "not found in

1

PLAINTIFFS' OPPOSITION TO MOTIONS TO DISMISS AND STRIKE
Case No. 3:21-cv-1418-EMC

public records or traditional search engines." Compl. ¶ 2. Thomson Reuters obtains data not just from public records, social networks, and chat rooms, but also from other data brokers and law enforcement agencies—cell phone records, location data from billions of license plate detections, arrest records, booking information, and intake photos. *Id.* ¶¶ 2, 14–15. The company collects our credit information, DMV records, social-media posts, utility records, and even records indicating whether a person has had an abortion. *Id.* ¶¶ 2, 16, 20, 35(a). In other words, Thomson Reuters has the names, addresses, and photos of millions of people, but also detailed information about almost all aspect of their lives. And the company updates its information in real time. *Id.* ¶¶ 2, 17.

Thomson Reuters "fuse[s]" together all of this information into "an ever-evolving, 360-degree view" of each person's life. *Id.* ¶ 16. The company constructs these 360-degree dossiers on millions of people. *Id.* And it sells them to its private customers through a service it calls CLEAR. *Id.* ¶ 2. Through CLEAR, Thomson Reuters' customers can buy a dossier on any individual in the company's database for a per-report fee—a dossier featuring not only the personal information Thomson Reuters has collected on them, but also their families and associates—which customers explore on Thomson Reuters' proprietary CLEAR platform. *See id.* ¶¶ 24–26, 28, 62. The detailed dossiers Thomson Reuters constructs, however, are not always accurate. Compl. ¶ 54. For example, its dossier on named plaintiff Rasheed Shabazz said he had been sued for failing to pay child support when, at the time, he hadn't even had a child. *Id.*

Accurate or not, Thomson Reuters has never obtained consent from the millions of Californians whose identities it sells—or even notified them that it does so. *Id.* ¶ 12.

Thomson Reuters makes significant profits from selling Californians' identities. *See id.* ¶¶ 58–63. Indeed, its products would have no value if they did not include the images and identities of individuals like Plaintiffs—their identities *are* the product. *Id.* ¶ 100. The company's "pay-as-you-go" pricing model even goes so far as to place a specific dollar value on the different types of information it sells. *Id.* ¶ 62. But the company makes no effort to share its profits with those whose identities generate them—after all, it doesn't even tell them it's doing so. Compl. ¶¶ 1, 3, 39.

PLAINTIFFS' OPPOSITION TO MOTIONS TO DISMISS AND STRIKE
Case No. 3:21-cv-1418-EMC

The named Plaintiffs, Cat Brooks and Rasheed Shabazz, are Californians whose identities Thomson Reuters sells to its customers through CLEAR. *Id.* ¶¶ 6–7. Neither Ms. Brooks nor Mr. Shabazz consented to the company selling their personal information—and neither wants the company to do so. *Id.* ¶¶ 41–42, 50–51. Both are civil rights activists concerned about being targeted because of their work. *Id.* They do not want a 360-degree view of their lives available to those willing to pay for it. *Id.* In fact, Ms. Brooks even subscribes to a service that routinely deletes her information from the internet. *Id.* ¶ 41. Yet Thomson Reuters still sells her identity.

Ms. Brooks and Mr. Shabazz brought this class action suit to stop Thomson Reuters from violating the rights of all Californians to control the sale of their identities, and to seek damages and disgorgement of the profits Thomson Reuters gained by selling Californians' identities without consent.

## ARGUMENT

**I.  The complaint sufficiently alleges that Thomson Reuters' nonconsensual sale of Californians' identities violates the Unfair Competition Law.**

California's Unfair Competition Law prohibits both "unlawful" and "unfair" business practices. Cal. Bus. & Prof. Code §§ 17200, *et seq.* Thomson Reuters' sale of detailed personal information about Plaintiffs—and millions of other Californians—is both.

### A.  Thomson Reuters' conduct is unlawful.

#### 1.  Plaintiffs properly allege that Thomson Reuters violated, and continues to violate, their common law right of publicity.

California common law has long recognized the right to control the exploitation of one's identity. *Fairfield v. Am. Photocopy Equip. Co.*, 138 Cal. App. 2d 82, 85-86 (1955). This common-law right to publicity is violated whenever (1) a defendant like Thompson Reuters uses a plaintiff's "identity"; (2) for its "advantage, commercially or otherwise"; (3) without the plaintiff's consent; and (4) the plaintiff suffered a "resulting injury." *Stewart v. Rolling Stone LLC*, 181 Cal. App. 4th 664, 679 (2010); *White v. Samsung Elecs. Am., Inc.*, 971 F.2d 1395, 1397 (9th Cir. 1992).

Thomson Reuters does not dispute that Plaintiffs never consented to its use of their private, personal data. Nor does it dispute that Plaintiffs were injured. Instead, Thomson Reuters argues

that it somehow neither "use[s]" the personal information it sells, nor appropriates for its "advantage." These arguments are as meritless as they seem.

Thomson Reuters collects and sells troves of personal information about Californians—"use." And it does so to make money—"advantage." Identity is the product, so it's hardly debatable (and certainly not at the pleadings stage) that Californians' personal information has value; that value contributes to the commercial value of CLEAR; and that personal information is featured prominently in a manner directly related to the commercial purpose of CLEAR. *See* Compl. ¶¶ 1, 11, 84, 97.

Thomson Reuters' sole argument that it does not "use" Californians' personal information when it procures it, creates detailed dossiers from it, and sells those dossiers, is that Thomson Reuters gathered the information it sells from third parties. But that's irrelevant. Nearly all personal information and photos that are used without consent come from third parties. The common law does not allow the commercial exploitation of others' identities, so long as they've been procured from someone else. To the contrary, the common law prohibits all nonconsensual use of a person's identity to the defendant's advantage. *See White*, 971 F.2d at 1397.

In arguing otherwise, Thomson Reuters cites two cases, both of which involved personal information that was posted by someone other than the defendant. Neither of these cases demonstrates that if the defendant itself chooses to post or sell a plaintiff's identity, it can be absolved for that use merely because it sourced its data from someone else. In *Perfect10, Inc. v. Google, Inc.*, the defendant, Google, merely hosted websites on which *third parties* posted models' names and likenesses. *See* 2010 WL 9479060, at *13 (C.D. Cal. July 30, 2010). The plaintiff had made no showing that Google—as opposed to the owners of the websites Google hosted—was "inappropriately using the models' likenesses." *Id* .[1] And in *Cross v. Facebook, Inc.*, third-party users posted the plaintiff's name and likeness to Facebook. 14 Cal. App. 5th 190, 210 (2017). Facebook

---

[1] Contrary to Thomson Reuters' assertion, the discussion of the right of publicity in this case expressly refers to Google's hosting of websites—not Google's search function. *See Perfect10*, 2010 WL 9479060, at *13. The only action by Google itself the right-of-publicity discussion references is Google's placement of ads. *Id.*

merely posted ads on the same page. *See id.* In neither case did the defendant itself actually post the personal information or likeness of the plaintiff.

Here, in contrast, there's no dispute that Thomson Reuters itself procured Plaintiffs' personal information, used that information to create dossiers on each Plaintiff, made those dossiers available through CLEAR, and is selling them to its customers. Under Thomson Reuters' own cases, it is Thomson Reuters that is using Plaintiffs' identities to make money.[2]

The company's argument that it hasn't appropriated Plaintiffs' identities to its advantage fares no better. Thomson Reuters contends (at 8) that the only appropriation of a plaintiff's identity that counts under the common law is appropriation "for purposes of publicity"—that is, appropriation "for promotional purposes or to imply an endorsement." But the California Court of Appeal has expressly rejected this assertion. *See, e.g., Eastwood v. Super. Ct.*, 149 Cal. App. 3d 409, 418 (1983) ("California law has not imposed any requirement that the unauthorized use or publication of a person's name or picture be suggestive of an indorsement or association with the injured person."); *see also id.* (cautioning courts to avoid limiting the common law right based on the ways in which it has arisen in prior cases because "[n]ew sets of facts are continually arising to which accepted legal principles must be applied, and the novelty of the factual situation is not an unscalable barrier to such application of the law"). Indeed, as Thomson Reuters recognizes in its brief (at 7), the common law prohibits any nonconsensual appropriation of a plaintiff's identity to the defendant's "advantage, commercial[] or otherwise." *See Stewart*, 181 Cal. App. 4th at 679.

There is no dispute that Thomson Reuters' appropriation of Plaintiffs' identities is to the company's advantage: Thomson Reuters' entire product is selling people's identities.

### 2.   Plaintiffs adequately allege that Defendant violated, and continues to violate, section 3344.

Plaintiffs' allegations are likewise sufficient to plead a violation of California's statutory right of publicity, as a predicate for their UCL "unlawful" claim. Thomson Reuters' main argument to the contrary gets the law wrong again. According to Thomson Reuters (at 14–15), section 3344

---

[2] Thomson Reuters' suggestion (at 8 n.12) that its use of Plaintiffs' personal information is "incidental" makes no sense. The company's entire product *is* personal information.

PLAINTIFFS' OPPOSITION TO MOTIONS TO DISMISS AND STRIKE
Case No. 3:21-cv-1418-EMC

simply adds additional elements to the common-law right—so Plaintiffs' supposed failure to adequately allege a common-law claim dooms their attempt to allege a § 3344 claim as well.

That's wrong for two reasons. *First*, as discussed above, Plaintiffs *do* sufficiently plead a violation of the common-law right of publicity. And Thomson Reuters does not argue that Plaintiffs insufficiently allege the other statutory elements it asserts are required. *Second*, in any event, section 3344 does not simply tack additional requirements onto the common-law right. Rather, the statute was expressly intended to "*complement*" the common law right—not duplicate it. *Comedy III Prods., Inc. v. Gary Saderup, Inc.*, 25 Cal. 4th 387, 391 (2001) (emphasis added); *see* Cal. Civ. Code § 3344(g) (noting that the remedies the statute supplies "are cumulative" and "shall be in addition to any others provided for by law"); *Miller v. Collectors Universe, Inc.*, 159 Cal. App. 4th 988, 1002 (2008).[3]

The California Supreme Court has expressly rejected efforts to give the statutory right a narrower scope than its text provides. *See Comedy,* 25 Cal. 4th at 396 (rejecting Ninth Circuit case that had overly-narrowly construed statute). To the contrary, courts should "give effect to the plain meaning of the statute." *Id.* at 395. The statute provides that it is unlawful to knowingly use someone's "name . . . photograph, or likeness, in any manner, *on or in products* . . . without such person's prior consent[.]" Cal. Civ. Code § 3344(a) (emphasis added). That's just what Thomson Reuters did here. Thomson Reuters uses Californians' names, photographs, and likenesses "in" its product—CLEAR. Indeed, Californians' identities *are* Thomson Reuters' product. By its plain terms, that violates section 3344.

Falling back, Thomson Reuters makes a conclusory assertion (at 15) that its sale of Californians' personal information is somehow "in connection with [a] news, public affairs, or sports broadcast or account, or [a] political campaign" and is therefore exempt from § 3344. The company's only explanation for how its private sale of data fits within this exemption is that the named Plaintiffs are, according to the company, "in the public eye." Mot. 15. But the exemption

---

[3] The legislature rejected an amendment that would have linked the scope of the statutory right to the common law. *See* S.B. 613, 1983–84 Reg. Sess. (Cal. 1983), as introduced by Sen. Campbell on Feb. 28, 1983 (proposing adding the language "or for any other commercial purpose for which consent is required under the common law").

does not hinge on the newsworthiness of the plaintiff; it hinges on whether the defendant's *use* of the plaintiff's identity is journalistic. A commercial use of the identity of even a newsworthy plaintiff still violates § 3344. *Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785, 804–05 (N.D. Cal. 2011) (citing Ninth Circuit case law). CLEAR is not a news, public affairs, or sports broadcast or anything like that—it's not public at all. The news exception simply does not apply. *See also id.* ("Under California law, the 'newsworthiness' exception under § 3344(d) tracks the constitutional right to freedom of speech under the First Amendment."); *infra* Section IV.A (explaining why the First Amendment does not bar Plaintiffs' claims).

## B. Thomson Reuters' practices also violate the UCL because they are unfair.

### 1. The complaint sufficiently alleges unfairness.

This is not the "rare" case where this Court can decide as a matter of law that Thomson Reuters' conduct isn't unfair under the UCL. *Reid v. Johnson & Johnson*, 780 F.3d 952, 958 (9th Cir. 2015). Far from it, Thomson Reuters' conduct is unfair no matter how you slice it. There are two tests under which courts determine whether conduct that harms consumers is unfair under the UCL: the balancing test and the tethering test. *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 736 (9th Cir. 2007).[4]

*First*, under the balancing test, courts weigh the "harm to the consumer against the utility of the defendant's practice." *Pangilinan v. Downey Sav. & Loan Ass'n*, 2011 WL 2837587, at *3 n.1 (N.D. Cal. July 18, 2011).[5] "The cost-benefit analysis this test calls for is not properly suited for

---

[4] Courts do not consider whether conduct is unfair under a third test known as the "FTC test" unless the claim arises between direct competitors, which is not this case. *Lozano*, 504 F.3d at 736; *Fraley*, 830 F. Supp. 2d at 813. Regardless, the conduct here is unfair under that test, too: the nonconsensual sale of Plaintiffs' personal information is a substantial invasion of privacy; that harm isn't outweighed by any countervailing benefit to consumers or competition; and Plaintiffs could not have easily avoided these harms. Compl. ¶¶ 41–57.

[5] Thomson Reuters (at 16) makes the standard for unfairness seem more demanding than it really is. "An unfair business act or practice is one that offends an established public policy *or* when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Pangilinan*, 2011 WL 2837587, at *3 n.1 (emphasis added). To show conduct meets this standard, courts apply the balancing test. *Id.* The balancing test and the definition of unfair conduct—as offending public policy or being immoral, unethical, etc.—are not separate requirements. Regardless, the complaint spares no punches in alleging Thomson Reuters'

1   resolution at the pleading stage." *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1117 (N.D. Cal.

2   2015); *McKell v. Wash. Mut., Inc.*, 142 Cal. App. 4th 1457, 1473 (2006) (determination "is one of

3   fact which requires a review of the evidence from both parties").

4       Still, the complaint here plausibly pleads that the harm to Californians outweighs any utility

5   of the nonconsensual sale of their personal information. Plaintiffs—and millions of other

6   Californians—suffer substantial harm from the sale of personal information to undisclosed buyers

7   without consent. *See* Compl. ¶¶ 102–04, 115; *supra* pp. 2–3. Not only do those whose information

8   Thomson Reuters sells suffer economic harm—the company, after all, doesn't pay them for their

9   data—they also suffer a tremendous invasion of privacy. *See* Compl. ¶¶ 3–4, 87. Details about

10  practically everything—from their address and cell phone number to their criminal history to

11  information about their families to whether they've ever had an abortion—is sold to strangers

12  without their consent. *See* Compl. ¶¶ 2, 26–30, 33, 35. Breach of "the right to define one's circle

13  of intimacy—to choose who shall see beneath the quotidian mask" is deeply harmful. *Hill v. Nat'l*

14  *Collegiate Athletic Ass'n*, 7 Cal. 4th 1, 25 (1994) (emphasis omitted).

15      Thomson Reuters argues this harm should be discounted because the information in CLEAR

16  is already public. That gets the facts and the law wrong: Thomson Reuters itself boasts that

17  CLEAR provides non-public information. *See* Compl. ¶¶ 18, 20. But more importantly, the mere

18  fact that Thomson Reuters procured some of the information it sells from public sources does not

19  make Thomson Reuters' conduct fair as a matter of law. Quite the opposite, the invasion of

20  privacy caused by compiling disparate pieces of information about a person into a single dossier,

21  the Supreme Court has recognized, vastly exceeds the harm caused by the mere public

22  availability of those disparate pieces of information from disparate sources. *See infra* pp. 14–16.

23      Against this harm, Thomson Reuters (at 17) makes only a conclusory assertion that the utility

24  of its nonconsensual sale of Californians' personal information is "substantial." Even if a court

25  could apply the balancing test at the pleading stage, Thomson Reuters' conclusory assertion of

26  utility is far from sufficient to outweigh its widespread invasion of privacy.

27  ───────────────

28  conduct is unscrupulous. *See* Compl. ¶¶ 1-4, 102, 115; *see Hill*, 7 Cal. 4th at 25.

8

*Second*, under the tethering test, the unfairness of a defendant's business practices is "tethered" to "legislatively declared policy." *In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. 3d 953, 989 (N.D. Cal. 2016) (citation omitted). Because the complaint sufficiently alleges that Thomson Reuters' conduct is unlawful under section 3344, *see supra* Section I.A.2, it has, by definition, "successfully alleged that [Thomson Reuters'] practice is contrary to a statutorily declared public policy of preventing the nonconsensual appropriation of an individual's name, photograph, or likeness for commercial gain." *Fraley*, 830 F. Supp. 2d at 813. It thus easily satisfies the tethering test.

### 2. The CCPA does not bar this Court from considering whether Thomson Reuters' conduct is unfair.

Thomson Reuters argues (at 15–16) that the California Consumer Privacy Act—a statute designed to *protect* consumer privacy—somehow prohibits this Court from concluding that its nonconsensual sale of millions of Californians' personal information is unfair. It does not. As the California Supreme Court recently reiterated, a state statute only forecloses a UCL action where the statute makes the challenged conduct "lawful, for all purposes, under all regulations." *De La Torre v. CashCall, Inc.*, 5 Cal. 5th 966, 987 (2018). That is a high bar—and it isn't met here.

For starters, the statute repeatedly—and expressly—makes clear that it does *not* supplant other statutes. For example, the CCPA states that its limitations on private rights of action under the CCPA "shall *not* be construed to relieve *any* party from *any* duties or obligations imposed under other law." Cal. Civ. Code § 1798.150(c) (emphasis added). Similarly, the statute states that it is intended to "supplement"—not supplant—"existing laws relating to consumers' personal information." Cal. Civ. Code § 1798.175. If there's a conflict between the CCPA and other statutes, the statute explains, "the provisions of the law that afford the greatest protection for the right of privacy for consumers shall control." *Id.* In other words, the CCPA itself states that if the UCL affords greater protection for consumers, the UCL controls.

Even setting all that aside, Thomson Reuters doesn't actually comply with the CCPA. So even if compliance with the CCPA were sufficient—which it's not—that would be no defense here. For example, the statute requires a "clear and conspicuous" opt-out link. Cal. Civ. Code §

1798.135(a)(1); Cal. Code Regs, tit. 11, § 999.315(a). But Thomson Reuters' link is a tiny link at the bottom of its webpage, accessible only after scrolling through pages of text. Compl. ¶ 48. And the law requires an opt-out process that is "easy for consumers to execute," "require[s] minimal steps," and does "not require the consumer to provide personal information that is not necessary to implement the [opt-out] request," Cal. Code Regs., tit. 11, § 999.315(h). But Thomson Reuters requires consumers to click on a tiny link on a website they're unlikely to know even exists and provide their drivers' license—additional personal information (that some people don't even have)—to a company that is already selling their personal information without their consent. Compl. ¶¶ 46–49. That is not easy to execute; it does not require minimal steps; and it requires the provision of sensitive information far beyond what is necessary to comply with a request. And, because the named Plaintiffs couldn't get all the way through Thomson Reuters' process without providing personal information they did not wish to provide, there's no allegation in the complaint that demonstrates that consumers seeking to opt out would even be successful.[6]

Bottom line: By its terms, the CCPA does not impede a UCL "unfair" action. And even if it could, nothing in the complaint demonstrates that Thomson Reuters has complied with it. It cannot, then, be a basis to dismiss this lawsuit.

## C.  This Court may award equitable relief because there is no adequate and complete remedy at law.

Thomson Reuters is wrong to say (at 18) this Court lacks power to award equitable relief simply because Plaintiffs also seek compensatory damages. "The core equitable rule is that simply having *any* remedy at law is not sufficient to foreclose equitable relief" in federal court. *Zeiger v. WellPet LLC*, 2021 WL 756109, at *22 (N.D. Cal. Feb. 26, 2021). The remedy must be "*plain, adequate and complete.*" *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 840 (9th Cir. 2020). Compensatory damages here are neither an adequate nor complete remedy for Thomson Reuters' ongoing violations of Californians' privacy.

---

[6] If this Court believes that compliance with the CCPA is a defense, it should allow discovery on the company's compliance throughout the class period.

10

*First*, damages address past harm, not future harm. They cannot stop Thomson Reuters from continuing to sell people's identities without their consent—only an injunction can. *See Zeiger*, 2021 WL 756109, at *22; *Andino v. Apple, Inc.*, 2021 WL 1549667, at *5 (E.D. Cal. Apr. 20, 2021) ("Money damages are an inadequate remedy for future harm, as they will not prevent Defendant from continuing the allegedly deceptive practice."). *Second*, compensatory damages are an incomplete remedy even for past harm because the harm here is an invasion of privacy—a harm that can never be fully remedied through damages. *See Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1045 (9th Cir. 2012) (violation of privacy is "irreparable harm"); *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) ("[I]nvasions of privacy, because of their intangible nature, could not be compensated for by monetary damages[.]"); *Maxcrest Ltd. v. United States*, 2016 WL 6599463, at *4 (N.D. Cal. Nov. 7, 2016) (similar). Compensatory damages are particularly insufficient to address the harm here because, although Californians' identities have economic value, the harm to an individual of having their personal information sold without their knowledge or consent far exceeds the price they are likely to get for that information. Restitution, then, is necessary to fill that gap.

Thomson Reuters also faults (at 18) Plaintiffs for not explicitly pleading that damages are inadequate. But this case was initially filed in state court, which is not subject to federal standards for equitable relief, so there was no need. Anyway, there should be no need for punctilious pleading here because the complaint, read favorably for Plaintiffs, shows damages would not fully remedy the harm. But if this Court disagrees, Plaintiffs should be allowed to amend.[7]

## II. Plaintiffs properly plead their common law right of publicity claim.

For the same reasons described in Section I.A.1, Thomson Reuters' motion to dismiss Plaintiffs' common law right of publicity claim should be denied.

---

[7] If, however, the Court believes it lacks jurisdiction to award equitable relief that cannot be cured through amendment, despite the ongoing harm and the incompensable violations of privacy, Plaintiffs' equitable claims should be remanded to state court. *See, e.g.*, *Rogers v. Lyft, Inc.*, 452 F. Supp. 3d 904, 920–21 (N.D. Cal. 2020).

PLAINTIFFS' OPPOSITION TO MOTIONS TO DISMISS AND STRIKE
Case No. 3:21-cv-1418-EMC

### III. Plaintiffs properly plead unjust enrichment as a standalone claim.

Thomson Reuters' assertion that "unjust enrichment is not a cause of action" under California law is based on outdated case law. Mot. 18 (relying on *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1031 (N.D. Cal. 2012)). Although the existence of "unjust enrichment . . . as a standalone cause of action" used to be "uncertain," "the California Supreme Court has" since "clarified" that "an independent claim for unjust enrichment [may] proceed." *Bruton v. Gerber Prod. Co.*, 703 F. App'x 468, 470 (9th Cir. 2017) (citing *Hartford Cas. Ins. Co. v. J.R. Mktg., L.L.C.*, 61 Cal. 4th 988, 1000 (2015)); *see In re Burke*, 2019 WL 6332370, at *3–4 (B.A.P. 9th Cir. Nov. 25, 2019). Courts, therefore, now routinely recognize a standalone unjust enrichment claim. *See, e.g.*, *Hart v. TWC Prod. & Tech. LLC*, --- F. Supp. 3d ---, 2021 WL 1032354, at *8 n.5 (N.D. Cal. Mar. 17, 2021) (recognizing clarification of law and permitting unjust enrichment cause of action to proceed in case alleging that company sold consumers' location data without their consent); *Wu v. Sunrider Corp.*, 2017 WL 6880087, at *4 (C.D. Cal. Oct. 10, 2017) (rejecting argument that unjust enrichment cannot be brought as an independent cause of action as "rely[ing] on outdated precedent"); *Luna Distrib. LLC v. Stoli Grp. (USA), LLC*, 2018 WL 5099277, at *20 –21 & n.9 (C.D. Cal. July 10, 2018).[8]

The company's only other argument (at 18) for dismissal is that unjust enrichment is an equitable claim, and Plaintiffs have not shown "that legal remedies are inadequate." But as shown above, that too is wrong. There is simply no reason to dismiss this claim.

### IV. Federal law does not shield Thomson Reuters from liability for its misconduct.

#### A. The First Amendment is no obstacle to Plaintiffs' claims.

Thomson Reuters contends (at 10–14) that the First Amendment requires that it be permitted to sell Californians' personal information without their consent to the company's private customers. The company provides just one argument in support of this contention: that "the

---

[8] Even before this development, courts did not dismiss claims for unjust enrichment that could be construed as claims for restitution. *See Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015). Thomson Reuters' refusal to recognize that Plaintiffs' unjust enrichment claim is, at the very least, a rose by another name is not a ground for dismissal.

public interest" in its nonconsensual sale of Californians' identities somehow "outstrips" the "economic and noneconomic interests" of those whose identities the company sells. Mot. 10. But Thomson Reuters gets it exactly backwards. Californians have a strong interest in protecting their personal information from being sold without their consent, whereas there is no public interest in permitting companies to profit from people's personal data.

***Public interest.*** In Thomson Reuters' telling, the sale of people's personal information is basically journalism. Indeed, the company claims (at 10) that its private data sales are covered by a "news-reporting privilege." And that's the public interest Thomson Reuters attempts to rely on—the interest in the public dissemination of "news and information about current and historical events." Mot. 10.[9] But Thomson Reuters doesn't *publicly* disseminate anything. It *privately* sells personal data without consumers' consent.

And it's been well-established for decades that the private sale of personal data is ordinarily *not* "a matter of public concern." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761 (1985) (credit report "concerns no public issue."); *see also Sunward Corp. v. Dun & Bradstreet, Inc.*, 811 F.2d 511, 534 n.25 (10th Cir. 1987) ( "[C]ourts, in varying contexts, have consistently held that credit reports do not involve matters of public concern.").[10] As the Ninth Circuit has explained, "the sale of data" about individuals is an "inherently private exchange between private parties." *IMDB.com Inc. v. Becerra*, 962 F.3d 1111, 1124–25 (9th Cir. 2020). It is "solely in the individual interest of the speaker and its specific business audience." *Dun & Bradstreet*, 472 U.S. at 762; *see also Trans Union Corp*, 267 F.3d at 1141 (sale of "people's names, addresses, and financial circumstances" is of "purely private concern"); *Lukis v. Whitepages Inc.*, 2020 WL

---

[9] The only other public interest Thomson Reuters offers (at 12) is the interest in providing its opinion about consumers in the form of its risk inform scores, scores where it purports to measure the riskiness of a consumer. But Plaintiffs do not challenge the risk inform scores themselves. Plaintiffs challenge Thomson Reuters' sale of the factual—or purportedly factual—data about Californians. Even if the First Amendment gave Thomson Reuters a right to sell its risk inform scores (a dubious proposition), that would not protect it from liability for the sale of that data.

[10] Although the credit report in *Dun & Bradstreet* was false, that was not "critical to the Court's decision." *Trans Union Corp. v. F.T.C.*, 267 F.3d 1138, 1140 (D.C. Cir. 2001). "The important point" there, as here, was that "the targeted speech solely interests the speaker [the seller of the report] and its specific business audience (its customers)." *Id.*

6287369, at *6–7 (N.D. Ill. Oct. 27, 2020) (holding background reports "properly characterized as private concern, not public concern" and distinguishing sale of personal information from journalism).

Thomson Reuters offers no reason its private data sales are any different. It just ignores this precedent entirely, relying exclusively on cases involving the *public* dissemination of information—cases involving newscasters or websites or magazines. But those cases are irrelevant here. *See IMDB.com*, 962 F.3d at 1124–25 (distinguishing private data sales, like those at issue here, from publication of information on a public website "free of charge for the public to review"); *Trans Union*, 267 F.3d at 1140–41 (cases involving public dissemination of information do not govern private sale of personal data). There simply is no public interest in Thomson Reuters' private data sales.[11]

***Californians' interest in not having their identities sold without their consent.***
On the other side of the ledger, Californians have obvious, significant interests in preventing Thomson Reuters from selling their personal information without their consent. First, Californians have an economic interest in their personal information. Thomson Reuters concedes (at 12) that this information has value. It has no choice. Its business is selling people's personal information; CLEAR would not exist if that information did not have economic value. Thomson Reuters' only argument is that the information isn't worth that much. But that's a quibble of degree—and one that can only be resolved after discovery. The company cannot dispute the existence of an economic interest—Thomson Reuters itself charges for Plaintiffs' identities. *See Motschenbacher v. R. J. Reynolds Tobacco Co.*, 498 F.2d 821, 824 n.11 (9th Cir. 1974) (explaining that while those of greater notoriety may have a greater economic injury, "the appropriation of the identity of a relatively unknown person may result in economic injury or

---

[11] Thomson Reuters' assertion (at 11) that it hasn't "exploit[ed]" Plaintiffs' personal information "to garner attention for itself or its services, suggest an endorsement, or otherwise" is both wrong and irrelevant. The company *does* exploit Plaintiffs'—and other Californians'—personal data. That's its whole business model. And regardless of how the company characterizes its nonconsensual sale of personal data, that sale remains a private sale, not a matter of public concern.

may itself create economic value in what was previously valueless"); *Fraley*, 830 F. Supp. 2d at 799 (concrete allegations about value placed on the names, photographs, and likenesses of noncelebrity plaintiffs—similar to those here—sufficient to plausibly allege economic harm).

And, in any event, Californians' economic interest in their identities is not the only interest at stake. Thomson Reuters' sale of personal information—information that spans everything from addresses to financial and employment information to information about whether a person had an abortion—about Californians without their consent, is a substantial invasion of privacy. *Cf. U.S. Dep't of Def. v. Fed. Lab. Rels. Auth.*, 510 U.S. 487, 500 (1994) (privacy interest in home addresses); *U.S. Dep't of Just. v. Reps. Comm. For Freedom of Press*, 489 U.S. 749, 749–50, 764 (1989) (disclosure of compilation of information about a person's criminal history—even though information was otherwise available through public sources—"unwarranted invasion of privacy"); *U.S. Dep't of State v. Ray*, 502 U.S. 164, 175–76 (1991) (disclosure of personal information such as "marital and employment status, children, living conditions and attempts to enter the United States" is a significant invasion of privacy when "linked" to specific people); *accord Burton v. Wolf*, 803 F. App'x 120, 121 (9th Cir. 2020).

The company tries (at 13) to minimize the privacy interest in prohibiting its nonconsensual data sales by noting that some of the information it sells is available from public sources. But much of the information Thomson Reuters sells is not publicly available. Compl. ¶ 2. And, in any event, as the Supreme Court has explained, the availability of isolated "bits of information" through various public sources someone could potentially hunt down does not pose nearly the same threat to privacy as the aggregation of those previously-disparate bits of information into a single dossier. *Reps. Comm. For Freedom of Press*, 489 U.S. at 765 ("Plainly there is a vast difference between" information that might be found after a "diligent search" of multiple sources and a "computerized summary located in a single clearinghouse of information."); *see UFed. Lab. Rels. Auth.*, 510 U.S. at 500 ("An individual's interest in controlling the dissemination of information regarding personal matters does not dissolve simply because that information may be available to

15

PLAINTIFFS' OPPOSITION TO MOTIONS TO DISMISS AND STRIKE
Case No. 3:21-cv-1418-EMC

the public in some form.").[12]

Thomson Reuters emphasizes (at 10 & 13) that Plaintiffs are an actor and a journalist engaged in activism. But the company does not—and cannot—explain how that could possibly diminish their interest in not having detailed dossiers of personal information about them sold without their consent. If anything, it only heightens this interest: Both are targeted by those who dislike their speech. Compl. ¶¶ 41, 50. The availability of personal information about them— their addresses, for example, or information about their children—only increases the threat. *Cf.* Daniel J. Solove, *A Taxonomy of Privacy*, 154 U. Pa. L. Rev. 477, 530 (2006) (explaining that the nonconsensual disclosure of information like, for example, addresses actually threatens free speech because it enables retaliation). Thomson Reuters' argument isn't really about the strength of Plaintiffs' privacy interests at all. It's a rehash of the company's contention that those interests are outweighed by "the free speech rights of the press to disseminate information to the public." Mot. 13. That argument fares no better a second time. Selling data still is not journalism.[13]

To sum up, Thomson Reuters has identified no public interest in the nonconsensual private sale of Californians' personal information, while Californians have a strong interest in preventing such sales. On the company's own account, then, there is no First Amendment problem.[14]

## B. The Communications Decency Act does not shield Thomson Reuters from liability for creating and selling CLEAR profiles of Californians.

Thomson Reuters seeks refuge in the Communications Decency Act of 1996 (CDA), 47 U.S.C. § 230, but that law does not immunize companies from selling others' personal

---

[12] Thomson Reuters itself recognizes this difference—it's the basis of its business model. If the compilation of a detailed personal dossier were no different than the bits of information that dossier contained being strewn across multiple sources, Thomson Reuters would have no market for its product.

[13] Thomson Reuters' suggestion that Plaintiffs or Californians are to blame for not protecting their privacy ignores reality and the allegations in the complaint.

[14] Nor would a permanent injunction here be an impermissible prior restraint. "The special vice of a prior restraint is that communication will be suppressed, either directly or by inducing excessive caution in the speaker, *before* an adequate determination that it is unprotected by the First Amendment." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 390 (1973) (emphasis added). Here, an injunction would only issue *after* a trial on the merits—and after a decision that Thomson Reuters' conduct is not shielded by the First Amendment. *See id.*

16

information without consent—even if they do so over the internet. Congress passed the CDA at the dawn of the internet age to enable internet companies to remove objectionable "*user-generated* content without thereby becoming liable for all defamatory or otherwise unlawful messages that they didn't edit or delete." *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1163 (9th Cir. 2008) (emphasis added). In other words, the statute allows websites like Facebook to take down, for example, death threats (or other offensive content) posted by its users without the company becoming liable either for the posts it does not take down, *see* § 230(c)(1), or for having taken down posts in good faith, *see* § 230(c)(2)(A). *See also Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S. Ct. 13, 14 (2020) (Thomas, J., statement respecting denial of certiorari).

But the statute goes no further. It does not immunize the companies' own conduct. And it does not immunize companies for violating the law, simply because they do so over the internet. *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 683 (9th Cir. 2019) ("We have consistently eschewed an expansive reading of the statute that would render unlawful conduct magically lawful when conducted online." (cleaned up)).

But that's exactly what Thomson Reuters argues here. The company contends that Section 230(c)(1) of the CDA grants it immunity for its own conduct of selling Californians' identities without their consent, simply because it does so through a website. But Section 230(c)(1) grants immunity to a provider of an interactive computer service only where the plaintiff (1) "seeks to treat [the provider], under a state law cause of action, as a publisher or speaker" of (2) "information provided by another information content provider." *HomeAway.com*, 918 F.3d at 681. Neither is true here.

As to the first requirement, the Ninth Circuit has repeatedly held that the question is not whether the defendant publishes information on the internet, but rather whether the plaintiff's specific claims *depend* on the defendant's status as a publisher. *See, e.g.*, *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 853 (9th Cir. 2016). And a plaintiff's claims only depend on a defendant's status as a publisher within the meaning of § 230(c) if they would "necessarily require" the company "to monitor third-party content." *HomeAway.com*, 918 F.3d at 682. The claims here impose no such

17

requirement. Nothing about Plaintiffs' claims would require Thomson Reuters to monitor CLEAR's content at all. Thomson Reuters could comply with the law simply by either not charging for Californians' identities or by getting consent to do so. *Cf. id.* at 683 (explaining that even though monitoring third-party content "would be the best option" for complying with regulation, because there were other methods of compliance, regulation did not treat defendant as publisher).

That said, even if Plaintiffs' claims did seek to impose liability on Thomson Reuters as a publisher, § 230(c)(1) only provides immunity from such liability where the unlawful content is entirely "provided by another information content provider." § 230(c)(1). Thus, for example, Facebook is immune from liability for profiles created by its users, if Facebook itself had nothing to do with their content. Twitter is immune for lawsuits based on the content of a user's tweets. Where, on the other hand, the defendant "is "responsible, in whole" or even "in part for creating or developing" the offending content, there is no immunity. *Roommates.Com*, 521 F.3d at 1162.

Unlike Facebook or Twitter, Thomson Reuters is entirely responsible for the content of CLEAR. Compl. ¶¶ 1–2. The company's customers do not input their own information. Thomson Reuters creates dossiers on millions of Californians and then sells what it has created through CLEAR. The company does not argue otherwise (nor could it based on the allegations of the complaint). Instead, Thomson Reuters argues that simply because it creates its dossiers from information it has acquired from third parties, it is automatically immune.

The Ninth Circuit has repeatedly rejected this argument. *See, e.g., Internet Brands*, 824 F.3d at 852–53 ("We have already held that the CDA does not declare a general immunity from liability deriving from third-party content." (quotation marks omitted)); *Roommates.Com*, 521 F.3d at 1171 ("Providing immunity every time a website uses data initially obtained from third parties would eviscerate the exception to section 230 for developing unlawful content in whole or in part." (cleaned up)). A company that "develops" unlawful content lacks immunity under § 230, even if it does so using information provided by third parties. *See id.*

The Ninth Circuit has explained that, in this context, development means "making usable or available." *Id.* at 1168; *accord Lemmon v. Snap, Inc.*, --- F.3d ----, 2021 WL 1743576, at *6 (9th Cir.

18

May 4, 2021). That is precisely what Thomson Reuters does: It is Thomson Reuters—not the third parties from whom it procures information—that makes available Californians' identities through CLEAR. And it is Thomson Reuters—not its sources of information—whose conduct is illegal.

"[A] website helps to develop unlawful content, and thus [lacks immunity under] section 230, if it contributes materially to the alleged illegality of the conduct." *Roommates.com*, 521 F.3d at 1168. Thomson Reuters not only contributes materially to the illegality here; it is the sole cause of that illegality. Only Thomson Reuters is responsible for the sale of Californians' identities without their consent through CLEAR. Thomson Reuters attempts to compare itself to an ordinary search engine like Google. But CLEAR is no ordinary search engine. It is not a search engine at all. It is a product designed specifically and solely for an illegal purpose—to sell Californians' identities without their consent. The Ninth Circuit has already held that, unlike generic search engines like Google or Yahoo!, which "play no part in the development of any unlawful searches," a search engine that is "designed to achieve illegal ends" is not immune under Section 230(c)(1). *Id.* at 1167. Thus, even if CLEAR were a search engine, Thomson Reuters still would not be immune.

Relying on *Barnes v. Yahoo!*, Thomson Reuters suggests (at 21) that any company that reproduces work originally intended for public consumption is automatically immune from liability under Section 230. Not so. As an initial matter, the complaint alleges that Thomson Reuters relies on non-public information—so even on Thomson Reuters' own argument, it would not be immune. Compl. ¶¶ 2, 16–20. But more importantly, the Ninth Circuit has held that an internet company can only be immune for information that was "tendered" to the company "*for posting online.*" *Roommates.Com*, 521 F.3d at 1172 n.32 (emphasis added). In other words, immunity only extends to information a third party asks a company to put online. It does not extend to the company's own independent, "affirmative decision[s] to publish" information—even if it procures that information from third parties. Thus, in *Barnes*, the Ninth Circuit held that Yahoo was immune from liability based on offensive profiles of the plaintiff that her ex-boyfriend chose to put online—information that Yahoo itself did not affirmatively seek to

post, but rather posted at the behest of the information-provider (the ex-boyfriend). *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1098 (9th Cir. 2009). Here, on the other hand, the complaint alleges that Thomson Reuters itself unilaterally decides what information it wants to publish on CLEAR; although it procures that information from third parties, those third parties are not asking Thomson Reuters to publish the information. Compl. ¶¶ 2, 11–19. Thomson Reuters is deciding to do so of its own accord. Moreover, as explained above, Thomson Reuters is materially contributing to—and, in fact, solely responsible for—the illegality of the conduct. For these two reasons, Thomson Reuters' conduct is outside the scope of Section 230 immunity.

Thomson Reuters cites several cases it contends are similar to this one, but almost all of its cases involve content generated and posted by an internet company's users—not information the company independently decided it wished to publish. *See, e.g.*, *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1121 (9th Cir. 2003) (offending content was posted on matchmaking site by a user of that site); *Ebeid v. Facebook, Inc.*, 2019 WL 2059662, at *3 (N.D. Cal. May 9, 2019) (claim for removing user-posted content); *Jurin v. Google Inc.*, 695 F. Supp. 2d 1117, 1122-23 (E.D. Cal. 2010) (claim for customer-generated advertisements).[15]

Courts that have considered conduct just like Thomson Reuters' CLEAR have held there is no immunity under Section 230. *See, e.g.*, *Fed. Trade Comm'n v. Accusearch Inc.*, 570 F.3d 1187, 1198 (10th Cir. 2009); *Lukis v. Whitepages Inc.*, 454 F. Supp. 3d 746, 763 (N.D. Ill. 2020). This Court should do the same.

## C.  Federal copyright law does not bar Plaintiffs' claims.

Finally, Thomson Reuters' argument (at 9) that Plaintiffs' claims are preempted by the

---

[15] The only case Thomson Reuters cites in which the defendant itself even arguably made an independent decision to publish information is *Callahan v. Ancestry.com Inc.*, 2021 WL 783524, at *6 (N.D. Cal. Mar. 1, 2021). But even there, the independence of the defendant's decision is only arguable. *See id.* at *1 (suggesting yearbooks—the offending content—were provided by internet company's visitors). And regardless, the case entirely ignores both key holdings of *Roommates.com*—(1) that an internet company develops information and is therefore not immune from liability when it contributes to the illegality of the conduct; and (2) that any immunity extends only to information a third party seeks to have the internet company publish, not information the internet company makes an independent, affirmative decision for itself to put on its site.

Copyright Act with respect to the photographs Thomson Reuters sells is just wrong. The Copyright Act protects "original works of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102(a). Thomson Reuters does not argue, because it cannot, that the photographs of Plaintiffs that Thomson Reuters sells were copyrightable works of art. In fact, the very cases Thomson Reuters cites distinguish "artistic visual work . . . distributed for personal use" (preempted) from "non-consensual *use* of one's name or likeness" (not preempted). *Maloney v. T3Media, Inc.*, 853 F.3d 1004, 1011 (9th Cir. 2017); *see Schroeder v. Volvo Grp. N. Am., LLC*, 2020 WL 6562242, at *8 (C.D. Cal. Sept. 3, 2020) ("In *Maloney*, the Ninth Circuit held that a "publicity-right claim is not preempted [by the Copyright Act] when it targets non-consensual *use* of one's name or likeness." (emphasis in original)).

## V. The Court should deny Thomson Reuters' anti-SLAPP motion.

Thomson Reuters' anti-SLAPP motion never gets past the starting gate, for two reasons: This putative class action squarely falls within the law's public-interest exception. Cal. Civ. Proc. Code § 425.17(b). And Thomson Reuters' alleged misconduct here—its *private sale* of individuals' personal identifying information to *paying subscribers*—is not an "act . . . in furtherance of [the company's] right of petition or free speech . . . in connection with a public issue." *Id.* § 425.16(b)(1). But even if Thomson Reuters' conduct were protected activity, its anti-SLAPP motion would still fail because, for the reasons above, Plaintiffs have "establish[ed] a reasonable probability that [they] will prevail on [their] claim[s]." *See Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 261 (9th Cir. 2013).

### A. Plaintiffs' suit is exempt from the anti-SLAPP statute under its public-interest exception.

In its rush to strike Plaintiffs' suit under California's anti-SLAPP law, Thomson Reuters ignores the law's "public-interest exception." *See* Cal. Civ. Proc. Code § 425.17. This exception was enacted because "the same types of businesses who used the SLAPP action were inappropriately using the anti-SLAPP motion against their public-interest adversaries." *Blanchard v. DIRECTV, Inc.*, 123 Cal. App. 4th 903, 913 (2004). So too here. Thomson Reuters seeks to weaponize the anti-SLAPP statute to prevent a lawsuit by ordinary California citizens

21

challenging its unlawful sale of their personal information without consent. Because this suit satisfies all three of the public-interest exception's requirements, Thomson Reuters' anti-SLAPP motion fails at the outset. *See San Diegans for Open Gov't v. Har Constr., Inc.*, 240 Cal. App. 4th 611, 628 (2015) ("A claim that the public interest exemption applies is a threshold issue that must be addressed before considering an anti-SLAPP motion.").

*First*, Plaintiffs are seeking the same relief as "the relief sought for" the "class of which the plaintiff[s] [are] member[s]." Cal. Civ. Proc. Code § 425.17(b)(1); *see* Compl. ¶ 21. That the measure of some of this requested relief—such as damages—may differ between Plaintiffs and class members is immaterial. All that matters is whether the forms of relief benefit the public interest or, instead, have a "more narrow advantage for a particular plaintiff." *Club Members for an Honest Election v. Sierra Club*, 45 Cal. 4th 309, 317 (2008); *see also Inland Oversight Comm. v. Cty. of San Bernardino*, 239 Cal. App. 4th 671, 677 (2015) (noting that "[t]he merits of plaintiffs' claims . . . are irrelevant to the [§ 425.17(b)] inquiry"). Because the complaint does not seek any personal advantage for Plaintiffs, this factor is met.

*Second*, this suit, "if successful, would enforce an important right affecting the public interest, and would confer a significant benefit, whether pecuniary or nonpecuniary, on the general public or a large class of persons." Cal. Civ. Proc. Code § 425.17(b)(2). This factor is also easily met. Plaintiffs bring right-to-publicity and UCL claims on behalf of a proposed class of *all* Californians whose information is sold through CLEAR. Compl. ¶ 70. And Plaintiffs seek "public injunctive relief under the UCL, enjoining Thomson Reuters from selling class members' personal data without their consent, except for legally permissible uses." Compl. ¶ 21. Plaintiffs, in other words, "seek[] to enjoin [Thomson Reuters] from continuing to violate [state laws] enacted to protect the general public" from the company's nonconsensual sale of millions of Californians' personal information. *Cf. Tourgeman v. Nelson & Kennard*, 222 Cal. App. 4th 1447, 1462–63 (2014) (finding that section 425.17(b) applied to plaintiffs' UCL class action).

*Third*, and finally, "[p]rivate enforcement is necessary and places a disproportionate financial burden on the plaintiff in relation to the plaintiff's stake in the matter." Cal. Civ. Proc. Code § 425.17(b)(3). "It is undisputed that no public entity has sought to enforce the rights that [the

PLAINTIFFS' OPPOSITION TO MOTIONS TO DISMISS AND STRIKE
Case No. 3:21-cv-1418-EMC

plaintiffs here seek] to vindicate in [their] lawsuit." *Tourgeman*, 222 Cal. App. 4th at 1464. So "private enforcement [i]s necessary to enforce the right[s] at issue" here. *Id.* Further, California courts have held that "[t]he relevant inquiry" under this factor "is whether the cost of the [plaintiffs'] legal victory transcends [their] personal interest." *Blanchard*, 123 Cal. App. 4th at 915 (internal quotations and citation omitted). Here, "the effect that this lawsuit could possibly have on the public at large" "far exceeds" Plaintiffs' "personal stake." *Id.* at 916. If successful, Plaintiffs' action will remedy Thomson Reuters' systematic violations of consumer protection and privacy laws, allowing individuals throughout the state the opportunity to determine whether to consent to the company's sale of their personal information. These public benefits far outweigh any financial recovery Plaintiffs might ultimately receive.

In sum, "[b]ecause [Plaintiffs'] action satisfie[s] each of the requirements of the public interest exception to the anti-SLAPP statute," this Court should conclude that it is "exempt from application of the anti-SLAPP statute" entirely. *See Tourgeman*, 222 Cal. App. 4th at 1467. That outcome should come as no surprise. Class actions that challenge systematic violations of consumer-protection and privacy laws, like this one, are quintessential public-interest actions— and the reason why California's legislature enacted the public-interest exception in the first place. *See Major v. Silna*, 134 Cal. App. 4th 1485, 1496 n.8 (2005).

## B. Thomson Reuters' sale of private information does not qualify as "protected activity" under the anti-SLAPP law.

Thomson Reuters' anti-SLAPP motion is fundamentally flawed in another way: Its commercially motivated, wholly private acts do not qualify as "protected activity" under the law.

Thomson Reuters concedes (at 23–24) that it has the burden to show that Plaintiffs' claims arise from "act[s] . . . in furtherance of [its] right of petition or free speech." Cal. Civ. Proc. Code § 425.16(b)(1). But it cannot carry that burden. Nothing about CLEAR suggests it is a "public forum" or that it has any "connection" to "an issue of public interest." Mot. 23–24 (quoting Cal. Civ. Proc. Code § 425.16(e)(3)).

Plaintiffs challenge Thomson Reuters' private, nonconsensual sale of their personal information to paying customers. *See* Compl. ¶¶ 11–19, 59–63. The company cites no case—

none—that even comes close to finding such conduct "protected activity" under the anti-SLAPP law. Still, Thomson Reuters argues that its sale of personal data on CLEAR is protected because it (1) involves a "public forum," and (2) "provides access to current and historical factual information." Mot. 24. But the company is wrong on both counts.

*First*, the mere fact that CLEAR is hosted on a website does not mean that it is a "public forum." Indeed, every single case that Thomson Reuters cites (at 24) on this point actually undermines the company's argument. In *Barrett v. Rosenthal*, 40 Cal. 4th 33 (2006), for instance, the California Supreme Court explained that only "[w]eb sites *accessible to the public*" are "public forums" for purposes of the anti-SLAPP statute. *Id.* at 42 n.4 (emphasis added). And *Barrett* specifically cited case law holding that the meaning of "the term 'public forum' as used in section 425.16 . . . is traditionally defined as a place that is open to the public where information is freely exchanged," such as a website that is "accessible to anyone who chooses to visit the site." *Huntingdon Life Scis., Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.*, 129 Cal. App. 4th 1228, 1247 (2005) (internal quotations and citations omitted); *see also ComputerXpress, Inc. v. Jackson*, 93 Cal. App. 4th 993, 1007 (2001); *MCSi, Inc. v. Woods*, 290 F. Supp. 2d 1030, 1033 (N.D. Cal. 2003); *New.Net, Inc. v. Lavasoft*, 356 F. Supp. 2d 1090, 1107 (C.D. Cal. 2004).[16]

CLEAR is the diametric opposite of a "public forum." It is not accessible to anyone who chooses to visit the site. It is not free of charge. And it provides no forum for the public to weigh in or to otherwise freely exchange information. Instead, it is a proprietary product that provides access to highly personal information only to a limited class of paying subscribers.

*Second*, even if the CLEAR website were a public forum, Thomson Reuters would still have to show its nonconsensual sale of personal data is connected to an "issue of public interest." *See* Cal. Civ. Proc. Code § 425.16(e)(3), (e)(4). The company cannot bring itself to argue the point—all it says (at 24-25) is that providing "access to current and historical information factual information"

---

[16] Thomson Reuters overstates (at 24) the conclusion in *Wilbanks v. Wolk*, 121 Cal. App. 4th 883, 897 (2004), that a "website is a public forum even if the operator limits access." The court's discussion about "access" related only to the fact that "Wolk . . . d[id] not *post* information or opinions from other sources"—any member of the public could *read* the site. *See Wilbanks*, 121 Cal. 4th at 895.

1   is inherently an issue of public interest. Such a conclusory assertion waives the argument. *See*

2   *United States v. Aguilar*, 782 F.3d 1101, 1108 (9th Cir. 2015) (courts need not consider an

3   underdeveloped argument unsupported by citations to authority). And, as explained above,

4   Thomson Reuters' sale of people's personal information without their consent is not in the public

5   interest. *See supra* pp. 13–14. Regardless, CLEAR does not provide *public* access to this

6   information—access is limited to a select group of paying subscribers. Indeed, Thomson Reuters'

7   own statements (at 4) about the product—asserting CLEAR is "available to *authorized* businesses

8   and government organizations for their legitimate *internal* business uses"— demonstrate that it

9   provides this information for largely private interests.

10      In Thomson Reuters' view, apparently, *any* sale of information or data would automatically

11  be connected to the public interest. But California courts have made clear that, "[a]lthough the

12  anti-SLAPP statute must be construed broadly, the Legislature did not intend to apply the statute

13  to purely private transactions." *Garretson v. Post*, 156 Cal. App. 4th 1508, 1524 (2007). Yet that is

14  precisely what Thomson Reuters' nonconsensual sale of Plaintiffs' information through CLEAR

15  is—a purely private transaction. And because Plaintiffs' claims do not arise from protected

16  activity, Thomson Reuters' motion to strike fails at the first step of the anti-SLAPP inquiry.

17      **C.  There is a reasonable probability Plaintiffs will succeed on their claims.**

18      For the same reasons explained above in response to Thomson Reuters' motion to dismiss**,**

19  there is a reasonable probability Plaintiffs will succeed on their claims. *See Planned Parenthood Fed'n*

20  *of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834 (9th Cir. 2018) (explaining 12(b)(6) standard

21  applies to anti-SLAPP motions based on legal arguments). For that reason, too, Thosmon

22  Reuters' motion to strike should be denied.

23                                **CONCLUSION**

24      For the reasons just discussed, the Court should deny Thomson Reuters' motions to dismiss

25  and strike. If, however, any claim is dismissed, Plaintiffs request leave to amend. *See* Fed. R. Civ.

26  P. 15(a)(2).

27

28

Dated: May 19, 2021

Respectfully submitted,

By: */s/ Andre M. Mura*

Eric H. Gibbs (SBN 178658)
Andre M. Mura (SBN 298541)
Amanda M. Karl (SBN 301088)
Jeffrey B. Kosbie (SBN 305424)
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, California 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
ehg@classlawgroup.com
amm@classlawgroup.com
amk@classlawgroup.com
jbk@classlawgroup.com

Jennifer D. Bennett (SBN 296726)
Neil K. Sawhney (SBN 300130)
**GUPTA WESSLER PLLC**
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 573-0336
jennifer@guptawessler.com
neil@guptawessler.com

Benjamin Elga (pro hac vice)
Alice Buttrick (pro hac vice)
**JUSTICE CATALYST LAW INC.**
123 William Street, 16th Floor
New York, NY 10038
Telephone: (518) 732-6703
belga@justicecatalyst.org
abuttrick@justicecatalyst.org

Albert Fox Cahn (pro hac vice)
**SURVEILLANCE TECHNOLOGY
OVERSIGHT PROJECT, INC.**
40 Rector Street, 9th Floor
New York, NY 10006
albert@stopspying.org

*Attorneys for Plaintiffs Cat Brooks and Rasheed
Shabazz and the Proposed Class*

PLAINTIFFS' OPPOSITION TO MOTIONS TO DISMISS AND STRIKE
Case No. 3:21-cv-1418-EMC