Pages 1 - 43

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN

CAT BROOKS, et al,                )
                                  )
                                  )
              Plaintiff,          )
                                  )
    vs.                           ) No. C 21-1418 EMC
                                  )
THOMSON REUTERS CORPORATION,      )
                                  )  San Francisco, California
              Defendant.          )  Thursday
                                  )  June 24, 2021
_____    )  1:30 p.m.


**TRANSCRIPT OF ZOOM VIDEO CONFERENCE PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:          GIBBS LAW GROUP LLP
                         505 14th Street
                         Suite 1110
                         Oakland, California 94612
                    BY:  **ANDRE M. MURA, ESQ.**

                         GUPTA WESSLER PLLC
                         100 Pine Street
                         Suite 1250
                         San Francisco, California 94111
                    BY:  **NEIL K. SAWHNEY, ESQ.**


For Defendant:           PERKINS COIE LLP
                         1201 Third Avenue
                         Suite 4800
                         Seattle, Washington 98101
                    BY:  **SUSAN D. FAHRINGER, ESQ.**


*Reported By:   Debra L. Pas, CSR 11916, CRR, RMR, RPR*
        Official Reporter - US District Court
        Computerized Transcription By Eclipse

<u>**Thursday - June 24, 2021**</u>                              <u>**1:39 p.m.**</u>

<u>**P R O C E E D I N G S**</u>

**---oOo---**

 1          **THE CLERK:**  Calling Civil Action 21-1418, Brooks, et
 2   al versus Thomson Reuters Corporation.
 3      Counsel, please state your appearances for the record
 4   beginning with counsel for plaintiffs.
 5          **MR. MURA:**  Good afternoon.  Andrew Mura for the
 6   plaintiffs.
 7          **THE COURT:**  All right.  Thank you, Mr. Mura.
 8          **MR. SAWHNEY:**  Neil Sawhney for the plaintiffs as
 9   well.
10          **THE COURT:**  All right.  Good afternoon, Mr. Sawhney.
11          **MS. FAHRINGER:**  And Susan Fahringer for Thomson
12   Reuters.
13          **THE COURT:**  All right.  Good afternoon,
14   Ms. Fahringer.
15      Interesting case.  My first question goes to the privacy,
16   the right of publicity claim or right of privacy claim.  And
17   I'm sort of curious.  You know, my understanding from many
18   years ago in tort law is that this is the branch where somebody
19   uses somebody else's likeness to either promote some product or
20   service, an endorsement, or uses their fame in some way to
21   capitalize on -- you know, putting their face on a magazine
22   cover or something.  In some way that is appropriating or

1    exploiting that person's likeness.  And this doesn't seem to be

2    that mode.  It seemed to me much more in the mode of just a

3    straight privacy invasion, intrusion of privacy.

4        I'm sort of curious why this sort cause of action as

5    opposed to a more traditional up front privacy, straight

6    privacy violation.

7            **MS. FAHRINGER:**  I assume that's a question for the

8    plaintiffs.  But we have the same question.

9            **THE COURT:**  Yes.  Yes, it is.

10           **MR. MURA:**  I'm happy to take that, Your Honor.

11       Well, one, we think this is tailor made for this because

12   California courts have rejected the view that this tort

13   requires that it be used for purposes of publicity.

14       And so the *Eastwood* case, which we've cited, has said that

15   California law has not imposed any requirement that the

16   unauthorized use or publication of a person's name or picture

17   be suggestive of an endorsement or association with the injured

18   person.

19       And, in fact, the statute --

20           **THE COURT:**  But it was still -- that case played on

21   Clint Eastwood's fame.  If it was Joe Shmoe, it wouldn't have

22   been much of a claim.  Who cares about that.

23       But, I mean, if you use somebody -- you know, it may not

24   be promoting a project.  It seems to me there's two branches of

25   this appropriation claim.

 1          One is -- is the implied endorsement, you know.  The other

 2     is the Clint Eastwood kind of using personality and fame.  And

 3     I don't see that here.

 4          **MR. MURA:**  Well, if you look at *Comedy III*

 5     *Productions*, which mentions that *Eastwood* was before the

 6     statute itself was amended so that it includes the language in

 7     products or advertisements.

 8          So now the statutes for a cause of action itself, which is

 9     the basis for our UCL claim, is not limited to advertisements

10     explicitly.  And there are many cases holding that the common

11     law cause of action as well is not limited to endorsements.

12          And there are cases as well cited in *Eastwood*.  *Eastwood*

13     cites the *Williams* case, where the Court found exploitation

14     where a professor lecturer's notes were sold without his

15     permission.

16          And then I can offer you another case, because this was

17     raised in defendant's reply, but the *KNB Enterprises against*

18     *Matthews* case, which is 78 Cal.App. 4th 362, Page 373,

19     concerned the unauthorized distribution of models' photos.

20     This was a case involving photographs that were not used in a

21     manner to create a false impression of an endorsement.  It was

22     the sale of non-famous people's sexually explicit photos.

23          So it wasn't using the photos to make the brand better as

24     an endorsement, but it was taking photos that you don't want to

25     be sold and selling him them, which is very similar to what's

1    happening here.

2         So if you look more broadly at the right of publicity,

3    it's dealing with two things.  It protects both the proprietary

4    interests and privacy interests.

5         So on the one hand, it allows persons to capture the

6    economic value of their identity.  And we know from cases like

7    *Motschenberger* -- *Motschenberger*, excuse me, that this applies

8    to the appropriation of identity of a relatively unknown

9    person.  It may result in an economic injury even as to that

10   person.  And it may create economic value in what was

11   previously valueless.  And so that's one aspect of it.

12        And the other aspect --

13             **THE COURT:**  Well, let me ask you though.  The idea is

14   you're creating value, exploiting somebody -- something about

15   their likeness, their personality, whether it's sexually

16   explicit photos, or -- even if they are not famous, or somebody

17   who is famous.

18        Here what's being exploited is just facts about the

19   person.  Not the person.  There's nothing about that person, it

20   seems to me, but it's the details and facts about the person.

21   It's not their -- it's not their likeness.  It's not their

22   photo.  It's not -- something about their -- I mean, it seems

23   different.

24        Do you have a case where this -- where this cause of

25   action has found to lie, where it's about information gathering

1  and creating dossiers?

2        **MR. MURA:**  Well, I would -- it is about photos, Your

3  Honor.  We have alleged that photos of millions of people are

4  included in the dossiers.  We have also alleged names.  And

5  names of photographs have traditionally been included both for

6  the common law purposes and under the statute explicitly as

7  indicia of identity.

8     I would point the Court to the *Vanna White* case.  That was

9  a case involving likeness of a robot, where the robot was found

10  not to meet the statutory definition of likeness.  But what the

11  Court said there is the common law is incredibly broad and

12  appropriation of any indicia by which the person is

13  identifiable is covered by the common law.

14     And you do have classic sort of information that is

15  typically covered by this type of cause of action:  Names,

16  photos of millions of people, detailed information.  And all of

17  this is being put together to create an identity profile.

18  Identity is the product.

19     And these dossiers exist solely from and because of

20  Thomson Reuters.  And this includes proceed proprietary

21  information.  Thomson Reuters talks about this in its marketing

22  materials.  It's not just public information out there --

23        **THE COURT:**  I understand that.  I understand that.

24  We get into that when we get in the balancing test and the

25  First Amendment.

```
1          Well, but you have no case on point where it's just a

2    matter of gathering personal information, as opposed to using

3    somebody's likeness for either promotion purposes or to -- to

4    enhance a product.

5          MR. MURA:  No, I believe we do.  I believe Eastwood

6    does say that the right of publicity is not merely a type of

7    law forbidding false advertising or false endorsement.

8          THE COURT:  Would that be your best case?

9          MR. MURA:  I believe the statement in Eastwood and

10   the cases cited there in Williams.

11         And KNB Enterprises against Matthews case, it's another

12   case in which the photos were not being used as an endorsement.

13   The photos were being used contrary to the consent of women,

14   very much like here.  The photos and the names and that sort of

15   information is being used without consent to provide these

16   identity profiles.

17         And so those cases show -- I mean, I certainly agree, Your

18   Honor, that some of the heartland cases are cases which involve

19   endorsements and celebrities.  But it's been long established

20   that this law is broader than that and does not simply cover

21   celebrities and it does not simply cover endorsements.

22         THE COURT:  So let me ask you my first question.  Why

23   not bring a straight privacy, whether it's intrusion or

24   collection of information case?  Is there something I'm missing

25   here?
```

1      **MR. MURA:**  We may be open to amending to include such

2  a claim, Your Honor.  But we thought that the claim fit nicely

3  within this.  Because identity, again, under the common law is

4  any indicia by which the plaintiff is identifiable.  And names

5  and photos are clearly part of the CLEAR products.  And that

6  information is being collected without consent.  And it's being

7  used to define and make clear, to use sort of the title of the

8  product itself, the identity of these individuals and to

9  provide sort of third parties who pay for this information

10 secretly to understand who these plaintiffs are.

11      **THE COURT:**  So would a phone book constitute a

12 violation of the right to publicity?

13      **MR. MURA:**  No, Your Honor.  First of all, a phone

14 book includes -- to the extent that it includes public

15 information and advertising, there is a Ninth Circuit case

16 about that.  And the Court found that a phone book -- you know,

17 first of all, it's not a right of publicity case.  That was

18 just a First Amendment case considering --

19      **THE COURT:**  I'm not talking about any case.  I'm just

20 asking under your theory, where you're collecting people's

21 information.  You're using it, you know, in a way.  Any kind of

22 directory, whether it's a phone book or any kind of directory

23 of -- someone puts it together, a directory of your classmates

24 from your law school.  Is that a violation of the right to

25 privacy?

1          **MR. MURA:**  You would have to analyze it based on the

2     nature of the information and the nature of the exchange.  And

3     here the information is -- a lot of it is private information.

4     It's proprietary information that Thomson Reuters collects.

5     It's simply not but public information.

6          Although there is case law that we cited where there is a

7     private interest in public information.  We cited numerous

8     Supreme Court cases which discuss privacy interests and

9     information like addresses.

10         And there is a vast difference between information that is

11     out there and in the disaggregate and the collection of that

12     information into a summary form of a profile, and that's what

13     we're dealing with here, which is very different from names and

14     addresses next to, for example, advertisements that are already

15     public.  I mean, the --

16         **THE COURT:**  Why would the public -- why does the

17     public versus private nature of the information, especially in

18     view of the aggregate, you know, idea -- I mean, your face is

19     public information; right?  Somebody could take a picture --

20     you're out in public and they take a picture.  I'm not sure why

21     that informs the question of the right to publicity.

22         **MR. MURA:**  Well, the difference is also the sale and

23     the consent, Your Honor.  There is not consent here to the

24     collection of this wholesale information which comes from, you

25     know, private sources, the scraping of chat rooms, non-public

1    information about abortion records, information that's

2    collected from data brokers, and then the sale that information

3    without consent.

4        I mean, very much the right of publicity is about -- it's

5    about consent.  The ability both to capture the economic value

6    of your identity, but also to control the use of your identity.

7    And your identity being the indicia by which you're

8    identifiable.

9        And here it's in spades.  The type of information, the

10   360-degree view of persons that's being sold by Thomson Reuters

11   through the CLEAR product.

12           **THE COURT:**  All right.  Ms. Fahringer, how do you

13   respond to *Eastwood*, *Williams* and *KNB Enterprises*.

14           **MS. FAHRINGER:**  I like those cases very much, Your

15   Honor.  And the Court's recollection of tort law is the same as

16   it is today.

17       The right of publicity doesn't allow you to stop someone

18   else from disclosing factual information about you.  Other

19   torts might.  Other circumstances than these, if they bring

20   that sort of a tort, it will -- it's doomed for other reasons.

21       What the right of publicity protects against is taking

22   identity, using its allure for your own gain.

23       We know what this means from the case law.  It requires a

24   certain chronological sequence.  You have to use the identity

25   and appropriate their likeness in order to secure some gain.

1      Use and appropriation have to happen first.  And we know

2  what those mean.  The cases all say so.  Use and appropriation

3  as a product endorsement, that's a -- that's one of the

4  possibles, one of the possibilities.  That's *Fraley*, *Fairfield*,

5  *Perkins*, *Stewart*.  Or in an ad, or something very like an ad --

6           **THE COURT:**  What about the non-endorsement cases, the

7  *Williams* and the *KNB* case?

8           **MS. FAHRINGER:**  Those are typically cases that are

9  and like.  For example, if they are selling model photos.  That

10  was also sort of the *Michaels versus Entertainment Group*.  That

11  actually was in an advertisement used to sell adult video

12  subscription.

13      I don't know about the *KNB* case.  To be honest, I haven't

14  read it.  It wasn't in the briefings.  But I would guess that

15  what it is, if it's talking about models, is that the models'

16  identities are something that's alluring and that would be used

17  to close a sale or that would be used to do something that

18  benefits the person in a right of publicity claim.

19      There are all of the -- all of the cases cited by -- all

20  of the cases cited by the parties, with the exception of those

21  cases that dismiss this claim with prejudice on the pleadings,

22  all of them have to do with use and appropriation as a product

23  endorsement.  Those are the cases I just recited.  Or in

24  something like an ad.  That's the *Eastwood* case.  That's the

25  *White* case.  *Michaels*, Brown, *Downing*, *Callahan*.  Even *Lucas*

1    *versus White Pages*, the Illinois case about the Illinois

2    statute on which the plaintiffs rely so heavily, that, too, was

3    an ad-like setting.

4        The photo in these cases used the allure, the attraction

5    or the identity as bait to achieve some gain.  And that's why

6    right of publicity cases are typically brought by celebrities.

7    Celebrities are the most alluring for that purpose.  And that's

8    why --

9            THE COURT:  They have to be.  There are cases --

10           MS. FAHRINGER:  No.

11           THE COURT:  -- where you have, you know, a non-known

12   person to use as the --

13           MS. FAHRINGER:  Absolutely, absolutely.  For example,

14   the endorsement cases.  And that's why another uses

15   endorsement.  A trusted person, or a person in the position of

16   a potential buyer.  That's the copy -- the *Fairfield* case,

17   where it's just an ordinary guy who happens to be in the

18   position of the buyer, a lawyer, who is used in an endorsement

19   setting.  That's more likely to attract attention.

20       In some of those cases the claim failed anyway for other

21   reasons.  Like *Callahan*, for example, it was barred under the

22   CBA.  But that was -- it's necessary, but it's not sufficient.

23   But it's certainly necessary.  And here the Complaint doesn't

24   allege that at all, as the Court has noted.

25       I want to speak just a minute in response to the Court's

1    question about have we got a case.   Has anyone got a case that

2    just deals with information, just merely information.   And the

3    answer is yes.   Yes, we have that case.   And that case is

4    *In Re Facebook Consumer Privacy User Profile Litigation*.

5           And just like in the *Aligo* case for different reasons, the

6    Court held that that use -- just as the Court noted, that that

7    use was so, quote, categorically different from what's covered

8    by this tort, so far beyond the reach of this tort that that

9    Court dismissed the right of publicity claim with prejudice on

10   the pleadings.

11          Similarly in *Aligo*, which isn't -- and let me just run

12   through.   We've got all of these cases that say what it could

13   be:   Necessary, but not sufficient.   Those are the cases I just

14   recited.   The endorsement cases.   The ad-like cases.

15          We also have a group of cases that tell us what it

16   definitely isn't.   What it definitely isn't.   Those cases tell

17   us what doesn't qualify as right of publicity claims.

18          Just displaying a name and likeness, just the mere

19   display, no, not covered.   That's' *Perfect 10*.

20          How about displaying somebody's name and likeness next to

21   an ad?   How about that?   No, not covered.   That's *Cross versus*

22   *Facebook*.

23          Okay.   How about displaying a likeness within an ad where

24   the likeness is just one of many?   No, that's not covered

25   either.   That's incidental use.   And the *Aligo* case held that

that claim on the pleadings was dismissed with prejudice

because it was, quote, inconceivable that the incidental use

would matter.

And then, of course, we have selling information, the

*In Re Facebook* case, not covered.  Categorically different from

what's covered by this tort.

This is not a right of publicity case at all.  It doesn't

fit this claim.  It doesn't fit this fact -- these facts.  And,

moreover, every other claiming asserted by the plaintiffs

hinges on the right of publicity concepts.  Their UCL claim,

their UCL unlawful claim barely does.  Their unfair claim does

as well.  And unjust enrichment claim is -- is an add on.

**THE COURT:**  I'm going to address that.

Let me just ask plaintiffs.  I take it you don't agree

with Judge Chhabria's decision in *In Re Facebook*.

**MR. MURA:**  No, we don't, Your Honor.

And if you look at *Eastwood*, I mean, *Eastwood* directly

addresses this question about whether the claim is limited to

the sort of exploitation or advertisement or promotion, and it

says it is not.

And it also cautions that the common law right should not

be limited to sort of these historical examples.

So we don't disagree that sort of the more common cases

historically have been the sorts of cases that counsel was

talking about.  But counsel is saying that this case is not

1   like *Cross* and other cases like *Perfect 10*, but those cases did

2   not deal with the type of conduct and product that we're

3   talking about here.

4       And for appropriation, it's quite simple under both the

5   statute and the common law.  You just have to show

6   appropriation to the company's advantage, commercial or

7   otherwise.

8       And here Thomson Reuters entire product is selling

9   people's identities, and they are taking the name and photos

10  and using it to their advantage.  And that satisfies both the

11  common law and it satisfies the statutory claims.

12      So, of course, I mean, these data brokers and --

13          **THE COURT:**  That would apply to any collection of

14  information about people; right?  I don't see how could you

15  draw the limit.  Whether it's a phone book, a directory of your

16  class, your law school class, anything.  You say:  Well,

17  there's consent.  That's a defense, but, I mean, there is a

18  prima facie tort violation.

19      Any time you collect in any way, even if it's two names;

20  right?  What if it's just one name?  You give somebody else

21  somebody's name and you sell it.  You say:  Well, I'm really

22  interested in so-and-so.  I want to know where they live,

23  et cetera, et cetera.  And you say:  Okay, I'll find out for

24  you.  That's a right of publicity claim.

25      Maybe, it seems to me, that could be something else, but

1    you're saying that's a right of publicity claim.

2              **MR. MURA:**  Yeah.  I mean, the question, Your Honor,

3    there would be whether you're appropriating the use of

4    someone's identity.

5         And there is this some concept of incidental use; right?

6    I mean, if you're just taking information and using it in a way

7    that is so fleeting and insignificant that it has no commercial

8    value, then that's not covered.

9         But clearly Thomson Reuters is not using information in

10   that incidental way, such as in the example that the Court just

11   gave.  It's using the information precisely of so many

12   Californians and featuring it prominently.  And it's directly

13   related to its commercial purpose, which is selling the

14   identity profiles of these individuals.

15        So we think that's quite distinct, especially given the

16   quantum, the private sale and the nature of the transaction.

17   That all sets it apart from sort of the ordinary examples of

18   someone using someone's name.

19        And, also, to the extent that there is a concern that this

20   would tread on free speech.  The claim itself includes

21   exceptions that deal with newsworthiness, transformative nature

22   for art.  None of those exceptions are met here, and that goes

23   a long way to showing that the claim itself is quite cabined if

24   it's applied by it's terms and consistently with its

25   exceptions.

1          **THE COURT:** All right.  Let me ask.  Your opponent

2    says that the unfairness -- the fairness claim under the UCL is

3    hinged upon establishing this right of publicity tort claim.

4          I take it you don't agree with that; that there is, for

5    instance, a balancing test, the *South Bay* test.  It doesn't

6    matter.  It's not a requirement that a tort be committed in

7    order for something to be unfair, as opposed to unlawful.

8          I take it, that's your view, Mr. Mura?

9          **MR. MURA:** Yes.  It's a cost benefit analysis that,

10   one, we don't think is properly suited for the pleadings, but

11   essentially the question would be whether there's a substantial

12   harm from the sale of the personal information.

13         Here there are two harms, economic harm and invasion of

14   privacy.  And the information isn't all already public, as

15   Thomson Reuters keeps suggesting.  It's non-public and

16   proprietary information.

17         And even as to the public information, the Courts have

18   distinguished between disaggregated information and information

19   that's compiled into a single dossier.  That vastly exceeds the

20   nature of the harm.

21         And when you compare that to the countervailing interests

22   that Thomson Reuters mentions, those interests simply dissolve.

23   I mean, they are just outweighed, but this is a factual

24   question that's typically --

25         **THE COURT:** Yeah.  No, I understand that.  I'm just

 1   trying to make sure that it is your position that this is a

 2   cause of action that is divorced and not tethered to the rise

 3   or fall of a publicity tort claim.  You can still have a UCL

 4   claim even without a tort claim.

 5           **MR. MURA:**  Yes.  You can still have a UCL claim even

 6   without a tort claim.

 7           **THE COURT:**  And you also under the tethering test,

 8   the *Cel-Tech* case, the unfairness, although it has to be

 9   tethered to some legislative declared policy, you don't

10   necessarily have to find a violation of a specific statute.

11   You can glean policy from statutes that's enough to state a

12   public policy.

13           **MR. MURA:**  That's exactly right, Your Honor, yes.

14           **THE COURT:**  All right.  So let me ask Ms. Fahringer,

15   what's wrong with that?  I mean, the UCL test is much broader.

16       I understand the unlawful prong is key to a violation of

17   some law, but the unfairness test is much more amorphous.  Then

18   there's different prongs of that.  Two of those prongs, which

19   seem to apply in a non-competitor situation, general balancing

20   test and the tether test, would suggest that those are claims

21   that could survive with or without establishing a right of

22   publicity tort claim.

23           **MS. FAHRINGER:**  Yeah.  And I might have been using

24   too much shorthand when I said that about the unfair claim.

25       Here are the issues.  Here are the problems with their UCL

 1    unfairness claim, and there are two categories of them.

 2        Let's start with the unfair conduct that they are

 3    targeting.  That's in Paragraph 92 of the Complaint.  And in

 4    Paragraph 92 they describe that conduct as "selling

 5    Californians' personal information and data without consent."

 6    That's the nature of the conduct they're targeting here.

 7        So that leads to our CCPA, unfairness, legislatively

 8    declared policy issue when -- this Paragraph 92 is sort of

 9    another way of saying that the plaintiffs want the right to

10    opt in to the sale of their personal information.  And the

11    California legislature and the CCPA said there is no such

12    right.

13        That's -- it governs the sale of personal information.  It

14    adopts an opt-out framework.  The framework Thomson Reuters

15    uses.  That's in the Complaint, Paragraph 46, 47, 57, where the

16    legislature has permitted the conduct that's serving as the

17    predicate for the unfair claim.  Courts can't override that.

18    That's one issue.

19        But regardless of the CCPA, the claim also fails under the

20    tests.  But that's the CCPA problem, that the unfair --

21            THE COURT:  And isn't part of the response to that

22    that there is a factual dispute whether the CCPA has been

23    actually complied with here, given the allegations about the,

24    quote, tiny link, quote/unquote, at the bottom of the page, "no

25    notice to consumer that exists."  The difficulty in actually

1   opting out.  There seems to me at least a factual question can

2   be resolved at this stage about whether or not the CCPA escape

3   hatch really works here.

4          MS. FAHRINGER:  Yeah.  And with respect, there is no

5   dispute that the CCPA adopts an opt-out framework.  And the

6   nature of their claim is that it's an opt-in.  They want

7   opt-in, and the CCPA said:  No, no.  Opt out is our model.

8          THE COURT:  Does that -- is that almost kind of a

9   preemption argument; that the -- to the extent that there would

10  have been a generalized unfairness claim in this area, that the

11  CCPA sort of, I don't know, roughly speaking, preempts this

12  notion.  You can't have an opt-in.  You can only have an

13  opt-out.  Is that your argument?

14         MS. FAHRINGER:  Not precisely.  The issue is that --

15  the CCPA is an unusual statute.  It goes to great, great

16  lengths to say you can't -- there is no -- the private right of

17  action is limited to security breaches.

18      You can't litigate whether somebody complied with the

19  CCPA.  It's not permitted.  CCPA private right of action is

20  limited to security breaches.

21      So what we've got here is a statute that says, hey,

22  opt-out is the framework, and here is all the details about how

23  that works.  And by way, Courts, stay out of it.  That's not --

24  you know, that's for -- that's not for -- not courts.  Private

25  litigants, stay out of it.  That's for the Attorney General.

1          That's the issue with the CCPA.  It's just -- it's an

2     unusual statute.  And the nature of its unusualness is the

3     reason that you can't really dive into the details of

4     compliance with the many provisions of that statute.

5          But I want to set that aside for the moment because it --

6     because it doesn't -- it's not required to show that the

7     unfairness claim isn't viable.  And the reason for that -- and

8     this is where the issue, the problem is tied to the flaws in

9     your right of publicity claim.

10         The -- the -- even if the CCPA didn't permit an opt-out

11    framework, plaintiffs still couldn't show it's an unfair

12    practice because they fail the tethering test.  The

13    legislatively declared policy they resort to is the statutory

14    right of publicity.  And that's -- even if it -- even if they

15    can't state a perfect claim under that, there's no -- the right

16    of publicity is not a legislatively declared policy that's at

17    issue here.

18         The other -- sometimes in their argument you get the sense

19    that this really should be an invasion of privacy claim, but in

20    this Complaint -- and I've underlined that in this briefing

21    they argue that the problem is not the disclosure of their

22    information.  It's -- it's sale.  That's at their opposition at

23    Page 18, where they say:

24              "Thomson Reuters could comply with the law simply

25         by either not charging for Californians' identities or

1           getting consent to do so."

2           This case, the one before us today, does not focus on --

3       it's not a privacy harm if Thomson Reuters could disclose the

4       exact same information for free.

5           So the harm to these plaintiffs is entirely economic.   And

6       that can't outweigh the many -- the utility of the defendant's

7       conduct against Thomson Reuters's conduct here.

8           CLEAR is used.   And this is in the complaint, it's

9       incorporated by reference.   It's used to prevent money

10      laundering, to verify and know your vendor, to facilitate

11      commercial lending, healthcare and insurance fraud prevention,

12      protecting victims of human trafficking and sexual

13      exploitation, finding absent parents.

14          The Complaint at Paragraph 11 cites the website's CLEAR

15      investigation pages that recite this.

16          That utility is not outweighed by the harm that this

17      Complaint alleges.   The balance doesn't favor plaintiffs.   They

18      can't show it's unfair under that balance.

19          Moreover, they can't show -- due to the CCPA, they can't

20      show that an opt-out method is unfair.   So their unfair

21      framework fails for both of those two reasons.

22          **THE COURT:**   Well, let me ask Mr. Mura this question

23      then.   So if the harm -- the objection is to the -- not the

24      aggregation in obtaining of the information, but the selling of

25      the information, then it strikes me as -- you know, what's the

1    incremental difference between -- taking all this information

2    and putting it all out on the web and taking all this

3    information and selling it and making it only available for

4    price, from the -- from the consumer's perspective, it seems

5    like just giving it away would even be worse.  It would be even

6    a greater dissemination.

7        So I'm not sure I understand.  If the gist -- the gravamen

8    of the Compliant is the selling of the personal information,

9    which is stated Paragraph 92, for instance, what's the harm

10   here that's being objected to?

11       **MR. MURA:**  It's both an economic and a privacy harm,

12   Your Honor.  And the point we were just trying to make -- I

13   think counsel is taking a statement that we're making in the

14   Section 230 section, but our Complaint overall, it's honed;

15   that the point is that these 360-degree dossiers about people

16   exist is because Thomson Reuters is collecting an amalgam of

17   private and public data and selling it, which distinguishes the

18   *Facebook* case.  Because the *Facebook* case is not about the sale

19   of data.  It was about data that was leaked through Cambridge

20   Analytica, which further distinguishes that case.

21       But here we're talking about an interest in controlling

22   private information and, also, an economic harm.

23       And the question of whether that substantial harm from the

24   sale of personal information outweighs whatever substantial

25   interest that defendants think the product has, including in

1   collecting and scraping chat records, abortion records, and

2   providing that --

3          THE COURT:  If that information were given out, it

4   appears you don't have any objection.  You're not asking in

5   your prayer for relief any injunction against collection, any

6   injunction against any dissemination.  It's selling without

7   consent or paying for it.

8          MR. MURA:  Well, we don't have a request because

9   that's not what Thomson Reuters is doing.  Thomson Reuters is

10  not collecting the information and providing it out for free.

11  I think that was just a flourish in that sentence.

12     But if you look at what Thomson Reuters is doing, we're

13  attacking the sale of it and that -- because that's what's

14  causing the privacy and the economic harm.  And it fits

15  precisely what Thomson Reuters is doing here.

16     And it also fits the right of publicity claim, because

17  that concerns the appropriation for a commercial advantage,

18  which is what Thomson Reuters is doing.  Not what Facebook was

19  doing with the information that it had that was leaked through

20  Cambridge Analytica.  That wasn't a sale of information.  So I

21  think that distinguishes that.  But that balancing test should

22  not be done at the pleading stage.

23     And I would disagree with counsel that we have not

24  criticized the opt-out function of their platform.  Our

25  Complaint does discuss the opt-out platform.  It says that the

1  plaintiffs could not comply, could not provide the opt-out.  It

2  explains why the opt-out doesn't comply with the CCPA.

3      But that's all a factual basis to reject Thomson Reuters'

4  defense based on the CCPA.

5      There's an even better argument, which is if you look at

6  what the CCPA says, it says:

7          "The provisions of the law that afford the

8      greatest protection for the right of privacy" --

9      (Court reporter clarification.)

10      **MR. MURA:**  Yes.  I'll speak a little more slowly.  I

11  apologize for that.

12      It says in Section 1798.175:

13          "The provisions of the law that afford the

14      greatest protection for the right of privacy for

15      consumers shall control."

16      And it also says that:

17          "The CCPA shall not be construed to relieve any

18      party from any duties or obligations imposed under

19      other law."

20      So it's quite clear that the CCPA is intended to

21  supplement not supplant existing laws relating to consumer's

22  personal information.

23      And beyond that, the mere fact that it has an opt-out

24  versus not opt-in, we know from *De La Torre against CashCall*,

25  *Cel-Tech* and many California Supreme Court cases that not

1    making conduct unlawful doesn't make it lawful for all

2    purposes.

3         So there is nothing in the law itself that suggests that

4    it bars consideration of whether conduct is unfair, especially

5    if the UCL, which it might here, afford greater protection for

6    consumers.

7              **THE COURT:**  Let's talk about the First Amendment, the

8    constitutional sort of defense.

9         I guess I want to hear from you, Ms. Fahringer.  Where --

10   what the -- how this is a matter of public interest, public

11   concern here.

12        There is -- it seems to me this is a matter of private

13   concern, not public concern, not unlike the credit reports in

14   Dun and Bradstreet.  And given that this is a -- you know, this

15   is not being widely publicized, you have to pay for it, paying

16   for data, paying for information, and it's not -- you know,

17   it's not being disseminated widely, as you would in a news

18   broadcast or something else.

19        So what's the First Amendment interest here that's so

20   compelling?

21             **MS. FAHRINGER:**  Yeah.  So here is the -- let me start

22   just from the step one.  The right of publicity is a

23   content-based restriction.  Restriction applies unless an

24   exception covers the conduct.

25        And the issue that we're really wrestling with, I think,

is commercial speech.  Commercial speech has to propose a
commercial transaction.  And here there is no commercial
speech-y sort of allegations.

In the context of the right of publicity, when right of
publicity cases talk about this, it means typically using
someone's identity in an ad-like setting, implying endorsement.
We don't have that here for the reasons we just discussed.  If
you did, where you have that sort of activity, you use a
balancing test.

And the -- the right to be protected from unauthorized
publicity against the public interest and the dissemination of
news and information.  And a clear platform is a platform
that's used.  It's a website.  It's a public forum.  And it's a
platform that's used for the dissemination of information.

The right of publicity test that Courts apply, it's the --
the question is does the -- does the speech merely exploit the
individual portrayed by -- for example, if it's nothing more
than an ad or an endorsement, immunity isn't granted.  That's
*New Kids on the Block*.

Here it doesn't even begin to exploit the individual
portrayed.  It's why there is this disconnect between these
facts and the right of publicity case.  The framework, the
First Amendment framework applied in light of publicity cases
starts from the premise that there is some sort of commercial
use.  That's just absent here.  Here there is nothing like

1    that.  They don't allege that.

2         So scrutiny should apply.  If there were --

3         **THE COURT:**  I guess I'm missing something here.  This

4    is strictly commercial.  I mean, people are buying this

5    information for -- like you say, to verify mortgages or, you

6    know, verify -- or do whatever they are going to do.  It's a

7    for purchase, for sale information.

8         It's not being published widely, you know, in some

9    publication free of charge.

10        **MS. FAHRINGER:**  But it doesn't matter.  First

11   Amendment doesn't care whether it's for -- newspapers aren't

12   free.  Books aren't free.  The First Amendment doesn't care

13   whether  --

14        **THE COURT:**  The nature of the dissemination informs,

15   it seems to me, the quality of the First Amendment interest.

16        First of all, this is all in the context -- this speech is

17   being used for commercial purposes.

18        What they are trying to enjoin is the sale of information

19   in a commercial context, not the publication in a news

20   broadcast.  So this sounds to me like classic, you know,

21   commercial speech.

22        **MS. FAHRINGER:**  But the right of publicity framework

23   the Courts use -- let me back up a step.

24        What these plaintiffs are arguing about is their

25   information.  And what we're saying, that the First Amendment

 1    bars their right of publicity claim.

 2            THE COURT:  Yeah, but what the First Amendment

 3    applies to is restriction on your client's speech.  Forget

 4    about what the plaintiff's interest is.

 5        I'm looking at what is it that's being restricted.  Is it

 6    political speech?  Somebody can't get on a soap box and espouse

 7    Marxist views in San Diego?  Or is it about somebody saying:  I

 8    want to sell you this kind of optometry services.

 9        You know, and here is, I want to sell this information.

10    Just like a credit report.  I want to sell a more extensive

11    credit report.  It's a dossier, according to the plaintiffs.

12    That's for sale.  That is a proposed commercial transaction

13    that would be impinged upon by any injunction of this Court.

14        That's where the First Amendment comes in.  That's the

15    state action.  So it is a commercial transaction, it seems to

16    me.

17            MS. FAHRINGER:  Well, either way.  Say it is.  The

18    right to be -- in a right of publicity case -- in a right of

19    publicity case the balancing test that is then triggered.  Say,

20    it is a commercial transaction.  Then you go to this balancing

21    test.  That's in *New Kids on the Block*.  And what you balance

22    is the right to be protected from unauthorized publicity on the

23    one hand, against the public interest and the dissemination of

24    news and information on the other.

25        So let's start with the plaintiff's right to be protected

1    from unauthorized publicity.  Does this merely exploit the

2    individual portrayed?  That's the *New Kids on the Block* test.

3         Is it nothing more than an ad or an endorsement, for

4    example?  Then immunity would be granted.  That's *New Kids on*

5    *the Block*.  And that's one where First Amendment was found

6    to -- I'm sorry.  So I've got -- I got ahead of myself there.

7         If it merely exploits the individual portrayed, if it's

8    nothing more than an ad, immunity won't be granted.

9         And here there is -- there is nothing like that even at

10   the threshold.  There is no ad-like activity.  There is no

11   ad-like endorsement.  They are not used to propose a commercial

12   transaction.

13           THE COURT:  So, in other words, there's not much of a

14   privacy interest here.  There's not much of a -- on the other

15   side of the equation, this is only a right of publicity case.

16   What's being deprived is the money that you paid for it, not

17   some exposure of something, you know, that's intensely personal

18   or private or somehow injurious.

19        And which is why I raise the question:  Why isn't this

20   just a straight privacy case?  Because then it's -- then you

21   weigh how deeply intrusive it is to have all your information

22   harvested, gathered, some of it allegedly non-public

23   information, and then put out there for sale, everything about

24   your -- you know, all those kind of details; where you've been,

25   license plate detections, or whatever it is.  All this stuff

 1    that tells you, you know, everything.  Then I sort of

 2    understand that.

 3        But I hear what you're saying, is that since they've only

 4    asserted a very limited privacy interest, the right of

 5    publicity, which is in many ways an economic deprivation kind

 6    of thing, because you should have paid me -- if you're going to

 7    say, I'm going to endorse this thing, or if you're going to use

 8    my face on the cover of your product or whatever it is, I

 9    should get my royalty out that and then we'll be okay.

10        So let me put the ball back in your court.  So the fact

11    that you framed this only as a publicity -- right of publicity

12    and not as a privacy intrusion case, does that inform the First

13    Amendment calculus here?

14        **MR. MURA:**  It does, Your Honor, because the only --

15    the only U.S. Supreme Court case, *Zacchini*, to address the

16    First Amendment in the right of publicity context found that

17    the commercial use of identity without consent is ordinarily

18    unprotected by the First Amendment.

19        And then you have *Comedy III Productions*, which is a

20    California Supreme Court case, which found the same.  And they

21    did so.  They did not supply strict scrutiny.  They applied a

22    balancing test, even though the right of publicity was a

23    content-based restriction.

24        All the arguments that Thomson Reuters is make, which are

25    sort of the framework that you might think of through *Time Hill*

1   or *New York Times versus Sullivan*, that's the same category

2   error that the Ohio Supreme Court had made in the *Zacchini*

3   case.

4          And if you read the *Zacchini* case, the Supreme Court says,

5   no, those types of privacy cases are -- that's not the right

6   line of cases, because this does involve proprietary interests,

7   this tort.

8          And so what applies here is a balancing test, even though

9   it's a content-based restriction.  And those are -- those are

10  two cases that are both on all points.

11         It's Thomson Reuters, who in its opening brief, applied

12  the balancing test.  They did not bring up strict scrutiny

13  until their reply, so it should be waived.

14         But if you look at any of the cases that have applied any

15  sort of traditional tiered scrutiny, Court after Court have

16  held that private sales of data aren't subject to strict

17  scrutiny.  It's not journalism.  It's not a matter of public

18  concern.

19         All the analog cases -- and those are not right of

20  publicity cases, but all the analog cases, they applied

21  intermediate scrutiny.  So at most you would apply intermediate

22  scrutiny.

23         But I do think given *Zacchini* and *Comedy III Productions*,

24  which is both U.S. Supreme Court and California Supreme Court,

25  applying a balancing test, that that's the appropriate test

 1    that should apply.

 2            THE COURT:  Well, let me ask.  As I understand it,

 3    the First Amendment is being asserted against both common law

 4    and statutory claims of publicity.  Is it being asserted

 5    against the UCL claim as well?

 6        (Brief pause.)

 7            THE COURT:  Maybe I need to clarify that.  I want to

 8    make sure I understand what the context here is.

 9            MS. FAHRINGER:  Yeah.  And I'm -- I'm pausing on the

10    question because the UCL claim is wrapped up so tightly in the

11    right of publicity claim --

12            THE COURT:  Well, it may or may not.  I know that's

13    your view.  I don't know if that's necessarily correct.

14        I'm going to assume for a moment that the UCL claim has

15    its own legs, particularly under the balancing test, which is a

16    little bit more amorphous and broad.

17        Is there a First Amendment assertion there as well, or is

18    it just a CCPA defense, or what's --

19            MS. FAHRINGER:  Well, two things.  So we're talking,

20    I think, about -- there is certainly a UCL First Amendment

21    assertion with respect to the unlawful UCL prong obviously

22    because that relies on the right of publicity.

23            THE COURT:  Right.

24            MS. FAHRINGER:  The unfairness prong.  And you will

25    we have the CCPA issue, the unfairness balancing, tethering

 1   tests that are failed without resort to the First Amendment.

 2       And then on top of that, I do think that the First

 3   Amendment -- and it's for the same reasons that it should bar

 4   the same -- even if you apply intermediate scrutiny, it fails

 5   here due to the nature of the plaintiff's interests.  It's sort

 6   of these -- these flaws that run through the way the claims are

 7   treated in this complaint.  They, in fact -- the -- the claim

 8   itself on the merits, they color the use -- the unfairness

 9   prong, and it also is the reason it would fail even under

10   intermediate scrutiny under the First Amendment.

11       Does that answer the question?

12       **THE COURT:**  I believe that bottom line is you're

13   saying that there is a First Amendment.  Even as against the

14   balancing test of the UCL, you would assert a First Amendment.

15       To which, I assume, you would respond, Mr. Mura, that in

16   addition to the -- the cases that would say that the First

17   Amendment doesn't bar tort action for right of publicity, the

18   broader balancing test, which takes into account just the

19   straight privacy invasion here, not just the publicity aspect,

20   serves as an additional counter balance to the First Amendment

21   interest.

22       **MR. MURA:**  Yes, Your Honor.

23       I did not understand Thomson Reuters to be raising an

24   argument against any -- any First Amendment claim against

25   anything other than the rights of publicity.  That's not how I

 1   read their brief.

 2        So this is -- and I did not -- and they did not argue

 3   strict scrutiny until their reply.  So I think the tiered

 4   security argument should be considered waived, but, again, I

 5   think if -- I've made my argument.

 6        If the Court does consider it then, at best, it would be

 7   intermediate security because this is the private sale of data,

 8   which isn't subject to strict security.

 9        And just if I could say something about the harm.  I mean,

10   the reason the harm is happening here is not just money.  I

11   mean, it's because -- the only reason this information is out

12   there as a dossier is because Thomson Reuters is selling it is

13   as such and can sell it as such.  And if they couldn't make any

14   money selling it, it wouldn't be out there and the privacy

15   harms that we have been discussing wouldn't be happening.

16        So it's not our position that the harm is just money.  The

17   harm is also loss of control over the info and the ability to

18   control identity, which are at the hart of the right of

19   publicity claims.

20             THE COURT:  All right.  Let me -- last point.  Let me

21   get your response to the CDA issue, Mr. Mura.  Tell me why that

22   the immunization of CDA doesn't apply here.

23             MR. MURA:  Well, first and fundamentally, I think the

24   Court can resolve it because Thomson Reuters has created a

25   profile of Californians.  They select the data.  They create

1    the product, a 360-degree view dossier that doesn't exist

2    anywhere.

3         And their marketing materials say explicitly that Thomson

4    Reuters has proprietary records.  And the definition of

5    "proprietary" is essentially that Thomson Reuters has created

6    and developed it.

7         And so that puts it outside of the ordinary sort of

8    publisher realm, and it puts it outside -- it puts our claim

9    outside of the type of claim that is targeting conduct that

10   doesn't materially contribute to the illegality.  I mean, this

11   clearly is targeting the creation and the development of these

12   dossiers.

13        And it's Thomson Reuters own actions in collecting and

14   merging both proprietary and non-proprietary data that means

15   it's making a material contribution to the creation of this

16   development.  So it cannot have Section 230 immunity.

17        And Ninth Circuit law, *Roommates* and many other cases are

18   crystal clear that that immunity only applies to the extent

19   that interactive computer service provider doesn't also provide

20   some of the challenged information conduct.

21        And so here the creation and development of the dossiers

22   puts it well outside the bounds of what Congress considered to

23   be acceptable for Section 230 immunity.

24        We would also disagree with the argument that our claims

25   seek to treat Thomson Reuters as a publisher or speaker.  That

1    first argument was really about the information being provided

2    by another information content provider.

3         But this other argument, which is sort similar is that,

4    you know, when you get to that consideration about publisher or

5    speaker, you ask whether the cause of action inherently

6    requires the Court to treat the defendant as a publisher or

7    speaker and you look to whether the duty that plaintiff alleges

8    the defendant violated derives from that status.

9         And so you have a nice quotation in *Roommates* which says:

10   Look, if someone -- if a third party tenders information for

11   posting online and all the editor's job is to do is to sort of

12   make minor edits or decide whether to post it or not, that's

13   going to be immunized.  But if the editor publishes the

14   material and makes the affirmative decision to publish, that

15   person is contributing materially to the allegedly unlawful

16   dissemination.  And so that person is a developer, it's not a

17   publisher, and is not entitled to CDA immunity.

18        So here it's just the nature of the product that

19   distinguishes Thomson Reuters from Google and from other

20   platforms.  I mean, Thomson Reuters is making the affirmative

21   decision to publish.  It's going out and procuring the

22   material.  It's -- some of this information, again, is

23   proprietary and so, therefore, it's not entitled to CDA

24   immunity.

25             **THE COURT:**  All right.  So the model doesn't fit

1   because they are not just sitting there as sort of a neutral

2   forum for third-party posts exercising minimal editorial

3   comment, but instead really publishing their own and deciding

4   to publish their own content.

5          **MR. MURA:**  That's right, Your Honor.

6          **THE COURT:**  All right.  Your response, Ms. Fahringer.

7          **MS. FAHRINGER:**  Deciding whether to publish content

8   is obviously publisher activity.  The question is:  Whose

9   content is it?  What information is at issue?

10      The Complaint answers this.  The information at issue is,

11  quote, the names, photographs, personal identifying information

12  and other personal data that's included in the database.

13  That's Paragraph 70 of the Complaint.

14      The plaintiffs have made clear they are not challenging

15  the risk inform reports.  So what we're talking about is the

16  names, photographs, personally identifying information,

17  et cetera.

18      By the way, *Roommates* makes clear that, quote:

19          "Providing neutral tools to carry out what may be

20          unlawful or illicit searches" -- and there is not even

21          that allegation here -- "doesn't amount to development

22          for purposes of CDA immunity."

23      Where do the names, photographs, personal identifying

24  information other personal data come from?

25      Paragraph 2.  It comes from social -- this is the

1  Complaint, Paragraph 2.  It comes from social networks, blogs,

2  chat rooms, third-party data brokers, law enforcement accesses.

3       Paragraph 14.  It comes from public records, government

4  sources, internet searches, third-party data brokers.

5       Paragraph 16.  Credit agencies, DMV records.

6       These are not Thomson Reuters.  These are third parties.

7  It's covered -- clearly cover their other information --

8  another information content provider, that criteria is met.

9  Thomson Reuters --

10      THE COURT:  Let me ask you about that.  I mean, if

11  you are choosing for your own publication quoting from other

12  works, citing other works, does that make that content created

13  by a third party?  It may be information gleaned from third

14  party put into your own content.

15      MS. FAHRINGER:  So if the Court is asking about sort

16  of where on the spectrum, at what point does the use become so

17  transformative to turn it into your own content.  Where does

18  that --

19      THE COURT:  I don't know if it has to be

20  transformative, but you've adopted it as your own content at

21  some point.

22      I mean, you may be gathering stuff from here and there and

23  then consolidating it in a way.  That's different from people

24  just posting without you necessarily using it or endorsing it

25  is as your own.  Because it's being sold as your own package,

1    right, as Reuters package?

2            **MS. FAHRINGER:**  Well, it's being -- this is like the

3    Ancestry.com case.  This is -- this is a -- and it -- which is,

4    by the way, dismissed with prejudice because the CDA barred the

5    claims.

6        This -- maybe the delivery of the content provided by

7    others is done through the -- through the CLEAR product,

8    through Thomson Reuters, but that's not to say that an online

9    service provider -- that the content is provided.  That's not

10   what it means to have an information content provider.

11       Information content provider, that's the entity

12   responsible for the creation or development of information

13   provided through the internet or any other interactive computer

14   service.  And the information that's at issue in this case is

15   the content of what is said about the plaintiffs, and that

16   comes from others.

17           **THE COURT:**  Well, what if somebody just does an

18   interview, does a field investigation?  Gathers information,

19   writes a report and then puts it.  Is that content created by

20   another provider because they got the information from somebody

21   out on the field who was interviewed?

22           **MS. FAHRINGER:**  Again, that is not this case.  That

23   is --

24           **THE COURT:**  Well, but it's -- your argument seems to

25   suggest that.  You looked at where the original source was?

 1    I'm not sure I understand that.

 2        I mean, the CDA was all about people posting stuff, you

 3    know, on various websites, interactive websites.  It was their

 4    own post, et cetera, et cetera.  It was not somebody gleaning

 5    and pulling together posts and annotating them or doing

 6    something with it and making it their own.

 7            **MS. FAHRINGER:**  But the third-party content needn't

 8    come from users.  That's the *Liberi* case, the *Nasser* case.

 9        The -- the -- I think the issue -- I'm not -- I think -- I

10    get the sense that I'm not answering the question.  That's

11    probably because it seems so clear to me, Your Honor.  This --

12    what we've got is a -- and it's because I'm queuing off of the

13    Complaint.

14        So plaintiffs claims treat Thomson Reuters as the

15    publisher of -- or speaker.  We know that.  It's not a breach

16    of contract case or design defect case.  It's about the content

17    of the information Thomson Reuters supplies.  That's

18    publishing.

19        And so the question then becomes:  Where does the

20    information -- and Thomson Reuters is acknowledged to be a

21    provider or user of an interactive computer service, it's

22    publishing or speaking content provided by another.

23            **THE COURT:**  What's your response to that, Mr. Mura?

24            **MR. MURA:**  The division is exactly what Your Honor

25    was suggesting.  This is not a case where third parties are

1  posting or providing information to put forth on a platform.

2  It's Thomson Reuters that's making the decision about what to

3  post, what information to go out and to collect and to put in

4  its dossier.

5      And *Roommates* talks about the distinction between, you

6  know, a passive transmitter of information provided by others

7  and someone who does more than that.  And someone who does more

8  than that becomes a developer, at least in part, of that

9  information.  And Section 230 doesn't provide immunity for that

10  type of action.

11      And so here Thomson Reuters, the illegality completely

12  stems from what Thomson Reuters is doing, which is going out,

13  collecting all this information, creating this product that

14  would not exist.  It doesn't exist anywhere else.  It's not

15  just simply coming in some neutral fashion from some third

16  party.  It's Thomson Reuters that's making the affirmative

17  decision to go and create this product, to put it together.  It

18  decides what's in it.  It uses proprietary information.  So

19  clearly it's just not passively publishing some information

20  that some third party wants to be provided on screen.

21      And the question is never whether the information comes

22  from a third party.  That is not the test.  I mean, the test

23  laid out in *Roommates* is all about the focus on whether the

24  party claiming immunity as an interactive computer service

25  provider is actually simply just passively transmitting

```
 1  information provided by others or whether it's sort of actively
 2  taking a role in a way that's related to the illegality, the
 3  alleged illegality of the conduct.  And that's exactly what you
 4  have here.
 5       And it's a closed universe.  These are not neutral tools
 6  for displaying information that other parties, you know,
 7  provide online.
 8           THE COURT:  All right.  This argument has been
 9  helpful.  I'll take it under submission.
10       Thank you, counsel.  Your presentation has been very
11  helpful.  Appreciate it.
12           MS. FAHRINGER:  Thank you, Your Honor.
13           MR. MURA:  Thank you, Your Honor.
14       (Proceedings adjourned.)
15
16
17
18
19
20
21
22
23
24
25
```

## <u>CERTIFICATE OF OFFICIAL REPORTER</u>

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Thursday, July 15, 2021