Eric H. Gibbs (SBN 178658)
Andre M. Mura (SBN 298541)
Amy M. Zeman (SBN 273100)
Mark H. Troutman (*pro hac vice*)
Ezekiel S. Wald (SBN 341490)
Hanne Jensen (SBN 336045)
**GIBBS LAW GROUP LLP**
1111 Broadway, Suite 2100
Oakland, CA 94607
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
ehg@classlawgroup.com
amm@classlawgroup.com
amz@classlawgroup.com
mht@classlawgroup.com
zsw@classlawgroup.com
hj@classlawgroup.com

Geoffrey A. Graber (SBN 211547)
Karina G. Puttieva (SBN 317702)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
ggraber@cohenmilstein.com
kputtieva@cohenmilstein.com

*Attorneys for Plaintiffs and the Proposed Class*

## UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA SAN FRANCISCO DIVISION

CAT BROOKS and RASHEED SHABAZZ, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

THOMSON REUTERS CORPORATION,

Defendant.

Case No. 3:21-cv-01418-EMC-KAW

**FIRST AMENDED CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

**CLASS ACTION**

1.    Thomson Reuters is best known for its news agency (Reuters) and its online legal-research service (Westlaw). But the company makes money in another, lesser-known way: It collects a vast quantity of photos, identifying information, and personal data of American consumers, including Californians, without their consent and sells that information to corporations, law enforcement, and government agencies. Those whose identities the company sells, however, receive no compensation. Most of them don't even know it is happening.

2.    Thomson Reuters sells this information through an online platform it calls CLEAR. CLEAR provides access to both public and non-public information about hundreds of millions of people and offers comprehensive cradle-to-grave dossiers on each person, including names, photographs, criminal history, relatives, associates, financial information, and employment information. The company advertises that CLEAR enables its users to access "both surface and deep web data to examine intelligence" about people "not found in public records or traditional search engines." This allows CLEAR users "to uncover" personal "facts hidden online," by licensing "real-time information" about individuals from social networks, blogs, and even chat rooms. The CLEAR database also includes information from third-party data brokers and law enforcement agencies that are not available to the general public, including live cell phone records, location data from billions of license plate detections, real-time booking information from thousands of facilities, and millions of historical arrest records and intake photos. This information is "fused and vetted by algorithm to form" what the *New York Times* described as "an ever-evolving, 360-degree view of U.S. residents' lives."[1]

3.    Because of CLEAR, Californians' identities are up for sale without their knowledge, let alone consent. Named plaintiff Cat Brooks, for example, is an activist, who has spent years fighting police violence, particularly in communities of color. Because of her work, Ms. Brooks is targeted by white supremacist groups. Concerned for her safety and that of her family, Ms. Brooks works hard to maintain ownership and control over her personal information. She even subscribed to a service that routinely scrubs her personal information from the internet. Yet,

---

[1] McKenzie Funk, *How ICE Picks Its Targets in the Surveillance Age*, N.Y. Times (Oct. 3, 2019) https://www.nytimes.com/2019/10/02/magazine/ice-surveillance-deportation.html.

CLEAR offers a "360-degree view" of her life: Her address, her cell phone number, and information about her relatives, neighbors, and associates, are all for sale without her consent.

4.     Ms. Brooks is not alone. Thomson Reuters sells detailed dossiers on Californians across the state, people who have no idea their personal information is being appropriated, aggregated, and sold over the internet. California's common law right of publicity has long protected the right of its residents to determine for themselves whether, how, and to what extent their personal information is disseminated. Similarly, California's Unfair Competition Law prohibits corporations from engaging in unlawful and unfair acts, which include appropriating a person's personal information and selling it without their consent. Yet that is precisely what Thomson Reuters is doing with CLEAR, depriving Californians of their autonomy, dignity, and ownership of their own identities in the process.

5.     This lawsuit seeks to remedy Thomson Reuters' repeated violations of Plaintiffs' and class members' rights and to enjoin the company from continuing to profit off their personal information without their consent.

## PARTIES

6.     Plaintiff Cat Brooks is a resident of Alameda County, California, whose name, photo, likeness, and other personal information Thomson Reuters has appropriated and sold without her consent.

7.     Plaintiff Rasheed Shabazz is a resident of Alameda County, California, whose name, photo, likeness, and other personal information Thomson Reuters has appropriated and sold without his consent.

8.     Defendant Thomson Reuters Corporation is a multinational media company incorporated in Ontario, Canada, with its principal place of business in Toronto, Canada.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d)(2) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs, there are more than 100 members in the proposed class, and at least one member of the class of Plaintiffs is a citizen of a state different

from Defendant.

10.    This Court has personal jurisdiction over Thomson Reuters because Thomson Reuters Corporation is licensed to do business in California, regularly conducts business in California, and purposefully targets California residents for the collection and sale of personal information without consent. The company also regularly collects information about California residents from California sources. And it systematically sells CLEAR to California residents.

11.    Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in, were directed to, and/or emanated from this District. Venue is also proper in this Court pursuant to 28 U.S.C. §§ 84(a) and 1441(a), because this "district and division embrac[e]" Alameda County, where the Complaint was initially filed.

## FACTUAL ALLEGATIONS

**CLEAR aggregates billions of data points about individuals and sells this information without obtaining consent or providing compensation.**

12.    Thomson Reuters collects and aggregates "billions of data points" about individuals—including their photos, names, and personal identifying information—into searchable dossiers about each person and sells these dossiers through its CLEAR platform for substantial profits.[2]

13.    At no point during its process of collecting, packaging, and selling individual information does Thomson Reuters ever ask individuals for their consent. In the vast majority of cases, the individuals do not even know that Thomson Reuters has collected their personal information and data—let alone that it is selling this information for profit.

14.    Thomson Reuters has never offered individuals compensation for the sale of their photos, names, identifying information, or other personal data. And it provides no mechanism by which individuals can seek compensation.

15.    The information aggregated and stored on the CLEAR database—which the

---

[2]Thomson Reuters, *Thomson Reuters CLEAR*, *available at*:
https://legal.thomsonreuters.com/en/products/clear-investigation-software.

company collects from public records, government sources, internet searches, and third-party data brokers—is highly personal and even confidential. For example, CLEAR includes data from government agencies and corporations that is not available to the general public, such as live cell phone records and license plate detections.

16.  Thomson Reuters also collects data from law enforcement, including real-time booking images and information from local jails and corrections departments. According to its website, Thomson Reuters has acquired 140 million historical booking records, including intake photos. Taken together, Thomson Reuters estimates that CLEAR houses over 38 million images gathered from over 2,000 agencies in over 40 states.[3]

17.  In addition, the company purchases and consolidates information held by third-party data tracking firms, data brokers, and other companies that compile consumer and location data—private firms that the *Wall Street Journal* once dubbed "Big Brother-in-Law."[4] This information has included data from credit agencies, DMV records, cellphone registries, social-media posts, property records, utility accounts, professional and fishing licenses, internet chat rooms, court records, and bankruptcy filings. All of this information is then "fused and vetted by algorithm to form an ever-evolving, 360-degree view of U.S. residents' lives."[5]

18.  Even with respect to public-record information, CLEAR gives users the ability to search and analyze massive amounts of data that they would not otherwise be able to access on their own—in almost real time. For example, CLEAR has "real-time access to address and name-change data from credit reports and to motor-vehicle registrations from 43 U.S. states plus the District of Columbia and Puerto Rico." And CLEAR has offered access to "utility records, which come from more than 80 electric, gas, water, telephone, cable and satellite television companies nationwide," with daily updates. Likewise, "[i]ncarceration and arrest records, often paired with booking photos that allow for facial-recognition-powered virtual

---

[3] Thomson Reuters, *CLEAR Plans and Pricing*, *available at*:
https://legal.thomsonreuters.com/en/products/clear-investigation-software/plans-pricing.
[4] McKenzie Funk, *How ICE Picks Its Targets in the Surveillance Age*, N.Y. Times (Oct. 3, 2019)
https://www.nytimes.com/2019/10/02/magazine/ice-surveillance-deportation.html.
[5] *Id.*

lineups, arrive almost immediately from 2,100 state and local agencies."[6]

19.  On the page of its website describing CLEAR's corporate pricing plans, Thomson Reuters explains that its "intermediate" and "comprehensive" plans permit users to access "both surface and deep web data," which includes data that is not ascertainable via public records or traditional search engine queries.[7] A marketing brochure similarly states that CLEAR's "Web Analytics" are capable of uncovering "facts hidden online" through its deep web search technology.[8]

20.  In addition, corporate customers who purchase CLEAR's "comprehensive" plan have access to not only individuals' own personal information, but computer-generated lists of that subject's relatives and associates and their personal information.[9]

**CLEAR sells customers the ability to easily and quickly search for a specific individual's personal and non-public information**

21.  Thomson Reuters advertises CLEAR as a "user-friendly platform," which offers customers an "easier . . . search experience that brings together key proprietary and public records into one intuitive, customizable environment." According to the company, CLEAR allows users to "quickly search across thousands of data sets and get accurate results in less time."

22.  CLEAR's products are widely used. The platform receives approximately 100,000 search queries each day.

23.  Users sign into the CLEAR platform through a portal similar to Thomson Reuters' well-known Westlaw sign-in page.

---

[6] *Id.*
[7] Thomson Reuters *CLEAR Plans and Pricing*, *available at*:
https://legal.thomsonreuters.com/en/products/clear-investigation-software/plans-pricing#corporate.
[8] Thomson Reuters *CLEAR Brochure*, *available at*:
https://www.thomsonreuters.com/content/dam/openweb/documents/pdf/legal/fact-sheet/clear-brochure.pdf.
[9] Thomson Reuters, *CLEAR Plans and Pricing*,
https://legal.thomsonreuters.com/en/products/clear-investigation-software/plans-pricing#corporate.

24.   CLEAR offers users the ability to conduct numerous types of searches for a targeted individual or entity, including a "person search" and a "risk inform" search.

**CLEAR's Person Search:**

25.   CLEAR prompts users conducting a "person search" to input information such as an individual's name, address, contact information, social security number, date of birth, age range, or driver's license number in order to locate a targeted individual.

26.   The directions for filling out the "age range" field direct the user to enter "1 to 3 digits," indicating that CLEAR permits searches for minors as well as adults.

27.   The "person search" results bring the user to a landing page with personal identifying information. A column on the side of the screen includes the target individual's full name, age, current address, and partial social security numbers; "vital statistics," such as date of birth, gender, and former names; and former addresses and phone numbers.

28.   The "person search" results page also features a dashboard of additional tools allowing a user to dive deeper into the targeted individual's profile. The front page of the dashboard displays "possible quick analysis flags," which indicate whether, according to CLEAR's data, the individual's profile includes various putative risk factors, such as bankruptcies, arrests, a criminal record, or "associate[s] or relative[s]" with arrests or criminal records.

29.   CLEAR's "web analytics" tool, available via the dashboard, permits the user to browse through images and profiles of the targeted person, as well as individuals with similar names. It also provides search hits for the targeted individual from websites. These results can be filtered by various metrics, including city, country, "FamilyRelation," "PersonAttributes," and "PersonRelationship."

30.   The "person search" dashboard also offers a number of other tools, such as a "graphical display" tool that provides visual depictions of the targeted individual's legal history, as well as the individual's relationship to registered agents, relatives, and other people with whom the individual shares phone numbers; an "associate analytics" tool exploring the personal information of a targeted individual's purported family members and other

"associates"; and a "map analytics" tool allowing a user to view all of the addresses associated with the targeted individual on a detailed map, which includes satellite imagery.

31.  Users may also create a report from the results of the "person search," including detailed information not only about the targeted individual, but also that person's relatives, "associates," neighbors, addresses, properties, vehicles, and businesses in the report.

**CLEAR's Risk Inform Search:**

32.  CLEAR's "risk inform" search creates a detailed report of the putative risks associated with a targeted individual, summarizing a person's purported "risk" using a numerical score.[10] A "risky" person has a high score, while a "safe" person has a low score.

33.  The age range field for the "risk inform" search directs users to enter "1 to 3 digits," again indicating that this tool may be used to profile minors as well as adults.

34.  The "risk inform" results include the same "vital statistics," address, contact information, web analytics information, and photographs that CLEAR provides in a "person search."

35.  In addition, the "risk inform" results include an automatically generated "risk inform score."

---

[10] Thomson Reuters, *CLEAR Risk Inform*, *available at*:
https://legal.thomsonreuters.com/en/products/clear-investigation-software/clear-risk-inform.



36.   The potential "flags" identified as components of this score demonstrate the breadth and sensitivity of the information included in the CLEAR database. For instance, under a list of "custom" flags, which appear to be associated with a wide range of state criminal offenses:

a.   CLEAR includes indicators for several types of conduct related to "Abortion," including "Abortional Act on Self";

b.   Under the header "Breach of the Peace," CLEAR includes indicators for speech and protest-related activity, including "Anarchism," "Desecrating a Flag," and "Engaging in a Riot," and in subsequent sections, it also identifies "Indecent, Obscene, or Vulgar Language" and "Refusing to Aid a Police Officer";

c.   CLEAR includes indicators for "Homosexual Act with a Man" and "Homosexual Act with a Woman";

d.   Under the header "Weapons Offenses," CLEAR includes indicators for "Licensing – Registered Weapon" and "Possession of a Weapon"; and

e.   CLEAR also includes flags for intrusive conduct under the header "Invasion of Privacy."[11]

37.   Several of CLEAR's "risk inform" flags are automatically triggered if the targeted individual changes their name, as illustrated by the dossiers on both of the named plaintiffs described below. Members of groups that are more likely to change their names—such as women who marry, victims of domestic violence, trans people, and Muslim converts—are thereby more likely to be tagged as "risky" by CLEAR's "risk inform" product.

38.   Clicking on any of the "risk inform" flags enables the user to see additional information about the alleged offense or trigger.

39.   As with the "person search," CLEAR permits users to generate a report of the "risk inform" results that may include information about the targeted individual as well as their relatives, associates, and neighbors.

**Thomson Reuters has offered the named plaintiffs' personal and sensitive information for sale through CLEAR, without the plaintiffs' consent**

40.   Neither of the named plaintiffs ever agreed to permit Thomson Reuters to collect, store, or sell their personal information. Thomson Reuters has never asked either of them for their consent, nor has it offered them compensation for selling their personal information.

41.   Nevertheless, Thomson Reuters sells its customers access to extensive personal and sensitive information about both of the named plaintiffs on CLEAR.

**Cat Brooks:**

42.   Named plaintiff Cat Brooks is a Black activist and actress. Ms. Brooks has been targeted by white supremacist groups as a result of her activism: She receives hateful emails and threats at her home. She also fears retaliation from law enforcement. Out of concern for her

---

[11] Although it has been held unconstitutional to use several of the items identified under "Criminal Records" as the basis for a criminal charge, it is unclear whether CLEAR determines whether these "flags" are triggered strictly using criminal records and whether it takes account of whether charges have subsequently been sealed or expunged. Moreover, it is unlikely that CLEAR's algorithm discounts criminal charges in its database that predate changes in the criminal code (*e.g.*, a charge for private homosexual conduct that preceded the Supreme Court's ruling in *Lawrence v. Texas*, 539 U.S. 558 (2003)).

safety and that of her family, Ms. Brooks has taken active steps to remove her personal information from the internet, including subscribing to a service that routinely deletes identifying information.

43.   Ms. Brooks did not give Thomson Reuters consent to include her identity and identifying information in the CLEAR database. Thomson Reuters neither asked Ms. Brooks for permission to sell her identifying information, nor paid Ms. Brooks for the right to sell it.

44.   Nevertheless, CLEAR's database includes extensive information about Ms. Brooks. CLEAR's "individual report" on Ms. Brooks includes a trove of information, including a social security number that is only partially redacted, current address, cell phone number, prior addresses, and details about her current employer, her business, and licenses. It also identifies her neighbors, relatives, and "associates"—both current and past—and provides detailed information about them.

45.   Ms. Brooks changed her name in connection with her activist work. CLEAR's dossier on Ms. Brooks also contains her prior name, as well as detailed information associated with that name. In addition, CLEAR's "risk inform" report on Ms. Brooks heavily penalizes her for changing her name: All of the risk factors it identifies for Ms. Brooks are associated with her name change, including "Duplicate Personally Identifiable Information," "First Appearance in Public Records content after 30," "SSN Matched to Multiple Individuals," and "Thinness of File." As a result, Ms. Brooks is saddled with a high "risk inform" score, indicated in bold red. CLEAR's "individual report" of information associated with Ms. Brooks' prior name is also extensive.

46.   CLEAR also provides photographs of Ms. Brooks.

47.   At the bottom of a Thomson Reuters' webpage about CLEAR—only visible after scrolling past two or more pages of text—there is a link in very small font that says: "For CA: Do not sell my information."[12]

48.   Clicking on the link sends visitors to a page that purports to allow California

---

[12] Thomson Reuters, *Thomson Reuters' CLEAR*, *available at*:
https://legal.thomsonreuters.com/en/products/clear-investigation-software.

residents to opt out of the sale of their "personal information" for a period of "at least twelve (12) months."

49.  Beyond its presence in tiny font at the very bottom of its webpages, Thomson Reuters provides no notice to consumers that this link exists. Nor does the company enable California consumers who happen to find out about the link to easily make use of it. [13]

50.  Ms. Brooks clicked the "For CA: Do not sell my information" link, seeking to opt out of the sale of her personal information via CLEAR. However, when she attempted to do so, Thomson Reuters required that she provide a photograph of her government-issued identification card as well as a separate picture of her face. Given that Thomson Reuters is already selling her personal information without her consent, Ms. Brooks was not comfortable providing further personal information to the company, and thus she could not complete the company's process.

**Rasheed Shabazz:**

51.  Named plaintiff Rasheed Shabazz is a Black Muslim journalist and activist. He is concerned about being targeted by people who disagree with his writing, his teaching, and his activism, as well as by people who simply dislike his identity. He does not want his personal information to be publicly available.

52.  Mr. Shabazz did not give Thomson Reuters consent to include his identity and identifying information in the CLEAR database. Thomson Reuters neither asked Mr. Shabazz for permission to sell his identifying information, nor paid Mr. Shabazz for the right to sell it.

53.  Mr. Shabazz does not want Thomson Reuters to profit from his identity. He also does not want Thomson Reuters to present the story of his life to others without his input.

54.  But CLEAR's "individual report" on Mr. Shabazz includes detailed information such as his current and prior addresses, employer information, phone numbers, a partially redacted social security number, his "associates," his neighbors—and their addresses and

---

[13] Several Thomson Reuters webpages also include a second link at the bottom of the page that say: "Do not sell my personal information." Clicking on one of these links brings up a pop-up window that states that the personal information to which it refers is information collected by cookies stored on the visitor's browser "to collect information."

phone numbers.

55.   Because, in Mr. Shabazz's view, the last name he was given at birth was associated with the slave owners who held his ancestors in bondage, Mr. Shabazz legally changed his name to one he felt was a better representation of himself and his family. CLEAR includes detailed information associated with Mr. Shabazz's prior name, including the same partially redacted social security number, his race, and physical addresses, email addresses, and phone numbers. Some of this information is inaccurate: CLEAR's profile on Mr. Shabazz's prior name indicates Mr. Shabazz was divorced, when he has never legally been married, and that he had been sued for failing to pay child support when he had no children.

56.   Like Ms. Brooks, CLEAR's "risk inform" report penalizes Mr. Shabazz for changing his name: His "risk inform score" is based on flags indicating "First Appearance in Public Records after 30," "No relatives," and "SSN Matched to Multiple Individuals."

57.   CLEAR also provides photographs of Mr. Shabazz.

58.   Mr. Shabazz also attempted to opt out of the sale of his personal information by clicking the "For CA" link provided at the bottom of Thomson Reuter's webpages. However, when he attempted to do so, Thomson Reuters required that he provide a photograph of his government-issued identification card as well as a separate picture of his face. Given that Thomson Reuters was selling his personal information without his consent, Mr. Shabazz was not comfortable providing further personal information to the company, and thus he could not complete the company's process.

**Thomson Reuters makes substantial profits from its sale of personal data and identifying information through CLEAR**

59.   Thomson Reuters markets the CLEAR platform to private corporations, law enforcement, and other government agencies.

60.   Thomson Reuters stores and collects CLEAR data in one or more of its Strategic Data Centers, or provides customers with access to data housed by its data partners through an Application Programming Interface (API) or similar technology. To access this data, an individual can pay for a monthly subscription for one or more of Thomson Reuters' CLEAR

data "plans." A customer can also choose to pay per individual search, demonstrating the value that each individual profile in CLEAR's database holds for Thomson Reuters. CLEAR offers tailored subscription plans for law enforcement, government agencies, and private corporations, respectively. Thomson Reuters charges customers a monthly rate for access to its many CLEAR programs.

61.  Thomson Reuters makes significant profits from the collection, aggregation, and sale of individuals' names, photographs, likenesses, identifying information, and personal data through its CLEAR products.

62.  Thomson Reuters charges users for each component of CLEAR's search functionalities. It offers both flat rate and "pay-as-you-go" pricing models, with a minimum contract term of twelve months.[14]

63.  In Thomson Reuter's "pay-as-you-go" pricing model, users pay per each component of a search and per report. For instance, in one pricing schedule, Thomson Reuters indicated that users would pay $5.00 for a basic "Person Search," with additional charges added for additional information. According to this schedule, users also incur additional charges for a "Photo Line-Up Search" and a "Web Analytics Search." Thomson Reuters also charges separately to use CLEAR's "Risk Inform" product, up to $6.75 for a "premium" search. And users must also pay additional fees to generate reports from their searches: An "individual report" costs $15.00, with additional charges added to include "associates" or "Risk Inform" data in the report.[15]

64.  Government records offer another glimpse into the revenues that Thomson Reuters derives from its sale of CLEAR products. U.S. Immigration and Customs Enforcement ("ICE") has signed over $54 million in contracts with Thomson Reuters to access CLEAR for purposes

---

[14] Thomson Reuters, *CLEAR Plans and Pricing*, *available at*:
https://legal.thomsonreuters.com/en/products/clear-investigation-software/plans-pricing#corporate.

[15] Thomson Reuters, *CLEAR Services Schedule A Commercial Subscriber's Accessing Enhanced CLEAR Services*, *available at*:
https://static.legalsolutions.thomsonreuters.com/static/agreement/schedule-a-clear.pdf.

of surveilling and tracking immigrants.

**Thomson Reuters is aware of the privacy concerns posed by its appropriation and sale of individuals' personal data without their consent**

65.   Thomson Reuters knows that its aggregation and sale of personal data without consent implicate significant privacy concerns.

66.   In an article posted on its website for "insights" on "legal" issues, Thomson Reuters acknowledges the negative privacy consequences that flow from the non-consensual sale of a person's personal data. As it explains, "[s]econdary uses of personal data"—that is, uses of a person's data for purposes the person didn't intend or consent to—"pose the most risk and unintended harm to people." Individuals are blindsided by these secondary uses because they rightfully assume that even if their personal information has been uploaded somewhere, that "doesn't mean permission has been given to share that information everywhere."[16]

67.   By the company's own admission, "the amount of digital data being collected and stored" by corporations that profit off of personal data has reached "unprecedented rates." Data analytics, a service which the company provides to its CLEAR customers, "has enormous power to reveal seemingly hidden patterns." According to Thomson Reuters, data analytics processes can be so invasive that their insights "can even predict behavior," thereby "threaten[ing] individual identity."[17]

68.   Because CLEAR's database is privately owned, it is not subject to the privacy protections that apply to government collection and storage of personal data. Commentators have observed that government agencies like ICE and local law enforcement may be able to avoid constitutional and statutory limitations by purchasing personal data from data brokers and other private companies like Thomson Reuters.[18]

---

[16] Thomson Reuters, *Big Data ethics: redefining values in the digital world*, *available at*: https://legal.thomsonreuters.com/en/insights/articles/big-data-ethics-redefining-values-in-the-digital-world.
[17] *Id.*
[18] Gilad Edelman, *Can the Government Buy Its Way Around the Fourth Amendment?*, Wired (Feb. 11, 2020), https://www.wired.com/story/can-government-buy-way-around-fourth-amendment/.

69. Despite Thomson Reuters' awareness that consent should be acquired before sharing personal information, the company never asks the individuals whose information is contained in the CLEAR database for their consent.

70. In fact, most individuals have no way of knowing that Thomson Reuters has bought, collected, aggregated, or sold their personal data.

**CLASS ACTION ALLEGATIONS**

71. Plaintiffs re-allege and incorporate by reference herein all of the allegations contained above.

72. Under Federal Rule of Civil Procedure 23, Plaintiffs assert claims on behalf of themselves and the following proposed class:

> All persons who, during the limitations period, both resided in the state of California and whose personal information Thomson Reuters made available for sale through CLEAR without their consent.

73. The proposed class definition excludes any officers and directors of Thomson Reuters; Class Counsel; and the judicial officer(s) presiding over this action and the members of his/her immediate family and judicial staff.

74. This action has been brought and may properly be maintained as a class action as it satisfies all requirements of Rule 23. The proposed class satisfies the Rule 23(a) requirements of numerosity, commonality, typicality, adequacy, and the requirements of Rule 23(b)(2) and Rule 23(b)(3).

75. Certification of a hybrid class under Rule 23(b)(2) and Rule 23(b)(3) is appropriate because Plaintiffs' UCL claim seeks only injunctive relief that satisfies the requirements of Rule 23(b)(2), and Plaintiffs' unjust enrichment claim seeks monetary relief that satisfies the requirements of Rule 23(b)(3).

76. The precise number of class members is unknown to the plaintiffs, but the class includes nearly all Californians. In light of Thomson Reuters' claims that the CLEAR database contains "billions of data points," including more than 140 million booking records and over 38 million images of individuals, the class is so numerous that joinder of all members is

1    impractical.

2    77.    There are questions of law and fact common to the class, which predominate over

3    any questions affecting only individual class members. These questions include, but are not

4    limited to, the following:

5        a.    Does Thomson Reuters seek the class members' consent or compensate them

6              before making their personal information available for sale through CLEAR?

7        b.    Did Thomson Reuters give class members any meaningful control over the use of

8              their personal information once it was offered through CLEAR?

9        c.    Is the harm to the public from making Californians' personal information available

10             for sale through CLEAR without their consent greater than the utility of allowing

11             Thomson Reuters to not seek class members' consent before selling access to their

12             information in CLEAR?

13       d.    Does Thomson Reuters' failure to seek Californians' consent before selling access to

14             their information through CLEAR offend public policy, as expressed in California's

15             constitution, statutes, or regulations?

16       e.    Did Thomson Reuters retain a benefit from its unfair business practices, such as

17             profits from its customers who paid to have access to the universe of information in

18             CLEAR, including Californians' personal information?

19       f.    Is it unjust for Thomson Reuters to retain the profits attributable to Californians'

20             data being available through CLEAR, when Californians never consented to

21             Thomson Reuters using or selling their information?

22   78.    These and other legal and factual questions are common to all class members. There

23   are no individual questions that will predominate over common questions.

24   79.    The plaintiffs will fairly and adequately protect the interests of the class because

25   their interests are aligned with, and not antagonistic to, those of the other members of the class.

26   In addition, the plaintiffs have retained counsel experienced in handling class claims and claims

27   involving unlawful business practices. Neither the plaintiffs nor their counsel have any

28   interests which might cause them not to vigorously pursue this claim.

80.  The plaintiffs are members of the putative class, and their claims are typical of the claims of the members of the class, as the claims arise from Defendant's common course of unlawful conduct. The damages and injuries of each class member were directly caused by the defendant's wrongful conduct.

81.  There are no defenses of a unique nature that may be asserted against the plaintiffs individually, as distinguished from the other members of the class, and the relief sought is common to the class.

82.  Certification of Plaintiffs' UCL claim under Rule 23(b)(2) is appropriate because Plaintiffs seek to enjoin Thomson Reuters' common business practice of selling access to Californians' personal information without consent. Thomson Reuters has acted on grounds that apply generally to the putative class, such that Plaintiffs' requested injunction is indivisible as to all putative class members and final injunctive relief is appropriate respecting the class as a whole.

83.  In the alternative, certification of the Class for all claims is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) because questions of law or fact common to the respective members of the Class predominate over questions of law or fact affecting only individual members. This predominance makes class litigation superior to any other method available for the fair and efficient adjudication of these claims including consistency of adjudications. Absent a class action, it would be highly unlikely that the members of the Class would be able to protect their own interests because the cost of litigation through individual lawsuits would likely exceed the expected recovery.

**CLAIMS FOR RELIEF**

**FIRST CAUSE OF ACTION**[19]

**Common Law Right to Publicity/Misappropriation of Likeness**

84.  Plaintiffs repeat and incorporate by reference each preceding paragraph as if fully stated herein.

---

[19] Plaintiffs recognize that this claim was dismissed, *see* ECF 54, and replead it here solely to preserve the claim for appellate purposes.

85.  California's common-law right of publicity protects people from the unauthorized appropriation of their identity by another for commercial gain.

86.  Thomson Reuters has used the named plaintiffs' and class members' identities by collecting, aggregating, and selling their names, images, likenesses, and other personal identifying information through products linked to its CLEAR database.

87.  Thomson Reuters appropriated the named plaintiffs' and class members' identities for its own commercial and economic advantage.

88.  At no time has Thomson Reuters sought consent from class members before appropriating and selling their personal data through its CLEAR products, nor does it have a process for doing so.

89.  The class members received no compensation for Thomson Reuters' use of their identities.

90.  Thomson Reuters' appropriation and sale of the plaintiffs' and class members' names, photographs, likenesses, and personal information without their consent injured the class members by violating their privacy. In particular, Thomson Reuters has prevented—and continues to prevent—the named plaintiffs and class members from retaining control over the dissemination of their personal information.

91.  The named plaintiffs and the class members have also suffered economic injury because they were not compensated by Thomson Reuters for the use of their name, photographs, likeness, and other personal identifying information.

92.  The named plaintiffs and class members are entitled to compensatory damages, restitution, declaratory relief, and injunctive relief.

### SECOND CAUSE OF ACTION[20]

### Unfair Competition Law, Cal. Bus. & Prof. § 17200, Monetary Relief

93.  Plaintiffs repeat and incorporate by reference each preceding paragraph as if fully stated herein.

---

[20] Plaintiffs recognize that this claim was dismissed, *see* ECF 54, and replead it here solely to preserve the claim for appellate purposes.

94.  California Business and Professions Code section 17200 *et seq.* ("UCL") prohibits "unlawful, unfair, or fraudulent business acts or practices."

95.  By selling Californians' personal information and data without consent, as described above, Thomson Reuters has engaged in unlawful and unfair acts and practices prohibited by the UCL.

96.  Thomson Reuters' conduct is unlawful under the UCL because it violates California's common-law right of publicity, as discussed in the first cause of action.

97.  In addition, Thomson Reuter's conduct is unlawful under the UCL because it violates California Civil Code section 3344(a).

98.  California Civil Code section 3344(a) provides that "[a]ny person who knowingly uses another's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, . . . without such person's prior consent . . . shall be liable for any damages sustained by the person or persons injured as a result thereof."

99.  Thomson Reuters knowingly used and continues to use the names, photographs, and other identifying information of the class members in its CLEAR database, and for the purpose of selling access to products linked to the CLEAR database. Thomson Reuters' use of this information is not an accident; it is central to these products.

100. Thomson Reuters' appropriation of the class members' names, photographs, and other identifying information was to the company's economic and commercial advantage. The company has generated millions of dollars of revenue from CLEAR.

101. At no time has Thomson Reuters affirmatively sought consent from class members before appropriating and selling their personal data, nor does it have a process for doing so.

102. The class members received no compensation for Thomson Reuters' use of their names, images, likenesses, and other personal identifying information.

103. Thomson Reuters' use of class members' names, photographs, and other identifying information is directly connected to its products' commercial purposes: Products linked to the CLEAR database would be without value if the CLEAR database did not include class members' names, photographs, and identifying information. Class members' names,

photographs, and identifying information are not ancillary to these products—they are the product.

104. Indeed, Thomson Reuters' entire marketing strategy relies on emphasizing the vast quantity of photographs, names, and other identifying information that is readily available to potential subscribers of CLEAR. Thomson Reuters' appropriation and sale of the named plaintiffs' and class members' names, photographs, likenesses, and personal information without seeking permission or consent injured the class members by violating their right to exercise control over the commercial use of their identities.

105. Thomson Reuters' conduct also constitutes unfair business practices under the UCL because these practices offend established public policy and cause harm to the named plaintiffs and class members, which cannot be reasonably avoided, and that outweighs any benefit to consumers or competition. The conduct also is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

106. The named plaintiffs and class members have suffered economic injury as a result of Thomson Reuters' unlawful and unfair business practices.

107. As a result of its unlawful and unfair business practices, Thomson Reuters has reaped and continues to reap unfair and illegal profits at the expense of the plaintiffs and class members. Thus, Thomson Reuters should be required to disgorge its illegal profits, and to pay the plaintiffs and class members restitution in an amount according to proof at the time of trial.

**THIRD CAUSE OF ACTION**

**Unjust Enrichment**

108. Plaintiffs repeat and incorporate by reference each preceding paragraph as if fully stated herein.

109. Thomson Reuters has wrongfully and unlawfully sold the named plaintiffs' and the class members' names, photographs, personal identifying information, and other personal data without their consent for substantial profits.

110. The named plaintiffs' and the class members' personal information and data have conferred an economic benefit on Thomson Reuters.

111. Thomson Reuters has been unjustly enriched at the expense of the named plaintiffs and class members, and the company has unjustly retained the benefits of its unlawful and wrongful conduct.

112. It would be inequitable and unjust for Thomson Reuters to be permitted to retain any of the unlawful proceeds resulting from its unlawful and wrongful conduct.

113. The named plaintiffs and class members accordingly are entitled to equitable relief including restitution and disgorgement of all revenues, earnings, and profits that Thomson Reuters obtained as a result of its unlawful and wrongful conduct.

### FOURTH CAUSE OF ACTION

### Unfair Competition Law, Cal. Bus. & Prof. § 17200, Injunctive Relief

114. Plaintiffs repeat and incorporate by reference each preceding paragraph as if fully stated herein.

115. California Business and Professions Code section 17200 *et seq.* ("UCL") prohibits "unlawful, unfair, or fraudulent business acts or practices."

116. By selling Californians' personal information and data without consent, as described above, Thomson Reuters has engaged in unlawful and unfair acts and practices prohibited by the UCL.

117. Thomson Reuters' conduct is unlawful under the UCL because it violates California's common-law right of publicity, as discussed in the first cause of action.[21]

118. In addition, Thomson Reuter's conduct is unlawful under the UCL because it violates California Civil Code section 3344(a).[22]

119. California Civil Code section 3344(a) provides that "[a]ny person who knowingly uses another's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, . . . without such person's prior consent . . . shall be liable for

---

[21] Plaintiffs recognize that their claim under the unlawful prong of the UCL was dismissed, *see* ECF 54, and replead it here solely to preserve the claim for appellate purposes.
[22] Plaintiffs recognize that their claim under the unlawful prong of the UCL was dismissed, *see* ECF 54, and replead it here solely to preserve the claim for appellate purposes.

1    any damages sustained by the person or persons injured as a result thereof."[23]

2        120. Thomson Reuters knowingly used and continues to use the names, photographs,

3    and other identifying information of the class members in its CLEAR database, and for the

4    purpose of selling access to products linked to the CLEAR database. Thomson Reuters' use of

5    this information is not an accident; it is central to these products.

6        121. Thomson Reuters' appropriation of the class members' names, photographs, and

7    other personal information was to the company's economic and commercial advantage. The

8    company has generated hundreds of millions of dollars of revenue from CLEAR.

9        122. At no time has Thomson Reuters affirmatively sought consent from class members

10   before appropriating and selling their personal data, nor does it have a process for doing so.

11       123. The class members received no compensation for Thomson Reuters' use of their

12   names, images, likenesses, and other personal identifying information.

13       124. Thomson Reuters' use of class members' names, photographs, and other identifying

14   information is directly connected to its products' commercial purposes: Products linked to the

15   CLEAR database would be without value if the CLEAR database did not include class

16   members' names, photographs, and identifying information. Class members' names,

17   photographs, and identifying information are not ancillary to these products—they are the

18   product.

19       125. Indeed, Thomson Reuters' entire marketing strategy relies on emphasizing the vast

20   quantity of photographs, names, and other identifying information that is readily available to

21   potential subscribers of CLEAR. Thomson Reuters' appropriation and sale of the named

22   plaintiffs' and class members' names, photographs, likenesses, and personal information

23   without seeking permission or consent injured the class members by violating their right to

24   exercise control over the commercial use of their identities.

25       126. Thomson Reuters' conduct also constitutes unfair business practices under the UCL

26   because these practices offend established public policy and cause harm to the named plaintiffs

27

28   [23] Plaintiffs recognize that their claim under the unlawful prong of the UCL was dismissed, *see* ECF 54, and replead it here solely to preserve the claim for appellate purposes.

and class members, which cannot be reasonably avoided, and that outweighs any benefit to consumers or competition. The conduct also is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

127. California's Unfair Competition Law allows anyone to bring an action for injunctive relief if they have "lost money or property as a result of the unfair competition." Cal. Bus. & Prof. § 17204.

128. Plaintiffs Brooks and Shabazz both lost money or property as a result of Thomson Reuters' unfair and unlawful practices in violation of the Unfair Competition Law. But for its violation of law, Thomson Reuters would have either paid Brooks and Shabazz for consent to sell their information or ceased the sale of their information.

129. The named plaintiffs' and class members' information is likely to remain available through CLEAR, without their consent, and without compensation from Thomson Reuters for its appropriation and sale of that information.

130. Although Plaintiffs seek to certify this claim for class relief, Plaintiffs alternatively bring this fourth cause of action in a representative capacity, not on a class basis, seeking public injunctive relief to enjoin Thomson Reuter's continued violation of California's Unfair Competition Law.

## PRAYER FOR RELIEF

For all of these reasons, the plaintiffs request that this Court:

    a.  Certify this action as a class action for purposes of Claims Three and Four;

    b.  Appoint Plaintiffs Cat Brooks and Rasheed Shabazz as class representatives and appoint their attorneys as class counsel;

    c.  Award injunctive relief;

    d.  Award restitution and disgorgement of the defendant's profits from its unlawful and unfair business practices and conduct;

    e.  Issue an order for public injunctive relief under the UCL;

    f.  Award costs and reasonable attorneys' fees; and

    g.  Grant such further relief that the Court deems necessary and proper.

## JURY DEMAND

131. Plaintiffs demand a trial by jury for all issues so triable under the law.


DATED: November 14, 2022        Respectfully submitted,

                                              _/s/ Andre M. Mura_____

                                              Eric H. Gibbs (SBN 178658)
                                              Andre M. Mura (SBN 298541)
                                              Amy M. Zeman (SBN 273100)
                                              Mark H. Troutman (pro hac vice)
                                            Ezekiel S. Wald (SBN 341490)
                                              Hanne Jensen (SBN 336045)
                                              **GIBBS LAW GROUP LLP**
                                              1111 Broadway, Suite 2100
                                              Oakland, California 94607
                                              Telephone: (510) 350-9700
                                              Facsimile: (510) 350-9701
                                              ehg@classlawgroup.com
                                              amm@classlawgroup.com
                                              amz@classlawgroup.com
                                              mht@classlawgroup.com
                                              zsw@classlawgroup.com
                                              hj@classlawgroup.com

                                              Geoffrey A. Graber (SBN 211547)
                                              Karina G. Puttieva (SBN 317702)
                                              **COHEN MILSTEIN SELLERS & TOLL PLLC**
                                              1100 New York Ave. NW, Fifth Floor
                                              Washington, DC 20005
                                              Telephone: (202) 408-4600
                                              Facsimile: (202) 408-4699
                                              ggraber@cohenmilstein.com
                                              kputtieva@cohenmilstein.com

                                              *Attorneys for Plaintiffs and the Proposed Class*