Eric H. Gibbs (SBN 178658)
Andre M. Mura (SBN 298541)
Amy M. Zeman (SBN 273100)
Mark H. Troutman (*pro hac vice*)
Ezekiel S. Wald (SBN 341490)
Hanne Jensen (SBN 336045)
**GIBBS LAW GROUP LLP**
1111 Broadway, Suite 2100
Oakland, CA 94607
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
ehg@classlawgroup.com
amm@classlawgroup.com
amz@classlawgroup.com
mht@classlawgroup.com
zsw@classlawgroup.com
hj@classlawgroup.com

Geoffrey A. Graber (SBN 211547)
Karina G. Puttieva (SBN 317702)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
ggraber@cohenmilstein.com
kputtieva@cohenmilstein.com

*Attorneys for Plaintiffs and the Proposed Class*

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| CAT BROOKS and RASHEED SHABAZZ, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THOMSON REUTERS CORPORATION,<br><br>Defendant. | Case No. 3:21-cv-01418-EMC-KAW<br><br>**REDACTED - PUBLICLY FILED VERSION PURSUANT TO COURT ORDER, DATED DECEMBER 7, 2022, DOCKET 147**<br><br>**PLAINTIFFS' NOTICE OF MOTION, MOTION FOR CLASS CERTIFICATION, AND MEMORANDUM IN SUPPORT**<br><br>Date: April 20, 2023<br>Time: 1:30 p.m.<br>Place: Courtroom 5, 17th Floor<br>Judge: Hon. Edward M. Chen |

## NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION

TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT on April 20, 2023 at 1:30 p.m., or as soon thereafter as the matter may be heard, via videoconference or in Courtroom 5 of the United States District Court, Northern District of California, San Francisco Division, located at 450 Golden Gate Avenue, San Francisco, California 94102, before the Honorable Edward M. Chen, Plaintiffs Cat Brooks and Rasheed Shabazz will, and hereby do, move this Court under Federal Rule of Civil Procedure 23 for an order certifying a proposed Rule 23(b)(2) and/or Rule 23(b)(3) class defined as follows:

> All persons who, during the limitations period, both resided in the state of California and whose information Thomson Reuters made available for sale through CLEAR without their consent.

Excluded from the class are officers and directors of Thomson Reuters, class counsel, the judicial officers presiding over this action, and the members of their immediate family and judicial staff.

Plaintiffs also move the Court to appoint them as class representatives, and to appoint the law firms of Gibbs Law Group LLP and Cohen Milstein Sellers & Toll PLLC as class counsel.

This motion is based on this Notice of Motion; the accompanying memorandum in support, the Declaration of Andre M. Mura ("Mura Decl."); the Declaration of Geoffrey Graber ("Graber Decl."); the evidence submitted in support of the motion; any additional evidence submitted on reply; the complete files and records in this action; and any such other written and oral argument as may be presented to the Court.

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................................1

II.   BACKGROUND..................................................................................................................2

    A.   The CLEAR platform makes available a vast array of personal information
        about Californians without first obtaining their consent.....................................................3

    B.   Thomson Reuters generates substantial profits from selling access to the
        CLEAR database to a wide range of customers. ................................................................7

    C.   Thomson Reuters does not inform Californians that their personal
        information is available through CLEAR, nor does it make any meaningful
        effort to enable Californians to correct or remove their information. .............................8

III.  STATEMENT OF THE ISSUES TO BE DECIDED ..........................................................9

IV.   ARGUMENT........................................................................................................................9

    A.   This action satisfies Rule 23(a)'s requirements. .............................................................11

        1.   The class is sufficiently numerous...........................................................................11

        2.   Legal and factual issues are common to the class. ..................................................11

        3.   The named plaintiffs' claims are typical of the class. .............................................13

        4.   The named plaintiffs and class counsel are adequate representatives. ...................14

    B.   The Court should certify a Rule 23(b)(2)/(b)(3) hybrid class, or, in the
        alternative, a single Rule 23(b)(3) class. .........................................................................15

        1.   The UCL claim may be certified under Rule 23(b)(2). ...........................................15

        2.   Common questions predominate over any individual questions. ............................16

        3.   A class action is superior to other ways of adjudicating this controversy. .............21

V.    CONCLUSION..................................................................................................................22

1

**TABLE OF AUTHORITIES**

2   <u>Cases</u>                                                                          Page(s)

3   *Alcantar v. Hobart Service*,
4       800 F.3d 1047 (9th Cir. 2015) ..........................................................................11

5   *Allegra v. Luxottica Retail N. Am.*,
6       341 F.R.D. 373 (E.D.N.Y. 2022) ......................................................................19

7   *Amchem Prods., Inc. v. Windsor*,
        521 U.S. 591 (1997)..........................................................................................9, 22
8
9   *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
        568 U.S. 455 (2013)................................................................9, 10, 16, 21
10
11  *Backus v. General Mills, Inc.*,
        122 F. Supp. 3d 909 (N.D. Cal. 2015) ........................................................12, 18
12
13  *Briseno v. ConAgra Foods, Inc.*,
        844 F.3d 1121 (9th Cir. 2017) ..........................................................................21
14
15  *Castillo v. Bank of Am., NA*,
        980 F.3d 723 (9th Cir. 2020) ................................................................11, 12, 13
16
17  *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
        973 P.2d 527 (Cal. 1999) ............................................................................17, 19
18
19  *Comcast Corp. v. Behrend*,
        569 U.S. 27 (2013).............................................................................................20
20
21  *DZ Reserve v. Meta Platforms, Inc.*,
        2022 WL 912890 (N.D. Cal. Mar. 29, 2022).....................................................15
22
23  *Ellis v. Costco Wholesale Corp.*,
        285 F.R.D. 492 (N.D. Cal. 2012) ......................................................................15
24
25  *Ellsworth v. U.S. Bank, N.A.*,
        2014 WL 2734953 (N.D. Cal. June 13, 2014) ..................................................18
26
27  *ESG Capital Partners, LP v. Stratos*,
        828 F.3d 1023 (9th Cir. 2016) ..........................................................................19
28
    *Freeman v. Time, Inc.*,
        68 F.3d 285 (9th Cir. 1995) ...............................................................................18

*Gaudin v. Saxon Mortg. Servs., Inc.,*
   297 F.R.D. 417 (N.D. Cal. 2013) ............................................................................................19

*Ghirardo v. Antonioli,*
   924 P.2d 996 (Cal. 1996) ...........................................................................................12, 19

*GHK Assoc. v. Mayer Grp., Inc.,*
   224 Cal. App. 3d 856 (1990)......................................................................................20, 21

*In re Anthem, Inc. Data Breach Litig.,*
   162 F. Supp. 3d 953 (N.D. Cal. 2016) ..........................................................................18

*In re Carrier IQ, Inc.,*
   78 F. Supp. 3d 1051 (N.D. Cal. 2015) ..........................................................................19

*In re Facebook, Inc. Internet Tracking Litig.,*
   956 F.3d 589 (9th Cir. 2020) .......................................................................................13

*In re Hyundai & Kia Fuel Econ. Litig.,*
   926 F.3d 539 (9th Cir. 2019) ..................................................................................14, 16

*In re Juul Labs, Inc., Mktg. Sales Pracs. and Prods. Liab. Litig.,*
   ---F. Supp. 3d---, 2022 WL 2343268 (N.D. Cal. June 28, 2022) .................................16

*In re Lendingclub Sec. Litig.,*
   282 F. Supp. 3d 1171 (N.D. Cal. 2017) ......................................................................14

*In re Tobacco II Cases,*
   207 P.3d 20 (Cal. 2009) ...............................................................................................17

*In re Visa Check/MasterMoney Antitrust Litig.,*
   280 F.3d 124 (2d Cir. 2001) ........................................................................................21

*James v. Uber Techs. Inc.,*
   338 F.R.D. 123 (N.D. Cal. 2021) ..............................................................11, 13, 14, 21

*Longest v. Green Tree Servicing LLC,*
   308 F.R.D. 310 (C.D. Cal. 2015)...........................................................................18, 19, 20

*Lozano v. AT&T Wireless Servs., Inc.,*
   504 F.3d 718 (9th Cir. 2007) ..................................................................................12, 17

*McKell v. Washington Mutual, Inc.,*
   142 Cal. App. 4th 1457 (2006) .....................................................................................18

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Newton v. Am. Debt Servs., Inc.,*
  2015 WL 3614197 (N.D. Cal. June 9, 2015) ............................................................17, 18

*Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC,*
  31 F.4th 651 (9th Cir. 2022) ...................................................................................17

*Parsons v. Ryan,*
  754 F.3d 657 (9th Cir. 2014) ...................................................................................15

*Senne v. Kan. City Royals Baseball Corp.,*
  934 F.3d 918 (9th Cir. 2019) ...................................................................................10

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.,*
  559 U.S. 393 (2010) ...................................................................................................9

*Smith v. Keurig Green Mountain, Inc.,*
  2020 WL 5630051 (N.D. Cal. Sept. 21, 2020) .........................................................19

*Tait v. BSH Home Appliances Corp.,*
  289 F.R.D. 466 (C.D. Cal. 2012) ..............................................................................17

*Teixeira v. Cnty. of Alameda,*
  873 F.3d 670 (9th Cir. 2017) ...................................................................................11

*Torres v. Mercer Canyons Inc.,*
  835 F.3d 1125 (9th Cir. 2016) ...........................................................................16, 17

*Tyson Foods, Inc. v. Bouaphakeo,*
  577 U.S. 442 (2016) .................................................................................................16

*Walker v. Life Ins. Co. of the Sw.,*
  953 F.3d 624 (9th Cir. 2020) ...................................................................................17

*Wal-Mart Stores, Inc. v. Dukes,*
  564 U.S. 338 (2011) ...............................................................................11, 15, 16, 20

*Wolin v. Jaguar Land Rover N. Am., LLC,*
  617 F.3d 1168 (9th Cir. 2010) .................................................................................13

*Wortman v. Air New Zealand,*
  326 F.R.D. 549 (N.D. Cal. 2018) .............................................................................14

<u>Statutes</u>

Cal. Bus. & Prof. Code § 22578 ...............................................................................12

Cal. Civ. Code §§ 1798 ................................................................................................12

Cal. Const. art. 1, § 1 ..................................................................................................12

<u>Other Authorities</u>

1 McLaughlin on Class Actions § 5.60 ..................................................................19, 20

2 Newberg on Class Actions § 4:38 (5th ed. 2014) ....................................................15

Restatement (Third) of Restitution and Unjust Enrichment § 51 ...............................20

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.      INTRODUCTION

Through CLEAR, Thomson Reuters sells a vast array of personal information about virtually everyone in California. With the click of a button, a paying customer can find comprehensive cradle-to-grave dossiers on hundreds of millions of people, containing billions of data points aggregated from public and non-public sources: social security numbers, criminal and court records, real-time booking information, utility and DMV records, and even personal information about an individual's family and associates.

But that access does not come cheap. Thomson Reuters has collectively charged its customers—including private corporations, law enforcement, debt collectors, towing services, private investigators, even ██████████████████ millions of dollars each year to subscribe to CLEAR.

And while Thomson Reuters takes great pains to make as much information on Californians available to its customers as possible, it makes no effort to notify Californians that their information is available for sale. In fact, the vast majority of people are entirely unaware that CLEAR exists, let alone that Thomson Reuters is selling access to dossiers that include their most personal data. Instead of compensating Californians for their personal information or obtaining their consent to make it available through CLEAR, the company buys data from third parties including private data aggregators. It then uses proprietary algorithms to associate this data with comprehensive individual profiles made searchable on CLEAR. The result for paying customers is access to what the *New York Times* described as an "ever-evolving 360-degree view of U.S. residents' lives."[1] And the result for Thomson Reuters is millions of dollars in profits.

Plaintiffs Cat Brooks and Rasheed Shabazz filed this case to stop Thomson Reuters from violating the rights of Californians to control the use of their own personal information. Thomson Reuters' decision to make available for sale Californians' personal information without their consent or compensation is an "unfair business practice" under the state's Unfair

---

[1] McKenzie Funk, *How ICE Picks Its Targets in the Surveillance Age*, N.Y. Times (Oct. 3, 2019) https://www.nytimes.com/2019/10/02/magazine/ice-surveillance-deportation.html.

Competition Law—one that cannot be reconciled with California's well-established public policy protecting privacy and the harms of which far outweigh any benefit. In addition to injunctive relief, Plaintiffs also seek disgorgement of all the profits that Thomson Reuters unjustly retained at Californians' expense.

This case is ideally suited for class treatment. Thomson Reuters' business practices are uniform across the class. Nothing about the company's licensing, collection, aggregation, analysis, or sale of data on CLEAR turns on anything about any particular class member. The harms to the class are also uniform. Every class member has been deprived of the right to exercise control over the use and sale of their personal information. And nothing about the relief is individualized either. Enjoining Thomson Reuters from offering Californians' personal information for sale without their consent would benefit Californians; and the monetary relief is merely the net profit that the company generated from making the class members' personal data available through CLEAR. For these reasons and more, this case easily satisfies Rule 23's requirements. The Court should therefore certify the class.

## II.     BACKGROUND

Thomson Reuters' CLEAR is based on a simple premise: a "one-stop shop" for information on nearly all Californians. *See* Ex. 1 (Fox Dep.) at 36:1-37:23, 38:15-24, 150:2-9;[2] Ex. 2 (CLEAR Overview Document I); Ex. 3 (CLEAR Working With Law Enforcement Document); *see also* Ex. 4 (Report of Professor Joseph Turow) at 10-12, 17. Thomson Reuters collects vast quantities of public and non-public personal information about individuals, aggregates that information into comprehensive profiles, and sells access to those profiles to a wide range of customers—all without obtaining consent. *See* Ex. 5 (Buckethal Dep.) at 23:5-25, 32:13-23; Ex. 1 (Fox Dep.) 36:1-37:23, 38:15-24, 98:19-99:20, 150:8-9, 189:16-23; Ex. 6 (Godlewski Dep.) at 17:9-10, 164:10-12; Ex. 2; Ex. 3; Ex. 4 (Turow Report) at 10-12. While Thomson Reuters' marketing highlights the customers it would prefer to serve as the face of its product, the company allows a wide range of customers to access Californians' personal information for a variety of

---

[2] All citations to exhibits refer to exhibits to the Mura Declaration unless otherwise noted.

purposes: Immigration & Customs Enforcement, casinos, debt collectors, towing services, private investigators, and thousands of other corporations have all bought access to CLEAR. Ex. 7 (Thomson Reuters Responses to Pls.' First Set of Interrogatories at 15); Ex. 8 (CLEAR Subscriber List 2014); Ex. 9 (CLEAR Subscriber List 2015-2022). Most Californians have no idea their information is available for sale through CLEAR, and none have affirmatively consented—Thomson Reuters does not even ask Californians for their consent. *See* Ex. 6 (Godlewski Dep.) at 151:22-152:4, 163:15-21, 164:10-12; Ex. 10 (Thomson Reuters' Privacy Statement); Ex. 11 (Thomson Reuters' Public Records Privacy Statement); Ex. 4 (Turow Report) at 15-16.

A.   **The CLEAR platform makes available a vast array of personal information about Californians without first obtaining their consent.**

"CLEAR contains information on pretty much all consumers[.]" Ex. 1 (Fox Dep.) at 150:8-9. Through these consumer profiles, CLEAR offers its customers access to a vast array of personal information: Even before it is populated with data, a representative sample CLEAR report is twenty-six pages long with forty categories of records that may be available. Ex. 12 (Sample CLEAR Report); Ex. 13 (Def.'s Answer to Pls.' Request for Admission No. 1). Reports on Californians can include names, photographs, contact information, relatives, associates, social security numbers, live cell phone records, location data from billions of license plate detections, real-time booking information from thousands of facilities, gender, race, current and historical driver's licenses, marriage and divorce records, professional and recreational licenses or permits, work history, education, aliases, current and historical addresses, utility services, military records, political donations, voter registrations, criminal records, community service information, arrest records, liens and judgments, bankruptcy records, civil lawsuits, real property and deed transfers, property tax records, motor vehicle information, unclaimed assets, and more. *See* Ex. 12; Ex. 14 (CLEAR for Federal Government Investigations). They can include anything from an individual's physical characteristics, *see* Ex. 12 at 12, to whether an individual had an abortion. Ex. 15 (Email 8/23/21). Thomson Reuters seeks to ensure that as much information as possible—from arrests to expunged records—is available to its customers. *See*

Ex. 16 (CLEAR Training Quiz); Ex. 1 (Fox Dep.) at 32:20-33:3, 156:11-157:4; Ex. 6 (Godlewski Dep.) at 220:1-20.

 Thomson Reuters benefits from CLEAR's uniform and comprehensive data coverage—the more information available, the more customers it can attract, and the more those customers may search, the more valuable CLEAR becomes. *See* Ex. 6 (Godlewski Dep.) at 220:1-20. Naturally, the company markets CLEAR's ability to give its customers access to billions of records, *see, e.g.*, Ex. 17 (CLEAR Child Support Document), spanning thousands of data sets, so that its customers can "easily connect information about people" that might otherwise exist only in disaggregated form—or not publicly at all. *See* Ex. 18 (CLEAR Webpage); Ex. 4 (Turow Report) at 17. Through CLEAR, Thomson Reuters has offered customers access to hundreds of millions of phone records, criminal and court records, driver's license records, motor vehicle records, consumer records, and motor vehicle service records, along with tens of millions of arrest records and work affiliations, and hundreds of thousands of utility listings, sex offender registry records, and conceal and carry weapons permits. *See* Ex. 16; Ex. 19 (Email 1/22-1/25); Ex. 20 (Email 3/18-3/23); Ex. 1 (Fox Dep.) at 104:1-110:17. If the data exists, it is likely within CLEAR's reach. And CLEAR routinely updates its available data sets to bring in new records once created. *See, e.g.*, Ex. 21 (CLEAR RTIA Spreadsheet) (showing coverage and update frequency for arrest records). If someone was just arrested in ██████████, for example, CLEAR may reflect that arrest within a week—and that record may remain available through CLEAR even if the arrest was later sealed or expunged. *See, e.g.*, *id.* at "Arrest Record Coverage" tab, row 16; Ex. 1 (Fox Dep.) at 156:11-157:4.

 Thomson Reuters collects the vast majority of the data available through CLEAR in the same way: It licenses it through ████████ third parties (everyone from third party data aggregators to credit bureaus to law enforcement). *See* Ex. 22 (Def.'s Second Supplemental Resp. to Pls.' Interrog. No. 1); Ex. 23 (August 2017 Public Records Powerpoint); Ex. 24 (February 2021 Licensor Table). All records, once licensed, are processed and standardized for storage and searchability. *See* Ex. 7 (Def.'s Resp. to Pls.' First Set of Interrog. at 20-21); Ex. 1 (Fox Dep.) at 60:21-61:14. They are then made available for customers to search. *See* Ex. 7 at 21; Ex. 25 (CLEAR

Plans Table); Ex. 26 (Search Spreadsheet). Customers may search for single individuals, or run "batch" searches for many individuals at once—up to 1 million people at a time. *See* Ex. 27 (CLEAR Brochure); Ex. 28 (CLEAR Batch Brochure); Ex. 29 (CLEAR Batch December 2021 Notes); Ex. 18. Even CLEAR's individual search function sees substantial search volume—with tens of millions of searches in 2020 alone. *See* Ex. 30 (Email 11/6); Ex. 26.

Each step of Thomson Reuters' data-aggregation and compilation process is uniform. The basic building blocks of CLEAR are consumer records, which Thomson Reuters gathers for virtually all individuals from the third parties that sell it data.[3] After processing and normalizing the data, Thomson Reuters uses its in-house technology to connect those data whenever possible to the profile of a single individual or entity already included in CLEAR. *See* Ex. 35 (CLEAR Overview Document II); Ex. 36 (CLEAR White Paper); Ex. 6 (Godlewski Dep.) at 172:22-173:5; *see also* Ex. 1 (Fox Dep.) at 35:16-37:23 (observing that it is "rare that a brand new consumer will show up in the CLEAR database"). In order to organize these expansive data so that its customers can quickly navigate through them, Thomson Reuters applies its "proprietary pinning process" and patented "entity resolution database" to all data, which associates particular records with particular individuals. *See* Ex. 1 (Fox Dep.) at 95:3-6, 102:16-103:5, 169:21-170:4; Ex. 37 (CLEAR Marketing Points); Ex. 38 (Email 5/20-6/25); Ex. 39 (CLEAR Overview Document III); Ex. 40 (ERD Patent); Ex. 35.

Thomson Reuters does all this without ever seeking consent from Californians. The company does not seek consent before acquiring their personal information. *See* Ex. 10; Ex. 6 (Godlewski Dep.) at 151:22-152:4, 163:15-21, 164:10-12; Ex. 4 (Turow Report) at 15. It does not seek consent before it melds their personal information into comprehensive profiles. *See* Ex. 10;

---

[3] *See, e.g.,* Ex. 31 ("Jane" Powerpoint) ██████████████████████████
████████████████████████████████ Ex. 32 (August 2015 Legal Powerpoint)
████████████████████████████████; Ex. 33 (Email 6/15-7/5) ( ███████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████; Ex.
6 (Godlewski Dep.) at 191:10-13; Ex. 34 (July 2020 Public Records Powerpoint).

Ex. 6 (Godlewski Dep.) at 151:22-152:4, 163:15-21, 164:10-12; Ex. 4 (Turow Report) at 15. And it does not seek consent to make their personal information available for purchase by its thousands of CLEAR customers. *See* Ex. 10; Ex. 6 (Godlewski Dep.) at 151:22-152:4, 163:15-21, 164:10-12; Ex. 4 (Turow Report) at 15; Ex. 9.

Thomson Reuters claims to restrict some customers' access to some data, cherry-picking terms from statutes like the Fair Credit Reporting Act and Gramm-Leach-Bliley Act. *See* Ex. 7 at 15-18. But lack of consent is not one of Thomson Reuters' restrictions. *See id.* And it executes its supposed restrictions by purporting to "verify" its customers' business identities, and then simply having those customers say that they have a "permissible use" for accessing information in CLEAR. *See id.* at 14-17; Ex. 41 (June 2021 Risk/Fraud Powerpoint); Ex. 42 (February 2021 Risk/Fraud Powerpoint); Ex. 43 (CLEAR Organizational Flowchart). Unsurprisingly, that doesn't translate into customers actually obeying those restrictions.[4] And Thomson Reuters has considered ███████████████████████████████████████████ *See* Ex. 50 (Email 12/9) (Thomson Reuters analysts discussing that they ██████████████████████████████████ ████████████████████████████████████ Ex. 51 (Email 6/22-6/23) (discussing ██████████████████████████████████████████████████████████ ██████████████████████ Ex. 52 (Email 7/10-10/26); Ex. 53 (Email 6/29-8/11).

That is not the only way Thomson Reuters endeavors to maximize the amount of information available to its customers. For example, when California's legislature passes laws protecting Californians' ability to control their personal information, ███████████████ ████████████████████████████████. *See* Ex. 54 (Email 4/6) (discussing

---

[4] *See* Ex. 44 (Email 6/13-6/14) ████████████████████████████████████████ ███████████████████████████████████████[.]"); Ex. 45 (Email 7/17-2/13) ████████████████████████████████████████████████; Ex. 46 (Public Records Compliance Chart); Ex. 47 (Email 3/5-4/20) ████████████████████████████████████████ ███████████ Ex. 48 (Email 1/28-1/29) ████████████████████████████████████████ ████████████████████████████████████████████████; Ex. 49 (Email 11/21-12/9) ██████████

1

2  ███████████████████████████████████████████████████; Ex. 55 (Email

3  2/2-2/11) ████████████████████████████████████████████████

4  ████████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████████

6  ██████████████████████████████; *see also* Ex. 56 (Email 11/19-11/22) (discussing how

7  Thomson Reuters found ████████████████████████████████████████████

8  ████████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████████

10  ██████; Ex. 57 (Email 11/15); Ex. 1 (Fox Dep.) at 121:15-123:12, 178:2-24.

**B.   Thomson Reuters generates substantial profits from selling access to the CLEAR database to a wide range of customers.**

Since 2017, Thomson Reuters has made over ██████ million selling access to its "vast collection of public and proprietary records." *See* Ex. 58 (2017 Investigations Document); Ex. 9; Ex. 59 (Report of Finance Scholars Group or "FSG Report") at 7, 10, 12-13; Ex. 60 (Def.'s First Supp. Answer to Pls.' Interrog. 16). As it has developed the scale and scope of its data coverage, CLEAR has only become more profitable, seeing revenues grow from ████████████████████ ████████████████. *See* Ex. 60.

CLEAR generates these revenues from a laundry list of clients that are ████████████████ ████████████ corporate and government customers. *See, e.g.*, Ex. 9; Ex. 59 (FSG Report) at 7, 10, 12-13; Ex. 1 (Fox Dep.) at 50:10-15. CLEAR's customers include technology companies, insurance agencies, casinos, financial institutions, management consultants, property appraisers, private investigators, towing and asset recovery companies, debt collectors, capital corporations, fast food companies, megachurches, manufacturers, and more. *See* Ex. 9. And Thomson Reuters offers CLEAR to these varied customers for a central purpose: "████████████ ████████████████" *See* Ex. 61 (September 2020 Powerpoint). Thomson Reuters markets CLEAR as a tool to save its customers money. *See* Ex. 6 (Godlewski Dep.) at 33:4-7; Ex. 62 (Risk Inform Document). Many, if not most, of the purposes Thomson Reuters' customers self-report for

using CLEAR center around money—debt collection, for example. *See, e.g.*, Ex. 61; Ex. 59 (FSG Report) at 12 n. 42, 13 n. 47.

**C.     Thomson Reuters does not inform Californians that their personal information is available through CLEAR, nor does it make any meaningful effort to enable Californians to correct or remove their information.**

While Thomson Reuters works hard to make available all the information it can on Californians, there is no evidence that it takes similar steps to make Californians aware of CLEAR. *See, e.g.*, Ex. 6 (Godlewski Dep.) at 151:22-152:4, 163:15-21, 164:10-12; Ex. 4 (Turow Report) at 15. Thomson Reuters' Senior Director of Marketing, for example, knew of no efforts to affirmatively inform people that their information is available through CLEAR, or whether their information has been searched. *See* Ex. 6 (Godlewski Dep.) at 151:22-152:4, 163:15-21, 164:10-12; Ex. 4 (Turow Report) at 15. In fact, for the most part, the general public does not know about CLEAR at all. *See, e.g.*, Ex. 6 (Godlewski Dep.) at 164:10-12.

But if Californians did learn that their information is available through CLEAR, Thomson Reuters makes it difficult for them to remove or correct their information. *See* Ex. 4 (Turow Report) at 15-16; Ex. 10; Ex. 11. To even request that Thomson Reuters refrain from making a person's information available, a person would have to (1) know that the company does so in the first place, (2) find links buried in small print in the footer of TR's webpages, (3) find a "supplemental" California statement buried in a general statement behind those links, and (4) navigate through multiple "portals" to submit their request. *See, e.g.*, Ex. 63 (CLEAR Customer Support Webpage); Ex. 64 (CLEAR Plans and Pricing Webpage); Ex. 10; Ex. 11; Ex. 65 (Thomson Reuters' Personal Information Request Portal); Ex. 66 (Thomson Reuters' Suppression, Statement, Correction Webpage). If a Californian somehow manages to do all that, they may still only be able to review or delete their data by providing yet more personal information, such as recent bills or a copy of a driver's license, through a prolonged and difficult process. *See* Ex. 10; Ex 67 (Email 2/14-8/3); Ex. 68 (Brooks Decl.) at ¶7; Ex. 69 (Shabazz Decl.) at ¶7; Ex. 11; Ex. 66; Ex. 4 (Turow Report) at 16-17.

Then, assuming someone manages to successfully navigate this labyrinthine process, Thomson Reuters still may not fully remove or correct their information. *See* Ex. 10; Ex. 11; Ex.

1 (Fox. Dep.) at 95:4-96:19; Ex. 70 (Personal Information Requests Spreadsheet) TR-BROOKS017559 For example, some data available through CLEAR is stored on Thomson Reuters' third-party licensee's servers, and is provided to CLEAR customers through "one of [CLEAR's] live gateways." *See* Ex. 11; Ex. 7 at 20; Ex. 1 (Fox Dep.) at 69:8-16, 96:5-16. Thomson Reuters will not remove or correct this information, nor will it remove information from "databases comprising information made available by government agency." *See* Ex. 11; Ex. 7 at 20; Ex. 1 (Fox Dep.) at 69:8-16, 96:5-16. Instead, Thomson Reuters uniformly disavows responsibility for the accuracy of the data within its records, stating that it cannot "independently verify or validate the accuracy and completeness of the data" and "expressly does not warrant the comprehensiveness, completeness, accuracy, or adequacy of the information for any purpose." *See* Ex. 7 at 20; Ex. 4 (Turow Report) at 21.

### III.    STATEMENT OF THE ISSUES TO BE DECIDED

Whether Plaintiffs have satisfied the requirements of Rule 23(a) and Rule 23(b) such that a class may be certified as either a hybrid Rule 23(b)(2)/(b)(3) class or, in the alternative, as a single Rule 23(b)(3) class, while appointing named plaintiffs Cat Brooks and Rasheed Shabazz as class representatives, and Gibbs Law Group LLP and Cohen Milstein Sellers & Toll PLLC as class counsel.

### IV.    ARGUMENT[5]

Rule 23 "creates a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010). The purpose of the Rule 23 requirements is to determine whether a class is "sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). Although the Court's analysis for class-certification is "rigorous" and can "overlap with the merits of the plaintiff's underlying claim," the Court may consider merits questions "only to the extent[ ]that they are relevant to determining whether

---

[5] Plaintiffs filed a motion for leave to file an amended complaint. ECF No. 123. The Proposed First Amended Complaint is attached as Exhibit 1 to that motion. ECF No. 123-1. References to Plaintiffs' amended complaint herein refer to that document; however, all substantive allegations can also be found in Plaintiffs' original complaint. *See* ECF No. 1-1.

the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465–66 (2013) (citation omitted).

Where, as here, the plaintiffs can satisfy the requirements of both Rule 23(a) and Rule 23(b), courts are required to certify the class. Rule 23(a) requires that Plaintiffs show that: (1) the class is so numerous that joinder of all class members impracticable, (2) there are common factual or legal issues, (3) the named plaintiffs' claims are typical of the class, and (4) the named plaintiffs and their counsel will fairly and adequately protect the class's interests. Rule 23(b) identifies "three different types of classes" and provides the requirements for each. *Senne v. Kan. City Royals Baseball Corp.*, 934 F.3d 918, 927 (9th Cir. 2019) (citation omitted). A class action may be certified under Rule 23(b)(2) if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." And a class may be certified under Rule 23(b)(3) if "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

Plaintiffs here seek certification of the following proposed class:

> All persons who, during the limitations period, both resided in the state of California and whose information Thomson Reuters made available for sale through CLEAR without their consent.

Am. Compl. at 15 (ECF No. 123-1).[6] This class comfortably meets Rule 23's criteria. Thomson Reuters' business practices are uniform: It collects, analyzes, and aggregates Californians' personal information and offers it for sale on CLEAR without consent or compensation. The

---

[6] Plaintiffs' proposed class definition excludes officers and directors of Thomson Reuters, class counsel, the judicial officers presiding over this action, and the members of their immediate family and judicial staff. *See* Am. Compl. at 15 (ECF No. 123-1). Plaintiffs' proposed class definition is co-extensive with, if not narrower than the previous definition, reflecting a more precise understanding of how CLEAR operates and moving "during the limitations period" so that it inarguably applies to both residency and whether information was made available for sale through CLEAR. *See id.*

injuries to the class are also uniform: Every class member has been deprived of the right to exercise meaningful control over the use and sale of their personal information. Determining liability will also be a classwide inquiry: The Court will weigh the utility of Thomson Reuters' business practices against the harms those practices cause to Californian consumers, and assess whether Thomson Reuters unjustly retained the profits derived from its nonconsensual sale of the class members' information. As explained below, *every* key question of law and fact in this case is common. Plaintiffs respectfully ask the Court to certify their claims for class treatment.

**A.    This action satisfies Rule 23(a)'s requirements.**

**1.    The class is sufficiently numerous.**

To begin, Rule 23(a)(1) is satisfied because the class is "so numerous that joinder of all members is impracticable." CLEAR includes information on "pretty much all" Americans, including virtually all Californians. *See* Ex. 1 (Fox Dep.) at 36:1-37:23, 150:2-9; Ex. 71 (Coverage Table by State); Ex. 72 (Coverage Table by County). The class therefore contains tens of millions of class members.[7] By any measure, the proposed class is sufficiently numerous for Rule 23(a)(1). *See, e.g.*, *James v. Uber Techs. Inc.*, 338 F.R.D. 123, 130 (N.D. Cal. 2021) (Chen, J.) (acknowledging courts' "general recognition" that numerosity "is satisfied when the proposed class contains one hundred or more members").

**2.    Legal and factual issues are common to the class.**

This case likewise easily satisfies Rule 23(a)(2)'s requirement that there be "questions of law or fact common to the class." Commonality is met if "even a single common question" exists, *Alcantar v. Hobart Service*, 800 F.3d 1047, 1052 (9th Cir. 2015), so long as "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *see also Castillo v. Bank of*

---

[7] The U.S. Census Bureau estimates that, as of July 2021, California's population was nearly 40 million people. *See* Annual Estimates of the Resident Population for the United States, Regions, States, District of Columbia and Puerto Rico: April 1, 2020 to July 1, 2021, available at https://www.census.gov/data/tables/time-series/demo/popest/2020s-national-total.html. Courts may take judicial notice of census data to establish population estimates. *See Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 676 n.6 (9th Cir. 2017).

*Am., NA*, 980 F.3d 723, 728 (9th Cir. 2020) ("Even a single common question of law or fact that resolves a central issue will be sufficient to satisfy this mandatory requirement for all class actions.").

As discussed in more detail in the section addressing Rule 23(b)(3)'s predominance requirement, the most important questions in this case are all common. *See infra* Section IV.B.2 at 16-21. For example, central to both the UCL and unjust-enrichment claims are several common questions of law and fact, including: (1) did Thomson Reuters seek the class members' consent or compensate them before making their personal information available for sale through CLEAR, and (2) did Thomson Reuters give class members any meaningful ability to control the use of their personal information once it was offered through CLEAR?

Common questions will also drive the resolution of both claims. As to the UCL claim, for example, both unfairness tests turn on common questions, including: (1) is "the harm to the public" from making Californians' personal information available for sale through CLEAR without their consent "greater than the utility" of allowing Thomson Reuters to not seek class members' consent before selling access to their information in CLEAR, *see Backus v. General Mills, Inc.*, 122 F. Supp. 3d 909, 929 (N.D. Cal. 2015); and (2) does Thomson Reuters' failure to seek Californians' consent before selling access to their information through CLEAR offend public policy as expressed in California's constitution, statutes, or regulations? *See Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 735 (9th Cir. 2007); *see, e.g.*, ECF No. 54 at 17-18 (citing provisions of California law relevant to the tethering test in this case, including Cal. Const. art. 1, § 1; Cal. Civ. Code §§ 1798.1, 1798.81.5(a); Cal. Bus. & Prof. Code § 22578). And as to unjust enrichment, the core elements are common to the class, namely: (1) did Thomson Reuters retain a "benefit" from its unfair practices, such as profits from its customers who paid to have access to the universe of information in CLEAR, including Californians' personal information; and (2) is it "unjust" for Thomson Reuters to retain the profits attributable to Californians' data being available for sale through CLEAR, when Californians never consented to Thomson Reuters using or selling their information? *See Ghirardo v. Antonioli*, 924 P.2d 996, 1003 (Cal. 1996). Each of these questions has a single, common answer that will be established using common proof.

And they are central to the validity of Plaintiffs' claims. No more is needed for Rule 23(a)(2).

### 3. The named plaintiffs' claims are typical of the class.

This case also meets Rule 23(a)(3)'s requirement that the named plaintiffs' claims be typical of the class's claims. Typicality tests "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (citation omitted). "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Castillo*, 980 F.3d at 729 (citation omitted). Plaintiffs meet this burden by showing (1) "other members have the same or similar injury," (2) "the action is based on conduct which is not unique to the named plaintiffs," and (3) "other class members have been injured by the same course of conduct." *James*, 338 F.R.D. at 132 (citation omitted).

Both named plaintiffs' claims are typical of the class. The named plaintiffs were injured in exactly the same way that all class members have been—Thomson Reuters made their personal information available for sale through CLEAR without their consent, depriving them of the right to exercise control over the use of their personas, which are their intellectual property. *See* Am. Compl. at 9-12 (ECF No. 123-1); ECF No. 1-1 at 9-12; Ex. 68 (Brooks Decl.) at ¶¶3, 7; Ex. 69 (Shabazz Decl.) at ¶¶3, 7; Ex. 73 (CLEAR Report – Cat Brooks); Ex. 74 (CLEAR Report – Rasheed Shabazz); Ex. 4 (Turow Report) at 18-19; *cf. In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 599–600 (9th Cir. 2020) (finding "collect[ing]" and "tracking" personal data "without users' consent" to create a "cradle-to-grave profile" causes "harm" to individuals' "interest in controlling their personal information"). Because Thomson Reuters' business model is collecting and selling access to personal information without the data subjects' consent, named plaintiffs' injuries were caused by the same uniform conduct that injured all class members, and thus the named plaintiffs are not subject to any unique defenses. *See supra* Section II.A at 3-7; Section II.C at 8-9. Accordingly, the named plaintiffs' claims are identical to those of the class.

1

### 4.   The named plaintiffs and class counsel are adequate representatives.

2      The final prerequisite, set forth in Rule 23(a)(4) confirms that the named plaintiffs "will

3  fairly and adequately protect the interests of the class." Adequacy has two parts: (1) that the

4  proposed representative plaintiff and his counsel do not have any conflicts of interest with the

5  proposed class; and (2) that they will prosecute this action vigorously on behalf of the class. *In*

6  *re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 566 (9th Cir. 2019) (en banc). Both are met here.

7      First, the named plaintiffs have "no conflicts of interest with other class members and

8  . . . will prosecute the action vigorously on behalf of the class." *See James*, 338 F.R.D. at 132.

9  Adequacy "imposes only a modest burden" on the named plaintiffs, and they have carried it

10  here. *In re Lendingclub Sec. Litig.*, 282 F. Supp. 3d 1171, 1182 (N.D. Cal. 2017). Ms. Brooks' and

11  Mr. Shabazz's interests are entirely aligned with those of the class: they "seek the same relief

12  and share an identical interest in proving Defendant's liability." *See Wortman v. Air New Zealand*,

13  326 F.R.D. 549, 557 (N.D. Cal. 2018); Ex. 68 (Brooks Decl.) at ¶¶8, 10; Ex. 69 (Shabazz Decl.) at

14  ¶¶8, 10. In addition, both named plaintiffs have diligently litigated this case and will continue

15  to vigorously pursue relief on behalf of the class. *See, e.g.*, Ex. 68 (Brooks Decl.) at ¶¶9-11; Ex.

16  69 (Shabazz Decl.) at ¶¶9-11.

17      Second, proposed class counsel is also adequate. They have no conflicts of interest with

18  the class and bring decades of experience in complex, plaintiffs-side litigation to this case. For

19  the past two years, Gibbs Law Group has secured tens of thousands of corporate documents,

20  deposed Thomson Reuters' employees and experts, retained experts to support the class's

21  certification efforts, and briefed and argued dispositive and discovery motions. *See* Mura Decl.

22  at ¶5. Because other counsel who have to date assisted in these efforts are not applying to be

23  appointed to represent the class, Gibbs Law Group will team up with Cohen Milstein Sellers &

24  Toll to lead this class action to its conclusion. Both are respected firms well-versed in class

25  litigation that have been appointed counsel in significant class and mass action cases, including

26  data privacy cases. *See* Mura Decl. at ¶¶4-5; Graber Decl. at ¶¶2-6.

27      Together, the named plaintiffs and proposed class counsel will continue to devote their

28  time and expertise to ensure the best outcome for the class as the case advances toward trial.

**B.     The Court should certify a Rule 23(b)(2)/(b)(3) hybrid class, or, in the alternative, a single Rule 23(b)(3) class.**

After satisfying Rule 23(a)'s requirements, a "proposed class . . . must also satisfy the requirements of one of the sub-sections of Rule 23(b), 'which defines three different types of classes.'" *Parsons v. Ryan*, 754 F.3d 657, 674 (9th Cir. 2014) (citation omitted). Here, Plaintiffs seek "a hybrid class certification approach": a Rule 23(b)(2) class for the UCL claim, which seeks only injunctive relief, and a Rule 23(b)(3) class for the unjust-enrichment claim. *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 503 (N.D. Cal. 2012) (Chen, J.) (granting hybrid certification); *see also, e.g.*, *DZ Reserve v. Meta Platforms, Inc.*, 2022 WL 912890, at *9-10 (N.D. Cal. Mar. 29, 2022) (certifying a (b)(2) class for the plaintiffs' UCL injunction claim and a (b)(3) class for the plaintiffs' monetary common law fraud claims); 2 Newberg on Class Actions § 4:38 (5th ed. 2014) (recognizing hybrid classes as "the best of both worlds, achieving judicial economies associated with group litigation while also respecting the due process rights of individuals with monetary claims"). Alternatively, because both claims meet Rule 23(b)(3)'s predominance and superiority requirements, the Court can certify a single (b)(3) class.

### 1.     The UCL claim may be certified under Rule 23(b)(2).

Rule 23(b)(2) certification is warranted where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." These "requirements are unquestionably satisfied when members of a putative class seek uniform injunctive or declaratory relief from policies or practices that are generally applicable to the class as a whole." *Parsons*, 754 F.3d at 688; *see also Ellis*, 285 F.R.D. at 536 ("Rule 23(b)(2) suits remain appropriate mechanisms for obtaining injunctive relief in cases where a centralized policy is alleged to impact a large class of plaintiffs, even when the magnitude (and existence) of the impact may vary by class member.") (citation omitted).

Plaintiffs' UCL claim for injunctive relief is perfectly suited for Rule 23(b)(2) certification. Enjoining Thomson Reuters from making Californians' personal information available for sale on the CLEAR platform without their consent is an indivisible remedy that would "provide

relief to each member of the class." *See Dukes*, 564 U.S. at 360; ECF No. 1-1 at 20; Am. Compl. at 21-23 (ECF No. 123-1). Thomson Reuters' unlawful conduct can thus be "remedied by a single classwide order." *Id.* That is all Plaintiffs need to show for Rule 23(b)(2) certification of their UCL claim. *See id.* at 362–63 (holding that, for (b)(2) classes, "there is no reason to undertake a case-specific inquiry into" predominance and superiority because they are "self-evident"). Nevertheless, if the Court declines to exercise its discretion to certify a hybrid class, it should certify a single 23(b)(3) class. As explained below, Plaintiffs also satisfy Rule 23(b)(3)'s requirements for both the UCL and unjust-enrichment claims.

### 2. Common questions predominate over any individual questions.

Rule 23(b)(3)'s predominance requirement concerns "the relation between common and individual questions in a case." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). Common questions are those where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Id.* (citation omitted). Individual questions, by contrast, are those requiring "evidence that varies from member to member." *Id.* (citation omitted). Predominance is satisfied if "the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id.* (citation omitted).

Thus, Rule 23(b)(3) "does *not* require a plaintiff seeking class certification to prove that each 'element of her claim is susceptible to classwide proof.'" *Amgen*, 568 U.S. at 469 (emphasis in original, cleaned up). The Court may certify a class "even if just one common question predominates." *Hyundai*, 926 F.3d at 557. "When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" *Tyson*, 577 U.S. at 453 (citation omitted). Predominance, in other words, "is not a counting game." *In re Juul Labs, Inc., Mktg. Sales Pracs. and Prods. Liab. Litig.*, ---F. Supp. 3d---, 2022 WL 2343268, at *9 (N.D. Cal. June 28, 2022). "'Rather, more important questions apt to drive the resolution of the litigation' carry greater weight than less significant individualized questions." *Id.* (quoting

*Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016)). In short, a plaintiff can satisfy predominance by "show[ing] that the common question relates to a central issue in the plaintiffs' claim." *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022). Plaintiffs can do so here for both claims.

*a. UCL.* Any "assessment of predominance 'begins, of course, with the elements of the underlying cause of action.'" *Walker v. Life Ins. Co. of the Sw.*, 953 F.3d 624, 630 (9th Cir. 2020) (citation omitted). To succeed on their UCL "unfairness" claim, Plaintiffs will need to establish that Thomson Reuters' conduct "offends an established public policy" or "is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 543 (Cal. 1999). The UCL's "focus [is] on the defendant's conduct, rather than the plaintiff's damages," which reflects the UCL's "larger purpose of protecting the general public against unscrupulous business practices." *In re Tobacco II Cases*, 207 P.3d 20, 30 (Cal. 2009). For this reason, "district courts in California routinely certify consumer class actions arising from alleged violations of the . . . UCL." *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 480 (C.D. Cal. 2012); *see also Tobacco II Cases*, 207 P.3d at 30 (recognizing that "[c]lass actions have often been the vehicle" for UCL actions).

Rule 23(b)(3) certification is especially "warranted" when "a plaintiff's claim under the 'unfair' prong 'hinges on the existence of a uniform business practice or series of practices amenable to some degree of precise definition.'" *Newton v. Am. Debt Servs., Inc.*, 2015 WL 3614197, at *10 (N.D. Cal. June 9, 2015) (Chen, J.) (citation omitted). That is the case here: Thomson Reuters' conduct is uniform and does not change from class member to class member. *See supra* Section II.B at 7-8. The company uses uniform data-collection, aggregation, and analysis practices to offer Californians' personal data for sale in a uniform way through CLEAR. *See supra* Section II.B at 7-8. And it uniformly does not seek any Californian's consent to do so. *See supra* Section II.C at 8-9.

California courts apply two tests to UCL unfairness claims: the balancing test and the tethering test. *See* ECF No. 54 at 13 (citing *Lozano*, 504 F.3d at 735). Proving that Thomson Reuters' nonconsensual collection and sale of the class members' personal information is unfair

under either test will be an entirely classwide exercise, and the common questions will predominate over any potential individualized issues.

Under the balancing test, Plaintiffs must show that "the harm to the public from the business practice is greater than the utility of the practice." *Backus*, 122 F. Supp. 3d at 929; *see* ECF No. 54 at 13–16. The balancing test, in other words, weighs whether the defendant's "public policy violation" is greater than "the utility" of the offending conduct. *In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. 3d 953, 990 (N.D. Cal. 2016); *see, e.g.*, *Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir. 1995) (noting that an "unfair business practices claim must be evaluated from the vantage of a reasonable consumer"). The Court's consideration of whether Thomson Reuters' business practices are "unfair" requires probing "the reasons, justifications and motives of the alleged wrongdoer"—all factors that do not change from class member to class member. *See McKell v. Washington Mutual, Inc.*, 142 Cal. App. 4th 1457, 1473 (2006) (citation omitted). The "harm to the public" resulting from Thomson Reuters' nonconsensual sale of Californians' personal information is definitionally a question that does not turn on any individualized inquiries—it asks whether Californians generally have been harmed by Thomson Reuters' offending conduct.[8] *See Backus*, 122 F. Supp. 3d at 929. Neither element of the balancing test is impacted by an individual outcome—in other words, the Court here "may make one uniform determination of whether the utility of the conduct outweighed the harm." *See Newton*, 2015 WL 3614197, at *10; *see also, e.g.*, *Ellsworth v. U.S. Bank, N.A.*, 2014 WL 2734953, at *28 (N.D. Cal. June 13, 2014) (noting that "whether harms outweigh utilities" under the UCL is a "question[] capable of classwide resolution"); *Longest v. Green Tree Servicing LLC*, 308 F.R.D. 310, 331 (C.D. Cal. 2015) (same). Common questions therefore predominate under the balancing test.

The same is true with the tethering test, which asks whether the defendant's unfairness

---

[8] Even if the harm to individual class members were relevant, the harms still would be uniform across the class: Each individual has been deprived of their right to exercise control over the use of their personal information. *See* Ex. 4 (Turow Report) at 13, 16; Ex. 68 (Brooks Decl.) at ¶3; Ex. 69 (Shabazz Decl.) at ¶3; *see also* Ex. 6 (Godlewski Dep.) at 17:9-10, 164:10-12 (noting that most of Californians do not even know that their data is offered for sale on CLEAR).

is "tethered to some legislatively declared policy" espoused in California's constitution, statutes, or regulations. *Cel-Tech*, 973 P.2d at 544. As this Court has already recognized, determining whether Thomson Reuters' nonconsensual collection and sale of Californians' personal data through CLEAR violates California's public policy requires an analysis of (1) California's statutes and regulations governing privacy and personally identifiable information, and (2) Thomson Reuters' conduct. ECF No. 54 at 17–18; *see also In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1116–17 (N.D. Cal. 2015). Because neither California law nor Thomson Reuters' business model changes by class member, "proving the claim will primarily require an investigation into [California law] and Defendant's uniform practice." *See Gaudin v. Saxon Mortg. Servs., Inc.*, 297 F.R.D. 417, 430 (N.D. Cal. 2013).

   ***b. Unjust enrichment.*** Common questions also predominate on the unjust-enrichment claim. To prevail on that claim, the class will need to show Thomson Reuters "received and unjustly retained a benefit at [their] expense." *See ESG Capital Partners, LP v. Stratos*, 828 F.3d 1023, 1038 (9th Cir. 2016). A "benefit" is "any form of advantage," including when "one saves the other from expense or loss." *Ghirardo*, 924 P.2d at 1003. Such benefits must be disgorged when "the circumstances of its receipt or retention are such that, as between the two [parties], it is unjust for [the beneficiary] to retain it." *Id.*

   Class treatment of unjust enrichment claims is appropriate when the claim "raises the same legal issues as to all class members." *Smith v. Keurig Green Mountain, Inc.*, 2020 WL 5630051, at *5 (N.D. Cal. Sept. 21, 2020) (certifying unjust enrichment class); *see, e.g., Allegra v. Luxottica Retail N. Am.*, 341 F.R.D. 373, 460 (E.D.N.Y. 2022) (certifying California unjust-enrichment class and collecting cases). When evaluating whether an unjust enrichment claim can be certified, courts focus on the "plaintiffs' theory of the case" to establish the relevant framework. *See Longest*, 308 F.R.D. at 330. In so doing, courts certify unjust enrichment claims for class treatment when the plaintiffs allege that the class members were all harmed in the same manner, even despite potential factual differences. *See id.* Put differently, "[c]ertification of an unjust enrichment class may be proper if it is clear that the defendant had uniform interactions or transactions with all members of the putative class so that it is reasonable to

conclude that no significant equitable differences exist in the status of class members." 1 McLaughlin on Class Actions § 5.60.

That precisely describes this case. Plaintiffs' "theory" of unjust enrichment here is that Thomson Reuters' conduct (obtaining the class members' personal information and making it available for sale on CLEAR without consent) unjustly resulted in the company retaining a benefit (the revenues and profits derived from doing so). *See Longest*, 308 F.R.D. at 330. Determining whether it is unjust for Thomson Reuters to retain its profits without first obtaining Californians' consent to sell access to their personal information depends solely on common questions of law and fact because Thomson Reuters acts uniformly with respect to the class. *See supra* Section II.A at 3-7; Section II.C at 8-9. Whether Thomson Reuters "unjustly" profited from these practices is therefore a question that can be answered in "one stroke" for the entire class—nothing turns on any individual class member. *See Dukes*, 564 U.S. at 350.

Plaintiffs can also show that their requested monetary relief is "capable of measurement on a classwide basis" and "consistent" with Plaintiffs' theory of liability. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 34-35 (2013). Plaintiffs' theory of unjust enrichment is straightforward: Thomson Reuters unjustly retained profits generated from making the class members' personal information available for sale on CLEAR without their consent. Disgorging Thomson Reuters' unjustly retained profits is a remedy consistent with Plaintiffs' theory of unjust enrichment liability—both focus on Thomson Reuter's conduct and profits, rather than the particular injury or amount of damages sustained by individual class members. The measure of the disgorgement here, therefore, is the company's net profits from CLEAR that are attributable to the use of the class members' personal data. *See* Restatement (Third) of Restitution and Unjust Enrichment § 51. This measure can be derived from Thomson Reuters' own financial statements and requires only basic accounting and arithmetic. It can easily, therefore, be performed on a classwide basis. Indeed, Plaintiffs' expert, Terry Lloyd of Finance Scholars Group, Inc., has set out a reasonable methodology for calculating the total amount of unjustly retained profits—all that is required at this stage. Ex. 59 (FSG Report) at 7-16; *see also GHK Assoc. v. Mayer Grp., Inc.*, 224 Cal. App. 3d 856, 873 (1990) (noting California law requires "only that some reasonable

basis of computation of damages be used . . . even if the result reached is an approximation").

In sum, whether and to what extent Thomson Reuters' profits from Californians' personal information being included in CLEAR without consent are "unjustly retained" is a natural fit for classwide determination.

### 3. A class action is superior to other ways of adjudicating this controversy.

Finally, Plaintiffs meet Rule 23(b)(3)'s requirement that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." When evaluating superiority, the Court considers a variety of factors including class members' interest in individually controlling separate actions, litigation that class members have already commenced, the desirability of concentrating litigation in one forum, and expected difficulties in managing a class action. *See James*, 338 F.R.D. at 143. Refusing to certify a class "on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule," *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 140 (2d Cir. 2001) (Sotomayor, J.), particularly "given the variety of procedural tools courts can use to manage the administrative burdens of class litigation." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1128 (9th Cir. 2017).

Here, individual litigation is neither a fair nor efficient solution for either party. Most class members are not even aware of CLEAR's existence and would therefore not know to bring individual claims *see* Ex. 6 (Godlewski Dep.) at 17:9-10, 164:10-12, which, in any event, would likely not be worth the cost of individual litigation. *See* Ex. 59 (FSG Report) at 18; *Amgen*, 568 U.S at 478 ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights."). Moreover, attempting to disgorge Thomson Reuters' profits for each individual plaintiff who brings an unjust enrichment claim would risk inconsistent verdicts, increase costs among class members and for Thomson Reuters, and generate largely duplicative litigation that could unnecessarily flood the Court's docket. Certifying this case as a class action, by contrast, allows the Court to "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly

situated, without sacrificing procedural fairness or bringing about other undesirable results."
*Amchem*, 521 U.S. at 615.

Because Californians are unlikely to pursue these claims individually, and Plaintiffs' claims are particularly well-suited to class adjudication, the Court should certify the class.

## V.      CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court certify a hybrid (b)(2) and (b)(3) class or, in the alternative, certify both claims for class treatment pursuant to Rule 23(b)(3), appoint Plaintiffs Cat Brooks and Rasheed Shabazz as class representatives, and appoint Gibbs Law Group and Cohen Milstein Sellers & Toll as class counsel.

DATED: December 1, 2022                          Respectfully submitted,

                                                  */s/ Andre M. Mura*
                                                  Andre M. Mura

                                                  Eric H. Gibbs (SBN 178658)
                                                  Andre M. Mura (SBN 298541)
                                                  Amy M. Zeman (SBN 273100)
                                                  Mark H. Troutman (pro hac vice)
                                                  Ezekiel S. Wald (SBN 341490)
                                                  Hanne Jensen (SBN 336045)
                                                  **GIBBS LAW GROUP LLP**
                                                  1111 Broadway, Suite 2100
                                                  Oakland, California 94607
                                                  Telephone: (510) 350-9700
                                                  Facsimile: (510) 350-9701
                                                  ehg@classlawgroup.com
                                                  amm@classlawgroup.com
                                                  amz@classlawgroup.com
                                                  mht@classlawgroup.com
                                                  zsw@classlawgroup.com
                                                  hj@classlawgroup.com

                                                  Geoffrey A. Graber (SBN 211547)
                                                  Karina G. Puttieva (SBN 317702)
                                                  **COHEN MILSTEIN SELLERS & TOLL PLLC**

1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
ggraber@cohenmilstein.com
kputtieva@cohenmilstein.com

*Attorneys for Plaintiffs and the Proposed Class*