# EXHIBIT 1

## (Redacted)

1      UNITED STATES DISTRICT COURT FOR THE

2        NORTHERN DISTRICT OF CALIFORNIA

3         SAN FRANCISCO DIVISION

4   *  *  *  *  *  *  *  *  *  *  *  *  *

5  CAT BROOKS and RASHEED SHABAZZ, individually

   and on behalf of all others similarly situated,

6

       Plaintiffs,

7

    vs.          Case No.  3:21-cv-1418-EMC

8

   THOMSON REUTERS CORPORATION,

9

       Defendant.

10

   *  *  *  *  *  *  *  *  *  *  *  *  *

11

        ***** CONFIDENTIAL *****

12

13  REMOTE VIDEOTAPED DEPOSITION OF STEVEN FOX

14

         May 16, 2022

15       10:02 a.m. to 5:36 p.m.

16     REPORTED BY ANITA KORNBURGER

      REGISTERED PROFESSIONAL REPORTER

17

18

        ***** CONFIDENTIAL *****

19

20  *  *  *  *  *  *  *  *  *  *  *  *  *

21

22

23

24

25

```
 1              A P P E A R A N C E S
 2   GIBBS LAW GROUP LLP, by
     Mr. Ezekiel S. Wald
 3   1111 Broadway, Suite 2100
     Oakland, California 94607
 4   510-350-9700
     zsw@classlawgroup.com
 5   Appearing by videoconference on behalf of the
     Plaintiffs.
 6
     SURVEILLANCE TECHNOLOGY
 7   OVERSIGHT PROJECT, by
     Mr. Albert Fox Cahn (pro hac vice)
 8   Mr. Evan Enzer
     Mr. David Siffert
 9   40 Rector Street, 9th Floor
     New York, NY 10006
10   albert@stopspying.org
     Appearing by videoconference on behalf of the
11   Plaintiffs.
12   PERKINS COIE LLP, by
     Ms. Nicola Menaldo
13   Ms. Erin Earl
     Ms. Susan Fahringer
14   1201 Third Avenue, Suite 4900
     Seattle, Washington 98101-3099
15   nmenaldo@perkinscoie.com
     Appearing by videoconference on behalf of the
16   Defendant.
17   ALSO PRESENT:  Jon Olson - Thomson Reuters
18
                    I N D E X
19
20   Examination by                        Page
21   Mr. Fox Cahn. . . . . . . . . . . . . 6
22
23
24
25
```

1    the question?

2    BY MR. FOX CAHN:

3       Q.   How did Thomson Reuters acquire CLEAR?

4       A.   Thomson Reuters acquired CLEAR when one

5    of our competitors acquired a company called Choice

6    Point, and the CLEAR product was something that had

7    to be divested before that acquisition would be

8    approved.

9       Q.   And this was due to antitrust concerns?

10      A.   I believe that's the case, yes.

11      Q.   And how did CLEAR -- strike that.

12           At the time that CLEAR was acquired,

13   how did it compare to the products that CLEAR

14   offers today?

15           MS. MENALDO:  Objection, form.

16           THE WITNESS:  Yeah, I'm not -- I'm not

17   very familiar with what CLEAR looked like or did at

18   the time it was acquired.

19   BY MR. FOX CAHN:

20      Q.   In the time you've been working with

21   CLEAR, how has it changed?

22      A.   In the time that I've been working with

23   it, again, since approximately 2010, it has become

24   a research tool used more than by government

25   entities and law enforcement, and has expanded

1    into, say, a corporate segment and, as such, new

2    features and new data has been added for those

3    additional use cases.

4        Q.   What data has been added for those use

5    cases?

6        A.   There's a lot of data that has been added

7    in the last twelve years.  I'm not going to

8    remember all of them.  But as examples, we have

9    increased our data sets containing phone numbers,

10   containing e-mail addresses, containing information

11   that would identify relationships between a

12   research subject and an employer, as well as other

13   files that meet certain regulatory needs, such as

14   data that would identify people or businesses that

15   are in the marijuana industry, and additional data

16   sources that helps identify research subjects that

17   might not be represented in the credit bureau

18   files, so consumers with early -- early to the

19   banking market consumers, younger consumers or

20   individuals that don't have the best credit.

21       Q.   And has that additional focus on

22   consumers that are early to banking included

23   minors?

24       A.   No.

25       Q.   So there has not been any minors whose

1    BY MR. FOX CAHN:

2        Q.    So there are occasions when a minor's

3    data is available on CLEAR?

4        A.    There are occasions where a minor's name

5    might show up in a record with no other identifying

6    information that would indicate that it's a minor

7    or the name of a person that's a minor.

8        Q.    You mentioned increasing the number of

9    e-mail addresses and phone numbers that are

10   available in CLEAR during the time you've worked on

11   the product.

12              Whose e-mail addresses and phone

13   numbers have been included?

14       A.    Basically consumers'.

15       Q.    So -- sorry.  Go ahead, please.

16       A.    I mean, it's a very broad question.  I

17   can't, you know, obviously produce a list of names,

18   but these files attempt to identify e-mail

19   addresses and phone numbers of -- and the owners of

20   those e-mail addresses and phone numbers, and that

21   can be -- they can be very large files.

22       Q.    Would it be fair to say that there are

23   millions of additional individuals whose e-mails

24   and phone numbers have been added to CLEAR during

25   the time you worked with the product?

```
 1        A.    In the last twelve years, I think that's

 2   a safe bet that it would number in the millions for

 3   each phones and e-mails.

 4        Q.    And this has included millions of

 5   additional consumers who previously weren't in the

 6   database?

 7        A.    No.  The vast majority of base -- based

 8   on our testing, as we're testing these files, it's

 9   actually pretty rare that a brand-new consumer will

10   show up in the CLEAR database as a result of an

11   e-mail or phone-centric file.  The subject is

12   usually already there, but these files may produce

13   different phone numbers or e-mail addresses for

14   that consumer.

15        Q.    Why is that?

16        A.    Can you clarify the question?

17        Q.    Would you say it's fair to say that CLEAR

18   contains profiles for most consumers?

19        A.    Yes, that's fair.

20              MS. MENALDO:  Objection, form.

21   BY MR. FOX CAHN:

22        Q.    I'm sorry, Mr. Fox, could you repeat your

23   answer?

24        A.    I said yes, that's fair.

25        Q.    Would you say that CLEAR likely has
```

1    profiles for more than 75 percent of consumers in

2    the United States?

3         A.   Based on our analysis, I think that is a

4    correct statement.

5         Q.   Would you say it's fair to say that CLEAR

6    has profiles on more than 90 percent of consumers

7    in the United States?

8         A.   I would say once you get to that number,

9    then I don't have -- I can't speak -- I can't

10   confirm that that is true or false.

11        Q.   Is it possible that you have that many

12   consumer profiles?

13        A.   In my opinion, it's possible, but I don't

14   know that for sure.

15        Q.   Do you believe it's likely?

16        A.   I think it's possible.

17        Q.   Would you say that CLEAR has records on

18   the vast majority of consumers in the United

19   States?

20        A.   If by "vast majority" that number

21   coincides with 90 percent, then I would say that

22   sounds right.  But I think it depends on your

23   definition of vast majority.

24        Q.   Of course.  And how many profiles do you

25   have on consumers outside the United States?

1      A.    I don't know the answer to that question.

2      Q.    Would you say you have profiles for a

3  smaller percentage of consumers outside of the

4  United States than you do for those inside the

5  United States?

6      A.    Can you clarify whether you mean all

7  consumers, international and US based?

8      Q.    So is the -- sorry.  Strike that.

9            Is the percentage of US consumers that

10  have CLEAR profiles higher than the percentage of

11  consumers that have CLEAR profiles outside of the

12  United States?

13     A.    I think I keep on missing the distinction

14  here.  US consumers in both instances?

15     Q.    No.  I'm comparing consumers within the

16  United States, American consumers, and those in

17  countries outside of the United States.  So the

18  rest of the world apart from the United States.

19     A.    Okay.  CLEAR contains predominantly US

20  consumers in the database.  There are instances,

21  but it's -- it's virtually all US consumers.

22     Q.    So it's virtually all US consumers in the

23  CLEAR database?

24     A.    That is correct.

25     Q.    All right.  Could you tell us what the

1    use cases?

2         A.   No.  We would also be able to obtain it,

3    but we would not be allowed to allow certain

4    customers or certain use cases.  We would not be

5    allowed to use those data elements in research or a

6    report for certain customers or certain use cases.

7         Q.   All right.  So, you know, some CLEAR

8    customers are able to access more data than others;

9    is that correct?

10        A.   Every CLEAR end user has to declare a

11   permissible use under GLB, DPPA, and certain

12   voters' laws every time they sign into the product.

13   So for the most part, all of the data that's

14   included is -- meets those use cases under those

15   regulatory frameworks.

16             There are very isolated instances

17   where CLEAR may have to restrict certain data

18   elements from certain use cases that might prevent

19   that data flowing to a specific end user with a

20   specific use case.

21        Q.   So is it fair to say that when states

22   expand the definition of PII, they can prevent

23   CLEAR from showing the covered data to users in

24   response to queries made under certain use cases?

25        A.   That is correct.

1    BY MR. FOX CAHN:

2        Q.   All right.

3             Well, Mr. Fox, moving back to the

4    prior line of questioning, looking at the users of

5    CLEAR, you mentioned that there was an increase in

6    commercial users during your time with the product;

7    is that correct?

8        A.   I think I refer to them as corporate

9    users, but yes.

10       Q.   And what percentage of CLEAR users are

11   corporate users?

12       A.   Today?

13       Q.   Correct.

14       A.   I don't know an exact number, but I

15   believe it's about ███████████

16      ███  ██████████████████████████

17   █████

18      ███  ███████████████████████████████

19   █████████████████

20       Q.   And what sort of government agencies use

21   CLEAR?

22       A.   A variety of federal, state, and local

23   agencies that need investigative tools.

24       Q.   And what percentage of those government

25   agencies are law enforcement agencies?

1       A.   I do not.

2       Q.   How do you track what portion of

3  customers use each payment model?

4       A.   I don't track that.

5       Q.   Does Thomson Reuters track what portion

6  of users use each type of payment model?

7       A.   I'm not sure if they track that or not.

8       Q.   Do you know what type of payment model is

9  most common for CLEAR users?

10       A.   To the best of my knowledge, most CLEAR

11  customers use a subscription model for CLEAR.

12       Q.   And how does pricing work with a

13  subscription model?

14       A.   I don't know.

15       Q.   Are users charged a flat fee with a

16  subscription model?

17       A.   I don't know.

18       Q.   Does Thomson Reuters track what

19  percentage of revenue comes from each product?

20       A.   Can you define "product"?

21       Q.   Does Thomson Reuters keep track of what

22  percentage of its revenue comes from each use case

23  of CLEAR?

24       A.   Not that I'm aware of.

25       Q.   And does Thomson Reuters track what

1      Q.   Is SFTP secure file transfer protocol?

2      A.   Correct.

3      Q.   Does CLEAR also receive data from

4   licensors on physical media?

5      A.   I don't know whether Thomson Reuters does

6   that anymore.

7      Q.   Is there any documentation of how Thomson

8   Reuters receives data from licensors?

9      A.   I'm not aware of any.

10      Q.   Does Thomson Reuters have a standard SFTP

11   protocol for transferring data from a licensor?

12      A.   No.   It varies from vendor to vendor.

13      Q.   How do you clean data you receive from

14   the vendors?

15           MS. MENALDO:   Objection, form.

16   BY MR. FOX CAHN:

17      Q.   Strike that.

18           Mr. Fox, do you know what I mean by

19   the term "clean data"?

20      A.   I don't.

21      Q.   Do you process data received from

22   licensors to make it -- strike that.

23           Do you process data once you receive

24   it from licensors?

25      A.   Yes, we do.

CONFIDENTIAL - STEVEN FOX

1      Q.   Do you take steps to review that data and

2   conform it to the protocols used by the CLEAR

3   platform?

4      A.   Our processing of inbound files from our

5   vendors varies from vendor to vendor and file to

6   file, but all of them will undergo some amount of

7   processing, yes.

8      Q.   And what are the factors you consider in

9   determining how to process data?

10     A.   As I said, all data is going to get

11  processed to some degree or another, and primarily

12  it is so that however the data came to us, it needs

13  to be able to be processed in a way that CLEAR

14  recognizes it and accepts it.

15     Q.   I've just marked plaintiffs' Exhibit 5.

16  It is an e-mail chain with a Bates stamp ending in

17  the number 144207 on the bottom of the first page.

18  Can you confirm that that document is available to

19  you, Mr. Fox?

20     A.   It is available to me.

21     Q.   And can you confirm that Bates stamp is

22  visible on the bottom of the first page?

23     A.   I can confirm that, yes.

24     Q.   Please take a moment to review the

25  document.

CONFIDENTIAL - STEVEN FOX

```
 1        A.    All right.  I've read the document.

 2        Q.    Do you know what this document is?

 3        A.    Yes.

 4        Q.    What is it?

 5        A.    It's an e-mail between myself and Leah

 6  Weikert.  And there are other individuals in the

 7  e-mail chain down below.

 8        Q.    Who's Leah Weikert?

 9        A.    She, at the time, was a senior -- senior

10  marketer in our marketing department.

11        Q.    You state in the first full paragraph of

12  the e-mail sent on June 25, 2018, at 3:14 p.m.,

13  "Thomson Reuters is not the source of any of the

14  data in the" -- strike that.

15              You state, "Thomson Reuters is not the

16  source of any of the data in a CLEAR report.  We

17  are simply the vehicle for facilitating the

18  compilation of unverified data for an

19  investigation."  Did I read that correctly?

20        A.    You did.

21        Q.    What do you mean by "unverified data"?

22        A.    Unverified data from an industry

23  standpoint indicates data that has not been

24  independently verified.  It is simply as is from

25  the source.
```

```
 1   happens on a file, we analyze the different fields

 2   within a document.  And in certain instances, it's

 3   fairly obvious when a data element is not accurate,

 4   such as a zip code only containing four digits,

 5   phone numbers that are -- have the incorrect number

 6   of digits, Social Security numbers that start with

 7   the number nine, like that.

 8        Q.   And in those cases does Thomson Reuters

 9   provide that data to CLEAR customers?

10        A.   Provide which data?

11        Q.   The data you identified as having the

12   incorrect number of digits in a zip code or a phone

13   number beginning with nine, is that data provided

14   to customers?

15        A.   It depends on the type of data.  ████████

16   ████████████      █████████████████████████████████

17   ████████████████████████████████████████████████

18   ████████████████████████████████████████████

19   ████████████████████████████████████████████

20   ███████████████████████

21        Q.   So are there times when Thomson Reuters

22   obtains data and, in the course of processing,

23   identifies that it has a zip code that has the

24   wrong number of digits and it will still be

25   provided to customers?
```

1      A.   Correct.

2      Q.   And there are times when that data will

3  be removed?

4      A.   There aren't -- there wouldn't be many

5  situations where data would be removed for

6  inaccuracy such as that.  It would still be

7  presented to the user based on the other elements

8  that are contained within that document.

9      Q.   Are there any cases where that data

10  wouldn't be presented to the user?

11      A.   There are instances where data, when it's

12  being processed for inclusion into CLEAR, may not

13  be -- may not make it into the product and

14  therefore not presented to users, yes.

15      Q.   So there are times when Thomson Reuters

16  receives data that doesn't make it into the

17  product?

18      A.   Correct.

19      Q.   In the paragraph I was previously reading

20  from, it says, "While our customers are trained on

21  CLEAR, and hopefully understand the unverified

22  nature of these reports, the general public, the

23  subjects of the investigations, does not."  Did I

24  read that correctly?

25      A.   Yes.

1     Q.    Why do you hope that customers understand

2     the unverified nature of these reports?

3     A.    I hope that they understand the

4     unverified nature of the reports because that is

5     part of the initial training that is given to CLEAR

6     customers and CLEAR end users, that the data that's

7     included in a CLEAR report is unverified and

8     presented as is, and ultimately it's up to the end

9     user if they need to verify the data, that they do

10    so independently.

11    Q.    Do you want customers to understand this

12    limitation with CLEAR data?

13    A.    Yes.

14    Q.    How do you think this understanding of

15    the limitation of CLEAR data impacts how customers

16    use the CLEAR product?

17    A.    The way that it impacts the way users use

18    the product is when they perform an investigation

19    and run a CLEAR report, they will need to verify

20    any important pieces of information that's relevant

21    to their investigation.

22    Q.    What percentage of customers do you think

23    understand that CLEAR reports are unverified?

24          MS. MENALDO:  Objection, form.

25          THE WITNESS:  I don't have an answer to

1   LPR gateway delivers more than six billion

2   commercial results"; is that correct?

3        A.    That is correct.

4        Q.    What is a commercial result?

5              MS. MENALDO:  Objection.

6              THE WITNESS:  I'm not sure what a

7   commercial result is referring to as used by the

8   marketing department when they created this

9   document.

10  BY MR. FOX CAHN:

11       Q.    Are you familiar with the LPR gateway?

12       A.    I am familiar, yes.

13       Q.    And are you familiar with the type of

14  search results it provides?

15       A.    I am, yes.

16       Q.    Given that, is there something you

17  believe that the number six billion could

18  accurately represent?

19       A.    It could represent the number of records

20  within that data set.

21       Q.    And by "record," do you mean photographs

22  of automotive license plates?

23       A.    Among other data elements, yes.

24       Q.    What other data elements would it

25  include?

1   ███     ██████████████████████████

2   ████████████████████████████

3        Q.   So would the number six billion be larger

4   than the number of photos available?

5        A.   No, the six billion represents the number

6   of records, but each record would contain those

7   data elements.

8        Q.   And where it says, "New license plates

9   scans are being added at a rate of more than 150

10  million per month"; did I read that correctly?

11       A.   Yes, you did.

12       Q.   Does that reference new photographs of

13  license plates?

14       A.   That does, yes.

15       Q.   What are the sources of this data?

16       A.   The source of this data, again, subject

17  to any confidentiality in the license agreement, is

18  Motorola.

19       Q.   And does this include photographs taken

20  within California?

21       A.   It does.

22       Q.   Is this available to customers in

23  California?

24       A.   That I am not sure of.

25       Q.   Does CLEAR process LPR data prior to



1    Did I read that correctly?

2         A.    You did.

3         Q.    And what is the ERD process?

4         A.    The ERD is an internal process that we

5    have.  The acronym refers to Entity Resolution

6    Database.

CONFIDENTIAL - STEVEN FOX



20    Q.    What is enough information to pin a

21  record to an individual?

22    A.    Technically, I don't have an answer to

23  that question.

24    Q.    I've just marked Exhibit 9.  It is a

25  spreadsheet with the Bates number ending 082062.

1    entire document so you can view it properly.

2            THE WITNESS:  I will do that, because I'm

3    trying to enlarge it as well, and then the document

4    doesn't load.  So give me a minute.  I will

5    download it.

6            MS. MENALDO:  If you just click on the

7    three dots, there's an option to download.  And it

8    should do that fairly quickly.

9    BY MR. FOX CAHN:

10       Q.   Mr. Fox, have you been able to download

11   the document?

12       A.   Yes, it is downloaded.  I can see it now.

13       Q.   Do you recognize it?

14       A.   I don't specifically recognize this

15   document, no.

16       Q.   All right.  Do you recognize the

17   categories of data that are listed in the document?

18       A.   Yes, I do.

19       Q.   And are these categories of data that are

20   accessible using CLEAR?

21       A.   Yes, these are data categories that

22   appear in the CLEAR product.

23       Q.   And does this data include individuals in

24   California?

25       A.   Yes, I see some that are specific to

CONFIDENTIAL - STEVEN FOX

1   California.

2       Q.   And is this data the same throughout the

3   United States?

4       A.   No, it is not.

5       Q.   So some of these databases are only

6   applicable to individuals in California?

7       A.   The geographic coverage of each one of

8   these data categories will be different and vary

9   from state to state.

10      Q.   Which of these data categories only apply

11  to entities within California?

12      ■    ████████████████████████████████

13  █████████████████████████████

14      ■    ████████████████████████████████

15  ████████████████████

16      ■    ████████████████████████████████

17  ████████████████████████████████

18  ███████████████████

19      Q.   Are there any others?

20      A.   Yes, there are others.

21      Q.   What does it mean when it says

22  searchable?

23      A.   The searchable reference indicates that

24  within the CLEAR product, that an end user would

25  have the ability to search by that particular

```
 1            THE WITNESS:  I have no idea.  I wouldn't
 2   be able to estimate that with any degree of
 3   accuracy.
 4   BY MR. FOX CAHN:
 5        Q.   Are there any documents that you could go
 6   to to figure out how many data points are
 7   accessible in CLEAR?
 8        A.   I can't think of any.
 9        Q.   Are there any Thomson Reuters' employees
10   who you might consult who could help answer that
11   question?
12        A.   I can't think of any.  It doesn't seem to
13   be the type of figure that would be relevant.
14        Q.   So you haven't discussed the number of
15   data points accessible through CLEAR?
16        A.   I can't think of a time that I have, no.
17        Q.   I'm going to mark Exhibit 10.  It should
18   be accessible to you now on the platform.  It is a
19   document with the Bates number ending in 79617.  Do
20   you see that?
21        A.   I do see that.
22        Q.   Have you had time to review this
23   document?
24        A.   Give me a couple of minutes.  Okay.
25        Q.   In the upper right corner of the document
```

1    it says, "CLEAR's proprietary pinning process and

2    real-time live gateways provide customers with more

3    current and accurate data than insert competitor

4    name"; is that correct?

5         A.   You read that correctly, yes.

6         Q.   And then in the third box on the

7    right -- sorry.  Strike that.

8              In the third row on the right-hand

9    side it says, "CLEAR is powered by billions of data

10   points and leverages cutting-edge public records

11   technology to bring all key content together in a

12   customizable dashboard"; is that correct?

13        A.   You read that correctly, yes.

14        Q.   How is the number of data points

15   calculated?

16             MS. MENALDO:  Objection.

17             THE WITNESS:  I don't know.  And I'm not

18   even sure what the phrase "data point" means.

19   BY MR. FOX CAHN:

20        Q.   Just to go back.  Have you seen this

21   document before?

22        A.   I have not.

23        Q.   And you don't know what the data point

24   could be referencing here?

25        A.   I don't.

CONFIDENTIAL - STEVEN FOX

```
 1         Q.   I'm now marking Exhibit 11.  It is an

 2   e-mail thread with the Bates number ending in 72634

 3   appearing on the bottom of the first page.  Can you

 4   see that document?

 5         A.   I can.

 6         Q.   And I'm just going to ask you about the

 7   e-mail on the third page.

 8              MS. MENALDO:  Mr. Fox, you have the right

 9   to review the entire document.

10              THE WITNESS:  Yeah.  I will do that.  All

11   right, I've read it.

12   BY MR. FOX CAHN:

13         Q.   Looking at the top of page 3, under the

14   sentence starting, "This is what's available,"

15   there are several different categories listed;

16   correct?

17         A.   Yes.

18         Q.   What are the numbers listed next to each

19   category?

20              MS. MENALDO:  Objection, foundation.

21   BY MR. FOX CAHN:

22         Q.   Strike that.

23              So Mr. Fox, you've -- you've seen this

24   e-mail before; correct?

25         A.   I have.  I don't specifically recall it,
```

```
 1   but I'm in the e-mail chain, so I have.

 2        Q.   And it is an e-mail about the data

 3   available on CLEAR; is that correct?

 4        A.   That is correct.

 5        Q.   And in the paragraph at the head of

 6   page 3, there are several categories of data

 7   listed; correct?

 8        A.   At the top of page 3, you mean?

 9        Q.   Yes.

10        A.   Yes.

11        Q.   And then there are numbers for each line;

12   correct?

13        A.   Yes.

14   ████   █████████████████████████████████████████

15   ██████████████████████████████

16        A.   Without verifying the accuracy of the

17   information, but based on who provided that

18   information, I believe that would be the number of

19   arrest records that were available at that point in

20   time.

21        Q.   So is it fair to say that these numbers

22   reflect the number of records available at the time

23   this e-mail was sent for each of the categories

24   listed?

25             MS. MENALDO:  Objection.
```

```
 1              THE WITNESS:  I don't -- sorry.  Again, I
 2    don't know for sure, but based on the author and
 3    the subject matter of the e-mail, that's what I
 4    believe.
 5    BY MR. FOX CAHN:
 6         Q.   So this is an e-mail sent on Thursday,
 7    January 21st, at -- 2021 at 9:55 a.m. by Paul J.
 8    Wohletz; correct?
 9         A.   That's correct.
10         Q.   And he is asking, "Can you provide this
11    detail, please, ███████████████████████████
12    ████████████████████████   correct?
13         A.   That's what it says, yes.
14         Q.   And by "all of the loaded content listed
15    below," he means categories of data available in
16    CLEAR; correct?
17    ████  ██████████  ████████████████████
18    CLEAR.  CLEAR is the acronym for CLEAR.  So I'm not
19    sure what he's referring to.
20    ████  ████████████████████████
21         A.   Again, I didn't write that, so I don't
22    know.
23         Q.   And do you think it would be strange that
24    he would reference CLEAR in the subject of the
25    e-mail list and then ask a question unrelated to
```

1    CLEAR?

2        A.   Not really.  At the base of -- the data

3    that's made available in the CLEAR product, the

4    data available in CLEAR would represent the base of

5    data.  But there are features and functionality

6    within CLEAR that may contain a subset or data

7    that's only relevant to a specific use case.

8        Q.   So could this represent a subset of the

9    data available in CLEAR?

10       A.   It could.

11       Q.   Do you have any reason to doubt that the

12   amount -- strike that.

13            Do you have any reason to think that

14   the amount of data available in CLEAR is lower than

15   the numbers provided in this e-mail?

16       A.   I wouldn't be able to answer that one way

17   or another.

18       Q.   All right.  I'm now introducing

19   Exhibit 12.  It is an e-mail thread with a Bates

20   number on the first page ending in 20290.  Do you

21   see that?

22       A.   I do see that.

23       Q.   I'm just going to ask you about the

24   e-mail visible on the top of the second page.  So

25   could you please review that?

CONFIDENTIAL - STEVEN FOX

```
 1        A.   I will.
 2             MS. MENALDO:  And I'll remind you that
 3   you have the right to review the entire document.
 4   Thank you.
 5   BY MR. FOX CAHN:
 6        Q.   And apologies, I'll actually be asking
 7   about a portion at the bottom of page 3.
 8        A.   Okay.
 9        Q.   And you've had a chance to review this
10   document?
11        A.   I have.
12        Q.   What is this document?
13        A.   It is an e-mail between myself and a few
14   others.
15        Q.   And at the -- near the bottom of page 3,
16   do you see where it says, ██████████████████████
17   ████████████████████████████████████████████████
18   ███████
19        A.   I do see that.
20        Q.   Is that referencing the addition of ████
21   ████████████████ to the CLEAR -- strike that.
22             Is that referencing the addition of
23   ██████████████████ to CLEAR?
24             MS. MENALDO:  Objection, foundation.
25             THE WITNESS:  Yeah, I'm not sure what
```

1    Justin is referring to with that sentence.

2    BY MR. FOX CAHN:

3        Q.    All right.  At the top of this e-mail, it

4    says, "The excitement and madness of March is

5    spreading off the basketball courts this month and

6    into the CLEAR product through new enhancements";

7    correct?

8        A.    Correct.

9        Q.    So this is an e-mail describing

10   enhancements to CLEAR; correct?

11       A.    That appears to be the case, yes.

12       Q.    So given that this is an e-mail about

13   enhancements to CLEAR, what do you take the phrase

14   "general lift in person entities from 550 million

15   records" to mean?

16       A.    The wording of that particular sentence

17   does not make a whole lot of sense to me, so I'm

18   not sure what Justin is referring to.

19       Q.    And two bullet points below it says,

20   "Huge lift of 190 million DL records"; correct?

21       A.    Correct.

22       Q.    DL records means driver's license

23   records?

24       A.    That's correct.

25       Q.    And so given that the sentence says,

1    "Nationwide coverage for driver's licenses, huge

2    ████████████████████████████████████████████

3    ██████████████████████████████    new driver's

4    license records for the CLEAR platform?

5        A.    No, it is not.

6        Q.    What does that mean then?

7        A.    Well, the -- that portion of the e-mail

8    is ██████████████████████████████████████████

9    And we don't -- and ██████████████████████████

10   █████████████████████████████████████

11        ██    ██████████████████████████████████████

12   ██████████████████████████████████

13            MS. MENALDO:  Objection, foundation.

14            THE WITNESS:  Yeah, again, I mean,

15   it's -- it's Justin's e-mail, but given my

16   familiarity with that, contents, that is what I

17   believe he's referring to.

18   BY MR. FOX CAHN:

19        Q.    And would Justin be able to provide a

20   more complete answer?

21        A.    I don't know, but it is his e-mail, so I

22   would hope so.

23        Q.    I'm now marking Exhibit 13.  It is a

24   two-page document with a Bates number at the bottom

25   of the first page ending in 60012.  Do you see that

CONFIDENTIAL - STEVEN FOX

1      A.   Yes.  It appears to be in the format of a

2   CLEAR person report without data.

3      Q.   And is this what a report would look like

4   for an individual?

5      A.   There are many ways that customers can

6   print or customize reports, but it does look like

7   the form of a report that a customer could -- could

8   format a report, yes.

9      Q.   Does this report show every category of

10  content that might be available for an individual

11  before a customization?

12     A.   Looking at the report section summary, it

13  looks to be comprehensive.  And without doing a

14  data set by data set analysis, it looks

15  comprehensive to me.

16     Q.   Are there categories that are

17  not -- strike that.

18          Are there categories of data that are

19  not available for all individuals?

20     A.   Can you ask that question again?  I'm not

21  sure that I understand.

22     Q.   For the categories of data shown on this

23  report, are some of them only available for a

24  portion of the user -- strike that.

25          For the categories of data shown in

1   this report, is there a portion of them that are

2   only available for a portion of the individuals

3   within CLEAR's various databases?

4        A.   Assuming that a subject has a record that

5   fits into one of these categories, it should apply

6   to all users.

7        Q.   Are any of these categories of data

8   unique to California?

9        A.   I don't see any of these categories that

10  would be unique to California, but consistent with

11  my previous testimony, there are many that would

12  not contain any California data because we don't

13  get the corresponding data from California.

14       Q.   How does the information in these reports

15  get into the CLEAR database?

16       A.   When a vendor supplies us with a file,

17  again, based on previous testimony, ███████████████

18  ████████████████████  it enters into our systems,

19  gets processed, and goes into the CLEAR data

20  warehouse and will eventually make it into a CLEAR

21  report.

22       Q.   And CLEAR pays for the information that

23  is entered into -- strike that.

24            And Thomson Reuters pays for the

25  information entered into a CLEAR report?

1    that question.

2        Q.   Well, has any vendor or prospective

3    vendor ever declined to enter into an agreement to

4    provide data for CLEAR based on privacy concerns?

5        A.   Based on the fact that most of the

6    vendors or data partners that we work with or that

7    I identify have files that they intend to license

8    for regulated uses, I'm not sure that I have ever

9    encountered a vendor that has invoked privacy as a

10   reason for not licensing a file to us.

11       Q.   Have you ever seen concerns from a vendor

12   or a prospective vendor that Thomson Reuters shares

13   information with law enforcement without a warrant?

14            MS. MENALDO:   Objection, form.

15   ████████████████    █████████████████████

16   ██████████████████████████████████████████████████

17   ███████████████████████████████████████████

18   ████████████

19   ███████████████

20       ██    ██████████████████

21       ██    █████████████

22       ██    ██████████████████

23       ██    ████████████████████████████

24   ███████████████████████

25       ██    ███████████████████████████████

1    ███████

2              ██████████████   ████████████

3              ██████████████   ██████████████████

4    ████████████████████████████████████████████████

5    BY MR. FOX CAHN:

6         Q.   I'm now marking Exhibit 16, which should

7    be available to you on the online platform.  And it

8    is an e-mail with a Bates number ending in 80527 at

9    the bottom of the seventh page.

10             MS. MENALDO:  Mr. Cahn, I've just

11   realized that we've been on the record for a little

12   over an hour.  So maybe after this line of

13   questioning, we could take another short break.

14             MR. FOX CAHN:  Sure thing.

15             THE WITNESS:  Okay, I do see that

16   document.

17   BY MR. FOX CAHN:

18        Q.   And do you recognize this document?

19        A.   I do.

20        Q.   What is it?

21        ██   ████████████████████████████████

22   ██████████████████████

23        ██   ██████████████████████████████████

24   ████████████████████████████████████████████████

25   ████████████████████████████████████████████████

CONFIDENTIAL - STEVEN FOX

```
1        A.    Let me review it first.

2        Q.    And Mr. Fox, I'll just be asking you one

3   question about the e-mail on page 7.

4        A.    Hold on one second, still.  Okay.

5   ████  ██████████████████████████████

6   ████████████████████████████████████████████████

7   ████████████████████████████████████████████████

8   ████████████████████████████████████████████

9   ██████████████████████████████

10  ██   ████████████████████████████████████

11  ████████████████████████████████████████████████

12  ████████████

13       Q.    Well, all resellers, or just those that

14  make it available to law enforcement without a

15  warrant?

16       A.    My understanding with discussions with

17  Equifax is all resellers in the industry no longer

18  were able to receive the file.

19       Q.    Has Equifax raised concerns about any

20  other data that is made available by CLEAR?

21       A.    Not to me, no.

22       Q.    Are you aware if they've raised those

23  concerns to anyone else at Thomson Reuters?

24       A.    I am not.

25            MR. FOX CAHN:  All right.  Well, why
```

1    given the data that's available in the underlying

2    records, he had an unrealistic expectation of how

3    the technology would be able to -- how the

4    technology would be able to make the proper match.

5         Q.   Why was the expectation un -- strike

6    that.

7              Why was the expectation unreasonable?

8         A.   Specifically with criminal records, there

9    is not always a lot of underlying data in the

10   record, which is why we instruct customers that

11   this is unverified and as is.  And with certain

12   data, we expect them to carefully look at the data

13   themselves and verify it if necessary.

14        Q.   So what would be a reasonable accuracy

15   expectation for this sort of data?

16        A.   I think in this instance, the data was

17   the information that was provided by CLEAR was as

18   good as the underlying data and technology could

19   make it, and it's up to the customer to come to

20   their own conclusions in terms of matching or

21   associating data with underlying subjects.

22        Q.   And can customers do that sort of

23   matching and analysis based only on CLEAR data?

24        A.   Not necessarily, no.  It sometimes

25   requires them to independently verify information

1    from this document.

2              Does CLEAR contain information on the

3    elderly?

4         A.   CLEAR contains information on consumers

5    of all ages, yes.

6         Q.   And does it contain information on

7    disabled consumers?

8         A.   CLEAR contains information on pretty much

9    all consumers, regardless of status.

10        Q.   And since Thomson Reuters has data on

11   nearly all consumers as part of CLEAR, we

12   understand that there are some consumers who seek

13   to access their data; is that correct?

14        A.   Per our privacy policy, consumers can

15   make a request of Thomson Reuters to see what data

16   Thomson Reuters has about them.

17        Q.   And consumers can request that Thomson

18   Reuters correct information about them; correct?

19        A.   Per the privacy laws in specific states,

20   that is correct.

21        Q.   Is one of those states California?

22        A.   To my belief, yes.

23        Q.   I'm now introducing what is being marked

24   as Exhibit 24.  It is a document with a Bates

25   number ending in 17559 at the bottom of the first

CONFIDENTIAL - STEVEN FOX

```
 1        Q.    And what about the person warehouse?

 2        A.    Based on my knowledge, I don't make -- I

 3   would not be able to make a distinction between the

 4   two.

 5        Q.    And when you think of the people

 6   available through Thomson Reuters' search

 7   products -- strike that.

 8              When you think of the people whose

 9   information is available on CLEAR, that includes

10   people who have been arrested; correct?

11        A.    The CLEAR product contains arrest

12   records, yes.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1 █████ █████████████████████████████

2 ██████████████████████████████████████

3 ██████████████████████████████████████

4 ████████████████████████████

5      Q.   And as part of your evaluation of the

6 quality of a potential vendor as you described it

7 before, does that include its relationship with the

8 court to identify when an arrest has been expunged

9 or sealed?

10      A.   The relationship between a vendor and the

11 source of the records is a factor in evaluating the

12 quality of the vendor.

13      Q.   And do you know if you've ever

14 specifically evaluated a vendor's capacity to

15 update arrest records to reflect when they are

16 expunged or sealed as part of your evaluation of

17 that vendor?

18      A.   The vendor that provides us with our

19 criminal and arrest content pre-dates my

20 involvement with evaluating vendors, so I don't

21 know, but that was a factor.

22      Q.   And it's not something that you've

23 evaluated when thinking about future product

24 changes or enhancements?

25      A.   It has -- the topic has come up from time

```
 1        A.    Based on the search criteria --

 2        Q.    Correct.

 3        A.    -- state and zip code?  I think that's

 4   why I'm struggling with coming up with a name of a

 5   person that would do that.  But we do occasionally

 6   get requests from data sources where they -- where

 7   the source does want to know, for example, how many

 8   motor vehicle registration records from the state

 9   of Florida have been produced.

10        Q.    And would you have copies of the

11   responses to those sorts of queries?

12        A.    No.

13        Q.    I'm going to now introduce Exhibit 26.

14   It is an e-mail thread with a Bates stamp ending in

15   40077 on the first page.  Apologies, this -- strike

16   that.  One moment.

17              Do you recognize this document that

18   was previously introduced under another exhibit

19   number as well?

20        A.    Yes, I do recognize it.

21        ████        ████████████████████████████████

22   ██████████████████████████████

23        A.    Correct.

24        Q.    And that's a way of identifying records

25   with specific individuals?
```

```
 1              MS. MENALDO:  Objection, form.

 2  ████████████████    ██████████████████████

 3  ████████████████████████████████████████

 4  ███████████████████████████████████████

 5  BY MR. FOX CAHN:

 6       Q.   And going to the second e-mail on the

 7  first page that was sent by you on June 25, 2015 at

 8  2:27 p.m., it says, "He has" -- strike that.

 9             It says, "He seems to have a very low

10  tolerance for even a close mismatch"; correct?

11       A.   Correct.

12       Q.   What do you consider a close mismatch?

13       A.   In this context, I consider a close

14  mismatch as being a record that matches on a number

15  of data elements so as to receive a fairly, to me,

16  receive a very high confidence that it is a correct

17  match between the record and the individual, but,

18  even so, it is not a correct match between the

19  record and the individual.

20       Q.   And you say that he has a low tolerance;

21  correct?

22       A.   Correct.

23       Q.   What do you mean by a low tolerance?

24       A.   In this instance, my opinion is that this

25  particular user has an expectation that when a
```

CONFIDENTIAL - STEVEN FOX

```
1        A.   I am not aware of that either.
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25   BY MR. FOX CAHN:
```



CONFIDENTIAL - STEVEN FOX

```
 1        Q.   Do you know who might have a more
 2   up-to-date version of a document like this?
 3        A.   I don't.
 4        Q.   Do you know what portion of revenue for
 5   CLEAR comes from the United States?
 6        A.   In what context?
 7        Q.   What portion of revenue for CLEAR is
 8   generated by searches for subjects located in the
 9   United States?
10        A.   I don't -- I don't have the knowledge to
11   answer that.
12        Q.   Do you know what percentage of CLEAR
13   revenue is generated by searches related to
14   subjects located in the state of California?
15        A.   I don't.
16        Q.   Earlier you mentioned that the vast
17   majority of CLEAR records are on consumers in the
18   United States; correct?
19        A.   That's correct.
20        Q.   So is it true that the vast majority of
21   searches relate to consumers in the United States?
22        A.   Based on my experience, that would be
23   correct, and also logical, yes.
24        Q.   And do you have an estimation of how
25   searches break down between states within the
```

CONFIDENTIAL - STEVEN FOX

1

2

3

4        I, ANITA KORNBURGER, Registered Professional

5    Reporter and Notary Public, do hereby certify

6    that the preceding deposition was recorded by

7    me and reduced to writing under my personal

8    direction.

9        I further certify that said deposition was

10    taken remotely, with all parties appearing by

11    videoconference, on May 16, 2022, commencing at

12    10:02 a.m. and concluding at 5:36 p.m.

13        I further certify that I am not a relative

14    or employee or attorney or counsel of any of

15    the parties, or a relative or employee of such

16    attorney or counsel, or financially interested

17    directly or indirectly in this action.

18        In witness whereof, I have hereunto set my

19    hand and affixed my seal of office, this 20th

20    day of May, 2022.

21

22        _____

     ANITA KORNBURGER, RPR - Notary

23        Commission #1166910800033

24  My commission expires January 31, 2025.

25

**June 17, 2022**


**Re:    Brooks et al. v. Thomson Reuters Corporation, USDC Northern District of California - San Francisco Division Case No. 3:21-cv-01418-EMC:  Defendant's Deposition Errata (Steven Fox Deposition Transcript dated May 16, 2022)**


To whom it may concern:

     I, Steven Fox, have reviewed the transcript of my deposition in Brooks et al. v. Thomson Reuters Corporation, Case No. 3:21-cv-01418-EMC, taken on May 16, 2022.  Attached hereto is a list of errata identified in the deposition transcript.



/s/ Steven Fox _____                    June 17, 2022 _____ ___
STEVEN FOX                                                        DATE

**Steven Fox Deposition Errata Sheet**

| Page:Line(s) | Existing Testimony | Corrected Testimony | Reason |
|---|---|---|---|
| 43:22 | "...**SCRA**, DPPA, GLB, HIPAA, et cetera." | "..**FCRA**, DPPA, GLB, HIPAA, et cetera." | Transcription error |
| 112:21 | "Does not." | "**It** does not." | Transcription error |
| 116:17 | "…again, based on previous testimony, ██████████ …" | "…again, based on previous testimony, ██████████ …" | Transcription error |