# EXHIBIT 4

## (Redacted)

CONFIDENTIAL

**United States District Court for the**

**Northern District of California**

**San Francisco Division**

CAT BROOKS and RASHEED SHABAZZ,

individually and on behalf of all others

similarly situated,

Plaintiffs,

v.

THOMSON REUTERS CORPORATION,

Defendant.

Case No. 3:21-cv-1418-EMC

**REPORT OF PROFESSOR JOSEPH TUROW**

**TABLE OF CONTENTS**

I. BACKGROUND, QUALIFICATIONS, AND ASSIGNMENT ................................................ 1

II. SUMMARY OF OPINIONS ......................................................................................... 4

III. PRIVACY IN THE DIGITAL AGE REQUIRES PROTECTION OF THE RIGHT TO
EXERCISE CONTROL OVER ONE'S PERSONAL INFORMATION ...................................... 6

IV. THOMSON REUTERS' CLEAR PRODUCT DIMINISHES CALIFORNIANS' RIGHT TO
CONTROL THEIR PERSONAL INFORMATION AND TO BE LET ALONE ........................ 9

V. THOMSON REUTERS' CLEAR PRODUCT IS NOT JOURNALISM ............................... 20

VI. CONCLUDING COMMENTS ................................................................................... 22

Appendix 1: List of Materials Considered ................................................................... 23

Appendix 2: Curriculum Vitae (Attached)

CONFIDENTIAL

## I. BACKGROUND, QUALIFICATIONS, AND ASSIGNMENT

I am the Robert Lewis Shayon Professor of Media Systems and Industries at the Annenberg School for Communication at the University of Pennsylvania. My research focuses on digital cultural industries (meaning the ways technology shapes our culture). I focus especially on the intersection of the internet, marketing, and society, as well as studies on database marketing, media and privacy, digital out-of-home media, and the processes of innovation in the mass media. I approach "marketing" with a wide lens, interpreting it to include activities that involve the tracking and targeting of audiences for monetary gain.

I am an elected Fellow of the International Communication Association and was presented with a Distinguished Scholar Award by the National Communication Association. A 2005 New York Times Magazine article referred to me as "probably the reigning academic expert on media fragmentation." In 2010, the New York Times called me "the ranking wise man on some thorny new-media and marketing topics." In 2012, the TRUSTe internet privacy-management organization (now TrustArc) designated me a "privacy pioneer" for my research and writing on marketing and digital-privacy. I was awarded a Lady Astor Lectureship by Oxford University. I lecture widely nationally and internationally. I was invited to give the McGovern Lecture at the University of Texas College of Communication, the Pockrass Distinguished Lecture at Penn State University, the Chancellor's Distinguished Lecture at Louisiana State University, and the Melvin De Fleur Lecture at Boston University. I currently serve on the editorial boards of the *International Journal of Communication*, the *Journal of Broadcasting and Electronic Media*, *Media Industries*, and *Advertising & Society Quarterly*. I teach graduate and undergraduate courses on data collection, privacy policies, media industries and society, and advertising and society.

My ongoing research explores the topic of digital audience targeting, and privacy in two interrelated ways. One way involves understanding the organizational, industrial, and institutional forces that are shaping the ways companies track consumers and exploit data about them. Many of my findings are in the six authored books, two edited books, and many articles I have authored on the digital world. My most recent book is *The Voice Catchers: How Marketers Listen In To Exploit*

Document Ref: SQXX4-4MG45-7ADOH-EOOKW

CONFIDENTIAL

*Your Feelings, Your Privacy, and Your Wallet* (Yale University Press, 2021). Yale University Press has licensed it for translation into Spanish, Chinese, and Korean. The five other works are *The Aisles Have Eyes: How Retailers Track Your Shopping, Strip Your Privacy, and Define Your Power* (Yale, 2017); *The Daily You: How the New Advertising Industry is Defining Your Identity and Your World* (Yale, 2011; Turkish edition, 2015); *Niche Envy: Marketing Discrimination in the Digital Age* (MIT Press, 2006); *Breaking Up America: Advertisers and the New Media World* (University of Chicago Press, 1997; paperback, 1999; Chinese edition 2004); and *Media Today*, an introductory text about media in the digital age that Routledge will next year publish in its 8th edition and that has been translated into Serbian. The edited books are *The Hyperlinked Society: Questioning Connections in the Digital Age* (with Lokman Tsui, University of Michigan Press, 2008), and *The Wired Homestead: An MIT Press Sourcebook on the Internet and the Family* (with Andrea Kavanaugh, 2003).

The other way I investigate the topic of digital audience targeting and privacy is to explore Americans' knowledge and opinions about surveillance issues regarding the digital world. I do it with an eye toward the implications for individuals' lives, for the larger society, and for public policy. Since 1999 I have conducted nine major national surveys of the American public. Carried out by well-respected major polling companies, they have all received a great deal of attention in *The New York Times* and other popular press outlets, as well as in the research community. I have been interviewed widely about my research, including by NPR's Fresh Air with Terry Gross, the *Atlantic*, the BBC, CBS News, and elsewhere. I have also written about media and advertising for the popular press, including essays for *The New York Times*, *The Atlantic*, *The Washington Post*, *The Boston Globe*, and *The Los Angeles Times*. My research has received financial support from the Digital Trust Foundation, the John D. and Catherine T. MacArthur Foundation, the Kaiser Family Foundation, the Robert Wood Johnson Foundation, the Federal Communications Commission, and the National Endowment for the Humanities, among others.

The findings of my work are numerous and wide-ranging, but two stand out. The first is that commercial firms are continually working with internet firms to collect information about

Document Ref: SQXX4-4MG45-7ADOH-EOOKW

CONFIDENTIAL

Americans (often surreptitiously) across as many media channels as possible, to use the data they accumulate for a variety of purposes. This includes, for example, using data as the product itself (selling the data as insights, reports, market research, or otherwise), or to personalize commercial activities toward the individuals in ways that raise issues around discrimination and social equity. The second broad finding is that although large majorities of Americans understand that firms are collecting information about them, and are concerned about it, they know little about the methods the firms use, and don't even understand the meaning of the term *privacy policy*. (We have found via several surveys that Americans believe incorrectly that when a website has a privacy policy, its very presence means the firm won't share information about them without their permission.)

My hourly rate is $1000. To the best of my recollection, I have opined three times, in the form of a report, for a party in a legal proceeding over the last four years. Once was in support of a proposed class settlement in the Central District of California in litigation challenging a television manufacturer's collection and sharing of consumer information, *In Re: Vizio, Inc., Consumer Privacy Litig.*, No. 8:16-ML-02693. The second was in support of Navigators Insurance Company in the Central District of California, for the case *Vizio, Inc., v. Navigators Ins. Co.*, No. 2:20-cv-06864-ODW. And the third was in support of Plaintiffs in the Northern District of California in *Calhoun v. Google LLC*, No. 20-cv-05146-LHK.

My opinions expressed in this report are my own, and do not necessarily reflect the views of the University of Pennsylvania. My compensation is not contingent on reaching any particular conclusion or otherwise based on the result of this case. I understand that this litigation, and the discovery process, are ongoing. I know that Thomson Reuters has produced documents to plaintiffs as part of the discovery process and understand that Thomson Reuters intends to produce still more documents and information in the future. I also know that depositions and other discovery efforts are likely to continue, and that new information bearing on the subject matter of my work is likely to become available or shed light on information already available. I therefore reserve the right to update this report, issue a subsequent report, or otherwise modify my analysis or conclusions based on the receipt of that new information.

Document Ref: SQXX4-4MG45-7ADOH-EOOKW

I understand that the plaintiffs in this case allege that Thomson Reuters, through a product known as "CLEAR," violates a California statute known as the Unfair Competition Law and has unjustly enriched itself at the expense of Californians. I am informed that California law, through the Unfair Competition Law and the doctrine of unjust enrichment, protects Californians against business practices that are immoral, unethical, oppressive, unscrupulous or substantially injurious to Californians, or that violate established California public policy. I am further informed that in order to evaluate whether a business practice violates California's Unfair Competition Law, a court must weigh the harm to Californians against the utility of the challenged business practice. I offer no legal opinions in this case, but instead apply the methodologies and techniques used in my field of study to the case materials, discovery to date, academic literature, and other sources detailed in my reliance list in order to assist the Court in evaluating, at this stage of the case, whether Thomson Reuters' operation of the CLEAR product affects a privacy interest of Californians in such a way that all Californians whose information is accessible through CLEAR could claim to be harmed in the same way. These methodologies and techniques include synthesizing primary source research and academic studies, and contextualizing those findings to offer a method for understanding how the accumulation, connection, and sale of individual information through online databases without robust opportunities for individuals to control, correct, opt-out, or contextualize the information in those databases, violates long-held conceptions of individual privacy and causes cognizable economic harm. My conclusions are based on the knowledge, skill, and experience developed across decades studying privacy, surveillance technology, and the impacts of wide-spread tracking and commercialization of data on individuals and the broader society. The materials that I have reviewed in order to form my opinions in this matter are detailed in the reliance list attached as Appendix 1. My curriculum vitae is attached as Appendix 2.

## II. SUMMARY OF OPINIONS

Individual privacy has long included the right to control one's information and the right to

Document Ref: SQXX4-4MG45-7ADOH-EOOKW

CONFIDENTIAL

be let alone.[1] These rights are prominent in the academic literature surrounding individual privacy and present in California law and policy.

   In my opinion, Thomson Reuters' operation of the CLEAR product affects privacy interests of Californians—the right to control personal information and to be let alone—in such a way that all Californians whose information is accessible through CLEAR are harmed. Thomson Reuters, through its CLEAR product, aggregates disparate sources of personal information, interconnecting that information into extensive profiles or dossiers about individuals, and sells that information for profit—all without the knowledge or consent of the majority of the individuals profiled, and without a meaningful and robust opportunity for those individuals to correct or remove information from those profiles or dossiers even if they did learn of their existence. I have considered the amount (and types) of information collected and made available, the connections made between otherwise disparate sources of information, the protections in place (or lack thereof) to ensure accuracy and reliability of the information, the protections in place (or lack thereof) regarding the use of information for "permissible" purposes, and the opportunities (or lack thereof) offered for individuals whose information is collected to meaningfully understand, contextualize, correct, or remove information that is provided about them. I conclude, based on a review and understanding of privacy scholarship, and my review of case materials, that Thomson Reuters' operation of CLEAR interferes with Californians' right of control and to be let alone, causing them privacy and economic harm. Thomson Reuters' practice of aggregating disparate sources of information, interconnecting that information into dossiers, and selling it for profit without the consent, input, or, in most cases, even the knowledge of those profiled also causes those individuals whose information is aggregated and made available by Thomson Reuters to lose the value of the information itself, which they would retain and have the option to capture in the absence of such

---

[1] My opinion addresses the ways scholars view the right to control one's information as one important aspect of privacy, and the impacts to people when their right to control their information is diminished. I also address the right to be let alone. There are other aspects of privacy that are present in the academic literature. My opinion is not intended to foreclose the validity of these measures of privacy, which may be relevant to Californians writ-large or individually.

Document Ref: SQXX4-4MG45-7ADOH-EOOKW

CONFIDENTIAL

practices.

## III. PRIVACY IN THE DIGITAL AGE REQUIRES PROTECTION OF THE RIGHT TO EXERCISE CONTROL OVER ONE'S PERSONAL INFORMATION AND THE RIGHT TO BE LET ALONE.

The issue of individuals' right to privacy, a protected sphere of human existence and a bedrock concept underlying human dignity and autonomy, is present in scholarly writings as far back as Socrates and other Greek philosophers.[2] The concept itself is as old as human society, and ties in to those most intimate aspects of personhood.[3] The contours of the right to privacy generally, and the right to informational privacy specifically, have been debated since at least the 14th century.[4] In American law, and in particular since the late 1800s, informational privacy has centered around the concept of control of one's information.[5] The long history of protecting privacy through the right to control one's information is reflected in the view of privacy enunciated by Americans today.[6]

---

[2] Jan Holvast, History of Privacy, in V. Matyas et al. (eds.): The Future of Identity, International Federation for Information Processing, AICT 298, pp. 13-42 at p.15 (2009).

[3] *Id.*, *supra* note 2 at p.15.

[4] *Id.*, *supra* note 2 at p.15.

[5] *Id.*, *supra* note 2 at p.15; Nicole Moreham, Privacy in the Common Law: A Doctrinal and Theoretical Analysis, 121 L.Q.R. (2005). Moreham argued that the long-standing view of privacy as centering on a dimension of individual "control" over information could not completely capture the long-standing historical right. In "The Right to Privacy: A Doctrinal and Comparative Analysis," Dr. Hilary Delany and Eoin Carolan, privacy scholar and visiting researcher at Harvard Law School, argue that Moreham's preferred definition ("desired inaccess" or "freedom from unwanted access") "misses the whole social dimension of privacy protection," and that the proper conception of "control" of one's information involves a graded scale of access, where an individual is "entitled to allow access to specified others and to prevent them from broadcasting the information to a wider audience." Hilary Delany & Eoin Carolan, The Concept of a Right to Privacy: The Emergence of a Right to Privacy, *in* The Right to Privacy: A Doctrinal and Comparative Analysis, pp. 20-23, available at https://ssrn.com/abstract=1889243.

[6] The majority of Americans believe that privacy and confidentiality are very important aspects of their lives. Mary Madden & Lee Rainie, *American's Attitudes About Privacy, Security and Surveillance*, Pew Research Ctr. 3 (May 20, 2015), https://www.pewresearch.org/wp-content/uploads/sites/9/2015/05/Privacy-and-Security-Attitudes-5.19.15_FINAL.pdf; *see also* Michelle Cao, U.S. Dep't of Commerce, Nat'l Telecomm. & Information Admin., *Nearly Three-Fourths of Online Households Continue to Have Digital Privacy and Security Concerns* (Dec. 13,

Document Ref: SQXX4-4MG45-7ADOH-EOOKW

CONFIDENTIAL

The importance of the right to control access to one's information in the American legal tradition is also reflected by decades of academic literature. As one example, Columbia University Professor of Public Law & Government Emeritus Alan F. Westin discussed privacy as "the claim of individuals, groups, or institutions to determine for themselves when, how, and to what extent information about them is communicated to others" in his widely-cited 1967 work "Privacy and Freedom."[7] This conception of individual privacy—"the right to determine how much of [one's] personal information is disclosed and to whom, how it should be maintained and how disseminated…became the cornerstone of our modern right to privacy."[8] This remains "[p]erhaps the most commonly accepted definition of information privacy."[9]

---

2021), https://www.ntia.doc.gov/blog/2021/nearly-three-fourths-online-households-continue-have-digital-privacy-and-security-concerns. In our contemporary world, Americans overwhelmingly believe that control over their personal information is central to maintaining individual privacy. Madden & Rainie, at 1. A major national survey I conducted with colleagues found that 84% of adult Americans want to have control over what businesses can learn about them online. Joseph Turow, Michael Hennessy, and Nora Draper, "The Tradeoff Fallacy," A Report from the Annenberg School for Communication, June 2015, p. 14. Similarly, according to Pew, 93% of American adults report that "being in control of *who* can get information about them is important," and "90% say that controlling *what* information is collected about them is important." Madden & Rainie, at 1.

[7] Alan Westin, Privacy and Freedom 7 (1967).

[8] Margalit Fox, *Alan F. Westin, Who Transformed Privacy Debate Before the Web Era, Dies at 83*, N.Y. Times (Feb. 22, 2013), https://www.nytimes.com/2013/02/23/us/alan-f-westin-scholar-who-defined-right-to-privacy-dies-at-83.html.

[9] Lourdes M. Turrecha & Emily Ashley, *The Rise of Privacy Tech: Defining the Privacy Tech Landscape 2021* 8 (Nov. 2021), https://www.riseofprivacytech.com/wp-content/uploads/2021/11/TROPT-Defining-the-Privacy-Tech-Landscape-2021-v1.0-1.pdf. Contemporary research continues to support the principle that consumers view the right to control their information as central to individual privacy. *See* Mark Fitzpatrick, *Beware! Survey Finds 43% of Americans Have Been Victim of a Cybercrime*, ValuePenguin (Oct. 21, 2019) (finding that "51% of Americans list their top data concern as companies selling their personal information or using it against them"); Pew Research Ctr., *Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information* 12 (Nov. 2019), https://www.pewresearch.org/internet/2019/11/15/how-americans-think-about-privacy-and-the-vulnerability-of-their-personal-data/ (noting that when Americans were asked for their own definitions of the words "privacy" and "digital privacy," they "most often mention their concerns about the role other people and organizations can play in learning about them, their desire to shield their personal activities and possessions, and their interest in controlling who is given access to their personal information."); danah boyd & Alice Marwick, Social Privacy in Networked Publics:

Document Ref: SQXX4-4MG45-7ADOH-EOOKW

Ensuring that people have "control" over the circulation of their personal information is essential not just to individual privacy, but to social cohesion. As Northeastern University law professor Ari Waldman writes, privacy is "a facet of social life that gives people the confidence and moral space to share information with others."[10] Strip away a lot of privacy, and you strip away the belief in relationships that keeps the society together.

The idea of privacy as the right to control one's information is also deeply rooted in California law. In a 1972 argument in favor of California ballot Proposition 11 (a successful bid to protect privacy as a constitutional right in California), California legislators described this fundamental privacy right as follows:

> Fundamental to our privacy is the ability to control circulation of personal information. This is essential to social relationships and personal freedom. The proliferation of government and business records over which we have no control limits our ability to control our personal lives. Often we do not know that these records even exist and we are certainly unable to determine who has access to them.[11]

Another paragraph in the argument to voters explained that "the right of privacy . . . prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information."[12] These quotes reflect California's long-standing public policy in favor of individual privacy through the right to control one's personal information—a public policy that extends to law enforcement use of personal information.[13]

---

Teens' Attitudes, Practices, and Strategies, in Oxford Internet Institute's "A Decade in Internet Time: Symposium on the .Dynamics of the Internet and Society," (Sept. 22, 2011), available at https://osf.io/2gec4/.

[10] Waldman, op. cit., p. 51.

[11] Ballot Pamp., Proposed amend to Cal Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972) at 27.

[12] *Id.*

[13] *See* California S.B. 178 (Oct. 8, 2015), *Privacy: electronic communications: search warrant* (enacting a law to "prohibit a government entity from compelling the production of or access to electronic communication information or electronic device information…without a search warrant, wiretap order, order for electronic reader records, or subpoena issued pursuant under specified conditions, except for emergency situations"); ACLU Southern Cal., *In Landmark Victory For Digital Privacy, Gov. Brown Signs California Electronic Communications Privacy Act Into Law Sends Message To Nation About Importance Of Saying No To Warrantless Digital*

Document Ref: SQXX4-4MG45-7ADOH-EOOKW

California legislators have also described the right to privacy as "the right to be left alone," explaining:

> It is a fundamental and compelling interest. It protects our homes, our families, our thoughts, our emotions, our expressions, our personalities, our freedom of communion and our freedom to associate with the people we choose. It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us.[14]

This conception of privacy as a right to be let alone is often attributed to Samuel D. Warren and Louis D. Brandeis's seminal publication The Right to Privacy, in the Harvard Law Review of 1890, and is now deeply rooted and widely accepted.[15]

The importance (in scholarship and California public policy) placed on privacy through the right to control one's information and to be let alone is due, in part, to the harms caused by the aggregation and distribution of data about individuals without their informed consent and a meaningful opportunity to correct and/or remove information from those databases.

## IV. THOMSON REUTERS' CLEAR PRODUCT DIMINISHES CALIFORNIANS' RIGHT TO CONTROL THEIR PERSONAL INFORMATION AND TO BE LET ALONE.

Based upon my review of the documents filed and produced in this litigation, I understand that Thomson Reuters, through its CLEAR product, compiles, aggregates, and makes available to its customers extensive information relating to individuals and businesses (although I understand that this case is only on behalf of individuals—California residents—whose information is

---

*Searches* (Oct. 8, 2015) (reporting statement of State Senator Mark Leno in support of S.B. 178 that "[f]or too long, California's digital privacy laws have been stuck in the Dark Ages, leaving our personal emails, text messages, photos and smartphones increasingly vulnerable to warrantless searches").

[14] Ballot Pamp., Proposed amend to Cal Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972) at 27.

[15] Samuel D. Warren & Louis D. Brandeis, The Right to Privacy, 4 Harv. L. Rev. 193, 193 (1890).

Document Ref: SQXX4-4MG45-7ADOH-EOOKW

available in CLEAR).[16] Thomson Reuters licenses or otherwise collects this information from a variety of sources and sells (or otherwise permits access to) that information in a variety of forms, and to a variety of customers.[17] Thomson Reuters advertises that this information includes "proprietary" records, which it defines as data owned or licensed by Thomson Reuters (as opposed to publicly available information).[18] While it sells access to information through CLEAR, Thomson Reuters "expressly does not warrant the comprehensiveness, completeness, accuracy or adequacy of the information for any purpose."[19]

CLEAR, as marketed by Thomson Reuters, provides customers the ability to coalesce large numbers of data points about individuals quickly and seamlessly.[20] The company states that "one

---

[16] *See* BDR Cube Hanger CLEAR, TR-BROOKS026283 at 1 ("Thomson Reuters CLEAR is a suite of public records technology that provides the capability to verify people and business identities, proactively mitigate risk with scoring, and improve investigations with accurate and sourced data."); Godlewski Dep. 53:9-54:3.

[17] Thomson Reuters' Responses to Plaintiffs' First Set of Interrogatories, Attachment A, p. 14, 19-20 (PDF pagination); Thomson Reuters' Data Licensing Agreements, TR-BROOKS036159-TR-BROOKS036210; TR-BROOKS035701-TR-BROOKS035708; TR-BROOKS038817-TR-BROOKS038835; TR-BROOKS039038-TR-BROOKS039048; TR-BROOKS039000-TR-BROOKS039012; TR-BROOKS038799-TR-BROOKS038808; TR-BROOKS037780-TR-BROOKS037787; TR-BROOKS038748-TR-BROOKS038751; TR-BROOKS039301-TR-BROOKS039307; TR-BROOKS037712-TR-BROOKS037713; TR-BROOKS037708; TR-BROOKS037849; TR-BROOKS020936-TR-BROOKS020942; TR-BROOKS020985-TR-BROOKS020989; TR-BROOKS020934-TR-BROOKS020935; TR-BROOKS020891-TR-BROOKS020894; TR-BROOKS020995-TR-BROOKS021000; TR-BROOKS020898-TR-BROOKS020900; TR-BROOKS038615-TR-BROOKS038642;TR-BROOKS038650-TR-BROOKS038665; TR-BROOKS038666-TR-BROOKS038667; TR-BROOKS038643-TR-BROOKS038644; TR-BROOKS038668-TR-BROOKS038672; TR-BROOKS038817-TR-BROOKS038835; TR-BROOKS038836-TR-BROOKS038837; Thomson Reuters' Master Licensing Agreement, TR-BROOKS017644-TR-BROOKS017654; Thomson Reuters Strategic Licensing – Sample Contract Provisions and Alternatives, TR-BROOKS017607-TR-BROOKS017637.

[18] Thomson Reuters CLEAR: The Smarter Way to Get Your Investigative Facts Straight, TR-BROOKS062991-TR-BROOKS062998; Godlewski Dep. 54:9-55:6.

[19] Thomson Reuters' Responses to Plaintiffs' First Set of Interrogatories, Attachment A, p. 19 (PDF pagination).

[20] BDR Cube Hanger CLEAR, TR-BROOKS026283 at 1; Thomson Reuters CLEAR Case Study: San Bernardino Mass Shooting, TR-BROOKS062999 at 4; Thomson Reuters CLEAR: The Smarter Way to Get Your Investigative Facts Straight, TR-BROOKS062991 at 2; Link Charts,

Document Ref: SQXX4-4MG45-7ADOH-EOOKW

Case 3:21-cv-01418-EMC   Document 148-3   Filed 12/14/22   Page 14 of 59

reason Thomson Reuters CLEAR is so useful is that it pulls together disparate pieces of information about an individual—from financial records, court documents, vehicle registration, property records, utility payments, and other databases—to help investigators identify and locate people. It's not uncommon for users to make connections using CLEAR that would not otherwise be possible."[21] Another document touts that "CLEAR's Web interface allows users to simultaneously search public and proprietary databases and the Web."[22] It adds that "the most relevant information to search criteria rises to the top for easy review."[23] The CLEAR web page notes that "Thomson Reuters CLEAR is powered by billions of data points and leverages cutting-edge public records technology to bring all key content together in a customizable dashboard . . . . The user-friendly platform was designed with intuitive navigation and simple filtering parameters, so you can quickly search across thousands of data sets and get accurate results in less time."[24] According to Thomson Reuters, CLEAR "delivers a vast collection of public and proprietary records and brings all key content together into a single working environment to give [customers] a more streamlined, efficient search."[25]

According to Thomson Reuters' documents, CLEAR allows customers to access reports about specific individuals (through a tool called "person search").[26] The information in a particular

---

TR-BROOKS063045; How CLEAR Helped Track Down a Fugitive Who Owed $63,000 in Unpaid Child Support, TR-BROOKS024022 at 1; Tax Assessors' Survey, TR-BROOKS024020.

[21] How CLEAR Helped Track Down a Fugitive Who Owed $63,000 in Unpaid Child Support, TR-BROOKS024022 at 1.

[22] Thomson Reuters CLEAR Case Study: San Bernardino Mass Shooting, TR-BROOKS062999 at 4.

[23] Id.

[24] TR-BROOKS000082.

[25] Thomson Reuters CLEAR: The Smarter Way to Get Your Investigative Facts Straight, TR-BROOKS062991-TR-BROOKS062998.

[26] Godlewski Dep. Ex. 28, TR-BROOKS060012 (indicating that all CLEAR products in the product suite except for CLEAR ID Confirm permit access to individual reports); Godlewski Dep. 207:25-208:6. Similarly, documents suggest that all products in the CLEAR suite except for CLEAR ID Confirm have, at minimum, filtered access to the following content sets: people,

Document Ref: SQXX4-4MG45-7ADOH-EOOKW

CONFIDENTIAL

report may vary according to what information in CLEAR is matched to the subject of the report, and any customer customization.[27] But CLEAR individual reports can be expansive: The sample, unpopulated report is 26 pages long,[28] and the individual report for one named Plaintiff is over ███ pages.[29] Thomson Reuters' ability to craft expansive reports on individuals is due to the volume of information included in the CLEAR platform.[30]

I understand that the CLEAR database contains a substantial amount of personal information about the "vast majority" of individuals in the United States, including Californians.[31] Thomson Reuters sells access to this information to business and governmental customers. The CLEAR home page lists a range of targeted "use cases" for CLEAR (meaning how a particular customer is using the CLEAR product),[32] including skip tracing, unemployment insurance, corporate security, fraud investigations of various types, contact tracing, risk-management, child and family services, and law enforcement investigations.[33] Thomson Reuters advertises to

business, phones, licenses, assets, address map, court records, quick analysis flags, Experian gateway, and reverse phone gateway. TR-BROOKS060012.

[27] Fox. Dep. Ex. 14, TR-BROOKS020865 (showing a blank individual sample report without data, but retaining the categories of data that may be included for a given subject); Fox. Dep. 114:20-115:15 (stating that TR-BROOKS020865 shows a comprehensive set of data categories, which would be populated by the subject's records if CLEAR contained any records within that category).

[28] TR-BROOKS020865.

[29] TR-BROOKS005220.

[30] Fox Dep. Ex. 9, *20150324 PR Content Details*, TR-BROOKS082062 (listing ███████ ███████████; Fox Dep. 98:21-22 ("[T]hese are data categories that appear in the CLEAR product."); Fox Dep. 36:2-8 ("Q. Would you say that CLEAR has records on the vast majority of consumers in the United States? A. If by 'vast majority' that number coincides with 90 percent, then I would say that sounds right.").

[31] Fox Dep. Ex. 9, *20150324 PR Content Details*, TR-BROOKS082062 (listing ███████ ███████████; Fox Dep. 98:21-22 ("[T]hese are data categories that appear in the CLEAR product."); Fox Dep. 36:2-8 ("Q. Would you say that CLEAR has records on the vast majority of consumers in the United States? A. If by 'vast majority' that number coincides with 90 percent, then I would say that sounds right.").

[32] Godlewski Dep. 24:13-15.

[33] Thomson Reuters CLEAR: The Smarter Way to Get Your Investigative Facts Straight, TR-BROOKS062991-TR-BROOKS062998; Godlewski Dep. Ex. 10, Thomson Reuters CLEAR:

Document Ref: SQXX4-4MG45-7ADOH-EOOKW

CONFIDENTIAL

potential clients that it collects a variety of personal information on people, including addresses, driver's license numbers, phone numbers, social security numbers, known associates, vehicle registration information, credit bureau data, utilities data, DMV records, real property data, professional licenses, criminal and court records, healthcare provider content, social media information, aggregated news and online content, real-time booking and release data, and more— and that these data include both public and proprietary records.[34] The breadth of information available in CLEAR, and the variety of uses for which Thomson Reuters permits business and governmental entities to access information through CLEAR, cover many aspects of Californians' lives. And Thomson Reuters continues to seek new and additional information to add to the CLEAR product.[35] Thomson Reuters may add new data to CLEAR at any time, without Californians' knowledge or consent.[36]

While the specific content of individual reports may vary, every Californian whose information is accessible through CLEAR has suffered the same fundamental privacy harm of a lack of control and violation of their right to be let alone. Regardless of how expansive an individual's report may be,[37] no Californian has control over the information in or use of dossiers about them. In these critical ways, all Californians face these same harms.

According to Thomson Reuters, CLEAR customers must certify that they have a

---

Online Investigation Software (May 4, 2022) (noting that "Thomson Reuters CLEAR is powered by billions of data points" and providing a list of "all use cases"); Godlewski Dep. 128:4-135:15 (discussing the list of use cases on the Thomson Reuters CLEAR website and confirming it looks comprehensive).

[34] Thomson Reuters CLEAR: The Smarter Way to Get Your Investigative Facts Straight, TR-BROOKS062991-TR-BROOKS062998.

[35] Godlewski Dep. 219:13-220:4; Thomson Reuters CLEAR: The Smarter Way to Get Your Investigative Facts Straight, TR-BROOKS062991-TR-BROOKS062998; Godlewski Dep. 54:9-55:6.

[36] Godlewski Dep. 59: 18-22; Godlewski Dep. 163: 15-21.

[37] Even if expansive, the privacy interests here are implicated by what is present and what is absent.

Document Ref: SQXX4-4MG45-7ADOH-EOOKW

"permissible use" for CLEAR when they log in.[38] I have seen no evidence that Thomson Reuters investigates that a customer's use is, in fact, permissible. In addition, although it seems that the "permissible use" may be tied to the person the customer initially looks up, a customer may nevertheless run a "person search"[39] in a way that results in that customer viewing information that pertains to other individuals unrelated to the target of their investigation (and accordingly, unrelated to the customer's selected permissible use).[40]

In any event, whether a person has consented to the sale of their data has nothing to do with whether Thomson Reuters lists the use as permissible.[41] And so, whatever the function of a customer certifying a purportedly permissible use, it does nothing to solve the privacy harms of lack of control or violation of the right to be let alone. No Californian is given any control over the uses of dossiers about them. There is no use of CLEAR profiles that is permitted *by the Californians* whose information is sold via CLEAR. To the contrary, Californians have not consented to the collection or sale of their information through Thomson Reuters' CLEAR

---

[38] https://legal.thomsonreuters.com/en/products/clear-investigation-software.

[39] TR-BROOKS060012.

[40] Fox Dep. 90:1-12 ("The end user has selected permissible uses that cover their investigation. And in the course of that investigation, they may – in the course of narrowing down to the subject of their investigation, they may encounter, you know, other descriptions of other entities until they get to the point of the subject of their investigation. But that session in CLEAR is per the permissible use selected by the end user when they went into the product and are running their search criteria."). I further understand that even if that customer did find the right individual for their chosen "permissible" use, Thomson Reuters uses an algorithm to "pin" records to individuals using a standardized process that may result in pinning inaccurate information (or information that relates to someone entirely different), to any given individual. Fox Dep. 94:13-96:23, 130:14-135:15. In fact, I understand that ▮▮▮▮▮
▮▮▮ Fox Dep. 132:20-133:19. ▮▮▮

[41] Fox Dep. 86:19-87:2.

Document Ref: SQXX4-4MG45-7ADOH-EOOKW

CONFIDENTIAL

platform, and largely do not know about it.

In addition, the right to be let alone, as mentioned, protects against "business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes."[42] That aptly describes Thomson Reuters' CLEAR, even if Thomson Reuters places certain limitations on the use of its product. Ultimately, Californians are harmed in these ways, whether their profiles are used for what Thomson Reuters deems a permissible use or not, because Thomson Reuters controls the CLEAR profiles of Californians for its own commercial purposes.[43]

With its CLEAR product, Thomson Reuters fails to follow the social importance of ensuring individuals are not blindsided by the unknown and unwanted collection and use of information about themselves. In fact, discovery demonstrates that Thomson Reuters is disinterested in helping members of the public learn about the data Thomson Reuters amasses about them, who uses it, and whether or how they could stop it.[44] There is no public campaign to inform Californians that CLEAR exists or to give them an opportunity to control the information about them within CLEAR. Thomson Reuters does not market or otherwise reach out to Californians to inform them that their information is included in CLEAR, or that their information was searched in CLEAR.[45] Nor does Thomson Reuters affirmatively reach out to inform Californians how they may opt out of having their information included in CLEAR—which may be a complex and labyrinthine process, if it's even possible at all.[46] And discovery suggests that,

---

[42] Ballot Pamp., Proposed amend to Cal Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972) at 27.

[43] "Corporate account validation and certification," Thomson Reuters, July 1, 2020; Thomson Reuters' Responses to Plaintiffs' First Set of Interrogatories, Attachment A, pp. 15-16 (PDF pagination) (listing 9 permissible uses under the GLBA, 4 under the DPPA, and 2 for access to voter registration records).

[44] Godlewski Dep. 151:22-152:4; Godlewski Dep. 163:15-21; Godlewski Dep. 164:10-12.

[45] Godlewski Dep. 151:22-152:4; Godlewski Dep. 163:15-21.

[46] Godlewski Dep. 151:22-152:4; Godlewski Dep. 163:15-21; Public records privacy statement, Thomson Reuters, not dated, https://legal.thomsonreuters.com/en/legal-notices/privacy-

Document Ref: SQXX4-4MG45-7ADOH-EOOKW

CONFIDENTIAL

for the most part, the general public does not know about CLEAR.[47]

My understanding is that Thomson Reuters has a Public Records Privacy Policy that applies uniformly to all Californians and that purports to address, among other things, the correction of information in CLEAR.[48] Discovery to date suggests that the steps outlined by this policy are convoluted, and I have not seen evidence that this policy is at all effective in giving Californians control over their information, whether to correct that information or to remove it.

Needless to say, Californians are not meaningfully informed of CLEAR, let alone this policy, and for this reason alone the policy can hardly be considered protective of privacy. In other words, Californians cannot fix a problem through any correction policy if they do not know that problem exists. It is also difficult for a Californian even to learn how much information about them is in CLEAR. An individual must prove that records relate unambiguously to them in order to view information in CLEAR about them. This appears to be a standard that Thomson Reuters does not itself meet before showing records to customers; as I understand it, a particular record in CLEAR may be "associated" with an individual even if it has only a 60% likelihood of a "match" to that individual. [49]

Putting that aside, I see nothing in the policy to suggest that Californians are given a meaningful right to control their information. While my examination of this question continues, I can note that there are problematic features that would apply to Californians generally, including that there seems to be no real (let alone straightforward) ability to remove information in CLEAR. For example, according to Thomson Reuters, in order to "suppress" one's information (Thomson Reuters does not accede to the term "removed"), a Californian must meet one of a pre-defined list

---

records?CID=TRSite , accessed April 3, 2022; Public records privacy statement (Oct. 20, 2021), https://legal.thomsonreuters.com/en/legal-notices/privacy-records, TR-BROOKS000056.

[47] Godlewski Dep. 164:10-12.

[48] Public records privacy statement (Oct. 20, 2021), https://legal.thomsonreuters.com/en/legal-notices/privacy-records, TR-BROOKS000056.

[49] Thomson Reuters' Public Records Privacy Statement (Oct. 20, 2021), TR-BROOKS000056-TR-BROOKS000059; TR-BROOKS057002.

Document Ref: SQXX4-4MG45-7ADOH-EOOKW

CONFIDENTIAL

of three criteria (identify, for example, as a judge, public official, or law enforcement officer; show that CLEAR exposes one to a risk of physical harm; or provide a police report substantiating identity theft).[50] The privacy rights I have discussed here, however, are rights that all Californians enjoy, be they judges, public officials, law enforcement, or private citizens.

CLEAR's very business model is to allow companies to take for granted that huge numbers of datapoints about Californians are compiled, connected, updated (including, for certain data, in real-time) and made available for Thomson Reuters' customers at the touch of a button. Some of the individual data points are proprietary and some are public, but the collection and connection of that data (its analytics) is how Thomson Reuters markets CLEAR to its customers.[51] And that collection and connection of data inflicts harms on all Californians. Before the internet era, melding information from even public databases was a cumbersome process, and so the material a company could bring together about a particular individual was limited.[52] With CLEAR, Thomson Reuters exploits the contemporary ease of collecting, transferring, and accessing data, along with the financial incentive of public and private entities to sell or license that data, to create extensive private dossiers about people. The availability, creation, and use of these dossiers take place without the knowledge, understanding, or acceptance of California citizens, who are the topics of many of CLEAR's dossiers. CLEAR deprives all Californians of the right to control their personal data, an economically valuable commodity and a well-defined feature of individual privacy.

---

[50] Thomson Reuters' Public Records Privacy Statement (Oct. 20, 2021), TR-BROOKS000056-TR-BROOKS000059.

[51] BDR Cube Hanger CLEAR, TR-BROOKS026283 at 1; Thomson Reuters CLEAR Case Study: San Bernardino Mass Shooting, TR-BROOKS062999 at 4; Thomson Reuters CLEAR: The Smarter Way to Get Your Investigative Facts Straight, TR-BROOKS062991 at 2; Link Charts, TR-BROOKS063045; How CLEAR Helped Track Down a Fugitive Who Owed $63,000 in Unpaid Child Support, TR-BROOKS024022 at 1; Tax Assessors' Survey, TR-BROOKS024020.

[52] See Josh Lauer, Creditworthy: A History of Consumer Surveillance and Financial Identity in America (New York: Columbia University Press, 2017), especially chapters 2-4; also Dan Bouk, "The History and Political Economy of Personal Data over the Last Two Centuries in Three Acts," *Osiris* 32:1 (2017), 85-106.

Document Ref: SQXX4-4MG45-7ADOH-EOOKW

CONFIDENTIAL

The harms that Thomson Reuters causes by aggregating and selling expansive private dossiers through CLEAR without the knowledge and consent of Californians[53] are ones that privacy scholars have identified as particularly worrisome.[54] Dossiers or profiles of individuals such as those Thomson Reuters makes available through CLEAR inflict concrete privacy harms, amounting to a theft of a person's persona in that information taken from that individual is exploited to create a data-picture of the individual that is not sanctioned by the person and might well be at odds with the picture the individual has been trying to create, or has actually created if all accurate facts were included in CLEAR's dossiers, of herself or himself within society. Akin to theft of personal property, the theft of one's persona in this way works such a harm upon the taking, connecting, or making available of the data; stripping the person of their right to control their own information even if they have not yet realized that it has occurred, and independent of what particular information has been taken, when or how it is made available to others, or for what purposes Thomson Reuters makes that information available. Thomson Reuters' collection of wide-ranging information about Californians, its aggregation of that data into interconnected databases, and its selling of that information for profit without providing Californians a meaningful right to remove or correct their information, strip away Californians' right to control their information and to be let alone, and thus violates the long-standing right to informational privacy discussed above.

Beyond creating a privacy harm for all Californians whose information is accessible in

---

[53] Godlewski Dep. 164:10-12.

[54] Robert C. Post, "Three Concepts of Privacy," Georgetown Law Journal 89 (2000-2001), p. 2087; *see also* Burk, *Algorithmic Legal Metrics*, *supra* note 55 at 1160 ("When applied to the data associated with individuals, [the] process [of large scale data accumulation, profiling, and use] in effect creates identities. Far from representing or capturing any given individual, the action of algorithmic processing results in the generation of abstracted and decorporealized 'data doubles' that figure or signify individual actions. This representational digital doppelganger is entirely epiphenomenal, capturing only the record of manifest personal activities. The construct in some sense constitutes a virtual profile, decontextualized and extracted from an amalgam of processed data. It is neither accurate nor inaccurate with regard to any corresponding natural person. It is rather an ex post emblem of assignment of the related natural person to an algorithmically determined category.") (internal citations omitted).

Document Ref: SQXX4-4MG45-7ADOH-EOOKW

CONFIDENTIAL

CLEAR, Thomson Reuters' practice of generating extensive databases about Californians without their informed consent also has material consequences for all Californians.[55] Privacy scholars have long discussed how the kind of information contained within CLEAR itself has economic value.[56] By taking disaggregated sources of information, compiling dossiers, and selling those dossiers for profit (without giving Californians the opportunity to control or profit from that practice), Californians lose the value the information would have retained, value they could have chosen to capture themselves.[57]

Thomson Reuters' collection and sale of data about Californians without their knowledge and consent causes these harms regardless of the accuracy of the data being stored or used, and regardless of whether or not that information is publicly available in disaggregated forms. Thomson Reuters causes the types of harms discussed here when it gathers even the most accurate facts or profiles about Californians without their informed consent and without their opportunity to control the flow of their information. Material harm also flows from the lost value of the information itself.[58] Each of these types of harms occur independent of the specific content of the

---

[55] *See* Marion Fourcade & Keiran Healy, *Seeing Like a Market*, 15 Socio-Econ. Rev. 9, 25 (2017) (describing how the processes of big data accumulation and creating of individual data profiles creates a market that better extracts value from consumers); Dan L. Burk, *Algorithmic Legal Metrics*, 96 Notre Dame L. Rev. 1147, 1178-81 (2021) ("The purpose of private-sector surveillance and algorithmic profiling is to develop systems of categories that will maximize profit extraction from the individuals profiled.").

[56] Kenneth C. Laudon, Markets and Privacy, 39 Communications of the Assoc. for Computing Machinery 92 (1996); Brian Stack, Experian, Here's How Much Your Personal Information is Selling for on the Dark Web (Dec. 17, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/

[57] *See* Kenneth C. Laudon, Markets and Privacy, 39 Communications of the Assoc. for Computing Machinery 92 (1996); *see also* Brian Stack, Experian, Here's How Much Your Personal Information is Selling for on the Dark Web (Dec. 17, 2017).

[58] Dan L. Burk, *Algorithmic Legal Metrics*, 96 Notre Dame L. Rev. 1147, 1180-82 (2021); Julie E. Cohen, *What Privacy Is For*, 126 Harv. L. Rev. 1904, 1916 (2013); Kenneth C. Laudon, Markets and Privacy, 39 Communications of the Assoc. for Computing Machinery 92 (1996); Brian Stack, Experian, Here's How Much Your Personal Information is Selling for on the Dark Web (Dec. 17, 2017),             https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

Document Ref: SQXX4-4MG45-7ADOH-EOOKW

data profiles (accurate or not) and impact, in the same way, each Californian whose information is accessible in CLEAR.

The harms discussed above are rapidly worsening as more aspects of individuals' lives are aggregated and compiled into data profiles—and Thomson Reuters continues to seek out new sources and types of information to add to CLEAR, including, potentially, ████████████.[59] Californians have no way to know or control when, or what, new information about them Thomson Reuters will take, compile, connect, and sell for profit.

## V. THOMSON REUTERS' CLEAR PRODUCT IS NOT JOURNALISM

Despite the wire-service moniker in Thomson Reuters, the company's CLEAR activities cannot be called journalistic, as it has previously argued.[60] Two well-known journalists and journalism educators, Bill Kovach and Tom Rosenstiel, identify ten elements common to good journalism.[61] These include journalism's obligation to truth and verification, its service to citizens and position as an independent monitor of power, and its role as a public forum. Of these principles, one of the most central and widely accepted is that journalists "[t]ake responsibility for the accuracy of their work[, and v]erify information before releasing it."[62] Another is to "diligently

---

[59]  TR-BROOKS127802 (listing ████████████████████████ in a page of a presentation to Thomson Reuters entitled "Current TR Coverage of Key Capabilities of RFC Value Chain"); Godlewski Dep. 219:13-220:4; Thomson Reuters CLEAR: The Smarter Way to Get Your Investigative Facts Straight, TR-BROOKS062991-TR-BROOKS062998; Godlewski Dep. 54:9-55:6; *see* Joseph Turow, "Hear That? It's Your Voice Taken for Profit," New York Times essay, September 12, 2021, https://www.nytimes.com/2021/09/12/opinion/voice-surveillance-alexa.html. Documents produced in this litigation suggest that Thomson Reuters is exploring the addition of ████████████ to its CLEAR profiles; *see also* Oliver Wyman Project Report, *Accelerate Risk, Fraud and Compliance Strategy: Project Report* (January, 2021), TR-BROOKS127802.

[60]  *Brooks v. Thomson Reuters Corp.*, No. 3:21-cv-01418-EMC, ECF No. 53 at 17 (N.D. Cal. Aug 16, 2021) (order granting in part and denying in part motion to dismiss).

[61]  "The Elements of Journalism," American Press Institute, no date, https://www.americanpressinstitute.org/journalism-essentials/what-is-journalism/elements-journalism/

[62]  Society of Professional Journalists, *SPJ Code of Ethics* (Sep. 6, 2014), https://www.spj.org/ethicscode.asp, last accessed May 29, 2022.

Document Ref: SQXX4-4MG45-7ADOH-EOOKW

CONFIDENTIAL

seek subjects…to allow them to respond."[63]

These propositions highlight just how different CLEAR is from journalistic practices. As Kovach and Rosenstiel note, professional norms require that journalists determine the accuracy of their information, while CLEAR disavows its responsibility for accuracy. In fact, a disavowal of accuracy is built into the very structure of Thomson Reuters' purchasing of data.[64] And Thomson Reuters expressly disclaims the accuracy of the data it gathers and sells about millions of people. The Public Records Privacy Statement notes that "Thomson Reuters (including its affiliates and subsidiaries, collectively, "Thomson Reuters") sources Public Records data from various third parties, including government agencies and private data providers.[65] The nature of the data and the collection processes limit our ability to independently verify or validate the accuracy and completeness of the data and data is subject to change at any time without notice. All data is provided "AS IS" without any warranty of any kind."[66] While journalism centrally emphasizes verification and accuracy, CLEAR disclaims it. And while journalists seek to contextualize information through public and transparent dialogue with the subjects of their information gathering, CLEAR provides limited—if any—opportunity for consumers to respond to the data profiles it makes available. As media scholar D. Charles Whitney observed, "nothing is more crucial to a news organization than its reputation for accuracy and [ ] nothing is more crucial to establishing this reputation than the honest, timely and public admissions of errors."[67] CLEAR

---

[63] *Id.*

[64] ████████████████████████████████████████████████████████████

[65] Thomson Reuters' Public Records Privacy Statement (Oct. 20, 2021), TR-BROOKS000056-TR-BROOKS000059.

[66] *Id.*

[67] Stephen Hess, "Corrections: When the News Media Make Mistakes," Brookings, Dec. 1, 1998, https://www.brookings.edu/articles/corrections-when-the-news-media-make-mistakes/

Document Ref: SQXX4-4MG45-7ADOH-EOOKW

cannot reasonably be described as journalism, and Thomson Reuters itself essentially acknowledges as much—it does "not allow journalists access to CLEAR."[68]

## VI. CONCLUDING COMMENTS

Thomson Reuters' operation of the CLEAR product affects Californians' right to control personal information and to be let alone such that all Californians whose information is accessible through CLEAR are so harmed. Particularly concerning as it relates to these privacy rights is the amount of personal information that is made available through CLEAR, without the knowledge and consent of Californians generally. CLEAR does its work by aggregating many databases at a scale not previously possible in ways that are opaque to the public, with rules about client data use that are not difficult to circumvent, and with information Thomson Reuters disavows when it comes to accuracy. The very availability of CLEAR to invade Californians' privacy with unwanted profiling harms all Californians whose information is available through CLEAR by diminishing their rights to control information and be let alone.


Respectfully Submitted,

*Joseph Turow*

DATED:   06 / 01 / 2022

Joseph Turow


(citing D. Charles Whitney, "Begging Your Pardon: Corrections and Corrections Policies at Twelve U.S. Newspapers," Gannett Center for Media Studies (Research Report), 1998).

[68] TR-BROOKS092889.

Document Ref: SQXX4-4MG45-7ADOH-EOOKW

CONFIDENTIAL

# APPENDIX 1

CONFIDENTIAL

## Appendix 1: List of Materials Considered

### Case Materials

Complaint, *Brooks v. Thomson Reuters Corp.*, No. 21-cv-01418-EMC (filed in Superior Court, County of Alameda, Case No. Rg200828n8) (Dec. 3, 2020).

Defendant Thomson Reuters Corporation's Answer and Affirmative Defenses to Plaintiffs' Class Action Complaint, *Brooks v. Thomson Reuters Corp.*, No. 21-cv-01418-EMC (Sept. 10, 2021).

Order Granting in Part and Denying in Part Def's Mot. to Dismiss, *Brooks v. Thomson Reuters Corp.*, No. 21-cv-01418-EMC (Aug. 16, 2021).

Defendant Thomson Reuters' Corporation's Responses and Objections to Plaintiffs' First Set of Interrogatories to Defendant, *Brooks v. Thomson Reuters Corp.*, No. 21-cv-01418-EMC (Apr. 4, 2022).

All documents cited in my report that are not cited herein.
Each cited document as well as any attachments to that document.

### Deposition Testimony

Deposition of Paul Godlewski, dated May 6, 2022, and deposition exhibits as cited herein.

Deposition of Steven Fox, dated May 16, 2022, and deposition exhibits as cited herein.

Deposition of Dori Buckethal, dated May 18, 2022, and deposition exhibits as cited herein.

### Production Documents

| Description | Beg Bates | End Bates |
|---|---|---|
| Video of sample CLEAR search for plaintiff Rasheed Shabazz by Plaintiffs' pre-suit investigators, Quest Research & Investigations | PLAINTIFFS_010275 | PLAINTIFFS_010275 |
| Thomson Reuters Privacy Statement (Effective June 2012, Last Updated January 2020) | TR-BROOKS000011 | TR-BROOKS000028 |
| Public records privacy statement (Oct. 20, 2021) | TR-BROOKS000056 | TR-BROOKS000059 |
| Thomson Reuters Personal Information Request form | TR-BROOKS000075 | TR-BROOKS000076 |
| Thomson Reuters CLEAR HomePage (Oct. 20, 2021) | TR-BROOKS000082 | TR-BROOKS000086 |

Document Ref: SQXX4-4MG45-7ADOH-EOOKW

CONFIDENTIAL

| | | |
|---|---|---|
| CLEAR Program Timeline for Q4 (Oct 2020) slide | TR-BROOKS002670 | TR-BROOKS002670 |
| CLEAR Program Timeline for Q1-Q2 (Jan 2020) slide | TR-BROOKS002672 | TR-BROOKS002672 |
| Account Validation and Certification (AVC) Form Westlaw and CLEAR (Government) - blank | TR-BROOKS003096 | TR-BROOKS003097 |
| Individual Report Plus Associates, Brooks, Cat (Nov. 30, 2021) | TR-BROOKS005220 | TR-BROOKS008254 |
| Acceptable Uses of TR Public Records Products (internal use only, issued Jan 2019) | TR-BROOKS013536 | TR-BROOKS013538 |
| Account Validation & Certification FAQs (internal use only, Jan 2020) | TR-BROOKS013540 | TR-BROOKS013541 |
| Compliance Presentation | TR-BROOKS013551 | TR-BROOKS013555 |
| Compliance Investigations FAQ (internal use only, Jan 2020) | TR-BROOKS013613 | TR-BROOKS013615 |
| Consumer Collections – Corp and Gov | TR-BROOKS013617 | TR-BROOKS013622 |
| Fair Credit Reporting Act (FCRA) FAQs (internal use only, issued Jan 2020) | TR-BROOKS013651 | TR-BROOKS013652 |
| CLEAR Use Case Chart for Government (company confidential) | TR-BROOKS013677 | TR-BROOKS013682 |
| Fraud Prevention & Investigations Review Request form | TR-BROOKS013741 | TR-BROOKS013741 |
| Program Integrity/FWA Customer Vetting Guidance – Customer Vetting Checklist | TR-BROOKS013742 | TR-BROOKS013743 |
| Consumer Fraud Investigation FAQs | TR-BROOKS013744 | TR-BROOKS013744 |
| CLEAR with Web Analytics ad | TR-BROOKS013829 | TR-BROOKS013829 |
| "Increase Revenue Recovery" flyer | TR-BROOKS013849 | TR-BROOKS013849 |
| "Increase Child Support Collections" flyer | TR-BROOKS013854 | TR-BROOKS013854 |

Document Ref: SQXX4-4MG45-7ADOH-EOOKW

CONFIDENTIAL

| | | |
|---|---|---|
| Thomson Reuters for Customer & Third Party Risk | TR-BROOKS013865 | TR-BROOKS013865 |
| Account Validation and Certification (AVC) Form Program Integrity (Fraud, Waste & Abuse/Pondera/Endera) – blank (July 2020) | TR-BROOKS013879 | TR-BROOKS013883 |
| Account Validation and Certification (AVC) Form Westlaw and CLEAR (Law Firm) - blank | TR-BROOKS013903 | TR-BROOKS013906 |
| Corporate account validation and certification (July 1, 2020) | TR-BROOKS013907 | TR-BROOKS013910 |
| Thomson Reuters Strategic Licensing – Sample Contract Provisions and Alternatives | TR-BROOKS017607 | TR-BROOKS017637 |
| Thomson Reuters' Master Licensing Agreement | TR-BROOKS017644 | TR-BROOKS017654 |
| Account Validation and Certification (AVC) Form Westlaw and CLEAR (Corporate) – completed by David Burghauser and Luke Brindle-Khym of Quest Research & Investigations | TR-BROOKS018652 | TR-BROOKS018655 |
| Email Chain between TR personnel (Amy Hurwitz, Shelly Bouchard, Vickie McElroy, Paul Godlewski, and others) discussing issues with CLEAR 3.0 access and development of user guides (Feb and March 2015) | TR-BROOKS018713 | TR-BROOKS018717 |
| Chart of client groups and corresponding CLEAR product uses | TR-BROOKS018762 | TR-BROOKS018763 |
| Email Chain between Shishir Yadav (Pangea3) and Amy Goin, Paul Godlewski, Tiffany Holman, Eric Gerhard, Sonya Southward, and Marilee Winiarski (TR) | TR-BROOKS018865 | TR-BROOKS018867 |

Document Ref: SQXX4-4MG45-7ADOH-EOOKW

CONFIDENTIAL

| discussing █████████ (June 2015) | | |
|---|---|---|
| Email from Ken Virnig to Kevin Appold, Paul Wohletz, and Eric Gerhard discussing use of phone number in Person Search or Phone Search (March 2016) | TR-BROOKS019396 | TR-BROOKS019396 |
| Email Chain between Kathleen Miner and Paul Godlewski editing chart outlining CLEAR product use (March 2017) | TR-BROOKS019843 | TR-BROOKS019847 |
| Thomson Reuters CLEAR: Acceptable Use Guidelines | TR-BROOKS020864 | TR-BROOKS020864 |
| Individual Report, Sample-Document | TR-BROOKS020865 | TR-BROOKS020890 |
| Annual Subscription Renewal, ████████ ██████████ ██████ & West Publishing Corporation (June 18, 2015) | TR-BROOKS020891 | TR-BROOKS020894 |
| Annual Subscription for Weekly Data Updates, ██████████ & West Publishing Corporation (July 1, 2017) | TR-BROOKS020898 | TR-BROOKS020900 |
| Agency Agreement, West Group & ████████ (Sept. 21, 2000) | TR-BROOKS020934 | TR-BROOKS020935 |
| Contract ████████ ████████ (June 16, 1999) | TR-BROOKS020936 | TR-BROOKS020942 |
| Contractual Agreement Between ████████ ██████████ & West Publishing Corporation (Oct. 1, 2020) | TR-BROOKS020985 | TR-BROOKS020989 |
| Agreement █████████ █ West Services Inc. & ██████ ████████ (Feb. 8, 2013) | TR-BROOKS020995 | TR-BROOKS021000 |

Page **26** of 32

CONFIDENTIAL

| | | |
|---|---|---|
| Tax Assessors' Survey: Using CLEAR Has Helped Agencies Collect Additional Money & Resolve Investigations More Quickly | TR-BROOKS024020 | TR-BROOKS024021 |
| "Tax Assessors' Survey: Using CLEAR" Has Helped Agencies Collect Additional Money & Resolve Investigations More Quickly" white paper | TR-BROOKS024020 | TR-BROOKS024021 |
| How CLEAR Helped Track Down a Fugitive Who Owed $63,000 in Unpaid Child Support | TR-BROOKS024022 | TR-BROOKS024023 |
| BDR Cube Hanger CLEAR | TR-BROOKS026283 | TR-BROOKS026284 |
| Data License Agreement, West Publishing & ██████ (Aug. 25, 2016) | TR-BROOKS035701 | TR-BROOKS035708 |
| Data Licensing Agreement, West Services & ████ ██████████ (July 19, 2004) | TR-BROOKS036159 | TR-BROOKS036210 |
| Pricing Addendum, West Services & ████████ ██████████████ (Aug. 29, 2006) | TR-BROOKS037708 | TR-BROOKS037708 |
| Pricing Addendum, West Services & ██████ ██████████████ (June 1, 2017) | TR-BROOKS037712 | TR-BROOKS037713 |
| Addendum to the Reseller Services Agreement For Use of Reference Services, West Services & █████ ██████████████ (Nov. 29, 2006) | TR-BROOKS037780 | TR-BROOKS037787 |
| Purchase Order, █████ █████████████████ ████████ | TR-BROOKS037849 | TR-BROOKS037849 |
| Data Purchase & Supply Agreement, ██████ █████████████ & West Services, Inc. (Dec. 15, 2003) | TR-BROOKS038615 | TR-BROOKS038642 |

Page 27 of 32

CONFIDENTIAL

| | | |
|---|---|---|
| Second Addendum to the Data Purchase & Supply Agreement, ███████ & West Services, Inc. (Feb. 9, 2007) | TR-BROOKS038643 | TR-BROOKS038644 |
| Data License Agreement, ███████ & West Services, Inc. (Dec. 28, 2004) | TR-BROOKS038650 | TR-BROOKS038665 |
| Amendment to the Data License Agreement, ███████ & West Services, Inc. (Feb. 9, 2007) | TR-BROOKS038666 | TR-BROOKS038667 |
| Second Addendum, ███████ & West Services, Inc. (Dec. 28, 2004) | TR-BROOKS038668 | TR-BROOKS038672 |
| Order Form for ███████, West Services & ███████ (Dec. 14, 2014) | TR-BROOKS038748 | TR-BROOKS038751 |
| License Agreement, West Publishing & ███████ (Mar. 1, 2017) | TR-BROOKS038799 | TR-BROOKS038808 |
| Data Reseller Agreement, West Publishing & ███████ (May 25, 2019) | TR-BROOKS038817 | TR-BROOKS038835 |
| Amendment to the Reseller Agreement, ███████ & West Publishing Corporation (Sept. 21, 2020) | TR-BROOKS038836 | TR-BROOKS038837 |
| Data Purchase Agreement, West Publishing & ███████ (Aug. 1, 2017) | TR-BROOKS039000 | TR-BROOKS039012 |
| Vehicle Verification Service Agreement, West Services & ███████ (Nov. 13, 2009) | TR-BROOKS039038 | TR-BROOKS039048 |
| Addendum to Contact Identity Services Reseller | TR-BROOKS039301 | TR-BROOKS039307 |

Document Ref: SQXX4-4MG45-7ADOH-EOOKW

| | | |
|---|---|---|
| Agreement, West Services & ███████ (Feb. 2, 2010) | | |
| Email Chain between TR personnel and client ███████ discussing CLEAR matching capabilities and issues (May and June 2015) | TR-BROOKS040077 | TR-BROOKS040089 |
| Email Chain between Kevin Appold, Paul Godlewski, and employees involved in the 2016 Everyday Heroes selection regarding potential breach of permissible use (January 2017) | TR-BROOKS044852 | TR-BROOKS044854 |
| Email chain between Tiffany Holman; Steve Kraus; Paul Godlewski; Steve Fox; Kevin Appold; Brett Peterson; Ken Virnig; Eric Gerhard; and others. | TR-BROOKS057002 | TR-BROOKS057018 |
| CLEAR Individual Report Plus Associates sample | TR-BROOKS059694 | TR-BROOKS059863 |
| CLEAR. The Easier Way to Know the Unknowns | TR-BROOKS060007 | TR-BROOKS060008 |
| Thomson Reuters CLEAR: Know the unknowns with advanced tools from Thomson Reuters CLEAR records resource | TR-BROOKS060012 | TR-BROOKS060013 |
| Thomson Reuters CLEAR: The Smarter Way to Get Your Investigative Facts Straight | TR-BROOKS062991 | TR-BROOKS062998 |
| Thomson Reuters CLEAR Case Study: San Bernardino Mass Shooting | TR-BROOKS062999 | TR-BROOKS063002 |
| Link Charts | TR-BROOKS063045 | TR-BROOKS063048 |
| 20150324 PR Content Details | TR-BROOKS082062 | TR-BROOKS082062 |
| E-mail thread with Mica Rosenberg, Kevin Appold, and Daniel DeSimone | TR-BROOKS092889 | TR-BROOKS092891 |
| Oliver Wyman Project Report, *Accelerate Risk, Fraud and Compliance* | TR-BROOKS127726 | TR-BROOKS127847 |

Document Ref: SQXX4-4MG45-7ADOH-EOOKW

CONFIDENTIAL

| Strategy: Project Report (January, 2021) | | |
|---|---|---|
| E-mail thread with Britton Wolf & Amanda Stubson | TR-BROOKS190363 | TR-BROOKS190371 |

**Literature**

ACLU Southern Cal., IN LANDMARK VICTORY FOR DIGITAL PRIVACY, GOV. BROWN SIGNS CALIFORNIA ELECTRONIC COMMUNICATIONS PRIVACY ACT INTO LAW SENDS MESSAGE TO NATION ABOUT IMPORTANCE OF SAYING NO TO WARRANTLESS DIGITAL SEARCHES (Oct. 8, 2015).

Alan Westin, Privacy and Freedom 7 (1967).

Ari Waldman, Industry Unbound: The Inside Story of Privacy, Data, and Corporate Power (Cambridge U Press, 2021).

Ballot Pamp., Proposed amend to Cal Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972).

California S.B. 178 (Oct. 8, 2015), *Privacy: electronic communications: search warrant*

danah boyd & Alice Marwick, Social Privacy in Networked Publics: Teens' Attitudes, Practices, and Strategies, in Oxford Internet Institute's "A Decade in Internet Time: Symposium on the Dynamics of the Internet and Society," (Sept. 22, 2011), available at https://osf.io/2gec4/.

Dan Bouk, The History and Political Economy of Personal Data over the Last Two Centuries in Three Acts, Osiris 32:1 (2017).

Dan L. Burk, *Algorithmic Legal Metrics*, 96 Notre Dame L. Rev. 1147 (2021).

Elizabeth Goitein, *The Government Can't Seize Your Digital Data. Except by Buying It.*, Brennan Center (Apr. 28, 2021), https://www.brennancenter.org/our-work/analysis-opinion/government-cant-seize-your-digital-data-except-buying-it.

Gilad Edelman, *Can the Government Buy its Way Around the Fourth Amendment?*, Wired (Feb. 11, 2020), https://www.wired.com/story/can-government-buy-way-around-fourth-amendment/.

Joseph Turow, "Hear That? It's Your Voice Taken for Profit," New York Times essay, September 12, 2021, https://www.nytimes.com/2021/09/12/opinion/voice-surveillance-alexa.html.

Joseph Turow, Michael Hennessy, and Nora Draper, The Tradeoff Fallacy, A Report from the Annenberg School for Communication, June 2015.

Document Ref: SQXX4-4MG45-7ADOH-EOOKW

CONFIDENTIAL

Josh Lauer, Creditworthy: A History of Consumer Surveillance and Financial Identity in America (New York: Columbia University Press, 2017)

Julie E. Cohen, *What Privacy Is For*, 126 Harv. L. Rev. 1904 (2013).

Lourdes M. Turrecha & Emily Ashley, The Rise of Privacy Tech: Defining the Privacy Tech Landscape 2021 (Nov. 2021), https://www.riseofprivacytech.com/wp-content/uploads/2021/11/TROPT-Defining-the-Privacy-Tech-Landscape-2021-v1.0-1.pdf.

Margalit Fox, Alan F. Westin, Who Transformed Privacy Debate Before the Web Era, Dies at 83, N.Y. Times (Feb. 22, 2013), https://www.nytimes.com/2013/02/23/us/alan-f-westin-scholar-who-defined-right-to-privacy-dies-at-83.html.

Marion Fourcade & Kieran Healy, *Seeing Like a Market*, 15 Socio-Econ. Rev. 9 (2017)

Mark Fitzpatrick, *Beware! Survey Finds 43% of Americans Have Been Victim of a Cybercrime*, ValuePenguin (Oct. 21, 2019).

Mary Madden & Lee Rainie, American's Attitudes About Privacy, Security and Surveillance, Pew Research Ctr. 3 (May 20, 2015), https://www.pewresearch.org/wp-content/uploads/sites/9/2015/05/Privacy-and-Security-Attitudes-5.19.15_FINAL.pdf.

McKenzie Funk, *How ICE Picks Its Targets in the Surveillance Age*, New York Times, (Oct. 2, 2019), https://www.nytimes.com/2019/10/02/magazine/ice-surveillance-deportation.html.

Michelle Cao, U.S. Dep't of Commerce, Nat'l Telecomm. & Information Admin., Nearly Three-Fourths of Online Households Continue to Have Digital Privacy and Security Concerns (Dec. 13, 2021), https://www.ntia.doc.gov/blog/2021/nearly-three-fourths-online-households-continue-have-digital-privacy-and-security-concerns.

Pew Research Ctr., Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information (Nov. 2019), https://www.pewresearch.org/internet/2019/11/15/how-americans-think-about-privacy-and-the-vulnerability-of-their-personal-data/.

Robert C. Post, "Three Concepts of Privacy," 89 Georgetown Law Journal 2087 (2000-2001).

Samuel Warren & Louis Brandeis, The Right to Privacy, 4. Harvard L.R. 193 (1890).

Society of Professional Journalists, *SPJ Code of Ethics* (Sep. 6, 2014), https://www.spj.org/ethicscode.asp, last accessed May 10, 2022.

The Elements of Journalism, American Press Institute, no date, https://www.americanpressinstitute.org/journalism-essentials/what-is-journalism/elements-journalism/.

Document Ref: SQXX4-4MG45-7ADOH-EOOKW

CONFIDENTIAL

Thomson Reuters CLEAR, https://legal.thomsonreuters.com/en/products/clear-investigation-software.

Document Ref: SQXX4-4MG45-7ADOH-EOOKW

CONFIDENTIAL

# APPENDIX 2

CONFIDENTIAL

May 2022

# JOSEPH TUROW

Annenberg School For Communication
University of Pennsylvania
Philadelphia, PA  19104
(215) 898 5842
Jturow@asc.upenn.edu

  General Information

Academic Record

Ph.D.  University of Pennsylvania (in Communications)
M.A.   The Annenberg School of Communications
     University of Pennsylvania
B.A.   The University of Pennsylvania (in English)

Professional Experience

1998-present  Robert Lewis Shayon Chair Professor
2011-2018  Associate Dean for Graduate Studies
2003-2009  Associate Dean for Graduate Studies
2002-2007  Director, Information and Society division, Annenberg Public Policy Center
1990-present  Professor, University of Pennsylvania
1986-1990     Associate Professor, University of Pennsylvania
1981-1986     Associate Professor, Purdue University
1985     Visiting Associate Professor (Summer) UCLA
1976-1981     Assistant Professor, Purdue University
1980     Visiting Assistant Professor (Summer) UCLA
1974 & 1975   Summer Lecturer, Drexel University
1972-1974     Graduate Teaching and Research Assistantships

Awards and Honors

- *The Daily You* (Yale University Press, 2011) named a "keywork in advertising research" for a volume to be published by Springer.
- Major grant from the Digital Trust Foundation to study a national survey of the privacy behaviors and needs of people with low economic status, August, 2015.
- Presented with the John P. McGovern Health Communication Award from the University of Texas School of Communication, for the book *Playing Doctor*, April 2013.
-Presented with the Distinguished Scholar Award by the National Communication Association, November 2010.
- Elected a Fellow of the International Communication Association, June 2010
-Astor Visiting Lectureship, Oxford University, for January 2009.
-Pockrass Memorial Lecturer, Penn State University, April 16, 2007.
-Grant from the John D. and Catherine T. MacArthur Foundation in support of The Hyperlinked Society conference of June 2006.
-Grants from the Robert Wood Johnson Foundation to create multi-media essay on CD-ROM aimed at educating medical students about how prime time television's images of health care might influence their patients, September 2005-July 2006 and July 2003-March 2004; distributed in Summers 2003, 2004, and 2005; 2nd edition created and distributed to first year medical students throughout the US in Summer 2006, Summer 2007, and Summer 2008.

CONFIDENTIAL

- Best faculty paper award (with coauthor Rivka Ribak), International Communication Division, Association for Education in Journalism and Mass Communication, presented at August 2002 conference.
- Major grant from Kaiser Family Foundation to study health policy issues on TV hospital programs, 2002.
- Chancellor's Distinguished Lecturer, Louisiana State University, April 2000.
- Commendation from the Provost's office for being named as the teacher of the "best doctoral course at Penn" by at least one of Penn's Ph.D. graduates of 1999.
- Awarded major grants from the Annenberg Public Policy Center for a multi-faceted study of the family and the Internet, 1998-2000.
- With Professors Kathleen Hall Jamieson and Joseph Cappella, awarded a major grant from the Ford foundation for research on the content, consequences and print-media coverage of political talk radio, 1996.
- Appointed to the National Endowment for Children's Educational Television of the US Department of Commerce, 1995-1997.
- Awarded a National Endowment for the Humanities Summer Stipend, Senior Division, 1994.
- Elected to chair the Mass Communication Division of the International Communication Association, 1993-1997
- Invited to teach a "master's session" at the 1991 annual International Communication Association Conference
- Appointed as a Commonwealth Speaker for 1991 by the Pennsylvania Humanities Council
- Awarded competitively selected research grant from the University of Pennsylvania Research Foundation, 1988-1989
- Appointed as a Commonwealth Speaker for 1989 by the Pennsylvania Humanities Council
- Appointed to the National Endowment for the Humanities Summer Stipend Advisory Committee, 1987
- Awarded a National Endowment for the Humanities Summer Stipend, Senior Division, 1986
- Top Three Mass Communication Division Paper, Mass Communication, 1977 and 1984 Speech Communication Association Conferences
- Top Ten Mass Communication Division Paper, 1981, 1983, and 1984 International Communication Association Conferences
- Authored a book designated "Book of the Month" by COMMUNICATION BOOKNOTES (May 1984)
- Recipient of the Russel Nye Award of the Popular Culture Association for the best article in the JOURNAL OF POPULAR CULTURE, 1982-83.
- Departmental Best Teaching Award, 1981 and 1983

- Dissertation Research Scholarship, 1975-1976
- University (work-free) fellowship, 1974-1975
- Full tuition scholarship, throughout graduate career
- Research and Teaching Assistantships, 1972-1974
- Dean's List With Distinction
- Phi Beta Kappa, 1971

<u>Membership in Scholarly Societies</u>

International Communication Association, 1973 -
Speech Communication Association, 1976 –
Association for Internet Researchers, 2012-

CONFIDENTIAL

&#8910; Research and Scholarship

<u>Authored Books</u>

Joseph Turow, THE VOICE CATCHERS: HOW MARKETERS LISTEN IN TO EXPLOIT YOUR FEELINGS, YOUR PRIVACY, AND YOUR WALLET, Yale University Press. 2021; Published in print, digital, and audio formats. One of Business Insider's "21 books on Big Tech to watch out for in 2021." Licensed by Yale U Press to be translated into Spanish, Chinese, and Korean.

Joseph Turow, MEDIA TODAY: AN INTRODUCTION TO A CONVERGING WORLD. New York: Routledge, fully revised 8th edition in press for 2023.  The 4th edition was **translated into Serbian** in two volumes, published in 2012 and 2013, respectively.

Joseph Turow, THE AISLES HAVE EYES: HOW RETAILERS TRACK YOUR SHOPPING, STRIP YOUR PRIVACY, AND DEFINE YOUR POWER.  New Haven and London: Yale University Press, 2017. Published in print, digital, and audio formats.

Joseph Turow, THE DAILY YOU: HOW THE NEW ADVERTISING INDUSTRY IS SHAPING YOUR IDENTITY AND YOUR WORLD. New Haven: Yale University Press, 2011.  **Translated into Turkish** and published in 2015.

Joseph Turow, PLAYING DOCTOR:  TELEVISION, STORYTELLING, AND MEDICAL POWER.  Originally New York:  Oxford University Press, 1989; Updated and expanded edition University of Michigan Press, 2010.

Joseph Turow, NICHE ENVY: MARKETING DISCRIMINATION IN THE DIGITAL AGE.  Cambridge, MA: MIT Press, 2006.

Joseph Turow, BREAKING UP AMERICA: ADVERTISING AND THE NEW MEDIA WORLD. University of Chicago Press, 1997; paperback edition, 1998. **Mainland Chinese translation** Trans. by Bin Hong.  Beijing: Huaxia Press, 2003..  Chapter 1 **reprinted** in the college composition anthology, *The Contemporary Reader*, Seventh Edition, edited by Gary Goshgarian (Addison Wesley Longman, 2001).

Joseph Turow, MEDIA TODAY: AN INTRODUCTION TO MASS COMMUNICATION 2nd edition.  Boston: Houghton Mifflin, 2003; 1st edition, 1999.

Joseph Turow, MEDIA SYSTEMS IN SOCIETY: UNDERSTANDING INDUSTRIES, STRATEGIES, AND POWER.  New York: Longman, 1992; second edition 1997.

Joseph Turow, MEDIA INDUSTRIES:  THE PRODUCTION OF NEWS AND ENTERTAINMENT.  New York:  Longman, 1984.

Joseph Turow, ENTERTAINMENT, EDUCATION, AND THE HARD SELL:  THREE DECADES OF NETWORK CHILDREN'S TELEVISION.  New York:  Praeger, 1981.

Joseph Turow, GETTING BOOKS TO CHILDREN:  AN EXPLORATION OF PUBLISHER-MARKET RELATIONS.  Chicago:  American Library Association, 1979.

Edited Books

Matt McAllister and Joseph Turow (editors), THINKING CRITICALLY ABOUT ADVERTISING AND CONSUMER CULTURE, New York and London: Routledge, 2009.

Joseph Turow and Lokman Tsui (editors), THE HYPERLINKED SOCIETY: QUESTIONING CONNECTIONS IN THE DIGITAL AGE. Ann Arbor, Michigan: University of Michigan Press, 2008.

Brooke Duffy and Joseph Turow (editors), KEY READINGS IN MEDIA TODAY. New York and London: Routledge:  2008.

Joseph Turow and Andrea Kavanaugh (editors), THE WIRED HOMESTEAD: AN MIT PRESS SOURCEBOOK ON THE INTERNET AND THE FAMILY.  Cambridge, MA: MIT Press, 2003.

Joseph Turow (Ed.), CAREERS IN MASS MEDIA.  Chicago:  Science Research Associates, 1984.


Monographs and Reports

Joseph Turow, Michael Hennessy, and Nora Draper, "Divided We Feel: Partisan Politics Drives Americans' Emotions Toward Surveillance of Low-Income Americans," April 2018. https://www.asc.upenn.edu/sites/default/files/documents/Turow-Divided-Final.pdf

Joseph Turow, Michael Hennessy, and Nora Draper, The Tradeoff Fallacy, Annenberg School for Communication, July 2015. https://www.asc.upenn.edu/sites/default/files/TradeoffFallacy_1.pdf

Joseph Turow, Americans, Marketers, and the Internet: 1999-2012.  Annenberg School for Communication, April 2014.  http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2423753

Joseph Turow, Michael Delli Carpini, Nora Draper, and Rowan Howard-Williams, "Americans Roundly Reject Tailored Political Advertising—At a Time When Political Campaigns are Embracing It," Annenberg School for Communication, U of Pennsylvania, July 2012.

Joseph Turow, "Buying Digital Advertising:  A Brief Overview."  This is a companion to a report on "Digital Advertising and News" *by* Katerina Eva Matsa, Kenny Olmstead, Amy Mitchell and Tom Rosenstiel of the Pew Project for Excellence in Journalism, February 13, 2012.  http://www.journalism.org/analysis_report/buying_digital_advertising_brief_overview

Chris Jay Hoofnagle, Jennifer King, Su Li, and Joseph Turow (listed in alphabetical order), "How Different are Young Adults from Older Adults When It Comes to Information Privacy Attitudes and Policies?"  Annenberg School for Communication (U of Pennsylvania) and Berkeley School of Law (U California, Berkeley), April 16, 2010.

Joseph Turow, Jennifer King, Chris Jay Hoofnagle, Amy Bleakley, and Michael Hennessy, "Americans Reject Tailored Advertising and Three Activities That Enable It," Annenberg School for Communication (U of Pennsylvania) and Berkeley School of Law (U California, Berkeley), November 2009.

CONFIDENTIAL

Joseph Turow (University of Pennsylvania), Christopher Hoofnagle, Deirdre Mulligan, Nathaniel Good, and Jens Grossklags (U.C. Berkeley Boalt Hall School of Law), "The FTC and Consumer Privacy in the Coming Decade," Presented at the Federal Trade Commission meeting, "Protecting Consumers in the Next Tech-ade," November 8, 2006.

Joseph Turow, "Open to Exploitation: American Shoppers Online and Offline," Report of the Annenberg Public Policy Center, June 2005.

"Prime Time Doctors: Why Should You Care?" a Multi-media essay on DVD, distributed to approximately 20,000 first-year US medical students by the Robert Wood Johnson Foundation each summer of 2003, 2004, 2005, 2006, 2007 and 2008.

Joseph Turow, Kara Coluccio, Alyssa Hersh, Lee Humphries, Lela Jacobsohn, and Nadia Sawicki, "Discussions of Health Websites in Medical and Popular Media." A Report from Consumer WebWatch, a project of Consumers Union, August 2003.

"Americans and Online Privacy: The System is Broken." Report of the Annenberg Public Policy Center, June 2003.

Matthew McAllister and Joseph Turow (editors), "Commercialism and the New Media," special issue of Journal of Broadcasting and Electronic Media 46:4 (December, 2002).

Joseph Turow and Rachel Gans, "As Seen on TV: Health Policy Issues on TV's Medical Dramas." A Report from the Kaiser Family Foundation, July 2002.

"Web Sites and the 2000 Election." Coordinated and edited three reports to the Pew Charitable Trusts, July 2002.

Joseph Turow, "Public Policies on Children's Websites: Do They Play By the Rules?" Report No. 38 of the Annenberg Public Policy Center, March 2001, 22 pages.

Joseph Turow and Lilach Nir, "The Internet and the Family 2000: The View From Parents, the View from Kids." A Report from the Annenberg Public Policy Center of the University of Pennsylvania, 35 pp.

"The Internet and the Family: The View from Parents, the View from the Press." A Report from the Annenberg Public Policy Center of the University of Pennsylvania under the direction of Joseph Turow, May 1999, 42 pp. **Reprinted** in Spanish by Professor Carole Cummings for a Web site on Youth and Internet established at Diego Portales University in Santiago, Chile.

"Call-In Political Talk Radio: Background, Content, Audiences, Portrayal in Mainstream Media," A Report from the Annenberg Public Policy Center of the University of Pennsylvania under the direction of Joseph Cappella, Joseph Turow and Kathleen Jamieson, and funded by the Ford Foundation and the Carnegie Foundation of New York, August, 1996, 72 pp.

"Program Trends in Network Children's Television,  1948-1978." Washington, DC:  Federal Communications Commission, 1979, 74.

CONFIDENTIAL

<u>Articles in Refereed Scholarly Journals</u>

Joseph Turow, "Prescience and Integrity in *The Panoptic Sort*," *International Journal of Communication*, May 6, 2022, https://annenbergpress.com/2022/03/07/international-journal-of-communicationpublishes-a-forum-on-gandys-the-panoptic-sort/.

Joseph Turow, , "The Unending Spiral of Personalization: Voice Profiling, Biometrics, Audience Construction, and the Future of Consent," Advertising & Society Quarterly vol. 22, no. 4: (2021), *Project MUSE*, <u>doi:10.1353/asr.2021.0045.</u>

Joseph Turow, "Journalism and the Voice Intelligence Industry," DIGITAL JOURNALISM, November 2020 online with print forthcoming. <u>https://doi.org/10.1080/21670811.2020.1829979</u>

Nora Draper and Joseph Turow, "The Corporate Cultivation of Digital Resignation," NEW MEDIA AND SOCIETY, March 2019.

Joseph Turow and Nick Couldry, "Media *as* Data Extraction: Towards A New Map Of a Transformed Communications Field," JOURNAL OF COMMUNICATION, Ferment in the Field special issue. 68(2018) 415-423.

Joseph Turow, Michael Hennessy, and Nora Draper, "Persistent Misperceptions:Americans' Misplaced Confidence in Privacy Policies, 2003-2015," JOURNAL OF BROADCASTING AND ELECTRONIC MEDIA 62 (2018) 461-478.

Joseph Turow, Lee McGuigan, and Elena Rosa Maris, "Making Data Mining a Natural Part of Life," EUROPEAN JOURNAL OF CULTURAL STUDIES," 8 (4) August-October, 2015, pp. 464-478.

Joseph Turow and Nora Draper, "Industry Conceptions of Audience in the Digital Space," CULTURAL STUDIES 28:4 (2014), pp. 643-656.

Nick Couldry and Joseph Turow, "Advertising, Big Data, and the Clearance of the Public Realm: Marketers' New Approaches to the Content Subsidy," INTERNATIONAL JOURNAL OF COMMUNICATION.  8 (2014) [Authors are listed in alphabetical order.]

"The Case for Studying In-Store Media," MEDIA INDUSTRIES JOURNAL 1:1 (2014) <u>http://www.mediaindustriesjournal.org/index.php/mij</u>

"Nurses and Doctors in Prime Time Series: The Dynamics of Depicting Professional Power Nursing Outlook," NURSING OUTLOOK 60:5 (2012), pp. S4-S11.

Joseph Turow, Michael Hennessy, and Amy Bleakley, "Consumers' Understanding of Privacy Rules in the Marketplace: Findings from a National Survey," JOURNAL OF CONSUMER AFFAIRS, 2008.

CONFIDENTIAL

Joseph Turow, Deirdre Mulligan, and Christopher Hoofnagle, "The Federal Trade Commission and Consumer Privacy in the Coming Decade,"  I/S: A JOURNAL OF LAW AND POLICY FOR THE INFORMATION SOCIETY 3:3 (Winter 2007-08): 723-750.

Joseph Turow and Michael Hennessy, "Internet Privacy and Institutional Trust: Insights From a National Survey," NEW MEDIA AND SOCIETY 9:2 (April, 2007) pp. 300-318.

Laura Grindstaff and Joseph Turow, "Television Sociology," ANNUAL REVIEW OF SOCIOLOGY 32 (2006) pp. 103-125.

 "Audience Construction and Culture Production: Marketing Surveillance in the Digital Age," ANNALS OF THE AMERICAN ACADEMY OF POLITICAL AND SOCIAL SCIENCE, vol. 597, January 2005, pp. 103-121.  Reprinted in Michael Hinner, editor, FREIBERGER BEITRAGE ZUR INTERKULTURELLEN UND WIRTSCHAFTSKOMMUNIKATION, Vm 3 (Munich, Germany: Peter Lang, 2007).

"'The Answers Are Always In The Body': Forensic Pathology In Us Crime Programmes," THE LANCET 364 (December, 2004), pp. 54-55.

"Internet Power and Internet Power and Social Context: A Globalization Approach to Web Privacy Concerns, JOURNAL OF BROADCASTING AND ELECTRONIC MEDIA, Fall 2003.  (Co-author with Rivka Ribak)

Matthew P. McAllister and Joseph Turow, "Commercialism in the New Media World," JOURNAL OF BROADCASTING AND ELECTRONIC MEDIA, 46:4 (December 2002), pp. 505-514.

"Family Boundaries, Commercialism and the Internet," JOURNAL OF APPLIED DEVELOPMENTAL PSYCHOLOGY, 22, (2001)  73-86.

"Domestic Zealotry and the Press: The Case of Kevorkian's Euthanasia Incident," JOURNALISM 1:2 (August, 2000), pp. 197-216. (First author, with Arthur Caplan and John Bracken.)

"Television Entertainment and the US Health Care Debate," THE LANCET 347: 9010 (May 4, 1996), pp. 1240-44.  **Reprinted** (in Spanish) as "Las series televisas y el debate sobre la sanidad norteamericana," in *Medicina y denos de comunicacion* (Barcelona, Spain: Fundacion Dr. Antonio Esteve, 1997), pp. 37-43.

"Hidden Conflicts and Journalistic Norms: The Case of Self-Coverage," JOURNAL OF COMMUNICATION 44:2 (Spring, 1994) 29-46.  Reprinted in The International Library of Politics and Comparative Government (Aldershot, England: Ashgate Publishing Ltd; forthcoming).

"The Organizational Underpinnings of Contemporary Media Conglomerates," COMMUNICATION RESEARCH 19:6, December 1992.  Reprinted in Peter Golding and Graham Murdock, (Eds.), THE POLITICAL ECONOMY OF MEDIA (Cheltenham, England: Edward Elgar, 1997).

"On Reconceptualizing 'Mass Communication,'" JOURNAL OF BROADCASTING & ELECTRONIC MEDIA, Spring 1992, pp. 105-109.

CONFIDENTIAL

"The Challenge of Inference in Interinstitutional Research on Mass Communication," COMMUNICATION RESEARCH, 18:2 (April 1991) 222-239.

"Public Relations and Newswork: A Neglected Relationship," AMERICAN BEHAVIORAL SCIENTIST 33:3 (November/December 1989) 206-212.

"Cultural Argumentation and the Mass Media:  A Perspective For Research," COMMUNICATION, 8:2 (Autumn 1985) 139-164.

"Hospitals and Hospital Administrators on Television," HOSPITALS AND HEALTH SERVICES ADMINISTRATION, Journal of the American College of Hospital Administrators 30:6 (November/December, 1985) 96-106.

"Television, the Treatment of Illness, and the Portrayal of Institutional Change," JOURNAL OF COMMUNICATION 35:4 (Autumn, 1985), 36-52 (first author with Lisa Coe).  Reprinted in G. Kreps and B. Thornton (eds.), *Health Communication: Theory & Practice* 2nd Edition (Waveland Press, 1992).

"TV's Effects on Children:  What the Experts Believe," COMMUNICATION RESEARCH REPORTS 2:1 (December 1985 149-155 (alphabetically ordered authorship with Carl Bybee and Danny Robinson).

"A Mass Communication Perspective on Publishing," JOURNAL OF POPULAR CULTURE (Spring 1984) 100-109.

"Local TV: Producing Soft News,"  JOURNAL OF COMMUNICATION (Spring, 1983) 111-123.

"Producing TV's News:  How Important is Community?"  JOURNAL OF COMMUNICATION (Spring 1982) 186-193.

"Determinants of Parental Guidance of Children's TV Viewing for a Special Subgroup:  Mass Media Scholars," JOURNAL OF BROADCASTING 26:3  (Fall, 1982) 697-711 (alphabetically ordered authorship with Carl Bybee and D. Robinson).

"The Role of 'The Audience' in Publishing Children's Books"  JOURNAL OF POPULAR CULTURE 16:2 (Fall, 1982) 90-100.  Winner of the Russell B. Nye Award

"Broadcast Television's Publicity Outlets:  An Initial Investigation,"  PUBLIC RELATIONS REVIEW  7:3 (Fall, 1981) 111-123 (first author with Ceritta Park).

"Non-fiction on Commercial Children's Television:  Trends and Policy Implication," JOURNAL OF BROADCASTING 24:4  (Fall, 1980)  437-448.

"Television Sponsorship Forms and Program Subject Matter," JOURNAL OF BROADCASTING  24:3 (Summer, 1980) 381-399.

"Occupation and Personality on Television Dramas:  An Industry View,"  COMMUNICATION RESEARCH 7:3 (July 1980) 295-318.

"Casting For Television:  The Anatomy of Social Typing," JOURNAL OF COMMUNICATION 28:4 (Autumn, 1978) 18-24.

CONFIDENTIAL

"The Impact of Differing Orientations of Librarians on the Process of Book Selection:  A Case Study of Library Tensions."  THE LIBRARY QUARTERLY (The University of Chicago Press) 48:3 (July, 1978) 278-292.

"Another View of Citizen Feedback to the Mass Media," PUBLIC OPINION QUARTERLY 41:4 (Winter, 1977-78) 534-543.

"Advising and Ordering:  Daytime, Prime Time,"  JOURNAL OF COMMUNICATION 24:2 (Spring, 1974) 138-140.

"Talk Show Radio As Interpersonal Communication," JOURNAL OF BROADCASTING 18:2 (Spring, 1974) 171-191.

"Dickens and Fire Imagery," REVUES DES LENGUES VIVANTES 40:4 (Winter, 1974)  359-370 (second author with Benjamin Fisher).


Book Chapters

"The Past, Present, and  Future of Internet Personalization." In Emily West and Matthew McAllister (Eds.), THE ROUTLEDGE COMPANION TO ADVERTISING AND PROMOTIONAL CULTURE, 2nd edition, forthcoming.

"Digital Advertising." In Gregory A. Bourchard (Ed.), ENCYCLOPEDIA OF JOURNALISM (Thousand Oaks, CA: Sage Publications, 2022).

"The Development of the Modern Advertising Industry."  Opening chapter in Jonathan Hardy (Ed.) THE ADVERTISING HANDBOOK (Routledge, 2018)

"Americans and Marketplace Privacy: Seven Annenberg National Surveys in Perspective."  In Evan Selinger, Jules Polonetsky, and Omer Tene (Eds.), CAMBRIDGE HANDBOOK OF CONSUMER PRIVACY (Cambridge University Press, 2018).

Nora Draper and Joseph Turow, "Audience Constructions, Reputations, and Emerging Media Technologies: New Issues of Legal and Social Policies." In Roger Brownsword, Eloise Scotford, and Karen Yeung (Eds.) THE OXFORD HANDBOOK OF THE LAW AND REGULATION OF TECHNOLOGY (Oxford UK: Oxford University Press), online publication date: December 2016.

"Personalization."  In Laurie Ouellett and Jonathan Gray (Eds.), KEYWORDS IN MEDIA STUDIES (New York: NYU Press, 2017).

 "The Digital Transformation of Physical Retailing." In A. Bechmann and S. Lomborg (Editors), THE UBIQUITOUS INTERNET (New York and London: Routledge, 2015).

"Self-Regulation and the Construction of Media Harms: Notes On the Battle Over Digital Privacy."  In Monroe Price and Stefaan Vurhurst (Eds.), HANDOOK OF MEDIA LAW AND POLICY (New York and London: Routledge, 2013).

"Media Buying: The New Power of Advertising." In Matt McAllister and Emily West (Editors), ROUTLEDGE COMPANION TO ADVERTISING AND PROMOTIONAL CULTURE (New York: Routledge, 2012).

CONFIDENTIAL

"The Industrial Construction of Audiences in Mass Media Industries."  In Charles Salmon (Editor), COMMUNICATION YEARBOOK *36* (Taylor & Francis).

"Media Buying: The New Power of Advertising." In Matt McAllister and Emily West (Eds.), ROUTLEDGE COMPANION TO ADVERTISING AND PROMOTIONAL CULTURE (New York: Routledge, in press).

"How Should We Think About Audience Power in the Digital Age?" In Vicki Mayer (Ed.) RESEARCH IN MEDIA INDUSTRIES. London and New York: Blackwell, 2012.

J Turow and Nora Draper, "Advertising's New Surveillance Ecosystem." In Kirstie Ball , David Lyon, and Kevin Haggerty (Eds.) ROUTLEDGE INTERNATIONAL HANDBOOK OF SURVEILLANCE STUDIES. London and New York: Routledge , 2012.

 "Doctor Kildare's Strange Case," In Henri G. Holt (Ed.), THE PICTURE OF HEALTH: MEDICAL ETHICS AND THE MOVIES. New York and London: Oxford University Press, 2011.

"Rethinking Television in the Digital Age."  In Lilie Chouliaraki and Mette Morsing (Eds.) MEDIA, ORGANISATION, AND IDENTITY.  London: Palgrave Macmillan, in press for 2010.

 "A World of Blurred Media Boundaries."  In B. Yiqun and H. Ming, POWER WITHOUT BOUNDARIES: DIALOGUE WITH SUMNER REDSTONE, Nanfang, China: Nanfang Daily Press, 2010.  In Chinese and English.

"Segment-Making and Society-Making Media: What is a Good Balance?"  In Academic Committee of Beijing Forum, SELECTED PAPERS FROM THE BEIJING FORUM (Beijing, China, 2009)

 "George Gerbner."  In Wolfgang Donsbach, editor, INTERNATIONAL ENCYCLOPEDIA OF  COMMUNICATION. London: Blackwell Publishing, 2008.

J Turow and R Gans-Boriskin, "From Expert in Action to Existential Angst: A Half Century of Television Doctors."  In  L Reagan and P Treichler (Eds.) MEDICINE'S MOVING PICTURES. State University Press of New York, 2007.

Jessica Taylor-Piotrowski and Joseph Turow, "Children and the Internet." In Jeffrey Jensen Arnett, Ed., ENCYCLOPEDIA OF CHILDREN, ADOLESCENTS, AND THE MEDIA. Newbury Park, CA: Sage, 2007.

 "Cracking the Consumer Code: Advertising, Anxiety and Surveillance in the Digital Age."  In Kevin Hagerty and Richard Ericson, Eds., THE NEW POLITICS OF SURVEILLANCE AND VISIBILITY.  Toronto: University of Toronto Press, 2006.

CONFIDENTIAL

"Taken to Extremes: Newspapers and Kevorkian's Televised Ethanasia Incident."  In Lester Friedman, Eds., CULTURAL SUTURES: MEDICINE AND MEDIA. Durham, NC: Duke University Press, 2004.

"Introduction to the Wired Homestead," in Joseph Turow and Andrea Kavanaugh (editors), THE WIRED HOMESTEAD: AN MIT PRESS SOURCEBOOK ON THE INTERNET AND THE FAMILY.  Cambridge, MA: MIT Press, 2003.

Joseph Turow and Rivka Ribak, "Toward a World System Perspective on Cross-National Web Research" in Robin Mansell, Rohan Samarajiva, and Amy Mahan, NETWORKING KNOWLEDGE FOR INFORMATION SOCIETIES: INSTITUTIONS & INTERVENTION (Delft, the Netherlands: University of Delft Press, 2002).

"U.S. Television Broadcasting," ENCYCLOPEDIA OF COMMUNICATION AND INFORMATION. (New York: Macmillan, in press).

With Lilach Nir, "The Internet and the Family: The View From Parents," in Cecilia von Feilitzen  amd Ulla Carlsson (ed.s), Children in the New Media Landscape.  (Goteborg, Sweden: UNESCO International Clearinghouse on Children and Violence on the Screen, 2000), pp. 331-348.

"Segmenting, Signaling and Tailoring: Probing the Dark Sides of Target Marketing," in Robin Andersen and Lance Strate (editors), CRITICAL STUDIES IN MEDIA COMMERCIALISM (New York: Oxford University Press, 2000).

"Marcus Welby, M.D." and "Medic" essays in Horace Newcomb, THE ENCYCLOPEDIA OF TELEVISION (Chicago: Fitzroy Dearborn, 1997).

"James Dean in a Surgical Gown," in Lynn Spigel and Michael Curtin (eds.), THE REVOLUTION WASN'T TELEVISED (New York and London: Routledge, 1996).

"Geschichtenerzalen im Zeitalter der Medien-Synergie" ("Storytelling and Media Synergy"), in B. Franzmann, et. al. (eds.), AUF DEN SHULTEN VON GUTENBERG (ON GUTENBERG'S SHOULDERS (Mainz, Germany: Stiftung Lesen, 1994), pp. 240-245.

"A Mass Communication Perspective on Entertainment Industries," in J. Curran and M. Gurevitch (eds.), CULTURE, SOCIETY, AND THE MEDIA 2nd Edition.  London: Edward Arnold, 1992; New York, Routledge, 1992.

"Power Roles and News Organizations," in C. Stratos (ed.), THE WORLD OF NEWS.  Athens, Greece: Gnosis Publishing Company, 1991.  Translated into Greek.

"Media Industries, Media Consequences: Rethinking Mass Communication," in J. Anderson (ed.), COMMUNICATION YEARBOOK.  Newberry Park, CA.: Sage Publications, 1990.

"The Critical Importance of Mass Communication As a Concept," in B. Ruben and L. Lievrow (eds.),  INFORMATION AND BEHAVIOR.  New Brunswick, NJ: Transaction Books, 1990, pp. 9-20.

"Television and Institutional Power:  The Case of Medicine," in B. Dervin, L. Grossberg, and E. Wartella, RETHINKING COMMUNICATION: PARADIGM EXEMPLARS.  Newberry Park, CA.: Sage Publications, 1989, pp. 454-473.

"Publishing Industry," in Erik Barnouw (ed.), THE INTERNATIONAL ENCYCLOPEDIA OF COMMUNICATION.  New York: Oxford University Press, 1989, Volume 3, pp. 402-406.

"Learning to Portray Institutional Power:  The Socialization of Creators in Mass Media Organizations," in Phillip Tompkins and Robert McPhee (eds.), ORGANIZATIONAL COMMUNICATION:  TRADITIONAL THEMES AND NEW DIRECTIONS.  Beverly Hills:  Sage Productions, 1985, pp. 211-234.

"The Influence of Pressure Groups on Television Entertainment:  A Framework for Analysis," in W. Rowland and B. Watkins, INTERPRETING TELEVISION.  Beverly Hills:  Sage Publications, 1985, pp. 142-164.

"Corporate Planning and Media Culture," in Robert Bostrom (ed.),  COMMUNICATION YEARBOOK 7.  Beverly Hills:  Sage Publications, 1983, pp. 412-442.

"Unconventional Programs on Commercial Television:  An Organizational Perspective," in C. Whitney and J. Ettema (eds.), INDIVIDUALS IN MASS MEDIA ORGANIZATIONS.  Beverly Hills:  Sage Publications, 1981, pp. 107-130.  Reprinted in D. Thomas, STUDIES IN MASS COMMUNICATION. Norwood, New Jersey: Ablex, 1984, pp. 77-95.

"Client Relationship and Children's Book Publishing," in Paul Hirsch, Peter Miller, and F. Gerald Kline (eds) STRATEGIES FOR COMMUNICATION RESEARCH.  Beverly Hills: Sage Publications, 1978, pp. 79-92.

Commentaries and Book Reviews

"Hear That? It's Your Voice Being Taken for Profit," Guest Essay, New York Times, September 12, 2021.

Richard John and Joseph Turow, "Cutting Back the U.S. Postal Service Would Hurt the Lifeblood of Democracy," Washington Post "Made by History" section, August 18, 2020.

"AI Marketing as a Trojan Horse," for a New America publishing project about issues surrounding artifician intelligence, November 29, 2018, https://www.newamerica.org/public-interest-technology/blog/ai-marketing-trojan-horse/

Essay "Mark Zuckerberg's Delusion of Consumer Consent," appeared in the "Opinion" (Op-Ed) Section of the *New York Times*, January 29, 2019, https://www.nytimes.com/2019/01/29/opinion/zuckerberg-facebook-ads.html

"Let's Retire the Phrase 'Privacy Policy,'" *New York Times* Opinion (Op-Ed) Section, August 20, 2018, p. A23, https://www.nytimes.com/2018/08/20/opinion/20Turow.html

Audio discussion of *The Aisles Have Eyes*, with Professors Inger Stole (U of Illinois) and Matt McAllister (Penn State U) recorded by invitation for the website of the journal ADVERTISING & SOCIETY QUARTERLY 18:1 (2017), "https://www.google.com/search?source=hp&ei=wbzXWoiJHeayggeP56fYDA&q=Fortune+"joseph+turow"+google&oq=Fortune+"joseph+turow"+google&gs_l=psy-ab.3..33i160k1l2.1664.11510.0.11848.31.31.0.0.0.0.106.2506.30j1.31.0....0...1c.1.64.psy-ab..0.30.2412...0j0i131k1j0i22i30k1j0i22i10i30k1j33i21k1.0.s70AKQ1dCRE

CONFIDENTIAL

"Google Still Doesn't Care About Your Privacy," Fortune.com, June 28, 2017, https://www.google.com/search?source=hp&ei=wbzXWoiJHeayggeP56fYDA&q=Fortune+"joseph+turow"+google&oq=Fortune+"joseph+turow"+google&gs_l=psy-ab.3..33i160k1l2.1664.11510.0.11848.31.31.0.0.0.0.106.2506.30j1.31.0....0...1c.1.64.psy-ab..0.30.2412...0j0i131k1j0i22i30k1j0i22i10i30k1j33i21k1.0.s70AKQ1dCRE

THE ATLANTIC interview (conducted and edited by Kaveh Waddel) about The Aisles Have Eyes: "Incessant Consumer Surveillance is Leaking Into Stores," *The Atlantic*, October 20, 2016. https://www.theatlantic.com/technology/archive/2016/10/incessant-consumer-surveillance-is-leaking-into-physical-stores/504821/

"The Future of Shopping is More Discrimination," *The Atlantic*, February 27, 2017. https://www.theatlantic.com/business/archive/2017/02/turow-aisles-future-of-shopping/517413/

"Behavior Aside, Consumers Do Want Control of Their Privacy," *Advertising Age*, January 29, 20013, p.  See also http://adage.com/article/guest-columnists/behavior-consumers-control-privacy/239376/

Invited blogger for ConcurringOpinions.Org, a popular blog site for law professors and policymakers.  Wrote three short opinion entries: "The Hidden Dynamics of the Media System," "The Disconnect Between What People Say and Do About Privacy," and "The Valentine's Day Gift That Keeps On Giving."

"The Importance of Distribution."  Written response to invited panel discussion on Media Industries at CarseyWolf Center at the University of California, Santa Barbara.http://www.carseywolf.ucsb.edu/files/Turow_NetWorth.pdf , 2010.

"Don't Give Google Double the Power," SAN FRANCISCO CHRONICLE, October 3, 2007, B-9.

"Wir Erleben Die Geburtsstunde Giner Kultur Der Verdächtigungen,"  GDI IMPULSE (Zurich, Switzerland), Fall 2007, pp. 64-69

Joseph Turow, Robert Gellman and Judith Turow, "Why Marketers Want Inside Your Medicine Cabinet," SAN FRANCISCO CHRONICLE, March 5, 2007, p. D-9.

Joseph Turow, Robert Gellman and Judith Turow, "Personalized Marketing of Health Products the 21st Century Way," VIRTUAL MENTOR: AMERICAN MEDICAL ASSOCIATION JOURNAL OF ETHICS, March 2007 (9:3), pp. 206-209.

"Hidden Messages: Is New Technology Empowering Consumers – Or Marketers," BOSTON GLOBE, August 27, 2006, p. D6.

"Industrial Folklore: George Gerbner's (Tele)Vision,"  THE AMERICAN INTEREST  1:4 (Summer, 2006), pp. 101-106.

"Have They Got a Deal For You; It's Suspiciously Cozy in the Cybermarket," THE WASHINGTON POST, June 19, 2005  An invited essay for the Sunday edition; republished in *Newsday*, the *Pittsburgh Post-Gazette*, and other newspapers.

CONFIDENTIAL

"The Challenges Facing Advertising," a Daily Brief commissioned by the Oxford Analytica consulting firm, week of January 19, 2004.

Book review of Commercial Culture: The Media System and the Public Interest by Leo Bogart in PUBLIC OPINION QUARTERLY (in press).

Joseph Turow, John Bracken, and Lilach Nir, "Special Report--The Internet and the Family: The View from the Press," ON THE INTERNET: AN INTERNATIONAL PUBLICATION OF THE INTERNET SOCIETY, July/August, 1999, pp. 26-41.

Joseph Turow and Arthur Caplan, "Media dropped the ball on Kevorkian broadcast," DETROIT FREE PRESS, Sunday, February 28, 1999, page 3J

"Workplace Bathroom as Think Tank," LOS ANGLES TIMES, March 2, 1998, pp. F8-F9.

"Breaking Up America: The Dark Side of Target Marketing," AMERICAN DEMOGRAPHICS, in November, 1997.

"Image Tribes," PENNSYLVANIA GAZETTE, May 1997.

"Interview with Larry King" In Larry King, FUTURE TALK (New York: Harper Collins, 1997).

"Print Media Coverage of Political Talk Radio," Annenberg School For Communication, August, 1996.

"Television's Doctor Shows," ENCYCLOPEDIA BRITANICA 1996 MEDICAL ANNUAL (Chicago: Encyclopedia Britannica, 1995), pp. 104-117.

"Doc Shows Give Wrong Health-Care Diagnosis," LOS ANGELES TIMES, October 31, 1994, p. F3.

"Book Review" of SOCIETY'S IMPACT ON TELEVISION, by Gary Selnow and Richard Gilbert, JOURNAL OF BROADCASTING AND ELECTRONIC MEDIA, Summer, 1994, pp. 367-369.

"Book Review" of PUBLIC RELATIONS ANNUAL by Larissa Grunig and James Grunig, JOURNAL OF COMMUNICATON.

"Commentary: Now's the Right Time for Dr. Kildare and Ben Casey," LOS ANGELES TIMES, December 18, 1993, p. F17, F22.

"Commentary: Just Boys or Civilization Destroyers? Say what you will about the moronic duo [Beavis and Butt-head], they've helped to cement MTV's identity with viewers and advertisers," LOS ANGELES TIMES, September 12, 1993, Sunday Calendar Section, p4 and 73.

"Commentary: Can a Meanie Make It in Sitcomland?" LOS ANGELES TIMES, December 29, 1992, p. F3 and F5.

"Book Review" of ORGANIZATIONAL LIFE ON TELEVISION by Leah Vande Berg and Nick Trujillo in JOURNALISM QUARTERLY.

Book Review" of AN EMPIRE OF THEIR OWN by Neal Gabler in JOURNAL OF COMMUNICATION, Autumn 1989.

"Book Review" of THE HOLLYWOOD TELEVISION PRODUCER by Muriel Cantor in JOURNAL OF BROADCASTING AND ELECTRONIC MEDIA 32:4 (Fall,.1988), 495-97.

"Television Doctors and the Real World," RESIDENT & STAFF PHYSICIAN, July 1986, 74-79.

"Book Review" of TELEVISION IN THE PUBLIC INTEREST by Michael Botein and David Rice in CONTEMPORARY SOCIOLOGY.

"Book Review" of POSITIVE IMAGES: BREAKING STEREOTYPES WITH CHILDREN'S TELEVISION by Jerome Johnstone and James Ettema in AMERICAN JOURNAL OF SOCIOLOGY.

"Children's Television" entry (on program THE SMALL FRY CLUB) in Clifford Johnson, THE BOOK OF DAYS. Ann Arbor, Michigan: Pierian Press, 1987 (with Wendy Hajjar).

"A View of Broadcast Museums," VARIETY (April 9, 1986) 96, 111.

"Book Review" of CREATING MEDIA CULTURE by Robert Snow in JOURNAL OF COMMUNICATION 34:3 (Summer, 1984) 193-196.

"Book Review" of BOOKS: THE CULTURE AND COMMERCE OF PUBLISHING BY L. Coser, C. Kadushin, and W. Powell, in LIBRARY QUARTERLY 53:2 (Spring, 1983, 191-192.

Book Review of OBJECTIVITY AND THE NEWS by Dan Schiller, in LIBRARY QUARTERLY 52:1 (January, 1982) 70-71.

"Book Review" of TELEVISION TODAY in LIBRARY QUARTERLY 51:4 (October, 1981) 454-456.

"Book Review" of PROGRESS IN THE COMMUNICATION SCIENCES edited by Melvin Voigt and Gehardt Hanneman, in Library Quarterly 51:1 (October, 1981) 126-127.

"Expanding the Spectrum of Choice in the Mass Market," SIGNAL (the official newsletter of the International Reading Association's Special Interest Group on Adolescent Literature) 3:6 (February, 1978) 1-3.

"Book Review" of TUBE OF PLENTY: THE EVOLUTION OF AMERICAN BROADCASTING by Eric Barnouw, in JOURNAL OF BROADCASTING 21:1 (Winter, 1977).

"Book Review" of POWER TO PERSUADE: MASS MEDIA AND THE NEWS by Robert Cirino, in JOURNAL OF BROADCASTING 19:3 (Summer, 1975) 378-379.

ဢ Editorial and Academic Consulting Activities

-Editorial Board Member, ADVERTISING & SOCIETY QUARTERLY, 2022-
Founding Advisory Board, Northeast Regional Privacy Scholars Conference, 2017-
-Editorial Board Member, JOURNAL OF BROADCASTING & ELECTRONIC MEDIA, 2012- , and JOURNAL OF MEDIA INDUSTRIES, 2014-
-Advisory Board Member, MEDIA AND COMMUNICATION journal of the Union of Local Public Broadcasters of Montenegro, Europe.

CONFIDENTIAL

- Series Editor, "New Media World," University of Michigan Press, 2008-
- Editorial Board Member, INTERNATIONAL JOURNAL OF COMMUNICATIOLN, 2018-continuing.
- Editorial Board Member, POETICS, 2002- 2018.
- Editorial Board Member, JOURNAL OF BROADCASTING & ELECTRONIC MEDIA, 1985-1994; 1997 -continuing.
- Editorial Board Member, JOURNALISM, 2001- 2006.
- Editorial Board member, CRITICAL STUDIES IN MEDIA COMMUNICATION, 1984-1989 (founding editorial board) and 1998-2003.
- Advising and Contributing Editor, JOURNAL OF COMMUNICATION, 1981-1991; 1996 -2000.
- Editorial Board Member, Sage Annual Reviews of Communication Research, 1986-continuing
- Founding International Advisory Board, NEW MEDIA AND SOCIETY, 1998 - continuing.
- Editorial Board Member, ENCYCLOPEDIA OF ADVERTISING.
- Awarded a major grant from the Kaiser Family Foundation for study study of health care policies on TV hospital series.
- Awarded a major grant from the Annenberg Public Policy Center for a multi-faceted study of the family and the Internet, 1998-99.
- Co-Principal Investigator on grant from the Ford Foundation to study the process and effects political talk radio, 1996. Other Principal Coinvestigators: Professors Kathleen Jamieson and Joseph Capella.
- Program review consultant, Rutger's University Department of Communication, March 1992.
- Communication Advisory Panel, Please Touch Children's Museum (Philadelphia), 1992-1993.
- Advisory Board Member, WPBT-TV, Miami, National Programming Division, for a new series aimed at "reluctant readers," 1991-
- Advising Editor, Ablex Communication Book Series, 1988-1991.
- Advisory Board Member, Telecourse Project on Mass Communication, WGBH-TV Boston, 1989-1991.
- Appointed to the National Endowment for the Humanities Summer Stipend Advisory Committee, 1987
- Assistant Editor, CENTRAL STATES SPEECH COMMUNICATION JOURNAL, 1983-1985
- Editorial Board Member, COMMUNICATION EDUCATION, 1978-1982.
- Occasional referee for manuscripts submitted to COMMUNICATION MONOGRAPHS, HUMAN COMMUNICATION RESEARCH, THE WESTERN SPEECH COMMUNICATION JOURNAL, POLITICAL COMMUNICATION, and THE LANCET.
- Reviewer of book manuscripts for HarperCollins, Holt, Rhinehart, & Winston, Allyn and Bacon, Bobbs-Merrill, Scott-Foresman, Sage Publications, Oxford University Press, and other publishers.


  Invited Presentations (examples)


- **Keynote address**, "The Unending Spiral of Personalization: Voice Profiling, Biometrics, Audience Construction, and the Future of Consent," meeting on voice technologies and privacy, Radbout University (Nijamen, The Netherlands), via Zoom, February 23, 2022.

CONFIDENTIAL

- Keynote address, *Advertising & Society* conference, November 12, 2021; address video published online in *Advertising & Society Quarterly*.
- **Communications and Media Annual Lecture 2021,** London College of Communications, planned for November 17, 2021.
- Held an "Author Meets Critics" discussion about The Voice Catchers with Nora Draper, Mara Einstein, James F. Hamilton, and Edward Timke, Advertising & Society Quarterly Conference, via Zoom, November 2021.
- Invited lecture, "Voice Biometrics, Marketing, and the Problem of Consent," University of Washington Law School, October 28, 2021.
- **Keynote discussant**, Toronto (Canada) Public Library system and McMaster University discussion series "Big Tech in Our Backyards," on May 14, 2021, via Zoom, focusing *The Voice Catchers* and *The Aisles Have Eyes.*
- Panel speaker, "Retailing and Discriminatory Digital Technologies," European University Institute conference on "Pricing Technologies and their Economic and Social Technologies," forthcoming on March 26, 2021.
- **Keynote Speaker**, "Seductive Surveillance and Consumer Technology: Ethical Challenges in Media Work," Lehigh University, October 20, 2020.
- "Seductive Surveillance and Social Change: The Rise of the Voice Intelligence Industry," Association of Internet Researchers annual conference, October 5, 2020.
- Panel speaker, "How Do We Move Beyond Consent Models in Privacy Legislation?" Public Knowledge webinar, August 21, 2020.
- "Seductive Surveillance and Social Change," Privacy Scholars Law Conference, June 4, 2020.
- **Keynote speaker**, "The Resignation Industry and the Future of Media," Infrastructures of Datafication conference, University of Copenhagen, September 12, 2019.
- "What Americans Don't Know About Marketing Research," invited talk to Facebook Corporation's Advertising Research group, July 31, 2019
- "The Resignation Industry and the Future of Media," Invited talk to Capitol Hill staffers arranged through the Wharton Policy Initiative, October 25, 2019
- Invite lecture, "The Rise of the Voice Intelligence Industry," University of Copenhagen, September 2019.
- Invited **Melvin DeFleur Memorial Lecture**, "The Resignation Industry and the Future of Media Studies," Boston University School of Communication, April 4, 2019.
- Invited lecture, "The Corporate Cultivation of Digital Resignation," CyLab Privacy and Security Institute, March 28, 2019.
- The Rise of the Resignation Industry," an invited lecture at Haifa University's Cyber Law Center, February 2019.
- Invited lecture, "Toward a Sociology of Resignation," Stanford University Department of Communication, October 1, 2018.
- Invited presentation at the "Technology and the Self" conference sponsored by the American American Academy of Sciences at Stanford University's Advanced Study in the Behavioral Sciences, September 29, 2018.
- Invited lecture, "The Resignation Industry and the Future of Media Studies," Cornell University Department of Communication, April 30, 2018.
- **Keynote speaker**, "The Data Explosion Online and Off: Pros and Cons," at a symposium in honor of Wayne State University's 150th anniversary, March 16, 2018.
- **Keynote speaker**, "Exploring Everyday Life to Understand Digital Democracy," at "Digital Democracy: Critical Perspectives in the Age of Big Data," Sodertorn University, Stockholm Sweden, November 11, 2017.
- **Keynote speaker**, "Branded Content and the New Advertising Landscape," Branded Content Research Network Conference, University of East London, November 7, 2017.

CONFIDENTIAL

-Invited lecture, "The Hidden Life of Data in 21st Century Commerce," Invited talk jointly by the University of Amsterdam Schoool of Communication Research (ASCoR) and the University of Amsterdam Law School, Amsterdam The Netherlands, February 2017; also presented as an invited lecture at Ryerson University's Privacy and Big Data Institute, Toronto Canada, February, 2017.
-Competitively selected speaker, first "Privacy Con" meeting, Federal Trade Commission, January 14, 2016.
-**Keynote panelist**, Data Power Conference 2015, University of Sheffield, June 22, 2015.
-Invited lecture, Temple University School of Communication, February 3, 2015.
-On stage "interview" of me about privacy and marketing conducted as a session at the "Mediapost RTB [real-time-bidding]"conference during Advertising Week in New York City, October 2014.
-Invited presentation, "Big Data, Marketing, and Discrimination," Federal Trade Commission meeting on "Big Data: A Tool for Inclusion or Exclusion," September 15, 2014.
-Presented annual Ethics and Media lecture, Loyola Marymount University, March 2014.
-Invited panelist, Alternative Scoring Products seminar, Federal Trade Commission, March 2013.
-Invite lecture, Goldsmith College, University of London, May 2013
-Presented invited written and oral testimony at the US Senate Committee on CSommerce, Science, and Transportation, December 2013.
-Invited lecture, University of Southern California Annenberg School, October 2013.
-Invited speaker, Culture Industries Workshop, Haifa University, October 2013.
-Invited lecture, Goldsmith College, University of London, May 2013.
-2013 John P. MCGovern Lecture in Health Communication, University of Texas at Austin, April, 2013.
-2013 *Choice Scholar* Lecturer for the Lambda Pi Eta Communication Honors Society at University of California, Santa Barbara, April 2013.
-Ford Foundation conference speaker on big-data and the media, October, 2012.
-**Keynote Speaker**, Cross-university journalism symposium in Helsinki, Finland, scheduled for May 10, 2012.
- **Keynote Speaker**, Ad-Tech conference in San Francisco, April 4, 2012.
- **Keynote Speaker**, Deutcher Medienkongress 2012, Frankfurt Germany 2012
- Faculty Seminar, Hebrew University's Department of Communication, December 27, 2011.
- Talk to the Federal Trade Commission Bureau of Consumer Protection, Washington, DC, October 4, 2011.
- Guest speaker, RIA Novosti press center (Moscow), as part of a series of seminars to commemorate RIA Novato's 70th anniversary.  September 8, 2011.  See http://en.rian.ru/agency_news/20110816/165826671.html
- Moscow State University School of Journalism, September 6, 2011.
- UCLA School of Nursing, **Keynote Speaker**, May 2011
- Haifa University, Israel, **Keynote Speaker** at the launch of a new information Studies Program, December 2010.
- New Media Days annual industry conference, Copenhagen, Denmark, **Keynote Speaker**, November 2010
- Invited testimony at a hearing titled "Consumer Online Privacy" convened by the U.S. Senate Committee on Commerce, Science, and Transportation, July 27, 2010.
- Robert Wood Johnson Foundation-sponsored conference on Digital Food-Marketing to Children, Washington, DC, April 2010
- Grand Rounds, Department of Neurosurgery, University of Pennsylvania School of Medicine, forthcoming May 2010
- Fordham University Law School, October 2009
- Columbia University School of Journalism, October 2009

CONFIDENTIAL

- Louisiana State University, Department of Communication (two talks), November 2009
- National Communication Association preconference on new approaches to media industries, November 2009
- Advertising Research Foundation, November 2009
- Microsoft Corporation, December 2009.
- Columbia University School of Journalism, December 2009.
- Louisiana State University, November 2009.
- Fordham University Law School, November 2009.
- Yale Law School, March 2009
- Oxford Internet Institute, Oxford University, June 2009.
-Distinguished Lecture, BSF/DIMACS/DyDAn Workshop on Data Privacy, Rutgers University, February 2008.
-Invited speaker, Beijing Forum, Beijing China, November, 2007.
- Keynote speaker, International Workshop on Data Mining and Audience Intelligence for Advertising , August. 2007
- Microsoft Research, Redmond, Washington, lecture on "Niche Envy," February 2007
- National University of Singapore, lecture on "Media Storytelling, Marketing, and Soft Power," January 2006.
- Federal Trade Commission, October 2006.
- Stanhope Center (London) lecture on "Shopping in the Digital Age," July 2005.
- Ford Foundation meeting, panelist on academic concerns over copyright, January 2005.
- Invited keynote speaker, Haifa University, and invited lecturer, Ben Gurion University of the Negev, Israel, November 2004.
- Central European Budapest, October 2004, series of lectures.
- University of South Florida College of Medicine, March 2004, "Media's Image of Today's Physician: A Message to Future Doctors," Tampa, Florida.
-National Academy of Sciences, Board on Children, Youth and Families, January 2001
-Invited lecturer, Haifa University, Israel, November 2000
-Chancellor's Distinguished Lecturer, Louisiana State University, April 2000
-Invited lecturer, Hebrew University, Tel Aviv University, and Haifa University, Israel, February 2000
-Fordham University, April 1999
-Philadelphia Newspapers, Incorporated, January, 1998.
-Fleishman Hillard international retreat, November, 1997.
-Fleishman Hillard New York executive meeting, October, 1997.
-New York University, May, 1997
-Florida Bar Association, March 1977.
-Senior Fellows Program, University of Texas, September 1996.
-Center For Bioethnics, University of Pennsylvania, June 1996.
-Grand Rounds lecture, Department of Pediatrics, Thomas Jefferson University Hospital, June 1996.
-Sieganthaler Conference on the Press, Nashville, Tennessee, April 1996.
-Medical College of Pennsylvania (Grand Rounds Humanities Lecture), September, 1994.
-International Communication Association, Sidney Australia July 1994
-St. Andrews Episcopal Church, March 1994, Luncheon Series on Media and Social Values
-The College of Physicians of Philadelphia (Leslie Nicholas Lecture), October, 1993
-University of Delaware, Department of Communication, November 1992
-The Center for the Humanities, Wesleyan University, October 1992
-Conference on Social Theory, Policy, and the Arts, October 1992.
-Stiftung Lesen conference, Mainz (Germany), September, 1992
-Florida Atlantic University, February, 1992
-Twentieth Century Fund, October 1991
-Institute For Contemporary Art, Philadelphia, October 1991

CONFIDENTIAL

-American Sociological Association, August 1991
-University of Pennsylvania Medical School entering class, January 1990
-University of Chicago Medical School, December 1989


🕮   Quotes and Appearances in Mass Media (examples)

- Joe Nocera, business columnist of *The New York Times*, cited my research (with Nora Draper) on digital resignation in his article "How Cookie Banners Backfired," January 29, 2022, https://www.nytimes.com/2022/01/29/business/dealbook/how-cookie-banners-backfired.html
-Guest Essay, *"Hear That? It's Your Voice Being Taken for Profit," The New York Times*, September 12, 2021, https://www.nytimes.com/2021/09/12/opinion/voice-surveillance-alexa.html
- Article about my book  *The Voice Catchers* by Shira Ovide, Tech Columnist of *The New York Times*, "Should Alexa Read Our Moods," New York Times, May 19, 2021,
-Interviewed regarding digital holiday shopping on Marketplace Tech, November 24, 2020,
- Interviewed by CNN.com about retailer-customer relations during the Covid pandemic, April 13, 2020.
-Quoted in "Welcome to the Promoconomy," by Jill Krasny, *New York Times* 20 August 2019.
-Quoted in "Timing Spurred Netflix Scene Cut," by Joe Flint, Wall Street Journal and Dow Jones Institutional News, July 18, 2019.
-Quoted in "Will Users Dump Google For an Offer of Privacy?" by Nathaniel Popper, The New York Times, 20 July 2019; also via New York Times Newsfeed and *International New York Times*.
-Essay "Mark Zuckerberg's Delusion of Consumer Consent," appeared in the "Opinion" (Op-Ed) Section of the *New York Times*, January 29, 2019,
https://www.nytimes.com/2019/01/29/opinion/zuckerberg-facebook-ads.html .
-Interviewed for an entire "Communicators" show in October 2018 on C-Span.  The interview is available online.  https://c-span.org/video/?452648-1/communicators-joseph-turow
-Essay "Let's Retire the Phrase 'Privacy Policy,'" appeared in the "Opinion" (Op-Ed) Section of the *New York Times*, August 20, 2018, p. A23,
https://www.nytimes.com/2018/08/20/opinion/20Turow.html
-*New York Times* article about the *Divided We Feel* report: Natasha Singer, "Creepy or Not?  Your Privacy Concerns Probably Reflect Your Politics," *New York Times*, April 30, 2018, pB4, https://www.nytimes.com/2018/04/30/technology/privacy-concerns-politics.html
-Interviewed about *The Aisles Have Eyes* on NPR's "Fresh Air with Terry Gross," February 13, 2017.
-Interviews about *The Aisles Have Eyes* during Winter and Spring 2017 on public radio's Marketplace, CBS Morning News, the BBC Radio 4, public radio's Marketplace and in *Kiplinger's Personal Finance* magazine, among others.
-*The New York Times* devoted an article on the first page of the Business Section to the "Tradeoff Fallacy" report, June 4, 2015.  Among the more than 3000 articles discussing the report were those from The Washington Post, Techcrunch, Fortune, ClickZ, and Mediapost.
-Interview with Bloomberg TV on "The Tradeoff Fallacy," June 9, 2015.
-Quoted in The Business of Fashion (UK) on "Will Personalised Pricing Take E-Commerce Back to the Bazaar," March 20, 2015.
-Quoted in The Guardian (UK) on the rise of voiceprint ID Technology, October 14, 2014.
-Quoted in *The New York Times* and *Washington Post* regarding Facebook's decision to let users alter their ad profiles, June 13, 2014.

CONFIDENTIAL

-Appeared in a Marketplace radio program report (on NPR) on data brokers, May 28, 2014.
-Profiled and interviewed in Marketing News, the magazine of the American Marketing Association, March 2014.
-Quoted in *The New York Times*, *International Herald Tribune*, *Toronto Star*, and other news outlets about the implications of data broker Acxiom's activities, September and October, 2013.
- Entire *New York Times* article devoted to my lead-authored report on tailored political advertising, July 24, 2012.
-Interviewed by Terry Gross on NPR program "Fresh Air" February 22, 2012.
- Among other places, articles about my work appeared in The Philadelphia Inquirer (December 4, 2011), The Chronicle of Higher Education (January 29, 2012), The New York times (February 21, 2012), Philadelphia Inquirer (March 11, 2012), Christian Science Monitor (March 14, 2012), and Times Higher Education Supplement (April 5, 2012)
-The Associated Press carried results of the report on young adults and privacy (April 15, 2010) and the article appeared in newspapers throughout the US and the world. A story by Agence France Presse based on an interview with me gave the research further coverage in print and online. Google News lists 346 links to the topic.
- The *New York Times* quoted me in three separate articles regarding media-and-marketing issues during the 2010-2011 academic year—on November 14, 2010, August 30, 2010, and August 8, 2010. The latter article, in the *New York Times Magazine*, called me "ranking wise man on some thorny new-media and marketing topics."
- *Marketplace*, a popular public-radio program, interviewed me four times during the 2010-2011 academic year for media-and-marketing stories—on March 17, 2011, December 20, 2010, October 27, 2010, October 14, 2010, and August 14, 2010.
- NPR's *Studio 360* built a story around my new Playing Doctor book, which it called Playing Doctor. The piece aired on December 10, 2010, as part of a *Studio 360* program on medicine in popular culture.
- The Associated Press carried results of the report on young adults and privacy (April 15, 2010) and the article appeared in newspapers throughout the US and the world. A story by Agence France Presse based on an interview with me gave the research further coverage in print and online.
- *New York Times* article quoting my comments at Federal Trade Commission roundtable on privacy, December 7, 2009.
- Entire *New York Times* article with data chart and photo of me devoted to the report on tailored advertising, September 29, 2009
- Research described in Saul Hansell's *New York Times* "Bits blog, March 19, 2009.
- Quoted in *New York Times*, *Washington Post*, *USA Today*, public radio's *Marketplace*, and elsewhere regarding the FTC decisionmaking regarding Google's decision to buy DoubleClick, late 2007.
- Findings of the "Open for Exploitation" survey reported in an Associated Press national article, on CNN, MSNBC, Fox, the *New York Times*, *Washington Post*, and many other news outlets throughout the US and internationally.
- Quoted prominently in a New York Times Magazine article about the Nielsen ratings, April 10, 2005. The article named "Joseph Turow . . . probably the reigning academic expert on media fragmentation…."
- Research highlighted in the Penn Arts & Sciences Magazine, Winter 2005.
- Interviewed in a story about cameras in the courtroom that appeared on CNN, July 2, 2004.
- Profiled (with photo) in *The New York Times* (June 14, 2004) about the Knowledge Held

CONFIDENTIAL

Hostage conference I implemented.

- Interviewed in a story on cellphone privacy that appeared on the CBS Evening News with Dan Rather and the CBS Morning News, December 2 and 3 2003.

- Front page article (with photo) in Philadelphia Business Journal (July 28, 2003) about the Robert Wood Johnson funded CD, *Prime Time Doctors: Why Should You Care?*

-"Americans and Online Privacy,: the APPC report released in June 2003, received coverage in the Wall Street Journal, New York Times, and Washington Post as well as nationally and internationally through Associated Press and Reuters articles.

-Article in The New York Times (12/29/02) about my attempt to de-capitalize the word internet.

-The Today Show (NBC) August 24, 2002, on ethical issues relating to pharmaceutical marketing

-The study for the Kaiser Family Foundation on health policy issues in TV's medical dramas was cited in several newspapers around the US.

-The 3rd Internet and the Family report, released at the end of March, 2001, received exclusive coverage in the New York Times and then appeared in many news sources across the country, including the Washington Post, Chicago Tribune, LA Times, Associated Press, and MSNBC. The study was received favorably by the Federal Trade Commission; it has been cited in at least one congressional hearing, and it continues to be cited in an ongoing debate about the Children's Online Privacy Protection Act.

-Over 100 television appearances, hundreds of newspaper quotes, Time magazine citation, and several radio interviews around release of "The Internet and the Family 2000," May 2000.

-Appearance on ABC Evening News spot about target marketing, March 2000.

-Various newspaper quotes (including *Newsday* regarding AOL's proposed purchase of Time Warner.)

-The Internet & Family study received enormous coverage in print, broadcast, and on the Internet during early May 1999. A (national) front page article in *The New York Times* was picked up around the nation. A long Associated Press piece was also circulated throughout the country, as were a *Newsday* article and Knight-Ridder wire article. CBS news commentator Charles Osgood read a poem about the study on the CBS Radio Network.

-National Public Radio, Talk of the Nation guest for entire hour on media and social segmentation, January 1999

-*Philadelphia Inquirer*, May 10, 1998, large article highlighting my research.

-*Toronto Globe and Mail*, August 9, 1997, entire article about *Breaking Up America*

-*Atlantic Monthly*, June 1997, entire article on *Breaking Up America*

-*Talk of the Nation*, May 6, 1997; the entire program focused on *Breaking Up America*

-*Christian Science Monitor*, October 3, 1996, on strategies behind television's fall shows

-*Houston Chronicle*, August 25, 1996, on political talk-radio report

-National AP wire, August, 1996, on the impact of media mergers on radio

-*Newsday*, August 4, 1996, on strategies behind the networks' "family" dramas

-*Today Show*, November 17, 1994, on the history of doctor images on television

-*Dateline NBC ,* July 10, 1993, on product placement in television and theatrical film