# EXHIBIT 6
## (Redacted)

CONFIDENTIAL - PAUL GODLEWSKI

```
 1         UNITED STATES DISTRICT COURT FOR THE
 2            NORTHERN DISTRICT OF CALIFORNIA
 3                 SAN FRANCISCO DIVISION
 4    *  *  *  *  *  *  *  *  *  *  *  *  *  *
 5   CAT BROOKS and RASHEED SHABAZZ, individually
     and on behalf of all others similarly situated,
 6
              Plaintiffs,
 7
        vs.            Case No.  3:21-cv-1418-EMC
 8
     THOMSON REUTERS CORPORATION,
 9
              Defendant.
10
        *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
11
              *****   CONFIDENTIAL  *****
12
13   REMOTE VIDEOTAPED DEPOSITION OF PAUL GODLEWSKI
14
                     May 6, 2022
15              10:00 a.m. to 6:36 p.m.
16           REPORTED BY ANITA KORNBURGER
             REGISTERED PROFESSIONAL REPORTER
17
18
              *****   CONFIDENTIAL  *****
19
20    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
21
22
23
24
25
```

CONFIDENTIAL - PAUL GODLEWSKI

```
 1                  A P P E A R A N C E S
 2   GIBBS LAW GROUP LLP, by
     Mr. Ezekiel S. Wald
 3   Mr. Andre Mura
     Mr. Mark Troutman
 4   1111 Broadway, Suite 2100
     Oakland, California 94607
 5   510-350-9700
     zsw@classlawgroup.com
 6   Appearing by videoconference on behalf of the
     Plaintiffs.
 7
     SURVEILLANCE TECHNOLOGY
 8   OVERSIGHT PROJECT, by
     Mr. Albert Fox Cahn (pro hac vice)
 9   40 Rector Street, 9th Floor
     New York, NY 10006
10   albert@stopspying.org
     Appearing by videoconference on behalf of the
11   Plaintiffs.
12   PERKINS COIE LLP, by
     Ms. Susan Fahringer
13   Ms. Nicola Menaldo
     Mr. Hayden Schottlaender
14   1201 Third Avenue, Suite 4900
     Seattle, Washington 98101-3099
15   sfahringer@perkinscoie.com
     Appearing by videoconference on behalf of the
16   Defendant.
17   ALSO PRESENT:  Jon Olson - Thomson Reuters
18
                          I N D E X
19
20   Examination by                              Page
21   Mr. Wald. . . . . . . . . . . . . . . . . .   6
22
23
24
25
```

```
 1      Q.   Was it in the last year?
 2      A.   I would assume, based on the most recent
 3   date that I can see.
 4      Q.   The current position at the top under
 5   Progressive Career Path says 2021.  Is that still
 6   your position today?
 7      A.   No.
 8      Q.   What is your position today?
 9      A.   Senior director of marketing, outbound
10   product marketing.
11      Q.   On the top of this document, under your
12   name, it has your work e-mail and then it has a
13   phone number.  Is that your work phone number?
14      A.   That's my personal number.
15      Q.   Your personal number.  And then next to
16   your personal number there's a black box.  It looks
17   like something was crossed out.  Do you know what
18   was crossed out?
19      A.   I can't recall.
20      Q.   Did you cross it out?
21      A.   No.
22      Q.   Did you ask for it to be crossed out?
23      A.   No.
24      Q.   Does it look to you like it might be an
25   address?
```

CONFIDENTIAL - PAUL GODLEWSKI

```
 1   developing strategies that help bring the CLEAR
 2   product to its customers in order to ultimately
 3   increase revenue and sales?
 4        A.   To bring a product to customers so they
 5   can become more efficient with the challenges that
 6   we are faced with so that, yes, Thomson Reuters,
 7   could have a successful product line.
 8        Q.   It also says here you drove the go to
 9   market launch for Abogado.com; is that right?
10        A.   Yes.
11        Q.   Does CLEAR work with international
12   companies?
13        A.   No.  But I'm curious as to why you asked
14   about Abogado.com and then back to CLEAR.
15        Q.   It looks here like you work with some
16   relationships with organizations that might focus
17   on customer groups that could include non-United
18   States residents; is that right?
19        A.   Abogado.com is a FindLaw-related
20   solution.  It has nothing to do with CLEAR.
21        Q.   So CLEAR's customers are entirely United
22   States based?
23        A.   That is correct.
24        Q.   And then it says you led the operational
25   and executional integration of Pondera 2020
```

CONFIDENTIAL - PAUL GODLEWSKI

1  BY MR. WALD:
2      Q.   Can you tell me how CLEAR is used for
3  contact tracing?
4      A.   I don't know how it's used, other than
5  speculating that it has to do with connecting data
6  points.
7      Q.   What sort of data points would CLEAR
8  connect to assist with contact tracing?
9      A.   The same ones we talked about before with
10 names and addresses.
11     Q.   Knowing names and addresses would help
12 contact trace?
13     A.   That would be my assumption.  But again,
14 I'm not technically aware of how that works.
15     Q.   Do you know if CLEAR has location data?
16     A.   As in addresses?
17     Q.   More precise than addresses, as in
18 individual locations at given periods of time.
19          MS. FAHRINGER:  Form.
20          THE WITNESS:  I don't -- well, I don't
21 believe the CLEAR product does itself.
22 BY MR. WALD:
23     Q.   You don't believe the CLEAR product has
24 information on an individual's location at a given
25 point in time?

```
 1      A.   Again, this is my ignorance of the
 2   licenses that we have with other organizations,
 3   et cetera, so I don't know if that CLEAR product
 4   itself has that type of information or that we are
 5   able to -- or if we are able to -- well, I know we
 6   ████████████████████████████████████████████████
 7   ██████████    ██████████████████████████████████
 8   ████████████████████████████████████████████████
 9   ██████████████████████
10      Q.   And we spoke before about Pondera.  Do
11   you remember that?
12      A.   Yes.
13      Q.   Do you know if Pondera uses an
14   individual's WiFi connectivity to track their
15   location?
16      A.   I don't know that.
17      Q.   Have you ever seen any discussion of
18   Pondera using an individual's WiFi connectivity to
19   track their location?
20      A.   I'm not certain, but -- I couldn't
21   confirm.  But if there's an e-mail or something
22   that talks about it, that might, again, jog my
23   memory.  But I haven't been able -- I haven't
24   worked a lot on the Pondera product other than the
25   initial setup behind the scenes, like I mentioned.
```

```
 1  on your own?
 2       A.   Not me, no.
 3            MR. WALD:  We can take down plaintiff's
 4  exhibit, please.
 5  BY MR. WALD:
 6       Q.   Does CLEAR track where the subject of a
 7  search is located?
 8       A.   Do you mean like in real time?
 9       Q.   In any sense that you understand to
10  include location.
11            MS. FAHRINGER:  Form.
12            THE WITNESS:  I mean, CLEAR
13  doesn't -- CLEAR doesn't track people.
14  BY MR. WALD:
15       Q.   Does CLEAR have information on the
16  location of individuals who are the subject of
17  searches through CLEAR?
18       A.   CLEAR has information about business and
19  individuals and where they live or may have lived.
20       Q.   And have you ever seen -- excuse me.  Go
21  ahead.
22       A.   No, I'm sorry.  I apologize.  I'm trying
23  to understand, I guess, the definition of track.
24       Q.   Have you ever seen any information about
25  how many individuals are searchable through CLEAR?
```

```
 1        A.    Yes.
 2        Q.    Did you speak with your counsel about
 3   your testimony today?
 4        A.    No.
 5        Q.    Did you speak with anyone else during the
 6   break?
 7        A.    No.
 8        Q.    Before we took the break, I asked you
 9   whether you discussed individual privacy in your
10   marketing materials.  Do you remember that?
11        A.    Yes.
12        Q.    And you said not in as many words; is
13   that fair?
14        A.    Can I have that read back?  I want to
15   make sure I understand the full context, please.
16        Q.    You said, "I don't know that we
17   specifically call that out, but I know in our
18   marketing materials for anything in the public, we
19   have our FCRA language attached to the bottom of
20   everything."
21        A.    Yes, I remember that.  Thank you.
22        Q.    In your marketing materials, do you
23   discuss how people can opt out of CLEAR?
24        A.    You mean users or people whose
25   information would be in there?
```

1  Q. People whose information would be in the
2  platform.
3  A. Not in our marketing materials, I don't
4  believe.
5  Q. Do you know how people can opt out of
6  being included in the CLEAR database?
7  A. I don't know the exact process, but I
8  know there is a process.
9  Q. Have you seen any information about the
10  success rate of opt-out requests?
11  A. I have not.
12  Q. Do you know if every opt-out request is
13  processed in the same way?
14  A. I do not know.
15  Q. Do you know if users can report incorrect
16  information that they find in CLEAR?
17      MS. FAHRINGER: Could you read back -- or
18  could you read back that question, please?
19  BY MR. WALD:
20  Q. Do you know if users can report incorrect
21  information that they find in CLEAR?
22      MS. FAHRINGER: Thank you.
23      THE WITNESS: I'm not in charge of that
24  process, but again, I know there's a process. So I
25  don't know the answer to that question.

1    that?

2        A.   Probably Sonya Southward.

3        Q.   If Thomson Reuters is notified that

4    information in CLEAR is wrong, do they notify the

5    subject of that information?

6        A.   I do not know.

7        MR. WALD:  We can take down plaintiff's

8    Exhibit 16.

9    BY MR. WALD:

10       Q.   Do you know if people can change how

11   their information is presented in CLEAR, either the

12   order in which their information is shown or the

13   format in which that information is shown?

14       A.   I do not know that.

15       Q.   Do you know if Thomson Reuters tells

16   people that their information is available through

17   CLEAR?

18       A.   Are you asking if Thomson Reuters

19   proactively tells people that?

20       Q.   Yes.

21       A.   Not that I'm aware of.

22       Q.   Do you know if Thomson Reuters notifies

23   individuals that their information was searched

24   through CLEAR?

25       A.   I do not know.

1      Q.   Do you know who would?

2      A.   No.  I mean, again, all of those types of

3  questions that I don't know about the product I

4  would ask Kevin Appold.

5      Q.   Is it a challenge from a marketing

6  perspective to make sure that people know that

7  CLEAR exists?  I'm sorry, sir, I did not hear your

8  answer.

9      A.   Yes.

10     Q.   Do you think the general public knows

11 about CLEAR?

12     A.   For the most part, no.

13     Q.   What do you think the brand awareness of

14 CLEAR is?

15          MS. FAHRINGER:  Form.

16          THE WITNESS:  If I may ask two questions?

17 One, are you asking currently?  And two, how should

18 I quantify that?

19 BY MR. WALD:

20     Q.   I'll strike the question.

21              Plaintiffs will introduce as

22 Exhibit 17 a document labeled TR_BROOKS060007.

23 That document is now available in your folder.  And

24 please let me know when you're able to open it.

25     A.   Okay, I have it open.

```
 1   instead of simply bringing you facts."
 2        A.   Are we on 60008?
 3        Q.   600008, yes.
 4        A.   Oh, I see.  I had to scroll over.  I
 5   apologize.
 6        Q.   Did I read that correctly?
 7        A.   Yes.
 8        Q.   What does that mean?
 9             MS. FAHRINGER:  Form.
10   BY MR. WALD:
11        Q.   I can specify.
12        A.   Yes, please.
13        Q.   What do you think it means to say CLEAR
14   helps you find answers instead of simply bringing
15   you facts?
16             MS. FAHRINGER:  Form.
17             THE WITNESS:  I think it means CLEAR
18   helps you make connections versus --
19   BY MR. WALD:
20        Q.   Would you say --
21        A.   -- just having a name, for example.
22        Q.   So would you say that collection of
23   information available through CLEAR is more
24   valuable than the individual facts that comprise
25   that information?
```

1      A.   I think the value of CLEAR is, as I said
2  earlier, is that it allows a user investigator to
3  be more efficient.  Instead of having to go to
4  seven places to find the information, they could go
5  to one or fewer.
6      Q.   In the bottom left, do you see a section
7  that says "Free training and support"?
8      A.   I do.
9      Q.   What if a customer wants to run a sample
10 search?
11     A.   What if -- what if they want -- what do
12 you mean, what if they want to run a sample search?
13     Q.   Let's say a customer needed support using
14 the person search, and they wanted to run a sample
15 to understand how it would work.  Is that something
16 that the support staff would be able to do?
17     A.   The support staff will use -- excuse
18 me -- will use a Jane sample document as a sample
19 search, which is a fake entity to show the
20 functionality of the product.
21     Q.   And Jane sample document is a sample
22 report that shows all of the possible information
23 on an individual for a fictionalized person; is
24 that right?
25     A.   I couldn't tell you with certainty that

```
 1       A.    Again, I'm not recognizing the document,
 2   but I have seen documents like this before.
 3       Q.    Do you see at the top next to the number
 4   one it says "Current and accurate data"?
 5       A.    I see that, yes.
 6       Q.    And then there's a table below that.  And
 7   the bottom left column in that table says CLEAR
 8   examples?
 9       A.    Yes.
10       Q.    Can you tell me what a credit header is?
11       A.    The best of my knowledge, it's the name
12   and address information at the top of a credit
13   report.
14       Q.    Can you tell me what a reverse phone is?
15       A.    I could not accurately describe that, no.
16       Q.    Below that table there's a header that
17   says Thorough Data Results.  Do you see that?
18       A.    Yes.
19       Q.    And the top right cell in that table
20   says, "CLEAR is powered by billions of data points
21   and leverages cutting-edge public records
22   technology to bring all key content together in a
23   customizable dashboard."  Did I read that
24   correctly?
25       A.    Yes, you did.
```

1      Q.   And do you think having more information

2   available through CLEAR enhances the value of

3   CLEAR?

4      A.   Yes, it does.

5      Q.   Do you think there's any specific

6   information that enhances the value of CLEAR more

7   than other information?

8      A.   I don't know that I could articulate

9   anything specific.

10     Q.   Have you done any market research on what

11  information customers or potential customers most

12  want to see?

13     A.   There has been research to try to

14  understand that, yes.

15     Q.   And does the number of people in the

16  CLEAR database enhance the value of CLEAR?

17          MS. FAHRINGER:  Form.

18          THE WITNESS:  The number of people

19  in -- the number of records in CLEAR would enhance

20  the value depending on the use case.

21  BY MR. WALD:

22     Q.   What sorts of information has your market

23  research suggested your customers most want to see?

24          MS. FAHRINGER:  Form.

25          THE WITNESS:  I would have to look back

CONFIDENTIAL - PAUL GODLEWSKI

1

2

3

4        I, ANITA KORNBURGER, Registered Professional

5    Reporter and Notary Public, do  hereby certify

6    that the preceding deposition was recorded by

7    me and reduced to writing under my personal

8    direction.

9        I further certify that said deposition was

10   taken remotely, with all parties appearing by

11   videoconference, on May 6, 2022, commencing at

12   10:00 a.m. and concluding at 6:36 p.m.

13       I further certify that I am not a relative

14   or employee or attorney or counsel of any of

15   the parties, or a relative or employee of such

16   attorney or counsel, or financially interested

17   directly or indirectly in this action.

18       In witness whereof, I have hereunto set my

19   hand and affixed my seal of office at this

20   11th day of May,  2022.

21

22   _____

     ANITA KORNBURGER, RPR - Notary

23      Commission #1166910800033

24  My commission expires January 31, 2025.

25

- 1 -

**June 10, 2022**

**Re:** ***Brooks et al. v. Thomson Reuters Corporation,*** **USDC Northern District of California - San Francisco Division Case No. 3:21-cv-01418-EMC: Defendant's Deposition Errata (Paul Godlewski Deposition Transcript dated May 6, 2022)**

To whom it may concern:

I, Paul Godlewski, have reviewed the transcript of my deposition in *Brooks et al. v. Thomson Reuters Corporation*, Case No. 3:21-cv-01418-EMC, taken on May 6, 2022. Attached hereto is a list of errata identified in the deposition transcript.

*Paul F. Godlewski*
_____
PAUL GODLEWSKI

6/10/2022
_____
DATE

**Godlewski Deposition Errata Sheet**

| Page : Line(s) | Existing Testimony | Corrected Testimony | Reason |
|---|---|---|---|
| 30:21 | "Basic, and as I alluded to earlier in my. . ." | "Basically, and as I alluded to earlier in my. . ." | Transcription error |
| 33:6 | ". . . we are faced with so that, yes, Thomson Reuters. . ." | ". . . they are faced with so that, yes, Thomson Reuters. . ." | Transcription error |
| 43:7 | "I'm sorry." | "I'm sorry, I can't recall." | Transcription error |
| 63:21, 63:25, 64:10, 64:13-14 | "John Koske" / "John McKoske" | "John Koski" | Transcription error |
| 68:21 | ". . .access to that product as a marketer. . ." | ". . .access to that process as a marketer. . ." | Transcription error |
| 71:22 | ". . .but I'd to look at it in detail to answer specific. . ." | ". . .but I'd like to look at it in detail to answer specific. . ." | Transcription error |
| 100:6 | "Judge Tens'" | "Judge Chen's" | Transcription error |
| 126:19 | ". . .a cell sheet of sorts. . ." | ". . .a sellsheet of sorts. . ." | Transcription error |
| 175:12 | ". . .I do not train." | ". . .I do not train customers." | Transcription error |
| 182:23-24 | "Well, Brook Martin, but he works for Kevin Appold." | Strike sentence:<br><br>"Well, Brook Martin, but he works for Kevin Appold." | Transcription error with no known substitution. |