1
2
3
4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    CAT BROOKS, et al.,                          Case No.  21-cv-01418-EMC

8                    Plaintiffs,                  <u>**REDACTED PUBLICLY FILED**</u>
                                                  <u>**VERSION (ECF NO. 206)**</u>
9            v.
                                                  **ORDER DENYING MOTIONS TO**
10   THOMSON REUTERS CORPORATION,                 **EXCLUDE LLOYD, TUROW,**
     et al.,                                      **AND KIVETZ AND BAMBAUER**
11
                    Defendants.                   Docket Nos. 157-2, 157-4, 159
12

13

14          Plaintiffs Cat Brooks ("Brooks") and Rasheed Shabazz ("Shabazz") filed suit individually

15   and on behalf of others similarly situated ("Plaintiffs") against Defendant Thomson Reuters, Corp.

16   ("Reuters") for unjust enrichment and injunctive relief under Unfair Competition Law, Cal. Bus.

17   & Prof. § 17200. Docket No. 145 ("FAC").  Ms. Brooks and Mr. Shabazz allege that Reuters has

18   appropriated and sold individuals' personal data without their consent through its platform

19   CLEAR, reaping millions of dollars in profit.

20          Along with Brooks and Shabazz's Motion to Certify Class, Docket No. 148 ("MCC"),

21   Plaintiffs also filed a *Daubert* motion to exclude the expert testimony of Kivetz and Bambauer.

22   Docket No. 159 ("P's MTE Kivetz and Bambauer").  Reuters filed a *Daubert* motion to exclude

23   the expert testimony of Lloyd, Docket No. 157-2 ("D's MTE Lloyd") and *Daubert* motion to

24   exclude the expert testimony of Turow, Docket No. 157-4 ("D's MTE Turow").  For the following

25   reasons, the Court **DENIES** the Motion to Exclude Lloyd, **DENIES** the Motion to Exclude

26   Turow, and **DENIES** the Motion to Exclude Kivetz and Bambauer.

27

28

United States District Court
Northern District of California

## I.   LEGAL STANDARD

A.   Motion to Exclude Expert Testimony (*Daubert*)

Federal Rule of Evidence 702 tasks a district judge with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. at 597. "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) (quoting *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013)).

"[T]he test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology." *Daubert*, 43 F.3d at 1318. The Court is "a gatekeeper, not a fact finder." *Primiano v. Cook*, 598 F.3d 558, 568 (9th Cir. 2010) (quotation omitted). If the proposed testimony meets the thresholds of relevance and reliability, its proponent is "entitled to have the jury decide upon [its] credibility, rather than the judge." *United States v. Sandoval-Mendoza*, 472 F.3d 645, 656 (9th Cir. 2006). "Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge. A district court should not make credibility determinations that are reserved for the jury." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014). "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564.

## II.   DISCUSSION

A.   Reuters' Motion to Exclude the Expert Testimony of Lloyd (Docket No. 157-2)

Plaintiff's expert Dr. Terry Lloyd is a certified public accountant (CPA) and a Chartered Financial Analyst (CFA) who authored an expert report on behalf of Finance Scholars Group. Docket No. 127-12 ("Lloyd Rep.") at 1; Docket No. 157-7 ("Lloyd Dep."). Dr. Lloyd's practice primarily involves the valuation of assets, liabilities, and businesses. *Id.* His report found that it "is possible to calculate Thomson Reuters's net profits attributable to using and selling Californians' data through CLEAR." Lloyd Rep. at 1. At a high level, Dr. Lloyd conducted the

following steps: "(1) examining Thomson Reuters's revenues from CLEAR during the relevant time period, (2) apportioning the total revenues to just California natural persons, and (3) reducing the gross revenues, based on marginal costs, to derive net profits." *Id.* at 17. He concluded that "Thomson Reuters's net profits attributable to CLEAR's use of Class members' data can be calculated as approximately ███ million." *Id.* at 19.

Reuters moves to exclude Dr. Lloyd's testimony. Docket No. 157-2 ("D's MTE Lloyd"). Plaintiffs oppose. Docket No. 168 ("P's Opp. to D's MTE Lloyd").

    1.    <u>Dr. Lloyd's Analysis</u>

Dr. Lloyd determines that ███ of Reuters' revenue from CLEAR is from recurring revenue (flat-rate subscriptions that allow customers to conduct an unlimited or fixed number of searches) and ███ is from transactional revenue (per-search charges) from the years between 2017 and 2021. Docket No. 127-13 (D's Supplemental Answers to Interrogatories) at 2–3.

Dr. Lloyd allocated revenue by calculating what revenue was generated by CLEAR, what revenue was attributable to California, and what revenue was from information about individual persons. As to how much revenue from CLEAR was attributable to the United States, he determined that the ███ was made in 2017, ███ in 2018, ███ in 2019, ███ in 2020, and ███ in 2021. Lloyd Rep. at 18. As to how much of the U.S. revenue was attributable to California, he determined that 14.0% of that revenue was attributable to California each year, based on the mean average of California's share of U.S. GDP in 2021 (14.6%) and California's share of U.S. arrests from 2018 (13.4%). *Id.* at 13, 18. He explains that,

> Because the CLEAR product provides information to a combination of companies seeking financial information and governmental entities (some of the latter of which are using CLEAR for economic-related purposes), and at least half the usage pertains to economic activity, I have averaged those two figures (14.6 and 13.4%) to conservatively estimate that California accounts for about 14% of total U.S. CLEAR revenues.

*Id.* at 13. As to how much of the California revenue resulted from the offering of information about natural persons in the CLEAR database, he determined that ███ of that California revenue was attributable to information about natural persons. *Id.* He explains that,

> A spreadsheet file provided by Thomson Reuters during this

United States District Court
Northern District of California

United States District Court
Northern District of California

> litigation, entitled "Fields_Used_by_Search Type 202009 YTD.xlsx," provides aggregate numbers of CLEAR "desktop" searches broken down by each search input field combination (e.g., searches where a customer input solely a social security number, searches where a customer input a last name, first name, and date of birth). Totaling the search types reasonably tied to natural persons (i.e., excluding company search, court search, search all business, risk inform business standalone, and intellectual property searches), the data indicates that approximately ▮▮▮ of all CLEAR searches relate to individuals.

*Id.* at 13–14.

Dr. Lloyd then allocated cost by estimating the "incremental cost" or "marginal cost"—the added cost to Reuters to bundle and deliver information to a single new customer—to Reuters of offering information pertaining to class members through CLEAR.  *Id.* at 14–17.  Dr. Lloyd determined that the relevant marginal costs incurred by CLEAR in generating revenues using Californians' personal information was ▮▮, resulting in a ▮▮ profit margin.  *Id.* at 18.  He explained that "the only marginal costs for CLEAR are royalties that Thomson Reuters pays to other vendors for data made available through CLEAR."  *Id.* at 16.  He explained that,

> While Thomson Reuters designates certain additional costs, such as sales, editorial, and other operational expenses as "direct" costs for CLEAR, those costs do not actually appear to vary based on customer usage or the availability of particular data in CLEAR (namely, the availability of data about Californians in CLEAR). Cybersecurity and infrastructure costs generally function in the same way. The costs that do vary for each additional data point included within CLEAR—Thomson Reuters's marginal costs for CLEAR— are the royalty costs Thomson Reuters may incur for making that data available.

*Id.*  For vendor agreements between Reuters and its vendors, some of which contain both flat fee royalties and transactional royalties, Dr. Lloyd only included the transactional royalties because he saw "no indication that material flat fee royalty costs would have been avoided had Thomson Reuters not made information about Californians available through CLEAR."  *Id.*

2.     Dr. Lloyd's Calculation of Net Revenue is Based on Reliable Methods

Reuters moves to exclude Dr. Lloyd's opinions on the basis that he should have calculated net revenue—not gross profit as in his report—by deducting fixed operational costs from profit.  D's MTE Lloyd at 6.  At the class certification stage, *Daubert* motions should be tailored to scrutinize expert testimony under Rule 23(b)(3), which only requires that the plaintiff show that its

damages are "capable of measurement on a classwide basis" and that its model for doing so "is consistent with its theory of liability in the case." *Brown*, 2022 WL 17961497, at *5 (citing *Comcast Corp v. Behrend*, 569 U.S. 27, 35 (2013)).

The Restatement provides that the proper measure of disgorgement is "net profit" and that a defendant "may be allowed a credit for money expended . . . in carrying on the business that is the source of the profit that is subject to disgorgement." Restatement (Third) of Restitution and Unjust Enrichment § 51(5)(c) (2011). Reuters explains that "[n]et profit requires the deduction of all expenses incurred in producing the revenue, while gross profit requires only the cost of goods sold to be deducted." *Id.* at 7 (citing Gross Profit, Black's Law Dictionary (11th ed. 2019)). Reuters cites to Dr. Lloyd's deposition, in which Reuters' counsel and Dr. Lloyd disagree as to whether the Restatement refers to "gross profit" or "net profit." *See* Lloyd Dep. at 56–62. Although Reuters argues that Dr. Lloyd concedes that he calculated "gross profit," Dr. Lloyd explained that he uses the terms interchangeably in his report because the calculation of net profit is case-specific depending on the type of operational costs incurred. *See* Lloyd Dep. at 55 (Dr. Lloyd stating: "For purposes of this report I have used them interchangeably. As I noted in the report, there might be variations depending on the user or the definition or the circumstances. Marginal, incremental, and variable in my mind for this purpose are synonymous, and I've used them that way here.").

Regardless of whether Dr. Lloyd terms his calculation "gross profit" or "net profit," Reuters' argument boils down to contesting that, in calculating what portion of CLEAR's profit was attributable to Plaintiffs' data, Dr. Lloyd should have deducted "sales, editorial, and other operational expenses" as costs from his calculation of net revenue (whether he refers to "gross profit" or "net profit"). *Id.* at 7–8 (arguing that it is not a reliable method to calculate net profit to "deduct only some of the costs of goods sold while ignoring all of the other costs necessary to operate the business"). But Dr. Lloyd has used standard accounting practices and logic in making his calculations. He has abided by the Restatement, which describes the focus of disgorgement damages as the harm "attributable to [defendant's] underlying wrong." Restatement (Third) of Restitution and Unjust Enrichment § 51 cmt. e (2011) ("The profit for which the wrongdoer is

liable by the rule of § 51(4) is the net increase in the assets of the wrongdoer, to the extent that this increase is attributable to the underlying wrong.").  It is reasonable, for the purposes of a *Daubert* motion, for an expert to assume that individuals' data substantially drives the revenue from CLEAR when that data makes up the entirety of the product, not merely a component of a larger product.  *Id.* ("The question of attribution will sometimes have a simple answer. Observable facts concerning the defendant's activities may support a direct inference about the proportion of the defendant's overall business profits, or the increase over profits that would otherwise have been realized, attributable to the defendant's interference with the claimant's interests."); *see also Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390, 408–09 (1940) (holding that the court properly relied on expert testimony in "making a fair apportionment" as to what profits from a motion picture are attributable to a copyrighted play).  Dr. Lloyd has explained that operational costs were not specifically attributable to Californian's personal information and "do not actually appear to vary based on customer usage or the availability of particular data within CLEAR," and thus is not an additional cost generated by providing information on natural persons on CLEAR.  Lloyd Rep. at 16.  If these costs (that would have been incurred regardless) were deducted from the calculation of net profit, then Reuters would effectively receive a subsidy on its other business as a windfall.  The question of whether Dr. Lloyd should have included additional cost categories is a question for the jury, not a basis on which to exclude the report as unreliable.  And whether he should have included additional cost categories goes to the weight of his opinion, not to admissibility.  *See In re Actiq Sales & Mktg. Pracs. Litig.*, No. CIV.A. 07-4492, 2014 WL 3572932, at *8 (E.D. Pa. July 21, 2014) (finding that "the issue of whether certain costs should have been included in [the expert's] analysis is ultimately more a question of the accuracy of her analysis, not necessarily the methodology she used in conducting her analysis").  Indeed, the scope of Reuters' liability (which cost categories it extends to) is not an appropriate issue to be resolved at the class certification stage through a *Daubert* motion.  *See Brown*, 2022 WL 17961497, at *4 n.4 (explaining that a defendant's arguments on a "merits dispute about the scope of its liability [] is not appropriate for resolution at the class certification stage of this proceeding").

Moreover, Dr. Lloyd's calculation of cost need not have applied the same 14% Californian

and ▮ natural person proportions that he used in his calculation of revenue.  Reuters does not allege that it earns profits and expends costs in the same way, so there is little to support to the notion that Dr. Lloyd's measurements profits and costs must be approximated in the same non-"hybrid" way.  D's MTE Lloyd at 10.  Reuters' criticisms of Dr. Lloyd's methodology rest on the erroneous assumption that deducting all costs from revenue is the only accurate way of measuring net profit.  Which of these opinions is a more accurate reflection of Reuters' net profits from Californian's personal information in CLEAR comes down to a difference of expert opinion and is a question for the jury.

Dr. Lloyd's calculation of net profit is properly based on reliable facts and methods, including his decision to exclude operational expenses from the cost calculation.  To the extent that such a calculation is not an optimal calculation of net profit, Reuters may explore that line of questioning on cross-examination.  The Court **DENIES** the *Daubert* motion on this ground.

3.    Dr. Lloyd's Calculation of Gross Revenue is Based on Reliable Facts and Data

Reuters moves to exclude Dr. Lloyd's opinions on the basis that he should have excluded revenues that were irrelevant to Plaintiffs' theory of liability.  D's MTE Lloyd at 9.  Specifically, Reuters argues that it is not a reliable method to simply average California's share of GDP (14.6%) with its share of national arrests (13.4%) to determine that 14% of CLEAR's domestic revenue should be allocated to California.  *Id.* at 11.

Dr. Lloyd utilized these two metrics based on a reliable method.  For Reuters' revenue from corporate economic-related activity, Dr. Lloyd uses California's share of GDP as a proxy (14.6%).  For Reuters' revenue from governmental law-enforcement activities, Dr. Lloyd uses California's share of national arrests as a proxy (13.4%).  Based on the fact that "about ▮ of CLEAR's current customers are corporate users" and the other ▮ are governmental entities, Lloyd Rep. at 13 n.47, Dr. Lloyd uses a simple mean to combine the two metrics of share of GDP (14.6%) and share of arrests (13.4%) to achieve an average of 14%.  It is logical and reliable to average these metrics based on the data that about ▮ the customers are governmental entities and ▮ are corporate users.  It is especially telling that, as Plaintiffs argue, subsequent document production showed that across all CLEAR searches run since 2015 with a "state" search field,

1    ███████ were for California.  P's Opp. to D's MTE Lloyd at 8 n.6.  Both the input metrics of Dr.

2    Lloyd's calculation and the calculation itself are reliable.

3         Moreover, "that the experts dispute what the appropriate inputs should be does not

4    undermine the approach or the reliability of [the] model."  *In re Lidoderm Antitrust Litig.*, No. 14-

5    MD-02521-WHO, 2017 WL 679367, at *12 (N.D. Cal. Feb. 21, 2017).  Reuters' criticism that the

6    metrics used to calculate Californian's proportion of national arrests are inaccurate—that "Dr.

7    Lloyd's sole source for the arrest rate did not account for arrests by the New York City Police

8    Department or the District of Columbia's Metropolitan Police Department, or from the State of

9    Iowa, and it appears to be missing data from large swaths of Illinois"—goes to the weight of the

10   testimony, not the reliability.  *See Grasshopper House, LLC v. Clean & Sober Media LLC*, No.

11   218CV00923SVWRAO, 2019 WL 12074086, at *3 (C.D. Cal. July 1, 2019) ("[A]n expert's

12   opinion is not per se unreliable because it relies on some unverified or inaccurate information

13   provided by the expert's client." (internal citations omitted)).  Likewise, Reuters' criticism that Dr.

14   Lloyd miscalculated percentage (Reuters alleges that the Californian share of national arrests is

15   12.8% as opposed to 13.4%) does not render the calculation excludable.  *See Gen. Elec. Co. v.

16   Joiner*, 522 U.S. 136, 146 (1997) (asserting that the focus of a *Daubert* inquiry must generally be

17   "on principles and methodology, not on the conclusions they generate"); *McCrary v. Elations Co.

18   LLC*, No. EDCV-13-00242-JGB (OPx), 2014 WL 12589137, at *15 (C.D. Cal. Dec. 2, 2014) ("An

19   expert opinion is not rendered inadmissible merely because the conclusion reached may not be

20   correct.").

21        Dr. Lloyd's calculation of gross revenue is properly based on reliable facts and methods,

22   including his calculation of the 14% allocation of CLEAR's domestic revenue to California.  The

23   Court **DENIES** the *Daubert* motion on this ground.

24   B.   Reuters' Motion to Exclude the Expert Testimony of Turow (Docket No. 157-4)

25        Plaintiff's expert Prof. Joseph Turow is a Professor of Media Systems and Industries at the

26   Annenberg School for Communications at the University of Pennsylvania.  Docket No. 124-7

27   ("Turow Rep.") at 1; Docket No. 157-10 ("Turow Dep.").  His research concerns the internet,

28   marketing, society, privacy, and mass media.  *Id.*  For this case, Prof. Turow considered the

United States District Court
Northern District of California

amounts and types of information collected and made available, the connections made between disparate sources of information, the protections in place to guarantee accuracy and reliability of the information, and the opportunities for individuals to understand, contextualize, correct, and remove information. *Id.* at 5. His expert report concludes that "Thomson Reuters' operation of the CLEAR product affects privacy interests of Californians—the right to control personal information and to be let alone—in such a way that all Californians whose information is accessible through CLEAR are harmed." *Id.* at 5.

Reuters now moves to exclude Prof. Turow's testimony on three grounds. Docket No. 157-4 ("D's MTE Turow"). Plaintiffs oppose. Docket No. 166 ("P's Opp. to D's MTE Turow").

1.  Prof. Turow's Opinion on Californians' Ethical and Social Rights of Privacy Are Properly Based on Seminal Legal Scholarship and Historical Legislation

First, Reuters seeks to exclude Prof. Turow's opinion that all Californians have suffered uniform harm to their ethical and social rights on the basis that it is nothing more than ipse dixit philosophizing and "not supported by any objective or verifiable evidence or methodology." D's MTE Turow at 1, 4. Reuters argues that "Prof. Turow lacks objective verifiable evidence that his testimony is based on scientifically valid principles." *Id.* at 4. Experts must explain their "reasoning between steps in a theory . . . based on objective, verifiable evidence and scientific methodology of the kind traditionally used by experts in the field." *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002). In this case, Prof. Turow's reliance on legal scholarship is a method traditionally used in the field of academic research. He cites to historical research about the origins and recognition of privacy rights in American and in California, as well as other seminal research in the field, such as Alan F. Westin's book *Privacy and Freedom* and Louis Brandeis' article *The Right to Privacy*. Turow Rep. at 6–7, 9. He cites to legislative proposals, California ballots, and legislators' comments. Turow Rep. at 8–9. He cites to modern privacy scholars' work. Turow Rep. at 30–32.

Prof. Turow's expertise also rests on solid credentials and qualifications as a privacy and marketing scholar: he has researched, taught, presented, and been awarded on his work on privacy and digital audience targeting. Turow Rep. at 1–2. And there is no dispute about whether the

general history of privacy is relevant to this case: Prof. Turow's opinions about the ethical and social rights of privacy provide "background and context information about what privacy is [and] the importance of privacy." *Brown v. Google, LLC*, No. 20-CV-3664-YGR, 2022 WL 17961497, at *10 (N.D. Cal. Dec. 12, 2022). The Court **DENIES** the *Daubert* motion on this ground.

> 2.     Prof. Turow Need Not Have Conducted a CLEAR-specific Survey Nor Expounded Upon His General Citations to Surveys Conducted by Others

Second, Reuters challenges Prof. Turow's failure to articulate how consumer preference affects his opinion or the reliability of the consumer surveys that he cites. D's MTE Turow at 5.

Reuters argues that Prof. Turow's expert opinion should be excluded because he conducted no survey of consumer preferences related to CLEAR. Plaintiffs contends that Prof. Turow need not have conducted a CLEAR-specific survey because his expert opinion doesn't extend to the issue of consumers' perceptions; in fact, it is his expert opinion that privacy harms are *not affected* at all by individual consumers' perceptions. P's Opp. to D's MTE Turow at 3. Indeed, Prof. Turow explains that CLEAR can harm consumers without their knowledge. *See* Turow Rep. at 14 ("[W]hether a person has consented to the sale of their data has nothing to do with whether Thomson Reuters lists the use as permissible."); *id.* at 14–15 ("Californians have not consented to the collection of sale of their information through Thomson Reuters' CLEAR platform, and largely do not know about it."); *id.* at 16 ("Californians are not meaningfully informed of CLEAR, let alone [Reuters' Public Records Privacy Policy], and for this reason alone the policy can hardly be considered protective of privacy."). The lack of a CLEAR-specific survey is not an "analytical chasm," D's MTE Turow at 5, that renders the entire report baseless. It is a matter that can be explored on cross-examination.

Reuters also argues that, to the extent Prof. Turow relies on survey evidence conducted by others to support his "sense" of consumer preferences, that extrinsic evidence is unreliable and fails to support his own conclusion. D's MTE Turow at 5. If an expert relies on surveys conducted by others, the expert must demonstrate that the survey was "conducted according to accepted principles" and that "the results were used in a statistically correct manner." *F.T.C. v. Com. Planet, Inc.*, 642 F. App'x 680, 682 (9th Cir. 2016); *M2 Software, Inc. v. Madacy Ent.*, 421

F.3d 1073, 1087 (9th Cir. 2005).  "[W]hile studies involving similar but not identical situations may be helpful, an expert must set forth the steps used to reach the conclusion that the research is applicable."  *Domingo*, 289 F.3d at 606.  Here, Prof. Turow cites to six papers describing surveys.  *See* Turow Rep. at 6–7 (citing the Turow working paper, National Telecommunications and Information Administration survey, ValuePenguin survey, boyd and Marwick paper, Pew Research Center survey (2015), and Pew Research Center survey (2019)).  However, for each paper, Reuters only disagrees with the survey's relevance to the circumstances at issue, not with the survey's methodology or statistical analysis.  *See* D's MTE Turow at 6–7.  Importantly, Prof. Turow does not rely on these surveys to demonstrate what consumers think about *CLEAR* in particular.  Rather, as Plaintiffs point out, the 2015 Pew Center survey and the National Telecommunications and Information Administration survey are only cited for the general proposition that "[t]he majority of Americans believe that privacy and confidentiality are very important aspects of their lives."  *See* Turow Rep. at 6 n.6 (citing the 2015 Pew Center survey, and National Telecommunications and Information Administration survey).  The Turow 2015 working paper is cited to generally show that "84% of adult Americans want to have control over what businesses can learn about them online."  *See id.* at 6 n.6 (citing the Turow 2015 working paper).  The ValuePenguin survey, 2019 Pew Center survey, and the boyd study are cited for the general proposition that "[c]ontemporary research continues to support the principle that consumers view the right to control their information as central to individual privacy."  *See id.* at 7 n.9 (citing the ValuePenguin survey, 2019 Pew Center survey, and the boyd study).  Simply because each of these studies include surveys is not fatal; an expert should not need to establish the statistical accuracy of a survey when his expert opinion does not rely upon the survey results.  Prof. Turow does not attempt to import the statistics of the cited surveys as quantitative data on the CLEAR tool, and thus he does not need to show the statistical accuracy of data that he did not rely upon.  *Cf. M2*, 421 F.3d at 1087 (requiring a description of the accepted principles behind an expert's cited survey when used to prove "likelihood of confusion" in a trademark infringement suit).  And Prof. Turow has the ability "rooted in the expert's relevant expertise" to opine upon the potential understandings and expectations of reasonable consumers about privacy *in general*.  *Cf. Brown v.*

United States District Court
Northern District of California

*Google, LLC*, No. 20-CV-3664-YGR, 2022 WL 17961497, at *11 (N.D. Cal. Dec. 12, 2022) (finding that a security technologist could opine "generally about relevant privacy issues" but not on the "understandings and expectations of consumers specifically").  So long as Prof. Turow cabins his expert testimony on these surveys to solely this proposition—general views on privacy—and not to compare the various  surveys' results to specific consumer sentiment on CLEAR—reliance on these citations is not so problematic as to undermine the Turow report. Reuters has thus not established that Prof. Turow's reliance on the papers falls short of the *Daubert* standard.  The Court **DENIES** the *Daubert* motion on this ground.

        3.      <u>Prof. Turow's Report Speaks to Only the "Ethical or Social" Privacy Rights and Not "Legal" Privacy Rights and Thus Are Not an Improper Legal Conclusion</u>

      Third, Reuters challenges Prof. Turow's opinion on whether consumers' legal rights have been violated as an improper legal conclusion.  D's MTE Turow at 7.  "[A]n expert cannot testify to a matter of law amounting to a legal conclusion."  *United States v. Tamman*, 782 F.3d 543, 552-53 (9th Cir. 2015) (citing Fed. R. Evid. 702(a)).  Testimony about whether a right has been violated is a legal opinion subject to exclusion.  *See, e.g.*, *Gong v. Jones*, 2008 WL 4183937, at *4 (N.D. Cal. Sept. 9, 2008) (excluding testimony regarding "probable cause" because it went to the ultimate legal issue of "whether any particular conduct violated any particular law or right"). However, Prof. Turow's opinion that "the CLEAR product affects privacy interests," Turow Rep. at 5, is not a legal conclusion: he clarifies in his deposition that his report is made in the context of privacy interests as an "ethical or social" right, not a "legal" right.  *See* Turow Dep. at 174 ("Q. All right. And you also testified that you're not rendering a legal opinion in this case. So what is the nature of the rights you are talking about in your report? Are they legal rights? Moral rights? Psychological rights? What – what type of right are you talking about?  A. I would characterize them as ethical and social.").  Indeed, although his report describes the legal history of privacy rights, it does not render any ultimate legal conclusion that CLEAR violated privacy law.

      The Turow report, as it stands, does not appear to give legal conclusions, so the Court **DENIES** the *Daubert* motion to exclude Prof. Turow's opinions as improper legal conclusions.

United States District Court
Northern District of California

C.      Plaintiffs' Motion to Exclude the Expert Testimony of Kivetz (Docket No. 159)

        Reuters' rebuttal expert Dr. Ran Kivetz is a professor at Columbia University Business School.  His field of expertise includes consumer psychology and behavior, survey design, perception, judgment, decision making.  Docket No. 151-14 at 4 ("Kivetz Rep."); Docket No. 158-4 ("Kivetz Dep.").  Dr. Kivetz's main opinion is a critique that Prof. Turow "fails to provide any empirical or scientific evidence of common injury allegedly suffered by the putative class members due to CLEAR."  *Id*. at 11.  In forming this opinion, Dr. Kivetz conducted the following steps: (1) analyzed Prof. Turow's statements about "ethical and social" privacy harm, (2) evaluated the academic literature and consumer surveys upon which Prof. Turow relies, (3) identified and analyzed other sources of evidence for assessing harm in this case, which he opines that Prof. Turow inappropriately ignored.  *Id.*, Part D, E.

        Plaintiffs move to exclude Dr. Kivetz, or at least Parts D and E of his report about the proper measure of privacy.  Docket No. 158-3 ("P's MTE Kivetz & Bambauer").  Reuters opposes.  Docket No. 165 ("D's Opp. to P's MTE Kivetz & Bambauer").

        1.      Dr. Kivetz is Qualified to Opine on Consumer Preferences and Consumer Opinion

        Plaintiffs first argue that Dr. Kivetz is not qualified to define privacy harms nor to opine on "California privacy rights" or "the proper contours of privacy harms[] under California law."  P's MTE Kivetz & Bambauer at 3–4.

        Both arguments mischaracterize the nature of Dr. Kivetz's opinions.  First, Dr. Kivetz does not opine—as characterized by Plaintiffs—"that the privacy harms here can only be defined and measured based on subjective consumer expectations."  *See id.* at 3.  Rather, he opines on what he believes what is a logical conclusion of *Prof. Turow's* conceptualization of privacy harms as ethical and social harms.  *See* Kivetz Rep. at 11–12.  Prof. Turow had opined that "ethical and social [privacy] rights do[] not correspond to any physical injury, financial consequences, loss of property, or other quantification scheme."  *Id.* (citing Turow Dep. at 174, 177–185, 188).  In response, Dr. Kivetz argues that because Prof. Turow does not provide any examples of how ethical and social harms can have quantifiable or legal effects, Prof. Turow's own logic requires that such harms be defined and measured by consumer perceptions and preferences.  *Id.*  Second,

United States District Court
Northern District of California

Dr. Kivetz does not opine on the precise scope of California privacy rights.  *See* D's Opp. to P's MTE Kivetz & Bambauer at 12.  His opinions only concern consumer preferences and perceptions about privacy rights and privacy harms.  *Id*.

Dr. Kivetz is qualified to opine on how violation of California privacy rights would harm a consumer.  "An expert witness may be qualified by 'knowledge, skill, experience, training, or education' as to the subject matter of the opinion."  *Brown*, 2022 WL 17961497, at *1 (quoting Fed. R. Evid. 702).  Dr. Kivetz is an expert on consumer psychology and behavior who teaches graduate and doctoral courses regarding consumer behavior and perception.  Kivetz Rep. at 4.  Dr. Kivetz has conducted, supervised, and evaluated over 1,000 consumer surveys, which are relevant as to the consumer surveys cited by Prof. Turow.  *Id*. at 6.  Thus, Dr. Kivetz is qualified to opine on consumer opinions and preferences on how a violation of privacy rights would cause them harm.

Plaintiffs then argue that Dr. Kivetz's opinions do not rest on reliable foundations and are irrelevant to the task at hand.  P's MTE Kivetz & Bambauer at 4.  But Dr. Kivetz's analysis is expressly based on "existing scientific research and treatises regarding survey design, consumer behavior, and decision making."  *See* D's Opp. to P's MTE Kivetz & Bambauer at 11–12.  For instance, Dr. Kivetz has cited academic literature showing how factors such as personality, demographics, and level of trust might explain the variation in consumers' perceptions towards the use of information.  *See e.g.*, *id*. at 79–81 n.268–276 (citing several peer-reviewed articles and surveys).  It is on the foundation of such academic literature that Dr. Kivetz formulates his opinion about the numerous variables that impact consumer preferences with respect to privacy.  *See generally* Kivetz Rep., Part E.1.

Lastly, Plaintiffs argue that Dr. Kivetz's experience measuring consumer perceptions about food labeling and false advertising is irrelevant to consumer perceptions in a privacy case.  P's MTE Kivetz & Bambauer at 6.  Considering Dr. Kivetz's general expertise in consumer psychology and behavior, his lack of specialization in privacy matters goes to weight, not admissibility, of his opinions.  *See In re Silicone Gel Breast Implants Prod. Liab. Litig.*, 318 F. Supp. 2d 879, 889 (C.D. Cal. 2004) ("[Expert's] qualifications are construed broadly. . . . A court

United States District Court
Northern District of California

abuses its discretion when it excludes expert testimony solely on the ground that the witness's

qualifications are not sufficiently specific if the witness is generally qualified."). Dr. Kivetz has

demonstrated sufficient expertise in measuring consumer perception that may be applied here.

The Court **DENIES** the *Daubert* motion on this ground.

2. Dr. Kivetz Has Proposed a Methodology Compatible for Evaluating Privacy Harm

Plaintiffs argue that Dr. Kivetz has not shown that consumer perception surveys are a

widely accepted methodology in the privacy field when he allegedly claimed that the "only way to

establish and measure privacy harm" is "getting into the minds of consumers." P's MTE Kivetz &

Bambauer at 6.

This argument is unpersuasive for two reasons. First, Plaintiffs' expert Prof. Turow

heavily bases his opinion on general consumer perceptions. *See* Docket No. 157-10, at 118:19–

121:14 (Prof. Turow answering affirmatively to the questions: "Are you offering opinion in this

case regarding consumer perceptions?", "So is your opinion in this case purporting to reflect

consumer perceptions . . .?", and "So at Footnote 6 and the materials cited in Footnote 6, this is

where you -- this is one place your report addresses consumer perceptions?"). Dr. Kivetz's

opinions are merely rebuttal arguments that Prof. Turow's view of ethical and social harms, when

taken to their logical conclusion, require such harm to be measured by consumer perceptions and

preferences. *See infra*, Section C.

Second, Plaintiffs again mischaracterized Dr. Kivetz' proposal. Dr. Kivetz never opined

that surveys are the *only* acceptable substantiation for Prof. Turow's opinions. Rather, he asserts

that Prof. Turow should bolster his conclusion about common harm with "(original) survey data

collected specifically for the current litigation, analysis of (existing) relevant secondary data, *or* a

careful application to the particulars of CLEAR of existing (empirical) academic literature on

consumers' perceptions and preferences about privacy." Kivetz Rep. at 24 (emphasis added). Dr.

Kivetz has sufficient expertise in consumer psychology and behavior, survey methods, and

perceptions to support the perspective that consumer perception surveys are *one of many*

acceptable methodologies in the privacy field. *Id*. at 4. Thus, it is appropriate for Dr. Kivetz to

critique another experts' opinion as lacking survey evidence, secondary data, or application of

United States District Court
Northern District of California

1  academic literature.

2       The Court **DENIES** the *Daubert* motion on this ground.

3            3.        Dr. Kivetz Has Cited Sufficient Facts or Data

4       Finally, Plaintiffs argue that Dr. Kivetz failed to cite sufficient facts or data.  P's MTE

5  Kivetz & Bambauer at 8.  However, in his report, Dr. Kivetz has cited over 200 independent

6  sources, including 61 case material documents, 59 third-party sources (*i.e.*, peer-reviewed

7  academic articles, textbooks, industry reports, etc.), and 104 examples of CLEAR use cases.  D's

8  Opp. to P's MTE Kivetz & Bambauer at 12 n.4.

9       Plaintiffs particularly find inadequate Dr. Kivetz's evidentiary support for his opinion that

10  some class members who recognize the benefits of CLEAR and other data aggregation businesses

11  are less likely to be surprised, blindsided, dissatisfied with or expect compensation from data

12  aggregators like CLEAR.  Kivetz Rep. at 95–99.  But Dr. Kivetz's opinion is not "wholly

13  speculative or unfounded testimony."  *See Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1025

14  (9th Cir. 2022).  Dr. Kivetz has examined six articles that "indicate variation (*i.e.*, a lack of

15  commonality) in consumers' perceptions or preferences regarding privacy."  *See* Kivetz Rep. at

16  75; *see generally* Kivetz Rep., Part D.2.  Additionally, Dr. Kivetz has presented a figure from

17  another peer-reviewed article that identifies perceived benefits of information disclosure and

18  shows, among other things, that a consumer's behavioral reaction to information disclosure is

19  shaped by their calculus of risks/costs and benefits.[1]  Kivetz Rep. at 77–80.  Dr. Kivetz then

20  enumerates some benefits that government agencies, corporate or business entities, and individuals

21  can derive or have derived from CLEAR.  *Id*. at 84, 146–68.  It is not too great an analytical leap

22  for Dr. Kivetz to suggest that some putative class members—as a subset of consumers—might

23  have different preferences and that those who recognize CLEAR's benefits would have less

24  negative reactions to CLEAR.  *See Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1230 (9th Cir.

25  _____

26  [1] *See* Smith, H. Jeff, Tamara Dinev, and Heng Xu (2011), "Information Privacy Research: An Interdisciplinary Review," MIS Quarterly, 35(4), 989–1015, at 1001 ("A subset of empirical

27  studies . . . assum[es] that a consequentialist tradeoff of costs and benefits is salient in determining an individual's behavioral reactions.") ("Scholars have identified three major components of

28  benefits of information disclosure including financial rewards, personalization, and social adjustment benefits.").

United States District Court
Northern District of California

1998) (holding that the analytical gap is not too great even where an expert opined that there was a link between a medical product and a disease but failed to cite studies that directly confirmed such a link). Any countervailing concerns go to weight, not admissibility. *See id.* at 1230–31.

Plaintiffs also argue that Dr. Kivetz does not offer evidence for his claim that some putative class members who view CLEAR as producing a net benefit might accept the alleged privacy violations. P's MTE Kivetz & Bambauer at 8–9. However, Dr. Kivetz has discussed a 2019 Pew Survey—which Prof. Turow also cites—that shows a significant percentage (between 36% and 57%) of U.S. adults were "somewhat" or "very" "comfortable with companies using their personal data" for purposes such as "improv[ing] their fraud prevention systems" and "sharing with outside research groups that might help improve society." Kivetz Rep. at 60. Many participants would accept the use of their personal data in some circumstances that could benefit the society. *Id.* at 62. For purposes of a *Daubert* motion, it is reasonable for Dr. Kivetz to conclude that some putative class members might find that the benefits of CLEAR outweigh the harms and might accept CLEAR on this basis. *Id.* at 63; *see Elosu*, 26 F.4th at 1025.

There is another opinion made once in passing in the Kivetz report: "it is likely that at least some putative class members who are informed about CLEAR's various potential benefits and safeguards would *prefer* to (or even be willing to pay to) have information collected and/or disseminated through CLEAR." Kivetz Rep. at 95 (emphasis added). The 2019 Pew Survey indicates that 6% to 10% of respondents would be "very comfortable" with companies using their personal data; this provides a reliable basis for Dr. Kivetz's opinion that "some putative class members . . . would prefer to . . . have their information collected and/or disseminated through CLEAR." *Id.* at 60–61. Dr. Kivetz's opinion about putative class members' willingness to *pay* is a greater analytical leap, but it is still admissible. Experts are allowed to make predictions about consumer purchasing decisions. *See, e.g.*, *Mier v. CVS Pharmacy, Inc.*, No. 820CV01979DOCADS, 2022 WL 1599633, at *6 (C.D. Cal. May 9, 2022) (explaining that the expert "is doing precisely what experts in the advertising field do: making a prediction based on experience as to how a claim will impact the consumer's choice in purchasing a product"). Here, Dr. Kivetz makes his prediction based on his knowledge, experience, and research. "Most of [Dr.

United States District Court
Northern District of California

17

1  Kivetz's] research has focused on buyers' purchase behavior . . . ; and the effect of product

2  characteristics . . . on purchase decisions and perceptions."  Kivetz Rep. at 4; *see Mier*, 2022 WL

3  1599633, at *6.  Elsewhere in the Report, Dr. Kivetz has cited use cases where consumers derived

4  significant benefits from CLEAR's collection and dissemination of their information.  For

5  example, "Department of Veterans Affairs has used CLEAR to locate veterans who are missing

6  their financial support due to a change of address," including "a veteran who was missing $31,317

7  in disability compensation."  Kivetz Rep. at 87.  Dr. Kivetz's opinion that some putative class

8  members who might derive significant benefits from CLEAR might be willing pay to have their

9  information collected and/or disseminated through CLEAR is thus admissible.

10  Plaintiffs also argue that Dr. Kivetz parrots Reuters' talking points without offering his

11  own opinion.  *See* P's MTE Kivetz & Bambauer at 9 (citing *Ask Chemicals, LP v. Computer*

12  *Packages, Inc.*, 593 Fed. Appx. 506, 510 (6th Cir. 2014) (quoting *King-Indiana Forge, Inc. v.*

13  *Millennium Forge*, Inc., No. 1:07–cv–00341–SEB–SML, 2009 WL 3187685, at *2 (S.D. Ind.

14  Sept. 29, 2009))).  However, Dr. Kivetz does not parrot CLEAR's talking points.  These so-called

15  "talking points" consist of factual information, such as: CLEAR's use cases (*e.g.,* use of CLEAR

16  in preventing fraud); CLEAR's data collection practice (*e.g.*, CLEAR does not directly collect data

17  from consumers and has "a licensing agreement with every third-party [data] vendor"); CLEAR's

18  business model (*e.g.*, it does not directly "sell" any given individual's "personal information" or

19  "dossier" to a third-party company); the existence of data aggregation platforms.  *See e.g.,* Kivetz

20  Rep. at 10 n.15–16, 47 n.161, 96 n.335.  But Dr. Kivetz, as an expert, is allowed to testify to an

21  opinion formed on the basis of information that is handed to rather than developed by him."  *See*

22  *King-Indiana Forge*, 2009 WL 3187685, at *2 (quoting *In re James Wilson Associates*, 965 F.2d

23  160, 172 (7th Cir.1992)).  In fact, he incorporates the information in forming his own opinions

24  about consumer perceptions.  For example, he uses information about CLEAR's use cases to form

25  his opinion that "Turow ignored all beneficial aspects . . . of CLEAR for consumers when forming

26  his conclusion that the product commonly harmed the putative class members."  *See e.g.*, Kivetz

27  Rep. at 10–11, 88.

28  Lastly, Plaintiffs claim that Dr. Kivetz inadequately reviewed Prof. Turow's work and

18

sources.  P's MTE Kivetz & Bambauer at 10–11.  An independent review of the Kivetz report

shows that Dr. Kivetz has extensively reviewed Prof. Turow's works and sources.  *See* Kivetz

Rep. at 27–31 (examining Prof. Turow's arguments and evaluating in-depth 20 sources that he

cites).  As to Plaintiffs' critique that Dr. Kivetz fails to offer suggestions on how Prof. Turow's

survey questions could be improved, it is the Plaintiffs—not Dr. Kivetz—who have the burden of

designing a reliable survey to establish commonality.  P's MTE Kivetz & Bambauer at 10; *see*

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F. 4th 651, 665 (9th Cir.

2022) ("[P]laintiffs must prove the facts necessary to carry the burden of establishing that the

prerequisites of Rule 23 are satisfied" and, to do so, "frequently offer expert evidence, including

statistical evidence or class-wide averages.").

   The Court **DENIES** the *Daubert* motion on this ground.

D. <u>Plaintiffs' Motion to Exclude the Expert Testimony of Bambauer (Docket No. 159)</u>

   Reuters' second rebuttal expert Prof. Jane Bambauer is a law professor at the University of

Arizona College of Law.  Docket No. 151-1 ("Bambauer Rep."); Docket 159-6 ("Bambauer

Dep.").  Her research focuses on "how new information technologies affect privacy, free speech,

and competitive markets."  Bambauer Rep. at 4.  For this case, her main opinion is that Prof.

Turow's absolutist definition of privacy—that any loss of control of personal data, no matter how

trivial, and no matter how beneficial the data practice may be, constitutes privacy harm—is too

rigid and falls outside the bounds of scholarly consensus.  *Id*. at 6.

   Plaintiffs move to exclude Prof. Bambauer's testimony on the grounds that she does not

discuss California privacy law.  P's MTE Kivetz & Bambauer.  Reuters oppose.  D's Opp. to P's

MTE Kivetz & Bambauer.

   Plaintiffs' argument is unpersuasive for two reasons.  First, "matters of law are for the

court's determination, not that of an expert witness."  *United States v. Scholl*, 166 F.3d 964, 973

(9th Cir. 1999) (citing *Aguilar v. International Longshoremen's Union*, 966 F.2d 443, 447 (9th

Cir. 1992)).  Expert should confine their opinion to "scientific, technical, or other specialized

knowledge that will assist the trier of fact to understand the evidence or determine a fact in issue."

*United States v. Tamman*, 782 F.3d 543, 552 (9th Cir. 2015).  Had Prof. Bambauer actually

United States District Court
Northern District of California

1   rendered a conclusion on California law, her opinion would not have been proper.  *See id.* ("The

2   district court concluded that Dinehart's opinion provided only a recitation of facts and the legal

3   conclusion that Tamman acted in conformity with unidentified SEC rules and regulations and

4   otherwise did not break the law. This is not a proper expert opinion.").

5           Second, Prof. Bambauer does not address California privacy law because Prof. Turow does

6   not either.  "A response is within the realm of proper rebuttal testimony if it is clearly intended

7   solely to contradict or rebut evidence on the same subject matter identified by another party in its

8   expert disclosures." *Teradata Corp. v. SAP SE*, No. 18-CV-03670-WHO, 2021 WL 6498855, at

9   *2 (N.D. Cal. June 24, 2021) (citation and internal quotation omitted).  Although Prof. Turow cites

10  the historical origin of privacy law in California, his opinion is not specifically focused on

11  California privacy law.  Turow Rep. at 6–7, 9.  Rather, his opinion is directed to the conception of

12  privacy and privacy harm generally.  Thus, Prof. Bambauer's rebuttal report, which offers her

13  opinion about the scholarly conception of privacy harm, is within the realm of a proper expert

14  response.

15          Moreover, Prof. Bambauer is qualified to opine on the academic conception of privacy

16  harm.  Her experience conducting "empirical research on consumer preferences and attitudes

17  related to the collection, disclosure, or repurposing of personal data" is evidence of her

18  qualifications.  Bambauer Rep. at 6; *see Brown*, 2022 WL 17961497, at *1 ("An expert witness

19  may be qualified by knowledge, skill, experience, training, or education as to the subject matter of

20  the opinion."); *cf. Russell v. Walmart Inc.*, No. CV 19-5495-MWF (JCX), 2020 WL 9073046, at

21  *4 (C.D. Cal. Oct. 16, 2020) (finding that an IP law professor is not qualified to opine on lamp

22  design, sculptural art, marine biology, or jellyfish anatomy).

23          Plaintiffs also seeks to exclude Prof. Bambauer's testimony on the basis that her tripartite

24  conceptual framework for assessing privacy harms is not widely used by other privacy scholars.

25  P's MTE Kivetz & Bambauer at 11, 13.  Specifically, she proposes that "data practices can be

26  [conceptually] organized into three categories: (1) practices that are per se privacy violations; (2)

27  practices that are . . . per se non-violations[]; and (3) the messy middle category, where the threat

28  to reasonable expectations in privacy will depend on controls and procedures that are in place, the

United States District Court
Northern District of California

1   sensitivity of the data, and the costs and benefits of the practice." Bambauer Rep. at 10–11. The

2   Court disagrees with Plaintiffs. Prof. Bambauer's tripartite framework is a conceptual framework

3   rather than a test or methodology. Bambauer Dep. at 70 ("[T]his is my way of helping to organize

4   concepts that aren't always given precise terminology."); *see Bona Fide Conglomerate, Inc. v.*

5   *SourceAmerica*, No. 314CV00751GPCAGS, 2019 WL 1369007, at *10 (S.D. Cal. Mar. 26, 2019)

6   ("In any event, the Court is not concerned by SourceAmerica's arguments that the Acquisition

7   Time Zones are not reliable and not peer-reviewed. The Acquisition Time Zones are a *conceptual*

8   *framework*, not a test or methodology or technique subject to scientific testing.") (emphasis

9   added). She has cited sufficient facts or data defining each of the three categories and how each is

10  treated by scholars. Bambauer Rep. at 10–12 n.20–25 (citing eight independent sources, including

11  the Second Restatement of Torts, peer-reviewed articles, and an FTC report, among others); *see*

12  *Bona Fide Conglomerate*, , 2019 WL 1369007, at *10 ("Moreover, the Acquisition Time Zones

13  adequately fits the particular facts of this case, and will advance the jury's understanding of the

14  issues."). Any challenges go to weight, not admissibility. *See McMorrow v. Mondelez Int'l, Inc.*,

15  No. 17-CV-2327-BAS-JLB, 2020 WL 1237150, at *4 (S.D. Cal. Mar. 13, 2020) ("Dr. Lustig's

16  minority view is admissible "because [his] opinions in this case are also based on his review of

17  materials, his research, the studies he has conducted, and his education and training. To the extent

18  Defendant argues Lustig's methodology is 'accepted by only a minority of scientists[,]' this may

19  'be a proper basis for impeachment at trial.'").

20      In conclusion, the Court **DENIES** the *Daubert* motion.

21              **III.**    <u>**CONCLUSION**</u>

22      For the foregoing reasons, the Court **DENIES** the Motion to Exclude Lloyd, **DENIES** the

23  Motion to Exclude Turow, and **DENIES** the Motion to Exclude Kivetz and Bambauer.

24      This order disposes of Docket Nos. 157-2, 157-4, and 159.

25  ///

26  ///

27  ///

28  ///

21

At this juncture, the Court instructs the Clerk of the Court to file this order, in its entirety, under seal. The Court orders the parties to meet and confer to determine which portions of this order may be publicly filed. The parties shall jointly file their request to file under seal within a week of the date of this order.

**IT IS SO ORDERED**.

Dated: May 16, 2023

EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California