Andre M. Mura (SBN 298541)
Ezekiel S. Wald (SBN 341490)
**GIBBS LAW GROUP LLP**
1111 Broadway, Suite 2100
Oakland, CA 94607
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
amm@classlawgroup.com
zsw@classlawgroup.com

Geoffrey A. Graber (SBN 211547)
Karina G. Puttieva (SBN 317702)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
ggraber@cohenmilstein.com
kputtieva@cohenmilstein.com

*Attorneys for Plaintiffs and the Class*

**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| CAT BROOKS and RASHEED SHABAZZ, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THOMSON REUTERS CORPORATION,<br><br>Defendant. | Case No. 3:21-cv-01418-EMC-KAW<br><br>**REDACTED**<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date: October 3, 2024<br>Time: 1:30 p.m.<br>Place: Courtroom 5, 17th Floor<br>Judge: Hon. Edward M. Chen |

## NOTICE OF MOTION AND MOTION

TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT on October 3, 2024 at 1:30 p.m., or as soon thereafter as the matter may be heard, in Courtroom 5 of the United States District Court, Northern District of California, San Francisco Division, located at 450 Golden Gate Avenue, San Francisco, California 94102, before the Honorable Edward M. Chen, the Court-appointed Named Plaintiffs and proposed Settlement Class Representatives Cat Brooks and Rasheed Shabazz, on behalf of themselves and the putative Settlement Class, will, and hereby do, move this Court for entry of an Order, pursuant to Federal Rule of Civil Procedure 23:

1. Certifying this Action as a class action for the purposes of settlement;

2. Granting preliminary approval of a non-reversionary settlement in the amount of $27,500,000, and with substantial injunctive relief, to resolve the action (the "Settlement");

3. Approving the form and substance of the proposed Notice of Proposed Settlement of Class Action ("Class Notice"), the Claim Form ("Claim Form"), the manner and timing of disseminating notice to the Class (the "Notice Plan"), and the selection of Angeion as Settlement Administrator;

4. Setting deadlines for Class Members to exercise their rights in connection with the proposed Settlement; and

5. Scheduling a hearing date for final approval of the Settlement and Plan of Allocation and application(s) for attorneys' fees and expenses ("Fairness Hearing").[1]

This motion is based upon this Notice of Motion, the attached Memorandum of Points

---

[1] Capitalized terms shall have the same meaning as set forth in the Class Action Settlement Agreement and Release (the "Settlement Agreement"), attached as Exhibit 1 to the Declaration of Andre M. Mura and Geoffrey Graber in Support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement Pursuant to Federal Rule of Civil Procedure 23(e)(1) ("Co-Lead Counsel Decl."). Unless otherwise noted, all emphasis is added and all internal citations and quotation marks are omitted.

and Authorities, the Counsel Declaration and the exhibits to that declaration,[2] the Declaration of Steven Weisbrot of Angeion Group, LLC ("Weisbrot Decl.") and the exhibits to that declaration,[3] the Declarations of Cat Brooks ("Brooks Decl.") and Rasheed Shabazz ("Shabazz Decl."), the Declaration of Layn Phillips ("Phillips Decl."), the concurrently-filed Proposed Order, the pleadings and records on file in this action, and upon any additional evidence and argument that may be presented before or at the hearing of this motion.

---

[2] These include: the Settlement Agreement (Exhibit 1) and a table of comparable settlement outcomes, as contemplated in the Northern District's Procedural Guidance for Class Action Settlements (Exhibit 2).

[3] These include: Angeion Group's firm resume (Exhibit A); the Class Notice (Exhibit B); the Claim Form (Exhibit C); Exclusion Form (Exhibit D); and a sample banner ad (Exhibit E).

# TABLE OF CONTENTS

Page

NOTICE OF MOTION AND MOTION.................................................................................i

NORTHERN DISTRICT OF CALIFORNIA PROCEDURAL GUIDANCE FOR CLASS
ACTION SETTLEMENTS: REFERENCE TABLE ...........................................................xi

MEMORANDUM OF POINTS OF AUTHORITIES ...........................................................1

ISSUE TO BE DECIDED......................................................................................................1

INTRODUCTION ..................................................................................................................1

Summary of Argument ..........................................................................................................2

BACKGROUND....................................................................................................................4

    I.  Overview of the Litigation......................................................................................4

        A.  The alleged circumstances that prompted this lawsuit...............................4

        B.  A brief procedural history. .........................................................................5

    II.  Terms of the Proposed Settlement ........................................................................7

        A.  Proposed Settlement Class..........................................................................7

        B.  Settlement Fund ..........................................................................................9

        C.  Injunctive Relief.........................................................................................9

        D.  Release .......................................................................................................12

        E.  Notice ........................................................................................................13

        F.  Administration and Plan of Allocation.....................................................13

ARGUMENT.........................................................................................................................14

    I.  Certification of the Settlement Class is Appropriate. ..........................................15

        A.  Rule 23(a) is satisfied. .............................................................................15

        B.  Rule 23(b)(3) is satisfied. ........................................................................16

        C.  The Court may also certify Plaintiffs' UCL claim under Rule 23(b)(2)..........16

        D.  Appointment of Class Counsel is Merited. ..............................................16

    II.  Preliminary Approval of the Settlement is Warranted. .......................................17

        A.  Strength of Plaintiffs' Case .......................................................................18

        B.  Risk, Complexity, Costs, and Likely Duration of Further Litigation,
            and Risk of Maintaining Class Certification ...........................................24

        C.  Amount Offered in Settlement..................................................................26

        D.  Plan of Allocation.....................................................................................30

        E.  Method of Distributing Relief ..................................................................30

        F.  Attorneys' Fees and Costs, and Service Awards ......................................31

        G.  Comparable Outcomes..............................................................................32

H.  Stage of the Proceedings and Extent of Discovery Completed ........................32

I.   Support of Experienced Counsel ................................................................33

J.   Positive Views of Class Members ..............................................................34

K.  Governmental Participation is Not a Factor at Issue Here ..............................34

L.   No Signs of Collusion ..............................................................................34

III. Approval of the Proposed Settlement Administrator ...........................................36

IV. Preliminary Approval of Class Notice Form and Method...........................................37

CONCLUSION ...................................................................................................40

# TABLE OF AUTHORITIES

<u>Cases</u>                                                                 Page(s)

*Al-Ahmed v. Twitter, Inc.,*
  2023 WL 27356 (N.D. Cal. Jan. 3, 2023) ........................................23

*Allen v. Bedolla,*
  787 F.3d 1218 (9th Cir. 2015) ........................................28

*Amchem Prods., Inc. v. Windsor,*
  521 U.S. 591 (1997) ........................................15, 16

*Bellinghausen v. Tractor Supply Co.,*
  306 F.R.D. 245 (N.D. Cal. 2015) ........................................26

*Beltran v. Olam Spices & Vegetables, Inc.,*
  2023 WL 5817577 (E.D. Cal. Sept. 8, 2023) ........................................37

*Betorina v. Randstad US, L.P.,*
  2017 WL 1278758 (N.D. Cal. Apr. 6, 2017) ........................................34

*Briseño v. Henderson,*
  998 F.3d 1014 (9th Cir. 2021) ........................................17

*Brooks v. Thomson Reuters Corp.,*
  No.23-80070 (9th Cir. Aug. 14, 2023) ........................................24, 25

*Brown v. Google LLC,*
  685 F. Supp. 3d 909 (N.D. Cal. 2023) ........................................23

*Chinitz v. Intero Real Est. Servs.,*
  2020 WL 7042871 (N.D. Cal. Dec. 1, 2020) ........................................37

*Class Plaintiffs v. City of Seattle,*
  955 F.2d 1268 (9th Cir. 1992) ........................................12

*Davis v. Yelp, Inc.,*
  2022 WL 21748777 (N.D. Cal. Aug. 1, 2022) ........................................29

*Forsyth. v. HP Inc.,*
  No. 5:16-cv-04775-EJD (N.D. Cal.) ........................................39

*Fraley v. Facebook,*
966 F. Supp. 2d 939 (N.D. Cal. 2013), *aff'd sub nom. Fraley v. Batman*, 638 F. App'x 594
(9th Cir. 2016) .................................................................................................................. 28, 29

*Hamilton v. Juul Labs, Inc.,*
2021 WL 5331451 (N.D. Cal. Nov. 16, 2021) ........................................................................ 32

*Harbour v. California Health & Wellness Plan,*
2024 WL 171192 (N.D. Cal. Jan. 16, 2024) .......................................................................... 26

*Hesse v. Sprint Corp.,*
598 F.3d 581 (9th Cir. 2010) ........................................................................................... 12, 29

*Hubbard v. Google,*
2024 WL 3302066 (N.D. Cal., July 1, 2024) ........................................................................ 24

*In re Apple Inc. Device Performance Litig.,*
50 F.4th 769 (9th Cir. 2022) ........................................................................................... 14, 17

*In re Bluetooth Headset Prod. Liab. Litig.,*
654 F.3d (9th Cir. 2011) ................................................................................................... 34, 35

*In re Carrier IQ, Inc.,*
2016 WL 4474366 (N.D. Cal. Aug. 25, 2016), *amended in part sub nom. In re Carrier Iq,
Inc.*, 2016 WL 6091521 (N.D. Cal. Oct. 19, 2016) ......................................................... 28, 29

*In re Chrysler-Dodge-Jeep Ecodiesel® Mktg., Sales Pracs., & Prod. Liab. Litig.,*
2019 WL 2554232 (N.D. Cal. May 3, 2019) ........................................................................ 36

*In re Facebook, Inc. Internet Tracking Litigation,*
956 F.3d 589 (9th Cir. 2020) ................................................................................................ 23

*In re Google Location Hist. Litig.,*
2024 WL 1975462 (N.D. Cal. May 3, 2024) ........................................................................ 26

*In re Google Plus Profile Litig.,*
2021 WL 242887 (N.D. Cal. Jan. 25, 2021) .................................................................... 27, 28

*In re Google Referrer Header Privacy Litigation,*
2023 WL 6812545 (N.D. Cal. Oct. 16, 2023) ...................................................... 28, 29, 38, 39

*In re Hanna Andersson & Salesforce.Com Data Breach Litig.,*
2020 WL 10054678 (N.D. Cal. Dec. 29, 2020) .................................................................... 36

*In re JUUL Labs, Inc., Mktg. Sales Practice and Prods. Liab. Litig.,*
No. 19-md-02913-WHO (N.D. Cal.) ...........................................................................40

*In re LinkedIn User Privacy Litig.,*
309 F.R.D. 573 (N.D. Cal. 2015) ...............................................................26, 27, 28

*In re MetLife Demutualization Litig.,*
262 F.R.D. 205 (E.D.N.Y. 2009) ...............................................................................39

*In re MyFord Touch Consumer Litig.,*
2019 WL 1411510 (N.D. Cal. Mar. 28, 2019).............................................................27

*In re Novartis & Par Antitrust Litig.,*
No. 1:18-CV-04361 (AKH) (S.D.N.Y. July 26, 2024)................................................30

*In re Netflix Privacy Litigation,*
2013 WL 1120801 (N.D. Cal. Mar. 18, 2013)........................................................28, 29

*In re NVIDIA Corp. Derivative Litig.,*
2008 WL 5382544 (N.D. Cal. Dec. 22, 2008) ............................................................12

*In re Omnivision Techs., Inc.,*
559 F. Supp. 2d 1036 (N.D. Cal. 2008) ....................................................................33

*In re Online DVD-Rental Antitrust Litig.,*
779 F.3d 934 (9th Cir. 2015)....................................................................................32

*In re Sony Gaming Networks & Customer Data Sec. Breach Litig.,*
No. 3:11-md-02258 (S.D. Cal. 2011) ........................................................................28

*In re Tableware Antitrust Litig.,*
484 F. Supp. 2d 1078 (N.D. Cal. 2007) ....................................................................26

*In re TracFone Unlimited Serv. Plan Litig.,*
112 F. Supp. 3d 993 (N.D. Cal. 2015) .......................................................................27

*In re Uber FCRA Litig.,*
2017 WL 2806698 (N.D. Cal. June 29, 2017) ............................................................12

*In re Uber,*
2018 WL 2047362 (N.D. Cal. May 2, 2018)..........................................................29, 36

*In re VeriFone Holdings, Inc. Sec. Litig.,*
2014 WL 12646027 (N.D. Cal. Feb. 18, 2014)...........................................................35

*In re Vizio, Inc., Consumer Priv. Litig.*,
    2019 WL 12966638 (C.D. Cal. July 31, 2019) ........................................................27, 28

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Li*ab. Litig.,
    895 F.3d 597 (9th Cir. 2018) ..............................................................................17, 18

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
    2020 WL 4212811 (N.D. Cal. July 22, 2020), *aff'd*, 2022 WL 2304236 (9th Cir. June 27,
    2022) ...........................................................................................................................35

*In re Zoom Video Commc'ns, Inc. Priv. Litig.*,
    2022 WL 1593389 (N.D. Cal. Apr. 21, 2022) ......................................................27, 29

*Katz-Lacabe v. Oracle America, Inc.*,
    No. 3:22-cv-04792 (N.D. Cal. Aug. 9, 2024) ............................................................29

*Kellman v. Spokeo, Inc.*,
    599 F. Supp. 3d 877 (N.D. Cal. 2022) ......................................................................23

*Lane v. Facebook*,
    2010 WL 9013059 (N.D. Cal. Mar. 17, 2010), *aff'd, 696* F.3d 811 (9th Cir. 2012) ...............28, 29

*Linney v. Cellular Alaska P'ship*,
    1997 WL 450064 (N.D. Cal. July 18, 1997), *aff'd, 151* F.3d 1234 (9th Cir. 1998) ........................33

*Linney v. Cellular Alaska P'ship*,
    151 F.3d 1234 (9th Cir. 1998) ................................................................................32

*Low v. Trump Univ., LLC*,
    881 F.3d 1111 (9th Cir. 2018) ..........................................................................37, 40

*Medoff v. Minka Lighting, LLC*,
    2023 WL 4291973 (C.D. Cal. May 8, 2023) ..............................................................23

*Merante v. Am. Inst. for Foreign Study, Inc.*,
    2022 WL 2918896 (N.D. Cal. July 25, 2022) ...........................................................32

*Moore v. Centrelake Med. Grp., Inc.*,
    299 Cal. Rptr. 3d 544 (2022) ..................................................................................24

*Morris v. Lifescan, Inc.*,
    54 F. App'x 663 (9th Cir. 2003) ..............................................................................31

*Nolen v. PeopleConnect, Inc.*,
    No. 3:20-cv-09203-EMC (N.D. Cal. May 20, 2024) .................................................36

*O'Connor v. Uber Techs., Inc.,*
   2019 WL 1437101 (N.D. Cal. Mar. 29, 2019)...............................................................12

*Parsons v. Ryan,*
   754 F.3d 657 (9th Cir. 2014).......................................................................................16

*Patel v. Trans Union, LLC,*
   2018 WL 1258194 (N.D. Cal. Mar. 11, 2018)..............................................................31

*Pelzer v. Vassalle,*
   655 F. App'x 352 (6th Cir. 2016).................................................................................35

*Perkins v. LinkedIn,*
   2016 WL 613255 (N.D. Cal. Feb. 16, 2016)................................................................28

*Ramirez v. LexisNexis Risk Sols.,*
   2024 WL 1521448 (N.D. Ill. Apr. 8, 2024) ..............................................................2, 23

*Ramirez v. Trans Union, LLC,*
   2022 WL 17722395 (N.D. Cal. Dec. 15, 2022) ...........................................................33

*Roberts v. AT&T Mobility LLC,*
   2021 WL 9564450 (N.D. Cal. Mar. 31, 2021)..............................................................36

*Roberts v. AT&T Mobility LLC,*
   2021 WL 9564449 (N.D. Cal. Aug. 20, 2021)..............................................................17

*Rodriguez v. W. Publ'g Corp.,*
   563 F.3d 948 (9th Cir. 2009)........................................................................................26

*Schofield v. Delta Air Lines, Inc.,*
   2019 WL 955288 (N.D. Cal. Feb. 27, 2019)...........................................................27, 35

*Schuchard v. Law Office of Rory W. Clark,*
   2016 WL 232435 (N.D. Cal. Jan. 20, 2016).................................................................26

*Schwarzschild v. Tse,*
   69 F.3d 293 (9th Cir. 1995)..........................................................................................37

*Taylor v. Shutterfly, Inc.,*
   2021 WL 5810294 (N.D. Cal. Dec. 7, 2021)................................................................27

*Thomas v. Dun & Bradstreet Credibility Corp.,*
   2017 WL 11633508 (C.D. Cal. Mar. 22, 2017)............................................................27

*Toolajian v. Air Methods Corp.,*
   2020 WL 8674094 (N.D. Cal. Apr. 24, 2020) ................................................................ 18

*Tseng v. PeopleConnect, Inc.,*
   665 F. Supp. 3d 1136 (N.D. Cal. 2023) ...................................................................... 22

*Uppal v. CVS Pharmacy, Inc.,*
   2015 WL 1089062 (N.D. Cal. Sept. 11, 2015) ............................................................ 33

*Vigil v. Hyatt Corp.,*
   2024 WL 2137640 (N.D. Cal. May 13, 2024) ............................................................ 26

*Williams v. Boeing Co.,*
   517 F.3d 1120 (9th Cir. 2008) .................................................................................... 12

*Wolf v. Permanente Med. Grp., Inc.,*
   2018 WL 5619801 (N.D. Cal. Sept. 14, 2018) ............................................................ 31

*Wynne v. Audi of Am.,*
   2022 WL 2916341 (N.D. Cal. July 25, 2022) ............................................................ 23

<u>Statutes</u>

28 U.S.C. § 1332(d) ........................................................................................................ 5

28 U.S.C. § 1453(b) ........................................................................................................ 5

28 U.S.C. § 1715(d) ...................................................................................................... 37

Cal. Bus. & Prof. Code § 17208 .................................................................................... 8

Cal. Bus. & Prof. Code § 22578 .................................................................................... 5

Cal. Civ. Code § 1798.81.5(a) ...................................................................................... 5

Cal. Const. art. 1, § 1 .................................................................................................... 5

<u>Rules</u>

Fed. R. Civ. P. 23 ................................................................................................... passim

Fed. R. Civ. P. 30(b)(6) ........................................................................................... 6, 33

Other Authorities

1 McLaughlin on Class Actions § 5:81,
   https://www.fjc.gov/sites/default/files/materials/58/frcv18_5924.pdf ......................38, 39

Bolch Judicial Institute, *Guidelines and Best Practices Implementing 2018 Amendments to Rule 23
   Class Action Settlement Provisions*, Duke Law School (August 2018) ..........................................37

Brian T. Fitzpatrick, *The End of Objector Blackmail?*,
   62 Vand. L. Rev. 1623 (2009) ..................................................................................................35

Class Action Fairness Act of 2005 (CAFA) ...................................................................................5

Conte & Newberg, Newberg on Class Actions § 14:6 (4th Ed. 2002) ...........................................31

Federal Judicial Center, Manual for Complex Litigation, Fourth § 21.63 (2004) .......................15

U.S.D.C., N.D. Cal., Procedural Guidance for Class Action Settlements ("N.D. Cal.
   Procedural Guidance"), https://www.cand.uscourts.gov/forms/procedural-guidance-
   for-class-action-settlements/ (last modified Aug. 4, 2022) ......................................................15

**NORTHERN DISTRICT OF CALIFORNIA PROCEDURAL GUIDANCE FOR CLASS ACTION SETTLEMENTS: REFERENCE TABLE**

| Guidance Section | Guidance Topic | Page(s) Where Guidance is Discussed |
|---|---|---|
| 1(a) | Differences between settlement class and class in complaint | 2-3, 7-8 |
| 1(b) | Differences between released claims and claims in complaint | 12-13, 29-30 |
| 1(c) | Recovery under settlement; potential recovery; discount | 9-12, 19, 26-29 |
| 1(d) | Other cases, if any, affected by settlement | 12-13 |
| 1(e) | Proposed allocation plan | 13-14, 30 |
| 1(f) | Claims rate | 27-28 |
| 1(g) | Reversion, if any | 1, 9, 34 |
| 2(a) | Settlement administrator | 13-14, 36-37 |
| 2(b) | Class member data; costs of administration | 30-31, 36-37 |
| 3 | Notice | 13, 37-40 |
| 4 | Opt-outs | 14 |
| 5 | Objections | 14 |
| 6 | Fees and Costs | 31-32, 37 |
| 7 | Service awards | 9, 32 |
| 8 | *Cy pres* | 9, 13-14, 30 |
| 9 | Timeline | 14 |
| 10 | CAFA notice | 37 |
| 11 | Comparable outcomes | 28-29, Ex. 2 to Co-Lead Counsel Decl. |

## MEMORANDUM OF POINTS AND AUTHORITIES

### ISSUE TO BE DECIDED

This Motion presents four issues: (1) Whether the proposed class action Settlement warrants preliminary approval; (2) Whether to certify this action as a class action for purposes of settlement; (3) Whether the Court should approve the form and substance of the proposed Class Notice, and Claim Form, as well as the Settlement Administration Protocol and Notice Plan, and the selection of Angeion Group as Settlement Administrator; and (4) Whether the Court should set deadlines related to settlement approval, including for Class Members to exercise their rights in connection with the proposed Settlement, for a motion for attorneys' fees and expenses, and for a Final Fairness Hearing.

### INTRODUCTION

Plaintiffs seek preliminary approval of a proposed settlement agreement that provides monetary and injunctive relief for current and former California residents whose personal information was made available for sale through CLEAR between December 3, 2016, and the Class End Date, which is 36 days before the anticipated deadline for participating settlement class members to submit a claim, object, or opt out.[4] The settlement, negotiated at arm's length and under the supervision of a retired federal judge, after years of intensive litigation and contested discovery, would end this litigation against Thomson Reuters on the following terms:

*First*, Thomson Reuters will establish a non-reversionary, $27,500,000 common fund for proportional monetary payments for settlement class members who submit a claim. The fund will also cover any court-approved expenses, costs, and attorneys' fees.

*Second*, Thomson Reuters will enhance its procedures for California residents to exercise control over information about them available through CLEAR, and those changes will be required for four years. The enhancements are threefold, covering notice, data deletion, and changes to CLEAR's settings and procedures. *Notice*: Thomson Reuters will create and maintain

---

[4] Although the Settlement estimated that date would be October 17, more realistically, that date will be October 30. Plaintiffs will update the date in the class notice consistent with the Court's Order on Preliminary Approval.

a public-facing website for California residents to learn about CLEAR, about the types of customers who use it, and the types of data available through it. *Data deletion*: Thomson Reuters will make it easier for California residents to remove certain data from CLEAR by no longer requiring them to provide a driver's license to do so, and it will direct removal requests that it receives to its network of data suppliers so that they too can remove information from the sources that supply CLEAR. *Changes to settings and procedure*: Thomson Reuters will make a series of changes to how it runs CLEAR, incorporating principles of privacy by design that meaningfully respond to the privacy harms alleged in this case.

Plaintiffs and class counsel are proud to present this groundbreaking settlement agreement to the Court. Unlike privacy cases that concern data taken directly from an individual without their consent, the data that populates CLEAR comes from other third-party sources and already exists, in large part, in the public sphere. Data privacy laws generally do not provide protection for the use of data that is already publicly available, and other courts have dismissed suits seeking relief against such practices, *Ramirez v. LexisNexis Risk Sols.*, ---F. Supp. 3d---, 2024 WL 1521448, at *1 (N.D. Ill. Apr. 8, 2024). This proposed settlement, on the other hand, provides current and former California residents with financial and injunctive relief for a corporation's use of certain data *about* them. Thomson Reuters will improve the practices that gave rise to Plaintiffs' claims and provide California residents with compensation comfortably within the range of reasonableness for their novel claims.

Given the settlement's many strengths and the real risk of achieving far less after trial, the Court should grant this motion to begin the settlement approval process.

### Summary of Argument

All of the factors this Court must consider in determining whether to grant a motion for preliminary approval are met here.

*First*, it is appropriate to preliminarily certify a settlement class of all persons who, during the Class Period, both resided in California and whose information Thomson Reuters made available for sale through CLEAR. The proposed settlement class mirrors the litigation class that this Court already certified, with minor changes to the class definition to fix dates for

class membership and promote clarity. As the Court already found based on a rigorous analysis of documentary and expert evidence, this class meets the requirements of Rule 23. Tens of millions of Californians are arguably affected by Thomson Reuters' practices through CLEAR (numerosity); questions common to all settlement class members, including whether Thomson Reuters gave class members any meaningful ability to control the use of information about them—information that Plaintiffs argued, and Thomson Reuters disputed, was their personal information—once it was offered through CLEAR, are answerable through common proof (commonality); the harm that Plaintiffs claim to have suffered is identical to the harm suffered by all settlement class members (typicality); and Plaintiffs and class counsel will continue to vigorously prosecute this litigation on behalf of the settlement class, as they have to date (adequacy).[5]

In addition, as the Court found, common questions predominate over any individual ones because Thomson Reuters is alleged to have engaged in a uniform course of conduct applicable to all settlement class members. This includes the core allegation that Thomson Reuters compiled and sold access to class members' personal data during the class period without their knowledge or consent. The proposed settlement class is thus sufficiently cohesive to warrant adjudication by representation. And class adjudication is superior to other available methods of adjudication, including because the high costs of litigating this case overwhelm Thomson Reuters' potential liability per class member. The only viable way for litigants and the courts to resolve tens of millions of such claims is through the class device.

*Second*, the proposed settlement is fair, reasonable, and adequate, and will likely be granted final approval. It is the product of serious, informed, non-collusive negotiations before a former federal judge, after considerable litigation and the close of fact discovery. It does not improperly grant preferential treatment to class representatives or segments of the class. It falls well within the range of possible approval. And it has no obvious deficiencies. To assure the Court that preliminary approval is appropriate and final approval likely, Plaintiffs discuss here

---

[5] Thomson Reuters opposed certification of a litigation class, but it does not oppose class certification for purposes of settlement only.

the class definition, benefits, claims process, distribution plan, the scope of the release, the range of litigated outcomes, the extent of discovery, the views of Plaintiffs and counsel, and the manner in which attorneys' fees will be addressed—ultimately demonstrating that there are no signs, explicit or subtle, of collusion between the parties. Plaintiffs will also seek the Court's approval of a settlement administrator, Angeion Group, LLC.

*Third*, the proposed content and method of the class notice plan is sufficient. The notice program is tailored to this case and practicably designed to maximize claims from roughly 40 million potential class members. A custom digital media campaign embracing the modern media that class members frequent and that accounts for class demographics and movement crosses the constitutional line. A long-form notice will also be available, in English and Spanish, at ClearPrivacySettlement.com, and it will answer typical questions and provide important information. Not only is this digital notice program the best practicable under the circumstances, it avoids the sizeable expense that would attend first-class mail notice.

**BACKGROUND**

## I.  Overview of the Litigation

### A.  The alleged circumstances that prompted this lawsuit.

Given the stage of this litigation, the Court is well familiar with the circumstances that led to this case. *See* Order Granting Plaintiffs' Motion for Class Certification, ECF No. 213 ("Cert. Order") at 1-5. In short, this case concerns Thomson Reuters' operation of the CLEAR platform—where Thomson Reuters' customers can search for and review information about adults residing in California. Cert. Order at 2-5.[6] Plaintiffs allege that Californians are largely unaware that Thomson Reuters commercializes their personal information in this way. Plaintiffs brought this case alleging that CLEAR violates their right to control their personal information by allegedly selling access to 360-degree views of their lives, asserting that their privacy rights extended to the commercial appropriation and sale of information about them,

---

[6] Because the Court is familiar with the background of this case, Plaintiffs do not fully recount those details here. Plaintiffs' motion for class certification, walks through discovery supporting Plaintiffs' allegations here. ECF No. 130 at 2-8 (and publicly filed at ECF No. 148).

even if that information was publicly available in disaggregated form. ECF No. 148 at 1.

**B.  A brief procedural history.**

In late 2019, the New York Times published a story about the U.S. Immigration and Customs Enforcement's use of CLEAR, and the data available through it, in policing immigrant communities. ECF No. 1-1 at ¶ 2. Plaintiffs Cat Brooks and Rasheed Shabazz, activists and residents of Alameda County, filed this lawsuit on December 3, 2020, on behalf of themselves and a proposed class. *See generally*, ECF No. 1-1. Plaintiffs alleged that Thomson Reuters' compilation and sale of access to Californians' personal information without their knowledge or consent violated state right of publicity and consumer protection law and unjustly enriched Thomson Reuters to the detriment of the proposed class. *Id.* Thomson Reuters removed the case to this Court pursuant to the Class Action Fairness Act of 2005 (CAFA), 28 U.S.C. §§ 1332(d), 1453(b), and filed a motion to dismiss the complaint on April 5, 2021. ECF Nos. 1, 28.

On August 16, 2021, The Court granted in part and denied in part Thomson Reuters' motion to dismiss. ECF No. 54 ("MTD Order"). The Court found that Plaintiffs properly alleged a claim for injunctive relief under the UCL's unfair prong based on both the "tethering" or "balancing" tests, noting that, as pleaded, "the harm to Plaintiffs is tremendous" and "clearly outweighs the utility of [the] sale" of Plaintiffs' personal information. *Id.* at 14-18. The Court also held that Plaintiffs had adequately alleged that Thomson Reuters' actions violated California public policy as expressed in established case law, multiple statutes, and the California Constitution. *Id.* at 17-18 (citing Cal. Const. art. 1, § 1; Cal. Civ. Code § 1798.81.5(a); Cal. Bus. & Prof. Code § 22578). And because Plaintiffs alleged that Thomson Reuters profited from the nonconsensual sale of access to their personal information, Plaintiffs also properly alleged an unjust enrichment claim. *Id.* at 21-22.

While the Court denied aspects of Thomson Reuters' motion to dismiss, it also trimmed Plaintiffs' case. *Id.* at 5-9. The Court ruled that Plaintiffs' claims under California's right of publicity could not proceed because Thomson Reuters did not misappropriate "their name or likeness to advertise or promote a *separate* product or service." *Id.* at 8. And the Court dismissed Plaintiffs' claims under the unlawful prong of the UCL, which were premised on the right of

publicity claims, for the same reason. *Id.* at 10. The Court also held that only injunctive relief was available under their UCL claim.

Following the Court's motion to dismiss order, Thomson Reuters answered the complaint on September 10, 2021, denying the material allegations and asserting various affirmative defenses, and the parties engaged in a lengthy and thorough discovery process. ECF No. 60. Over nearly three years, Plaintiffs served twenty-three interrogatories, ninety-seven requests for production of documents, and sixty-five requests for admission. Co-Lead Counsel Decl. at ¶¶ 14-17. Plaintiffs ultimately secured nearly 500,000 pages of documents. *Id.* at ¶ 15. Plaintiffs also took seven fact depositions, three expert depositions, and deposed Thomson Reuters pursuant to Fed. R. Civ. P. 30(b)(6). *Id.* at ¶ 17.

Plaintiffs also responded to discovery from Thomson Reuters, which served twenty-three interrogatories and fifty-eight requests for production. *Id.* at ¶ 20. The Named Plaintiffs turned over nearly 700,000 documents for review by their counsel in response to Thomson Reuters' discovery requests, and ultimately produced more than 40,000 pages of responsive information. *Id.* Thomson Reuters also deposed both of the Named Plaintiffs, each of whom spent time preparing to testify and responding to written discovery, along with both of Plaintiffs' class certification experts. *Id.* at ¶ 21.

Discovery disputes were first handled by the Court, who ruled on the parties' first dispute, and later referred to Magistrate Judge Westmore. ECF Nos. 82, 96. Judge Westmore ruled on two more discovery disputes over the next year. ECF Nos. 120, 212.

While discovery proceeded, Plaintiffs filed an amended complaint and moved for class certification on their remaining claims. ECF Nos. 123, 130. Both parties prepared class certification expert reports, with Plaintiffs promulgating two expert reports, and Thomson Reuters preparing three. Co-Lead Counsel Decl. at ¶ 22. This court heard argument on Plaintiffs' motion for class certification and the admissibility of expert testimony on April 20, 2023, and in May 2023, denied both parties' motions to exclude. ECF Nos. 201, 206.

On July 31, 2023, the Court granted Plaintiffs' motion for class certification. *See* Cert. Order. In opposing certification, Thomson Reuters challenged the Named Plaintiffs' standing

to bring their claims. *Id.* at 9-14. The Court disagreed and found that the Named Plaintiffs had shown that their "right to control" theory was a traceable and redressable injury-in-fact under Article III. *Id.* Next, the Court found both claims satisfied the requirements of Rules 23(a) and 23(b) because what Plaintiffs challenge is "one uniform practice" which "is measured in the aggregate." *Id.* at 19. The Court rejected Thomson Reuters' arguments that whether its conduct violates California law turns on individualized inquiries that may justify its actions in some circumstances. *Id.* at 29.

On August 14, 2023, Thomson Reuters petitioned the Ninth Circuit for interlocutory review of the class certification order, ECF No. 223, which was denied on November 17, 2023. ECF No. 228. The parties then completed merits expert discovery, with Plaintiffs disclosing five primary experts for trial to Thomson Reuters' three. Co-Lead Counsel Decl. at ¶ 24.

On May 17, 2024, the parties told the Court that they had reached a settlement in principle. ECF No. 233. The negotiations that led to the agreement were protracted. The parties conducted two in-person mediations under the supervision of U.S. District Court Judge Layn Phillips (ret.), in New York and California. Phillips Decl. at ¶¶ 8-12. Neither session resulted in a final agreement, and the parties continued to negotiate across numerous calls and video conferences under the supervision of Judge Phillips and his staff. *Id.* at ¶¶ 12-13. These negotiations finally culminated in a mediator's proposal that both parties accepted.[7] *Id.* at ¶ 13.

## II. Terms of the Proposed Settlement

### A. Proposed Settlement Class

This Court certified a litigation class defined as:

> All persons who, during the limitations period, both resided in the state of California and whose information Thomson Reuters made available for sale through CLEAR without their consent.

Cert. Order at 14. The proposed settlement class is defined in much the same way to cover the same individuals:

---

[7] Thomson Reuters Enterprise Centre GmbH is also a party to the Settlement Agreement.

> All persons who, during the Class Period, both resided in the state of California and whose information Thomson Reuters made available for sale through CLEAR.

Co-Lead Counsel Decl., Ex. 1 ("Settlement"), § I.25. "Class Period" means December 3, 2016 through the Class End Date. *Id.* § I.8.[8]

As between these two class definitions, there are two slight differences in language, and those changes are offered to improve clarity. The first change concerns the time period. While the litigation class used the language "during the limitations period," the proposed settlement class can now provide estimated dates: December 3, 2016, which is four years prior to filing the complaint, consistent with the limitations period for Plaintiffs' UCL claim, Cal. Bus. & Prof. Code § 17208 (West); and the Class End Date, which is 36 days prior to the Response Deadline that this Court will set in its Preliminary Approval Order. These revisions will help California residents understand whether they qualify for membership in the class.

The second change is to remove the language "without their consent" which follows the description of class membership. This language is unnecessary because there is no evidence that Thomson Reuters obtained consent directly from Californians. Keeping this language might lead a Californian to be confused as to whether they are in or out of the settlement class, as they may fear that they somehow consented when they did not.

Ultimately, the proposed settlement class is made up of the same group of class members that comprise the litigation class. While there is evidence from which the parties can reasonably estimate the size of that group, Thomson Reuters informs Plaintiffs that it does not have the ability to identify the precise number due to the lack of records in CLEAR that can determinatively establish residency. *Id.* at ¶ 7. This, and the ephemeral nature of CLEAR's data (particularly the data available through APIs) means that determining class size with exact precision is not possible. *Id.* But as the Court already recognized, judicially noticed data from the U.S. Census Bureau and discovery produced in this litigation can be used to reasonably

---

[8] Both classes exclude officers and directors of Thomson Reuters, class counsel, Judge Edward M. Chen, and any members of Judge Chen's immediate family and judicial staff. Cert. Order at 15; Settlement § I.25.

1    estimate the class size here: approximately forty million people. Cert. Order at 16.

2        **B.  Settlement Fund**

3        The proposed settlement provides for a fund in the amount of $27,500,000. Settlement §

4    IX. After payment of attorneys' fees and expenses to Class Counsel, payment of the settlement

5    administration costs, and payment of service awards, the remaining balance will be distributed

6    proportionally to all settlement class members who submit valid claims. *Id.* The settlement fund

7    confers a sizeable and meaningful benefit to the class. While the parties disputed plaintiffs'

8    entitlement to, and the calculation of, Thomson Reuters' net profits gleaned from selling access

9    to class members' data, under any measure, the settlement fund would disgorge a meaningful

10   amount of Thomson Reuters' alleged profits from its challenged conduct, and overall is an

11   excellent monetary award for the Class.

12       The settlement is non-reversionary, meaning Thomson Reuters will not be entitled to

13   retain any part of the settlement amount that is not paid out or distributed as part of the

14   administration of the settlement for any reason. Settlement § IX. If any part of the settlement

15   amount cannot feasibly be distributed to the class, the parties will jointly propose a *cy pres*

16   recipient or recipients for this Court's approval.  *Id.*

17       Plaintiffs will ask the Court to award each named Plaintiff up to $5,000 from the

18   settlement fund in recognition of the time, effort, and expense they incurred pursuing this case,

19   which ultimately benefited the entire class. *Id.* at § XII. The settlement agreement preserves the

20   Court's supervisory authority to determine the appropriateness of any service award. *Id.*

21   Counsel will petition the Court for an award of attorneys' fees (not to exceed $9,075,000 or 33%)

22   and reimbursement of costs or expenses (not to exceed $700,000) from the settlement fund. *Id.*

23   at § XIII. The settlement agreement also preserves the Court's supervisory authority to

24   determine the appropriateness of any attorneys' fee or reimbursement of expenses. *Id.*

25       **C.  Injunctive Relief**

26       The proposed settlement provides several different forms of prospective relief in the

27   form of business practice changes that correspond to the practices giving rise to Plaintiffs'

28   allegations. Settlement § XI.

Under the Settlement, Thomson Reuters has agreed to improve its data subject access request procedures for Californians—the means by which Californians can learn about, correct, and remove information about them from CLEAR. *Id.* Specifically, Thomson Reuters has agreed that it will delete certain locally hosted data that it is able to reasonably determine pertains to any Californian who submits a deletion request and verifies their identity. *Id.* It will not require the provision of a driver's license to verify Californians' identities when they seek to delete their data—although it will still do so for requests to *review* Californians' data, so as to adequately protect that data against third-party disclosure. *Id.* Under the settlement, Thomson Reuters will clearly disclose to Californians who seek to delete their data (1) what information they will be required to submit to verify their identity; (2) how that information will be used (and that it will not be made available through CLEAR); and (3) why additional information is necessary for validating a submission seeking to review CLEAR data. *Id.* These improvements to Thomson Reuters' disclosures and policies are significant changes that enhance Californians' ability to control the commercial use of information about them.

More still, under the Settlement, Thomson Reuters will take all verified data deletion requests from Californians, and share those requests with its third-party data licensors, asking them to treat each request as a verified opt out under the licensors' own deletion policies and to remove that Californians' data from any data flows, including APIs, provided to Thomson Reuters for use in CLEAR. *Id.* This is a sea change in Californians' ability to request removal of information about them from CLEAR and the commercial sources that feed into it. Thomson Reuters is unable to delete data that is returned to customers through its API feeds, so even when Californians successfully opt out of CLEAR, information about them could remain accessible through those sources. ECF No. 148 at 9 (collecting discovery). Without this settlement, the only way for California residents to request that their data be removed from these third parties' data flows would be to follow the threads to each of Thomson Reuters' data suppliers to submit individualized opt-out requests for each one, which would pose a huge burden to even the most engaged and privacy conscious Californian. But through the Settlement, with a single opt-out request (which, under the Settlement, will be easier to find,

understand, and have approved)—Californians can simultaneously request that certain information about them be removed from CLEAR, including from its APIs and from numerous other data sources, including several that they may never have learned about otherwise. Settlement § XI. This benefit to the class is achievable only through settlement.

Beyond these substantial changes to Thomson Reuters' opt-out processes, under the Settlement, Thomson Reuters will design and maintain a consumer-facing website to inform Californians about CLEAR. Settlement § XI. This will give Californians meaningful information about this product, the information it contains, the customers who use it, and how Californians can control the use of information about them (including through the revised opt-out process under the Settlement). *Id.*

Finally, Thomson Reuters has agreed to make a series of changes to how it operates CLEAR to incorporate principles of privacy by design. *Id.* These changes are directly responsive to allegations and expert testimony in this litigation and meaningfully address the privacy claims Plaintiffs make about CLEAR. Under the settlement, Thomson Reuters will make CLEAR's default settings more privacy protective—for example, the default CLEAR reports will exclude or limit information available about relatives, associates, licensed drivers, property owners, and neighbors of the report subject. *Id.* This was one way that CLEAR would show customers information about Californians even when the customer was not looking for that Californian at all. ECF No. 148 at 3. Similarly, Thomson Reuters will reduce the number of search results that show up by default when a customer runs a person search, narrowing the field of individuals whose personal information is made available to customers running broad searches. Settlement § XI. And Thomson Reuters will implement a narrow retention schedule for reports stored in customer's search history, to prevent the undue retention of personal information beyond what is necessary for the customer's legitimate purpose. *Id.*

Alongside these changes, under the Settlement, Thomson Reuters will eliminate an in-platform prompt for users who run searches that retrieve no results to utilize another feature of CLEAR, the "Web Analytics" tool. Settlement § XI. The Web Analytics tool provided customers with a broader web-based search within the CLEAR platform, which, when

combined with a prompt that showed up only for empty person searches, could surface information online pertaining to Californians other than the ones being searched. This change further enhances Californians' privacy.

Finally, Thomson Reuters will improve its compliance protocols and oversight of its customers' use of CLEAR. *Id.* Under the settlement, Thomson Reuters will substantially increase the affirmative audits that it uses to investigate how and why its customers are using CLEAR data, even when those customers have not triggered a reactive misuse investigation. *Id.* And Thomson Reuters will annually review both the number of compliance investigations that it has undertaken and the capacity of its workforce in order to adequately respond to those investigations, thus ensuring that it has devoted sufficient resources to monitoring its customers' use of CLEAR and the data available through it. *Id.*

These changes will take place within six months of Final Approval, and must be in place for four years, a length of time courts have found to be appropriate.  Settlement § XI.1; *In re Uber FCRA Litig.*, 2017 WL 2806698, at *2 (N.D. Cal. June 29, 2017) (one year); *O'Connor v. Uber Techs., Inc.*, 2019 WL 1437101, at *4 (N.D. Cal. Mar. 29, 2019) (two years); *In re NVIDIA Corp. Derivative Litig.*, 2008 WL 5382544, at *1 (N.D. Cal. Dec. 22, 2008) (three years).

### D. Release

In exchange for the benefits provided under the Settlement, the Plaintiffs and settlement class members will release specified parties, including Thomson Reuters and its current or former owners, shareholders, directors, employees, parents, direct and indirect subsidiaries, contractors, insurers, and affiliates, from all the claims asserted in this action as well as claims that were not asserted but could have been asserted because they are based on or related to the allegations in this action. Settlement § XVI. While the release thus includes certain entities and claims that were not actually brought in the action, it is appropriately limited under Ninth Circuit law to only those claims that are "based on the identical factual predicate as that underlying the claims in the settled class action." *Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010) (quoting *Williams v. Boeing Co.*, 517 F.3d 1120, 1133 (9th Cir. 2008); *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1287-88 (9th Cir. 1992)). To Plaintiffs' knowledge, there are no other

cases that might be impacted by the settlement.  Co-Lead Counsel Decl. at ¶ 30.

### E. Notice

The Settlement proposes notice by a robust and comprehensive media campaign.

As explained further in the declaration of Steven Weisbrot of Angeion, this campaign will execute digital banner ads through the Google Display Network, Social Media (Facebook and Instagram), and Google AdWords. An estimated 68 million impressions will be delivered, with an estimated reach of 75.30% of potential class members. The campaign will also include targeted advertisements on social media platforms, including Facebook and Instagram, and paid search on Google. The campaign will primarily target California, then prioritize other states to which Californians relocated during the class period, and finally, target media across all fifty states. A copy of a digital banner ad is attached to the declaration of Steven Weisbrot.

Lastly, the settlement administrator will set up a case-specific webpage for a long-form notice in English and Spanish, to host pleadings, to provide case updates, contact information for the settlement administrator, and other information. The English version of the long-form notice is attached to the declaration of Steven Weisbrot.

The notice and notice plan is further described below in Section IV, the Declaration of Steven Weisbrot, and the settlement agreement.

### F. Administration and Plan of Allocation

The Settlement provides that payment will issue after finality to class members who submit a valid claim form. The claim form is attached to the Declaration of Steven Weisbrot, which also describes the plan of allocation. *See also* Settlement § X. The simple claim form is clear, direct, and straightforward. All settlement class members who submit valid claim forms for monetary relief by the response deadline will each receive a pro-rata share of the net settlement fund. Settlement § X. The proposed notice directs class members to the settlement website, where they can find updated information about the case. Weisbrot Decl. at ¶ 25. Any remainder will be distributed to a *cy pres* recipient to be approved by this Court.

The Settlement also provides that the Settlement Administrator shall disseminate the notice and implement the notice. And it provides procedures for exclusion from the settlement

class or to comment on or opt out of the settlement class.

Deadlines for these events and the final approval hearing are proposed as follows:

| Event | Date |
|---|---|
| Deadline for Thomson Reuters to File Opposition or Notice of Non-Opposition | September 12, 2024 |
| Deadline for Plaintiffs to File Reply Supporting Preliminary Approval | September 19, 2024 |
| Proposed Preliminary Approval Hearing | October 3, 2024 |
| Notice Begins | 7 days after Order on Preliminary Approval |
| Deadline for Class Counsel to File Motion for Service Award, Attorneys' Fees and Costs | 14 days after Order on Preliminary Approval, which is 42 days before deadline to claim, object, or opt out |
| Notice of Class Action Settlement Completed Per Notice Plan | 42 days after Order on Preliminary Approval |
| Response Deadline for Class Members to Submit Claims for Monetary Relief, Opt-Out of the Settlement, or Object | 56 days after Order on Preliminary Approval |
| Responses to Objections Due | 70 days after Order on Preliminary Approval |
| Deadline for Class Counsel to File Motion for Final Approval | 35 days prior to Fairness Hearing |
| Fairness Hearing | _____ (at least 120 days after Order on Preliminary Approval) |

## ARGUMENT

To approve a class settlement, a court must determine that the settlement is "fair, reasonable, and adequate." *In re Apple Inc. Device Performance Litig.*, 50 F.4th 769, 780 (9th Cir. 2022) (quoting Fed. R. Civ. P. 23(e)(2)). The first step is considering whether to certify the

settlement class and preliminarily approve the proposed settlement.[9] Next is to disseminate notice of the proposed settlement to the class members, and finally, to hold a hearing concerning the fairness, adequacy, and reasonableness of the proposed settlement.[10]

Plaintiffs respectfully request that the Court begin this process by provisionally certifying the proposed settlement class, granting preliminary approval of the proposed settlement, and directing that notice be provided.

## I. Certification of the Settlement Class is Appropriate.

Although the parties have settled, the Court must still certify that the class satisfies Rule 23. Rule 23(a) requires (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. Fed. R. Civ. P. 23(a). In addition, the class must satisfy one of Rule 23(b)'s subsections. Even so, when "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there [will] be no trial." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997).

Here, this Court has already found that the requirements for class certification have been met and has already certified Plaintiffs' claims under Rules 23(b)(2) and (b)(3). Cert. Order at 33-35. The Settlement Class Plaintiffs seek to certify here is nearly identical to the certified litigation class, and the Court's analysis applies with equal force here. *See* Background, II.A, *supra*. The Court should preliminarily certify the settlement class for settlement purposes under Rule 23(a) and Rules 23(b)(2) and (b)(3), as it did before.

### A. Rule 23(a) is satisfied.

The Court already found that the class satisfied the requirements of Rule 23(a). Cert. Order at 14-24. Neither non-substantive change to the proposed settlement class definition alters that analysis. Background, II.A, *supra*. The proposed settlement class, as the Court found,

---

[9] *See* Federal Judicial Center, Manual for Complex Litigation, Fourth § 21.63 (2004); U.S.D.C., N.D. Cal., *Procedural Guidance for Class Action Settlements* ("N.D. Cal. Procedural Guidance"), https://www.cand.uscourts.gov/forms/procedural-guidance-for-class-action-settlements/ (last modified Aug. 4, 2022).

[10] *Id.*

numbers nearly forty million people. Cert. Order at 15-16. There are common questions of law and fact that are apt to drive the resolution of Plaintiffs' claims for unjust enrichment and violation of the UCL. *Id.* at 16-21. The Named Plaintiffs bring claims typical of the class. *Id.* at 21-22. And Named Plaintiffs and their counsel—Andre Mura of Gibbs Law Group and Geoffrey Graber of Cohen Milstein Sellers & Toll—are adequate representatives and class counsel. *See id.* at 22-24.

Because nothing about the Court's analysis of the 23(a) factors has changed from its order certifying a litigation class, the Court should find that Rule 23(a) is met here.

**B. Rule 23(b)(3) is satisfied.**

The Court also concluded that Rule 23(b)(3) was satisfied as to both of Plaintiffs' claims. *Id.* at 25. As to the UCL claim, Plaintiffs' claim "centers around [Thomson] Reuters' uniform practice of collecting data from a range of online sources, aggregating that data into individual profiles, and offering the data for sale on the CLEAR platform." *Id.* at 26. To resolve that claim, "no individualized inquiries are needed…and the common questions clearly predominate." *Id.* at 27. And on unjust enrichment, Plaintiffs' "claim raises the common inquiry of whether [Thomson] Reuters' uniform business practice of maintaining CLEAR unjustly resulted in [Thomson] Reuters retaining a financial benefit." *Id.* at 28. There too, "[l]iability turns on class-wide common conduct." *Id.* For those same reasons, the Court should find that predominance is satisfied for the settlement class. And while the Court concluded that there were no manageability concerns defeating superiority of the class mechanism here, *id.* at 32-33, the Court need not consider manageability for this settlement class. *Amchem*, 521 U.S. at 620.

**C. The Court may also certify Plaintiffs' UCL claim under Rule 23(b)(2).**

The Court previously certified Plaintiffs' UCL claim under both Rule 23(b)(3) and Rule 23(b)(2). Cert. Order at 33-35. Because a proposed injunction here would "prescribe a standard of conduct applicable to all class members," Rule 23(b)(2) is satisfied as to Plaintiffs' UCL claim. *See id.* at 34 (quoting *Parsons v. Ryan*, 754 F.3d 657, 687 (9th Cir. 2014)).

**D. Appointment of Class Counsel is Merited.**

Under Rule 23(g), "a court that certifies a class must appoint class counsel." Fed. R. Civ.

P. 23(g). As discussed above, and as noted by the Court in its order granting class certification, Andre Mura of Gibbs Law Group and Geoffrey Graber of Cohen Milstein Sellers & Toll have litigated this case vigorously on behalf of the class, dedicated considerable time and resources to this case, and have the necessary skill and expertise to ably represent the class. Cert. Order at 24. The Court should thus appoint these two lawyers as class counsel.

\* \* \*

For all these reasons, the proposed settlement class merits preliminary certification.

## II. Preliminary Approval of the Settlement is Warranted.

To approve a class settlement, a court must determine that the settlement is "fair, reasonable, and adequate." *In re Apple Inc. Device Performance Litig.*, 50 F.4th at 780 (quoting Fed. R. Civ. P. 23(e)(2)). The first step in so doing is considering whether to preliminarily approve the proposed settlement.[11] If preliminary approval is granted, the Court will examine many of the same procedural and substantive factors at the final approval stage. *Roberts v. AT&T Mobility LLC*, 2021 WL 9564449, at *3 (N.D. Cal. Aug. 20, 2021).

"A proposed settlement that is 'fair, adequate and free from collusion' will pass judicial muster." *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 895 F.3d 597, 610 (9th Cir. 2018). District courts may consider a number of factors to determine whether a settlement agreement meets this standard, including: "the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement." *Id.* at 610 n.18 (quotation omitted).

The 2018 amendments to Rule 23(e) require the Court to consider additional factors as well, even where a class settlement is reached following class certification. *Briseño v. Henderson*, 998 F.3d 1014, 1025-26 (9th Cir. 2021). These include whether: "(A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's

---

[11] N.D. Cal. Procedural Guidance.

length; (C) the relief provided for the class is adequate; and (D) the proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(A)-(D).[12]

Ultimately, however, the factors are guideposts. "'The relative degree of importance to be attached to any particular factor will depend upon . . . the unique facts and circumstances presented by each individual case.'" *In re Volkswagen*, 895 F.3d at 611 (citation omitted). "Deciding whether a settlement is fair is ultimately an amalgam of delicate balancing, gross approximations and rough justice," that is "best left" to the sound discretion of the trial judge. *Id.* (internal citation and quotation marks omitted).

And at this preliminary stage, because class members will still receive an opportunity to be heard on the settlement agreement, a full fairness analysis is unnecessary. *Toolajian v. Air Methods Corp.*, 2020 WL 8674094, at *7 (N.D. Cal. Apr. 24, 2020) (collecting cases). "At this point, the court's role is to determine whether the settlement terms fall within a reasonable range of possible settlements, with proper deference to the private consensual decision of the parties to reach an agreement rather than to continue litigating." *Id.* (internal quotations omitted).

As such, "[t]he Court may grant preliminary approval of a settlement and direct notice to the class if the proposed settlement [1] appears to be the product of serious, informed, non-collusive negotiations, [2] has no obvious deficiencies, [3] does not improperly grant preferential treatment to class representatives or segments of the class, and [4] falls within the range of possible approval." *Id.* at *8 (internal quotation omitted).

After evaluating the "lengthy but non-exhaustive list of [overlapping fairness] factors," *In re Volkswagen*, 895 F.3d at 610, the Court should preliminarily approve the settlement agreement because it is fair, reasonable, and adequate, and will likely be granted final approval.

### A. Strength of Plaintiffs' Case

As mentioned, the claims at issue here involve Thomson Reuters' alleged collection of

---

[12] Rule 23(e) also sets out sub factors to consider in determining whether the relief is adequate, including: "(i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)." *Id.*

information about Californians, connection of those data into comprehensive profiles, and selling of access to those profiles to its customer base, all without Californians' knowledge and consent. Whether the harm to the public from making information about Californians available for sale through CLEAR without their consent is greater than the utility of allowing Thomson Reuters to sell access to that information will drive resolution of Plaintiffs' UCL claim. Cert. Order at 17-19. Similarly, whether Thomson Reuters' retention of the profits earned from that same practice is "unjust" is the central question of Plaintiffs' claim for unjust enrichment. *Id.* at 20. What data Thomson Reuters collected, how it connects those data into profiles, whether and how the company confirms the accuracy of that data, to whom it sells access to that data to (and for what purposes), the monitoring and oversight processes Thomson Reuters puts in place over its customers' use of these data, and the processes it offers Californians to exercise control over their personal information will all inform the resolution of both claims. If these legal theories were proven at summary judgment or trial, Plaintiffs could be entitled to injunctive relief under the UCL, and disgorgement of Thomson Reuters' net profits from its commercial use of Californians' information. While the parties have never agreed on the proper measure of those profits, Plaintiffs' highest estimate, using data produced to Plaintiffs in discovery and assuming a three-year limitations period, is ███████. Co-Lead Counsel Decl. at ¶ 24.

But in order to recover any of these net profits, Plaintiffs must prove that Thomson Reuters' retention of those net profits is unjust, and that they should be legally required to return those profits to Californians. The Court has explained that this issue will require delving into "whether the beneficial uses of CLEAR in the aggregate outweigh the privacy harms." Cert. Order at 28-29. That inquiry here leaves much in the hands of the jury, with limited case law setting parameters around the jury's eventual determination. The central privacy harms here are that Californians are stripped of their ability to control the commercial use of wide swathes of information pertaining to them, with Thomson Reuters making comprehensive profiles available to customers across an array of industries for a diverse set of potential use cases.

At trial, Thomson Reuters will produce evidence undermining its role as the primary

cause of these alleged harms. Discovery, now closed, shows that virtually all of the information in CLEAR is otherwise available to CLEAR customers through other means. Much of the data is a matter of public record, collected from sources that are available to the public. Other data is more private and sensitive—information like license plate detections, or real time bookings—but these sorts of data are restricted in CLEAR so that they are only made available to customers who already would have access to them otherwise (namely, law enforcement). So the thrust of Plaintiffs' theory of harm at trial will come down to, rather than the sensitivity of the data itself, Thomson Reuters' role in *connecting* these data together, where customers would otherwise need to conduct wide-ranging research to find each data point in isolation. While Plaintiffs believe that this harm is significant and meaningful to Californians—and stand ready to offer substantial expert testimony, including survey evidence of Californians, that supports that conclusion—a jury in the modern internet era may shrug upon hearing that companies take data that is otherwise available and package it for sale.

Of course, Plaintiffs' theory of harm here does not turn only on the data that CLEAR contains—but on Thomson Reuters' practices with respect to making that data available. Here, Plaintiffs' evidence involves the array of customers that Thomson Reuters permits to access CLEAR and Thomson Reuters' disavowal of the accuracy of the data it provides, limiting Californians' ability to exercise control over the use of information about them. But here too, Thomson Reuters will present a different account to the jury. It will produce evidence that all of its customers must undergo specific credentialing processes to verify their identities. That many of its customers are governmental entities like law enforcement agencies, and others are strictly regulated institutions like banks, insurers, and nonprofit organizations like the National Center for Missing and Exploited Children. And that all of these customers must attest that their use of CLEAR, Thomson Reuters would argue, is consistent with a federal regulatory scheme including the Gramm Leach Bliley Act (which governs the consumer data in CLEAR), the Driver's Privacy Protection Act (which governs vehicular data in CLEAR), and state voting laws (which govern voting data in CLEAR). It will produce evidence that it maintains compliance teams that attempt to monitor customer use, that it maintains policies by which

Californians can opt-out of CLEAR, and attempt to convince a jury that, at bottom, this is a case about whether the broader information economy—including the laws and regulations that govern it—is categorically unlawful with respect to Californians' information.

On the other side of the balancing act, Thomson Reuters will also produce evidence of what it considers to be beneficial uses of the CLEAR platform. It has offered declarants and expert witnesses from federal and state law enforcement agencies to testify that without CLEAR, law enforcement would be less able to respond to serious threats, find missing children, or track stolen vehicles. That the government relies on CLEAR to get veterans benefits that they are owed. That banks and other financial institutions use CLEAR to help protect their customers from fraudulent attempts to access their financial information. A jury deciding whether it is unjust for Thomson Reuters to retain the profits it has earned from selling access to CLEAR—in light of the now ubiquitous understanding of how much information is already out there—may go either way. That jury may conclude that Thomson Reuters' actions here are unjust and exploitative of Californians' data—but they could also be unwilling to deny law enforcement and other access to data in the public sphere that can also be used for beneficial purposes, such as finding missing children.

Even if Plaintiffs were to prevail at trial on the merits, the amount they may be entitled to disgorge remains less than certain. Plaintiffs rely on well-founded admissible expert testimony to measure this figure—but as the Court noted, the specific categories of costs that Thomson Reuters is entitled to deduct from this calculation is a question for the jury. ECF No. 206 at 6 ("Daubert Order"). Thomson Reuters strongly contests Plaintiffs' calculation, contending that it incurs far more costs to provide this data, which a jury may conclude lowers the ceiling on the net profits Plaintiffs may pursue here. And as the Court held at the class certification stage—the specific inputs that Plaintiffs use for each step of their net profit calculation also involve factual disputes that may be resolved by the jury. *Id.* at 4-7. Because Thomson Reuters has never itself apportioned its profits to data about Californians, calculating this figure relies on a series of inferential steps apportioning down Thomson Reuters total revenues—each step of which subject to evaluation, and potential devaluation, by a jury.

Plaintiffs maintain that the data relied upon by their expert is sound and the calculation is reasonable and accurate. Plaintiffs rely on discovery and public data to make each necessary step in arriving at the final net profit figure. First, Plaintiffs narrow total revenues down to those attributable to domestic data, then to Californian data, then to Californian data about natural persons, and finally, account for appropriate costs. But as the Court recognized, each step is subject to challenge in front of the jury. Daubert Order at 5-8. Thomson Reuters has, and will continue, to challenge the inputs used at each stage of the calculation. *Id.* For example, Thomson Reuters has produced expert testimony suggesting that Plaintiffs' measurement must be reduced because it includes searches that necessarily only seek business information, and that Plaintiffs must account for far more operational costs than included in their disgorgement measure. *Id.* A jury may find that any of these steps require downward adjustment.

The jury's assessment of the inputs used in Plaintiffs' calculation is not the only risk point in Plaintiffs' maximum potential recovery here. Thomson Reuters has, and will at trial, introduce evidence of beneficial uses of CLEAR, including to find missing children and help veterans receive benefits they are owed. A jury may consider these beneficial uses, and reduce the recovery to which Plaintiffs are owed to account for these beneficial uses. And while Plaintiffs' calculation uses a start date in December 2017, the Court has not yet determined the applicable limitations period for Plaintiffs' unjust enrichment claim, which may cut out an additional portion of recoverable net profits here. *See Tseng v. PeopleConnect, Inc.*, 665 F. Supp. 3d 1136, 1144 (N.D. Cal. 2023) (Chen, J.) (applying two-year statute of limitations to unjust enrichment claim based on a similar theory).

Plaintiffs' entitlement to injunctive relief for violations of California's UCL is also not without risk. Under the balancing test, the inquiry is likely to look much like the assessment of unjustness described above—and the evidence, and questions that remain, will be similar there. A factfinder may find that on balance, the privacy harms posed to Californians here outweigh the benefits to the public from the operation of CLEAR. Or it may be swayed by the evidence of limitations on customer use of CLEAR, protective mechanisms limiting that use and providing means for Californians to withdraw their data, and countervailing beneficial uses.

Under the tethering test—the Court has recognized the strong protections for personal information embodied in California law and policy. Cert. Order at 19, 27. But, as the Court also noted, Thomson Reuters has identified other California policies that may weigh in favor of CLEAR's practices. *Id.* at 27. The factfinder will have to weigh these countervailing arguments, and much remains uncertain about how it may ultimately do so.

Finally, even after a favorable verdict, Thomson Reuters would still have arguments for why the Ninth Circuit, or the Supreme Court, should overturn the verdict. This includes, for both claims, whether Plaintiffs have established Article III standing based on commercial use of data *about* them, rather than data that was taken *from* them. Plaintiffs would arguably need to establish new law on appeal in order to uphold ordinary consumers' right to profits unjustly earned on such a theory.

Indeed, while this Court has rightly concluded that Plaintiffs have standing to pursue relief here, Cert. Order at 9-14; *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020),[13] other courts in recent cases have taken a different approach, highlighting potential appellate risk. For example, activists recently challenged LexisNexis' operation of a competitor platform to CLEAR, Accurint, on similar grounds to this case. *Ramirez*, 2024 WL 1521448, at *1. Activists alleged, like here, that Accurint's compilation of personal information about them caused serious privacy harms, and that its commercial use of that information led to its unjust enrichment. *Id.* But that court dismissed the case in full. *Id.* Because the data at issue was largely available through other forums, the court said, plaintiffs could not maintain privacy claims based on a companies' collection and commercial use of that data. *Id.* at *5, 8. The court also held that plaintiffs could not establish a better claim to the profits earned from that data, or that defendants' commercial operations were wrongful conduct that might give rise to unjust enrichment. *Id.* at *8-9. Again, in our view, this Court has rightly rejected similar arguments.

---

[13] *See also Kellman v. Spokeo, Inc.*, 599 F. Supp. 3d 877, 889–90 (N.D. Cal. 2022); *Brown v. Google LLC*, 685 F. Supp. 3d 909, 923-24 (N.D. Cal. 2023); *Medoff v. Minka Lighting, LLC*, No. 2:22-cv-08885-SVW-PVC, 2023 WL 4291973, at *3–4 (C.D. Cal. May 8, 2023); *Al-Ahmed v. Twitter, Inc.*, No. 21-cv-08017-EMC, 2023 WL 27356, at *5 (N.D. Cal. Jan. 3, 2023); *Wynne v. Audi of Am.*, No. 21-cv-08518-DMR, 2022 WL 2916341, at *4 (N.D. Cal. July 25, 2022).

MTD Order. But Thomson Reuters is certain to raise these issues on appeal, *see* Petition for Permission to Appeal an Order Granting Class Certification Under Rule 23(f) [23(f) Petition] at 9-18, *Brooks v. Thomson Reuters Corp.*, No. 23-80070 (9th Cir. Aug. 14, 2023), ECF No. 1, and an appellate court could certainly rule in its favor.

Similarly, Plaintiffs' UCL claim requires Plaintiffs to have lost (or be at risk of losing) money or property to seek redress. Plaintiffs' theory, which this Court rightly accepted, is that Plaintiffs' personal data carries financial value, and that Thomson Reuters' appropriation of that data causes the class to lose that value. Cert. Order at 22-23. Courts faced with this same issue have gone both ways. *Hubbard v. Google*, 2024 WL 3302066, at *8 (N.D. Cal., July 1, 2024) (summarizing cases from this district finding that lost value of personal information constitutes economic injury under the UCL, and those concluding that it does not, and dismissing claims against YouTube including on grounds that Plaintiffs' allegations of lost value did not give rise to statutory standing under the UCL); *see also Moore v. Centrelake Med. Grp., Inc.*, 299 Cal. Rptr. 3d 544, 538 (2022) (lost value of PII theory could not support UCL standing absent allegations that Plaintiffs attempted or intended to participate in the market for their data and were unable to do so on the same terms they would have been able to absent the use of their data). Thomson Reuters is also certain to raise this issue on appeal, 23(f) Petition at 19-22—and while this Court's ruling is on solid ground, disagreement among district courts presents appellate risk.

For all these reasons, while aspects of Plaintiffs' claims are strong, Plaintiffs may face headwinds in recovering more (or any) monetary relief at trial or defending an award on appeal. For similar reasons, further litigation could extinguish Plaintiffs' entitlement to, and ability to negotiate for, injunctive relief. Against those long odds, Plaintiffs achieved excellent relief for Californians. Overall, then, this factor strongly supports preliminary approval.

### B. Risk, Complexity, Costs, and Likely Duration of Further Litigation, and Risk of Maintaining Class Certification

This litigation is complex because it involves how a multinational corporate entity uses intricate technologies to compile and sell information about Californians, it is risky because Plaintiffs proceed with only two claims, each of which require balancing many factors arguably

to make new law, and it is expensive because it requires intensive work by qualified experts familiar with the data industry and digital privacy. Neither party is likely to accept a dispositive, adverse ruling without an appeal. The litigation has been intensive to date, and would only become more so, and increasingly costly, if litigation were to continue.

If this settlement is not approved, it is unlikely that further litigation would lead to a better settlement. This is evident for two reasons. First, the parties are operating with a fully developed record. Plaintiffs have already produced expert testimony calculating Thomson Reuters' unjust enrichment. Co-Lead Counsel Decl. at ¶ 24. And both parties have put forward their expert testimony on the merits. *Id.* Thomson Reuters knows its exposure, and Plaintiffs know what relief they seek. The parties negotiated in full light of those positions, and further litigation is unlikely to clarify or change either party's position here.

Second, as Thomson Reuters argued in support of its 23(f) Petition, it views this case as a grave threat to its CLEAR business. Thomson Reuters' Motion for Leave to File Reply in Support of 23(f) Petition, No. 23-80070 (9th Cir. Sept. 14, 2023), at 7. Plaintiffs negotiated for substantial and meaningful injunctive relief that will respond directly to the harms Californians allegedly experienced because of CLEAR. Thomson Reuters will not negotiate to business-dismantling injunctive relief—and were the class to obtain such relief at trial, it has already indicated it will continue to contest that relief to the company's fullest extent.

For these reasons, further litigation is unlikely to meaningfully enhance the benefits obtained in future settlement negotiations. In contrast, costs will increase substantially if litigation continues through remaining expert discovery, *Daubert* motions, summary judgment, trial, and appeals. Plaintiffs have put forward preliminary reports by five merits experts, and Thomson Reuters has itself disclosed three (and two additional class certification experts). Co-Lead Counsel Decl. at ¶ 24. These experts will have considerably more work to do in preparing rebuttal and reply reports, and preparing for trial, of this complex case.

Plaintiffs do not see serious obstacles to maintaining class certification. This Court has already certified the class, and the Ninth Circuit has declined Rule 23(f) review. Even so, Thomson Reuters has vigorously contested class certification, and would likely do so again on

appeal. Even a small risk of decertification weighs in favor of granting final approval, as settlement eliminates that risk. *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009); *In re Google Location Hist. Litig.*, 2024 WL 1975462, at *6 (N.D. Cal. May 3, 2024).

This settlement, by comparison, eliminates these risks, and offers "certain recovery in the face of an uncertain legal theory." *Harbour v. California Health & Wellness Plan*, 2024 WL 171192, at *4 (N.D. Cal. Jan. 16, 2024). This factor therefore weighs in favor of settlement approval. *Id.*; *see Vigil v. Hyatt Corp.*, 2024 WL 2137640, at *4 (N.D. Cal. May 13, 2024) ("Generally, 'unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results.'" (citation omitted)).

## C. Amount Offered in Settlement

"To determine whether a settlement 'falls within the range of possible approval,' courts focus on 'substantive fairness and adequacy' and 'consider plaintiffs' expected recovery balanced against the value of the settlement offer.'" *Schuchard v. Law Office of Rory W. Clark*, 2016 WL 232435, at *10 (N.D. Cal. Jan. 20, 2016) (quoting *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007). "Immediate receipt of money through settlement, even if lower than what could potentially be achieved through ultimate success on the merits, has value to a class, especially when compared to risky and costly continued litigation." *In re LinkedIn User Privacy Litig.*, 309 F.R.D. 573, 587 (N.D. Cal. 2015).

The class benefits offered in this settlement—both monetary and injunctive relief—represent an excellent outcome for the class. To begin, the settlement establishes a cash fund of $27,500,000. That represents approximately ███ of Plaintiffs' maximum recovery—well within the range courts in this district consider fair.[14] *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 256 (N.D. Cal. 2015) ("It is well-settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to class members at trial," and approving settlement ranging from 11-27% of

---

[14] $27,500,000 is ██ % of ████████. *See* Counsel Decl. at ¶ 25. And as noted above, this calculation assumes a three-year statute of limitations, the Settlement recovers even more as a percentage of maximum recovery if the limitations period is two years (approximately ██%).

---

maximum potential recovery (internal quotation omitted)); *In re MyFord Touch Consumer Litig.*, 2019 WL 1411510, at *10 (N.D. Cal. Mar. 28, 2019) (Chen, J.) (collecting cases approving settlements of less than 10% of the maximum potential recovery, and finding that 5.7% was fair in light of substantial litigation risks). This is particularly so where class members are not alleging actual damages. *Thomas v. Dun & Bradstreet Credibility Corp.*, 2017 WL 11633508, at *13 n.3 (C.D. Cal. Mar. 22, 2017) (settlement providing 6.7% of the maximum possible recovery was "a favorable result based on the limited actual damage that each Class Member suffered"). And it is even more reasonable in light of the fact that the amount was the product of a mediator's proposal following extensive negotiations before a retired federal District Court Judge. Phillips Decl. at ¶ 13; *Schofield v. Delta Air Lines, Inc.*, 2019 WL 955288, at *6 (N.D. Cal. Feb. 27, 2019) (Chen, J.). After payment of notice and administration costs and any approved award of attorneys' fees, costs, and service awards, the remaining settlement fund will be distributed to the class (*i.e.*, "the net settlement fund"). There are approximately 40 million class members. Thus, with an estimated claims rate between 1 and 2.5 percent—which is consistent with similar consumer class actions[15]—class members can expect a monetary recovery in a range that well exceeds the maximum value of actual harm per class member here, and compares favorably to other similar privacy settlements, which have paid out anywhere from $7 to $20. Co-Lead Counsel Decl. Ex. 2.

In addition, Plaintiffs have obtained extensive prospective relief. "It is appropriate for the Court, in assessing whether the class is benefited by the settlement, to take into account the injunctive relief obtained, even if the Court is unable to determine the exact monetary value of such relief." *Taylor v. Shutterfly, Inc.*, 2021 WL 5810294, at *6 (N.D. Cal. Dec. 7, 2021) (collecting cases); *In re TracFone Unlimited Serv. Plan Litig.*, 112 F. Supp. 3d 993, 1005 (N.D. Cal. 2015) (Chen, J.) (considering "the value of both the monetary and injunctive relief" in evaluating a proposed

---

[15] Weisbrot Decl. ¶¶ 43-45; *see In re Google Plus Profile Litig.*, 2021 WL 242887 (N.D. Cal. Jan. 25, 2021) (1.12% claims rate); *In re Vizio, Inc., Consumer Priv. Litig.*, 2019 WL 12966638, at *2 (C.D. Cal. July 31, 2019) (4.1% claims rate); *In re LinkedIn User Priv. Litig.*, 309 F.R.D. 573, 582 (N.D. Cal. 2015) (5.92% claims rate); *In re Zoom Video Commc'ns, Inc. Priv. Litig.*, 2022 WL 1593389, at *2 (N.D. Cal. Apr. 21, 2022) (0.97% claims rate).

settlement); *Allen v. Bedolla*, 787 F.3d 1218, 1225 (9th Cir. 2015) ("As a whole, the settlement appears to afford valuable relief, much by injunction, that will benefit the class."). Injunctive relief here, while perhaps difficult to measure in precise dollar amounts, is appreciable given the benefits to California residents seeking to remove certain data from CLEAR or its suppliers.

Both in terms of monetary recovery and injunctive relief, this settlement compares favorably with settlements in similar consumer privacy cases, where parties plead claims for monetary relief based on commercial collection and use of their personal information. *Perkins v. LinkedIn*, which concerned the collection and dissemination of user e-mails and address book contents, settled for $13 million. 2016 WL 613255, at *2 (N.D. Cal. Feb. 16, 2016). *In re Carrier IQ, Inc.*, which concerned the surreptitious collection of personal information by mobile phone manufacturers, settled for $9 million. 2016 WL 4474366, at *2 (N.D. Cal. Aug. 25, 2016), *amended in part sub nom. In re Carrier Iq, Inc.*, 2016 WL 6091521 (N.D. Cal. Oct. 19, 2016) (Chen, J.). *In re Google Referrer Header Privacy Litigation*, which concerned the collection and use of users' search terms, settled for $23 million. 2023 WL 6812545, at *1 (N.D. Cal. Oct. 16, 2023). *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, which concerned the disclosure of Sony PlayStation account holder information, settled for $15 million. No. 3:11-md-02258 (S.D. Cal. 2011), Doc. 204-1 at 6-10. *In re Netflix Privacy Litigation*, which concerned the collection and retention of users' viewing and personal information, settled for $9 million plus injunctive relief valued at $4.65 million. 2013 WL 1120801, at *6 (N.D. Cal. Mar. 18, 2013). *Fraley v. Facebook*, which concerned the collection of names and likenesses for promotional purposes, settled for $20 million. 966 F. Supp. 2d 939, 944 (N.D. Cal. 2013), *aff'd sub nom. Fraley v. Batman*, 638 F. App'x 594 (9th Cir. 2016). *Lane v. Facebook*, which concerned the public dissemination of information about members' online activities, settled for $9.5 million. 2010 WL 9013059, at *4 (N.D. Cal. Mar. 17, 2010), *aff'd*, 696 F.3d 811 (9th Cir. 2012). *Google Plus*, which concerned the alleged exposure of Google+ users' profile information, settled for $7.5 million. 2021 WL 242887. *In re Vizio*, which concerned the collection and commercialization of consumers television viewing activity, settled for $17 million. 2019 WL 12966638, at *2. *LinkedIn User Privacy*, which concerned exposure of LinkedIn users' account credentials, settled for $1.25 million. 309 F.R.D. 573, 582.

*Zoom Video*, which concerned Zoom's improper sharing of user data and involved a class of 150 million users, settled for $85 million. 2022 WL 1593389, at *2. And *Katz-Lacabe v. Oracle America, Inc.*, No. 3:22-cv-04792, ECF No. 135 (N.D. Cal. Aug. 9, 2024), which concerned Oracle's collection and sale of personal information through its advertising technology business and involved a nationwide class of approximately 220 million individuals, settled for $115,000,000. ECF No. 132 at 6.

*Katz-Lacabe*—like several of the settlements just mentioned— *Zoom*, *In re Netflix*, *In re Google Referrer Header*, and *Fraley*—resolved the claims of much larger classes.[16] Some of these settlements did not secure enough compensation to allow a distribution to class members, and thus directed funds entirely to *cy pres* recipients. *In re Netflix*, 2013 WL 1120801, at *1; *Lane*, 696 F.3d at 825. This further confirms the reasonableness of the settlement benefits achieved here.

Finally, the amount of the settlement is fair in view of the claims released by Plaintiffs and the class. Each class member will release claims that were or could have been asserted in this action, and the release does not extend beyond the Thomson Reuters Released Parties. Settlement § XVI. Because the release mirrors those that have won approval in other similar cases, its scope supports the conclusion that the amount offered in this settlement is fair. *See Hesse*, 598 F.3d at 590 ("A settlement agreement may preclude a party from bringing a related claim in the future even though the claim was not presented and might not have been presentable in the class action, but only where the released claim is based on the identical factual predicate as that underlying the claims in the settled class action." (internal quotation marks and citation omitted)); *In re Uber*, 2018 WL 2047362, at *3 (N.D. Cal. May 2, 2018) (Chen, J.); *In re Carrier IQ, Inc*, 2016 WL 4474366, at *3 (Chen, J.); *Davis v. Yelp, Inc.*, 2022 WL 21748777, at *2 (N.D. Cal. Aug. 1, 2022) (Chen, J.).

---

[16] *In re Netflix*, 2013 WL 1120801, at *8 (62 million members); *Google Referrer Header*, 2023 WL 6812545, at *3 (193 million members); *Fraley*, 966 F. Supp. 2d at 940 (150 million members). These large class sizes further demonstrate the strength of the relief afforded to class members by this settlement. For example, the $115 million settlement in *Katz-Lacabe* (with 220 million class members) is proportional to approximately $21 million for a class size of 40 million.

### D. Plan of Allocation

Plaintiffs plan to allocate the net settlement fund on a pro rata basis to all class members who submit valid and timely claims. The Court has already found that plan is appropriate here. Cert. Order at 29-30. Plaintiffs' notice explains that class members who submit valid and timely claims for monetary relief will receive a pro-rata distribution of the net settlement fund, explains to class members that a precise estimate of the amount they can expect to recover is not possible at this time, and directs class members to a website that will include updated information for class members as the Settlement is administered. Weisbrot Decl. at ¶ 25. Any remaining funds will be distributed via *cy pres*.

### E. Method of Distributing Relief

Rule 23(e) instructs that the Court consider the effectiveness of any proposed method of distributing relief to the class, including the method of processing claims, as part of the fairness inquiry. Fed. R. Civ. P. 23(e)(2)(C)(ii). This factor supports approval for several reasons.

For one, Angeion will distribute relief directly from the settlement fund to all class members who submit valid claims. Weisbrot Decl. at ¶¶ 49-55. Class members have the option to receive payment immediately through electronic payment systems or by printed check. *Id.*

For another, the claims process is not unduly demanding, burdensome, or oppressive. A claimant need not submit proof that information about them was available through CLEAR, but only attest under oath that they were an adult residing in California during the class period.

Further, the claims process facilitates the filing of claims. Claimants can complete a claim form on a website or on a paper form, and the case-specific website answers frequently asked questions through a long-form notice and provides a toll-free telephone number with an automated interactive voice response system.

Finally, the claims process will also deter fraudulent claims and has appropriate security for electronic payment methods. Angeion employs extensive fraud-detection techniques, which courts have recently found effectively respond to the growing issue of fraudulent claims. Weisbrot Decl. at ¶¶ 46-48; *see In re Novartis & Par Antitrust Litig.*, No. 1:18-CV-04361 (AKH), ECF No. 667 (S.D.N.Y. July 26, 2024) ("[T]he Court finds that Angeion has taken prudent and

necessary steps to address the fraudulent claims submitted in this case. As further set forth in the filings made under seal, Angeion's fraud detection system is robust and appropriately designed to weed out fraudulent claims."). The electronic payment walls, in turn, are operated by the payment systems themselves, such as Zelle, and thus have advanced security in place. The class member is simply directed to the platforms of these systems. Angeion does not receive any log in or password information.

For all of these reasons, the method of distributing relief is reasonable and supports preliminary approval.

### F. Attorneys' Fees and Costs, and Service Awards

As set forth in the proposed Settlement and schedule, Plaintiffs will submit their request for fees two weeks after preliminary approval. Plaintiffs will not seek attorneys' fees exceeding 33% of the settlement fund, which is $9,075,000. An attorney-fee request that does not exceed 33% would be reasonable and justified based on the exceptional results obtained for the class and the complexity and risk attendant to this hard-fought litigation. *Morris v. Lifescan, Inc.*, 54 F. App'x 663, 664 (9th Cir. 2003) (affirming 33% award); *Patel v. Trans Union, LLC*, 2018 WL 1258194, at *6 (N.D. Cal. Mar. 11, 2018) (same); Conte & Newberg, Newberg on Class Actions § 14:6, p. 551 (4th Ed. 2002) ("fee awards in class actions average around one third of recovery"). Given the significant work necessary to litigate this case and secure a positive result for the class, which resulted in millions of dollars of lodestar, the fee request will also be well within the multiplier range commonly awarded. *See Wolf v. Permanente Med. Grp., Inc.*, 2018 WL 5619801, at *2 (N.D. Cal. Sept. 14, 2018) (collecting cases).

This request is even more reasonable when factoring in the value of injunctive relief here. *Patel*, 2018 WL 1258194, at *6 ("When determining the value of a settlement, courts consider the monetary and non-monetary benefits that the settlement confers."). What's more, there is no 'clear sailing' agreement, and approval of the settlement is not contingent on approval of attorneys' fees. Settlement § XIII. As to costs and expenses, Plaintiffs intend to seek reimbursement of no more than $700,000 (excluding settlement administration costs, discussed below), an amount that is reasonable given the amount of litigation and expert work to date.

Plaintiffs will formally make and substantiate their request for fees and costs before the final approval stage.

Lastly, Plaintiffs will seek service awards of $5,000 when they file their motion for costs and fees. This enhancement is set at the Ninth Circuit's benchmark award for representative plaintiffs and is presumptively reasonable here. *Merante v. Am. Inst. for Foreign Study, Inc.*, 2022 WL 2918896, at *9 (N.D. Cal. July 25, 2022) (Chen, J.); *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 947-48 (9th Cir. 2015). It is an appropriate enhancement in this case because, as the Plaintiffs will document in declarations submitted at the final approval stage, both representative Plaintiffs actively participated in the litigation since its inception, turned over hundreds of thousands of documents for review in discovery, and sat for depositions. Co-Lead Counsel Decl. at ¶¶ 20-21; *Hamilton v. Juul Labs, Inc.*, 2021 WL 5331451, at *14 (N.D. Cal. Nov. 16, 2021) (approving service awards of $10,000) (Chen, J.). The enhancement here also constitutes far less than one percent (0.018%) of the total settlement fund. *See id.*

### G. Comparable Outcomes

The Northern District's Procedural Guidance asks counsel to provide a chart comparing the Settlement to comparable settlements. N.D. Cal. Procedural Guidance ¶ 11. **Exhibit 2** to the Counsel Declaration includes that chart for the Court's review, and here, it confirms that this settlement is fair, reasonable, and adequate, and likely to win final approval.

### H. Stage of the Proceedings and Extent of Discovery Completed

In order to settle a class action, the parties must have "sufficient information to make an informed decision about settlement." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998). Here, the parties did not settle until fact discovery was closed, and both parties had completed and exchanged their opening merits expert reports. Thus, the Settlement is informed by extensive knowledge of nonpublic facts related to Plaintiffs' allegations, facts that informed Plaintiffs' understanding of the claims and the risks of continued litigation.

Here, Plaintiffs propounded twenty-three interrogatories, ninety-seven requests for production of documents, and sixty-five requests for admission over nearly three years. Co-Lead Counsel Decl. ¶¶ 14-17. By the time the parties agreed to the settlement in principle,

Plaintiffs had secured nearly 500,000 pages of documents. *Id.* at ¶ 15. Plaintiffs had also taken seven fact depositions, three expert depositions, and deposed Thomson Reuters pursuant to Fed. R. Civ. P. 30(b)(6). *Id.* at ¶ 17. Plaintiffs also participated in three discovery hearings before the Court, which resulted in Thomson Reuters' production of its data licensing agreements for CLEAR, and in Plaintiffs' expert being granted access to the CLEAR platform. ECF Nos. 82, 96, 120, 212. Finally, Plaintiffs consulted with leading privacy experts about the strengths and weaknesses of this case, and ultimately prepared and propounded two class certification expert reports and five merits expert reports.  Co-Lead Counsel Decl. ¶ 24.

This extensive discovery has provided Plaintiffs the basis for an informed evaluation of their claims, and the fairness, reasonableness, and adequacy of the Settlement. *See Uppal v. CVS Pharmacy, Inc.*, 2015 WL 1089062, at *1 (N.D. Cal. Sept. 11, 2015) ("[S]ignificant formal and informal discovery, investigation, research, and litigation has been conducted such that counsel for the Parties at this time are able to reasonably evaluate their respective positions."). This factor, then, weighs in favor of granting preliminary approval.

## I.  Support of Experienced Counsel

"The recommendations of plaintiffs' counsel should be given a presumption of reasonableness." *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008) (citation omitted). In fact, experienced counsel's judgment in this respect carries considerable weight. *Ramirez v. Trans Union, LLC*, 2022 WL 17722395, at *5 (N.D. Cal. Dec. 15, 2022) ("Courts grant 'great weight . . . to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation.'") (citation omitted).

Plaintiffs' counsel are experienced in litigating complex class actions, including privacy class actions against major technology companies. Co-Lead Counsel Decl. ¶ 32. They wholeheartedly endorse the Settlement as fair, reasonable, and adequate, based on their experience and familiarity with the strengths and risks of this case. *Id.* at ¶ 33. The Court, then, may credit counsel's recommendation that the Settlement warrants preliminary approval. *See Linney v. Cellular Alaska P'ship*, Nos. C-96-3008 DLJ, 1997 WL 450064, at *5 (N.D. Cal. July 18, 1997), *aff'd*, 151 F.3d 1234 (9th Cir. 1998) ("The involvement of experienced class action

1    and the fact that the settlement agreement was reached in arm's length negotiations, after

2    relevant discovery had taken place create a presumption that the agreement is fair.").

### J.   Positive Views of Class Members

Both named Plaintiffs have submitted declarations supporting the Settlement. Decl. of Cat Brooks in Support of Plaintiffs' Motion for Preliminary Approval ("Brooks Decl."); Decl. of Rasheed Shabazz in Support of Plaintiffs' Motion for Preliminary Approval ("Shabazz Decl."). As the views of other class members become known, following issuance of notice to the class of the Settlement, the Court may take them into account as well. At this stage, however, all indications are that the class is reacting positively to the proposed Settlement.

### K.   Governmental Participation is Not a Factor at Issue Here

This factor is not at issue because there is no government participation here. *Betorina v. Randstad US, L.P.*, 2017 WL 1278758, at *9 (N.D. Cal. Apr. 6, 2017) (Chen, J.).

### L.   No Signs of Collusion

The Court should also analyze the three *Bluetooth* factors at this stage to seek out signs of collusion. *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011). Courts must look for explicit collusion and "more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *Id*. at. These include "when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund," disproportionate distributions of settlement funds to counsel, and clear-sailing arrangements. *Id*.

There are no signs, explicit or subtle, of collusion here. First, settlement funds will not revert to Thomson Reuters under any circumstances. Settlement funds will go to class members, and the use of electronic payment methods will increase the chances that even small dollar amounts can be distributed to the class. These payments will be divided equally among class members, so all class members are treated equitably. The same may be said for the injunctive relief which admits no distinctions among class members. The named Plaintiffs have stated under oath that they understand they are not legally entitled to any benefits other than those available to all settlement class members. Brooks Decl. at ¶ 8; Shabazz Decl. at ¶ 8.

Any amount that is not feasibly distributable may be awarded to next-best recipient. The Settlement Agreement provides that the parties will jointly propose such recipients for Court approval, if and when there remains an amount that is not feasibly distributable directly to participating settlement class members. Second, there will not be a disproportionate distribution of the settlement fund to counsel. *Bluetooth*, 654 F.3d at 947. Nor is there any "clear sailing" agreement. *Id.* As set forth in the Settlement Agreement, Class Counsel will request no more than 33 percent of the Settlement Fund. Settlement § XIII. And all attorneys' fees will be payable solely from the Settlement Fund in a percentage to be determined by the Court. *Id.* The fees are therefore not being paid by Thomson Reuters in exchange for Plaintiffs' acceptance of an unfair class action settlement. *Bluetooth*, 654 F.3d at 947.

The timing of the payment of attorneys' fees—shortly after the final approval of fees by this Court—is not controversial, either. Settlement § XIII. *In re VeriFone Holdings, Inc. Sec. Litig.*, 2014 WL 12646027, at *2 (N.D. Cal. Feb. 18, 2014) (Chen, J.) ("[A]long with other courts in this District, the Court finds that the "quick pay" nature of the attorneys' fee provision does not pose a problem."); *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 2020 WL 4212811, at *40 (N.D. Cal. July 22, 2020) ("quick -pay provisions have long been accepted in the appropriate circumstances."), *aff'd*, 2022 WL 2304236 (9th Cir. June 27, 2022); *Pelzer v. Vassalle*, 655 F. App'x 352, 365 (6th Cir. 2016) ("Quick-pay provisions are common.") (citing Brian T. Fitzpatrick, *The End of Objector Blackmail?*, 62 Vand. L. Rev. 1623, 1643 (2009), which found over one-third of federal class action settlement agreements in 2006 included quick-pay provisions).

Moreover, this settlement was the culmination of protracted discussions between the parties before a former federal District Court Judge. *See* Phillips Decl. These negotiations culminated in both parties accepting a mediator's proposal. *Id.* at ¶ 13.  "The assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive." *Schofield*, 2019 WL 955288, at *6 (Chen, J.).

Lastly, there is no undisclosed agreement made in connection with the settlement proposal. Co-Lead Counsel Decl. at ¶ 29; Settlement § XXXI.

For all these reasons, there are no indicia that the settlement is the product of collusion.

* * *

Considering all of these guideposts, the Court should preliminarily conclude that the class representatives and class counsel have adequately represented the class, that the Settlement was negotiated at arms-length, that the relief provided for the class is adequate, and that the Settlement treats class members equitably relative to each other. Fed. R. Civ. P. 23(e)(2)(A)-(D). Thus, the Court should preliminarily conclude that the proposed settlement is fair, reasonable, and adequate, and likely to receive final approval.

### III. Approval of the Proposed Settlement Administrator

Plaintiffs propose, and Thomson Reuters does not oppose, the appointment of Angeion Group, LLC as settlement administrator. Documentation of Angeion's competence is included in the Declaration of Steven Weisbrot. Notably, this Court has previously approved of Angeion as a settlement administrator in other class actions. *E.g.*, *Nolen v. PeopleConnect, Inc.*, No. 3:20-cv-09203-EMC, ECF No. 278 (N.D. Cal. May 20, 2024); *Roberts v. AT&T Mobility LLC*, 2021 WL 9564450, at *2 (N.D. Cal. Mar. 31, 2021) (Chen, J.); *In re Hanna Andersson & Salesforce.Com Data Breach Litig.*, 2020 WL 10054678, at *2 (N.D. Cal. Dec. 29, 2020) (Chen, J.); *In re Chrysler-Dodge-Jeep Ecodiesel® Mktg., Sales Pracs., & Prod. Liab. Litig.*, 2019 WL 2554232, at *2 (N.D. Cal. May 3, 2019) (Chen, J.); *In re Uber FCRA Litig.*, 2018 WL 2047362, at *1 (Chen, J.).

Angeion has estimated the cost of administering the Settlement here as $469,000. Weisbrot Decl. at ¶ 46. Plaintiffs solicited bids from numerous potential administrators, carefully reviewed and compared those bids, and selected Angeion as the best suited to administer the settlement here, including because its proposal preserved as much of the settlement fund as practicable for class members, while also engaging robust and comprehensive fraud-prevention techniques that will assist in distributing as much of the fund as possible to class members here. Co-Lead Counsel Decl. ¶ 35. These costs are reasonable in relation to the value of the settlement, and will be paid, with the approval of the Court, out of the settlement fund after they are incurred.[17] Angeion will also serve notice of the proposed

---

[17] At final approval and during the settlement administration phase, Plaintiffs will seek this Court's permission to authorize payment to Angeion as those costs are incurred.

settlement to relevant state and federal authorities within ten days of submission of this motion, which is at least 90 days prior to the date for the final fairness hearing, consistent with federal law, 28 U.S.C. § 1715(d); Weisbrot Decl. at ¶ 40; Settlement § VI.

For these reasons, the Court should appoint Angeion as the settlement administrator.

**IV. Preliminary Approval of Class Notice Form and Method[18]**

Fed. R. Civ. P. 23(c)(2)(B) requires the "best notice that is practicable under the circumstances." This includes individual notice where class members can be individually identified with reasonable effort, and may be by traditional mail, electronic means, "or any other appropriate means." Fed. R. Civ. P. 23(c)(2)(B). Rule 23(c) also sets out requirements for what information the notice must contain.[19] The content of class notice need not be perfect, but rather, must "reasonably convey the required information[.]" *Low v. Trump Univ., LLC*, 881 F.3d 1111, 1120 (9th Cir. 2018); *Chinitz v. Intero Real Est. Servs.*, 2020 WL 7042871, at *3 (N.D. Cal. Dec. 1, 2020) ("Notice does not have to be perfect—it must be the best notice that is practicable under the circumstances . . ..") (internal quotation omitted); *Beltran v. Olam Spices & Vegetables, Inc.*, 2023 WL 5817577, at *5 (E.D. Cal. Sept. 8, 2023) ("Importantly, notice to a class is not required to be perfect."). The Settlement contemplates a single, combined notice advising the class of the proposed certification and settlement of (b)(3) classes under both Rule 23(e)(1) and (c)(2)(B).

Consider first the method of notice. Rule 23(c)(2)(B) was amended because means of communication have evolved and permitting notice by electronic means, including digital media and social media, may provide the best notice practicable under the circumstances. Bolch Judicial Institute, *Guidelines and Best Practices Implementing 2018 Amendments to Rule 23 Class*

---

[18] "[N]otice must be sent before a judgment has been granted[.]" *Schwarzschild v. Tse*, 69 F.3d 293, 295 (9th Cir. 1995) (collecting cases). While the Court has already certified a litigation class, the class has not yet been notified.

[19] The notice must clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3). Fed. R. Civ. P. 23(c)(2)(B).

*Action Settlement Provisions*, Duke Law School (August 2018), at \*17-18; *In re Google Referrer Header*, 2023 WL 6812545, at \*4-5 (approving notice through digital media); *see also* 1 McLaughlin on Class Actions § 5:81.[20] The Committee Note to the amendments advised: "Counsel should consider which method or methods of giving notice will be most effective; simply assuming that the 'traditional' methods are best may disregard contemporary communication realities." Duke Law School, *Implementing 2018 Amendments to Rule 23, supra*, Rules Appendix C, at \*19. Consistent with that directive, counsel for the parties and the settlement administrator have carefully considered cost and effectiveness in determining the best practicable means of communicating the settlement benefits and rights of exclusion (among other matters) to the class. Co-Lead Counsel Decl. at ¶ 35; Weisbrot Decl. at ¶¶ 18-34.

Thomson Reuters does not have a direct relationship with class members here. *See* Cert. Order at 4, 21. Accordingly, Thomson Reuters does not have any direct channel of communication with class members that it might use for direct individual notice to Californians. *See id.*; Weisbrot Decl. at ¶ 22. And while Thomson Reuters does have physical address information for a portion of class members, it does not have useable email address information. Co-Lead Counsel Decl. at ¶ 5; Weisbrot Decl. at ¶¶ 22. Email is not a datapoint that Thomson Reuters optimizes for CLEAR, and so Thomson Reuters has no systematic set of email addresses that are likely to be used by class members here. Plaintiffs have conferred with the settlement administrator and, based on the size of the settlement fund here and the number of class members, the cost of physically mailing notice to the class is so substantial as to render it non-practicable under the circumstances. Weisbrot Decl. at ¶ 23. Thus, this is the sort of action where "publication notice placed in appropriate periodicals and on internet sites satisfies due process." *Id.* at ¶¶ 18-34, 57-59; 1 McLaughlin on Class Actions § 5:81 (20th ed.) (citing cases).

Plaintiffs and their proposed settlement administrator have carefully crafted a notice plan to target the forms of media that are most consumed by class members across a variety of cutting-edge digital sources. Weisbrot Decl. at ¶¶ 18-34, 57-59. This notice plan will reach 75% of class members with a 3X average frequency per class member. *Id.* at ¶ 58. It will prioritize

---

[20]*Available at* https://www.fjc.gov/sites/default/files/materials/58/frcv18_5924.pdf.

notice within California, then the top states Californians have moved to during the class period, and include national coverage for those class members that remain. *Id.* at ¶ 31. And it will include innovative new ways of reaching class members through social media, which many Californians now rely on for their daily news. *See id.* at ¶¶ 32-33.

This notice plan is the best practicable under the circumstances here. *Id.* at ¶ 62; Fed. R. Civ. P. 23(c)(2)(B); *In re Google Referrer Header*, 2023 WL 6812545, at *4-5 (notice through "internet-based banner advertisements, Google keyword search advertising, Gmail advertising, publication on social media platforms, publication on class action websites, and publication in nationally circulated print magazines" was best practicable under the circumstances); *In re MetLife Demutualization Litig.*, 262 F.R.D. 205, 208 (E.D.N.Y. 2009) ("In view of the millions of members of the class, notice to class members by individual postal mail, email or radio or television advertisements, is neither necessary nor appropriate. The publication notice ordered is appropriate and sufficient in the circumstances."); *see also* 1 McLaughlin on Class Actions § 5:81.

Consider next the form of notice. Under Rule 23(c)(2)(B), notice must include, in a form that is understandable to potential class members: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

That information is included in each of the notices in language that is easy to understand. Plaintiffs propose class notices created using templates that were designed by a California non-profit, the Impact Fund, with input from judges and practitioners across the country. Co-Lead Counsel Decl. at ¶ 36. Plaintiffs' proposed notice is easy to read, easy to understand, uses bold color and text to direct class members' attention, and contains all information required under Rule 23. Weisbrot Decl. at ¶¶ 41-42, Ex. 2. Courts in this district have approved substantially similar notices, based on the same templates, in other recent class actions. *Forsyth. v. HP Inc.*, No. 5:16-cv-04775-EJD (N.D. Cal.), ECF Nos. 526-2 at 47-64; 530 at 5; *In re JUUL Labs, Inc., Mktg.*

*Sales Practice and Prods. Liab. Litig.*, No. 19-md-02913-WHO (N.D. Cal.), ECF No. 3779 at 7[21]. This Court should find, as those courts did, that Plaintiffs' proposed form of notice satisfies due process and Rule 23. *Low*, 881 F.3d at 1120.

Because the class notices and notice plan set forth in the Settlement satisfy the requirements of due process and Federal Rule of Civil Procedure 23, and provide the best notice practicable under the circumstances, the Court should direct the parties and the Settlement Administrator to proceed with providing notice to settlement class members pursuant to the terms of the settlement agreement and its order granting preliminary approval.

## CONCLUSION

For the reasons just discussed, the Court should certify the proposed Settlement Class for settlement purposes, grant preliminary approval to the proposed class action settlement, appoint Angeion as settlement administrator, direct notice to the class, set deadlines for class members to exercise their rights in connection with the proposed Settlement, and schedule a Final Fairness Hearing to determine whether the Settlement, Plan of Allocation, and forthcoming applications for attorneys' fees and expenses should be finally approved.

DATED: August 29, 2024                    Respectfully submitted,

                                          */s/ Andre M. Mura*

                                          Andre M. Mura (SBN 298541)
                                          Ezekiel S. Wald (SBN 341490)
                                          **GIBBS LAW GROUP LLP**
                                          1111 Broadway, Suite 2100
                                          Oakland, California 94607
                                          (510) 350-9700
                                          amm@classlawgroup.com
                                          zsw@classlawgroup.com

                                          Geoffrey A. Graber (SBN 211547)
                                          Karina G. Puttieva (SBN 317702)
                                          **COHEN MILSTEIN SELLERS & TOLL**

---

[21] *Available at* https://www.juulclassaction.com/Content/Documents/Notice.pdf.

**PLLC**
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
ggraber@cohenmilstein.com
kputtieva@cohenmilstein.com

*Attorneys for Plaintiffs and the Class*