Andre M. Mura (SBN 298541)
Ezekiel S. Wald (SBN 341490)
**GIBBS LAW GROUP LLP**
1111 Broadway, Suite 2100
Oakland, CA 94607
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
amm@classlawgroup.com
zsw@classlawgroup.com

Geoffrey A. Graber (SBN 211547)
Karina G. Puttieva (SBN 317702)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
ggraber@cohenmilstein.com
kputtieva@cohenmilstein.com

*Attorneys for Plaintiffs and the Certified Class*

## UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA SAN FRANCISCO DIVISION

CAT BROOKS and RASHEED SHABAZZ, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

THOMSON REUTERS CORPORATION,

Defendant.

Case No. 3:21-cv-01418-EMC-KAW

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

Date: February 13, 2025
Time: 1:30 p.m.
Place: Courtroom 5, 17th Floor
Judge: Hon. Edward M. Chen

## NOTICE OF MOTION AND MOTION

TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT on February 13, 2025 at 1:30 p.m., or as soon thereafter as the matter may be heard, in Courtroom 5 of the United States District Court, Northern District of California, San Francisco Division, located at 450 Golden Gate Avenue, San Francisco, California 94102, before the Honorable Edward M. Chen, the Named Plaintiffs and Court-appointed Settlement Class Representatives Cat Brooks and Rasheed Shabazz, on behalf of themselves and the Settlement Class, will, and hereby do, move this Court for entry of an Order, pursuant to Federal Rule of Civil Procedure 23:

1. Granting final certification of the Settlement Class under Rules 23(a) and 23(b)(3);

2. Granting final approval of the proposed Settlement reached between Plaintiffs and Defendant Thomson Reuters Corporation in the above-captioned action, under Federal Rule of Civil Procedure 23(e);

3. Finding that notice has been conducted in accordance with the Court-approved notice plan and comports with due process; and

4. Granting awards of attorneys' fees and costs, service awards, and reimbursement of settlement administration costs, because those requests are reasonable and adequately documented;[1]

This motion is based upon this Notice of Motion, the attached Memorandum of Points and Authorities, the Co-Lead Counsel Declaration, the Declaration of Steven Weisbrot of Angeion Group, LLC ("Weisbrot Decl."), Plaintiffs' Motion for Preliminary Approval and the declarations submitted in support of Preliminary Approval (ECF Nos. 241; 241-1; 241-2; 241-3; 241-4; 241-5), the Parties' Joint Supplemental Brief in Support of Preliminary Approval (ECF

---

[1] Capitalized terms shall have the same meaning as set forth in the Class Action Settlement Agreement and Release ("Settlement"), attached as Exhibit 1 to the Declaration of Andre M. Mura and Geoffrey Graber in Support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement Pursuant to Federal Rule of Civil Procedure 23(e)(1), ECF No. 241-1. Unless otherwise noted, all emphasis is added and all internal citations and quotation marks are omitted.

No. 250), Plaintiffs' Motion for Attorneys' Fees, Costs, and Service Awards and the declarations submitted in support thereof (ECF Nos.  264; 264-1; 264-2; 264-3), the concurrently-filed Proposed Order, the pleadings and records on file in this action, and upon any additional evidence and argument that may be presented before or at the hearing of this motion.

PLAINTIFFS' MOTION FOR FINAL APPROVAL
Case No.: 3:21-cv-01418-EMC-KAW

# TABLE OF CONTENTS

Page

NOTICE OF MOTION AND MOTION.................................................................................i

MEMORANDUM OF POINTS AND AUTHORITIES .........................................................1

ISSUE TO BE DECIDED.....................................................................................................1

INTRODUCTION .................................................................................................................1

BACKGROUND ...................................................................................................................1

I. Terms of the Proposed Settlement................................................................2

    A. Proposed Settlement Class...................................................................2

    B. Settlement Fund ..................................................................................3

    C. Injunctive Relief.................................................................................3

    D. Release ...............................................................................................6

    E. Notice.................................................................................................6

    F. Administration and Plan of Allocation.................................................8

ARGUMENT.........................................................................................................................8

I. Certification of the Settlement Class Should be Finalized. ...........................8

II. Final Approval of the Settlement is Warranted. ..........................................9

    A. Strength of Plaintiffs' Case ...............................................................10

    B. Risk, Complexity, Costs, and Likely Duration of Further Litigation, and Risk of Maintaining Class Certification.................................................................11

    C. Amount Offered in Settlement..........................................................13

    D. Plan of Allocation.............................................................................15

    E. Method of Distributing Relief ...........................................................15

    F. Attorneys' Fees and Costs, and Service Awards................................16

    G. Settlement Administration Expenses..................................................16

    H. Stage of the Proceedings and Extent of Discovery Completed ..........16

    I. Support of Experienced Counsel .......................................................17

    J. Views of Class Members...................................................................17

PLAINTIFFS' MOTION FOR FINAL APPROVAL
Case No.: 3:21-cv-01418-EMC-KAW

    K.   Governmental Participation is Not a Factor at Issue Here ........................................18

    L.   No Signs of Collusion.........................................................................................18

III.   Notice to the Settlement Class Comported with Rule 23 and Due Process...................19

CONCLUSION .........................................................................................................................20

PLAINTIFFS' MOTION FOR FINAL APPROVAL
Case No.: 3:21-cv-01418-EMC-KAW

# TABLE OF AUTHORITIES

Page(s)

Cases

*Allen v. Bedolla,*
787 F.3d 1218 (9th Cir. 2015) ................................................................................................14

*Bellinghausen v. Tractor Supply Co.,*
306 F.R.D. 245 (N.D. Cal. 2015) ............................................................................................13

*Beltran v. Olam Spices & Vegetables, Inc.,*
2023 WL 5817577 (E.D. Cal. Sept. 8, 2023) .........................................................................20

*Betorina v. Randstad US, L.P.,*
2017 WL 1278758 (N.D. Cal. Apr. 6, 2017) ..........................................................................18

*Briseño v. Henderson,*
998 F.3d 1014 (9th Cir. 2021) ..................................................................................................9

*Chinitz v. Intero Real Est. Servs.,*
2020 WL 7042871 (N.D. Cal. Dec. 1, 2020) ..........................................................................20

*Class Plaintiffs v. City of Seattle,*
955 F.2d 1268 (9th Cir. 1992) ..................................................................................................6

*Elgindy v. AGA Serv. Co.,*
2024 WL 4634060, at *3 (N.D. Cal. Oct. 29, 2024) ................................................................9

*Harbour v. California Health & Wellness Plan,*
2024 WL 171192 (N.D. Cal. Jan. 16, 2024) ...........................................................................13

*Hesse v. Sprint Corp.,*
598 F.3d 581 (9th Cir. 2010) ...............................................................................................6, 14

*Hubbard v. Google,*
2024 WL 3302066 (N.D. Cal., July 1, 2024) ..........................................................................11

*In re Apple Inc. Device Performance Litig.,*
50 F.4th .....................................................................................................................................9

*In re Apple iPhone 4 Prods. Liab. Litig.,*
   No. 5:10-md-2188 RMW, 2012 WL 3283432 (N.D. Cal. Aug. 10, 2012)......................................17

*In re Bluetooth Headset Prod. Liab. Litig.,*
   654 F.3d 935 (9th Cir. 2011) ................................................................................................18, 19

*In re Carrier IQ, Inc., Consumer Priv. Litig.,*
   2016 WL 4474366, at *3 (N.D. Cal. Aug. 25, 2026) ........................................14, 17, 18

*In re Google Location Hist. Litig.,*
   2024 WL 1975462 (N.D. Cal. May 3, 2024) .........................................................................12

*In re LinkedIn User Privacy Litig.,*
   309 F.R.D. 573 (N.D. Cal. 2015) .............................................................................................13

*In re MyFord Touch Consumer Litig.,*
   2019 WL 1411510 (N.D. Cal. Mar. 28, 2019)........................................................................13

*In re NVIDIA Corp. Derivative Litig.,*
   2008 WL 5382544 (N.D. Cal. Dec. 22, 2008) ..........................................................................6

*In re Tableware Antitrust Litig.,*
   484 F. Supp. 2d 1078 (N.D. Cal. 2007) ..................................................................................13

*In re TracFone Unlimited Serv. Plan Litig.,*
   112 F. Supp. 3d 993 (N.D. Cal. 2015) ....................................................................................14

*In re Uber FCRA Litig.,*
   2017 WL 2806698 (N.D. Cal. June 29, 2017) ...........................................................................6

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.,*
   895 F.3d 597 (9th Cir. 2018) ..............................................................................................9, 10

*LaGorden v. Support.com, Inc.,*
   No. C 12-0609 JSC, 2013 WL 1283325 (N.D. Cal. Mar. 26, 2013).......................................17

*Linney v. Cellular Alaska P'ship,*
   151 F.3d 1234, 1239 (9th Cir. 1998) .....................................................................................16

*Linney v. Cellular Alaska P'ship,*
   Nos. C-96-3008 DLJ, 1997 WL 450064 (N.D. Cal. July 18, 1997) .......................................17

vi

*Low v. Trump Univ., LLC*,
  881 F.3d 1111 (9th Cir. 2018) ...........................................................................19

*McLeod v. Bank of Am., N.A.*,
  2019 WL 1170487 (N.D. Cal. Mar. 13, 2019) ......................................................9

*Moore v. Centrelake Med. Grp., Inc.*,
  299 Cal. Rptr. 3d 544 (2022) ..............................................................................11

*O'Connor v. Uber Techs., Inc.*,
  2019 WL 1437101 (N.D. Cal. Mar. 29, 2019) .......................................................6

*Ramirez v. LexisNexis Risk,*
  *Sols.*, 2024 WL 1521448 (N.D. Ill. Apr. 8, 2024) ...............................................11

*Ramirez v. Trans Union, LLC*,
  2022 WL 17722395, at *5 (N.D. Cal. Dec. 15, 2022) .........................................17

*Roberts v. AT&T Mobility LLC*,
  2021 WL 9564449 (N.D. Cal. Aug. 20, 2021) ......................................................9

*Rodriguez v. W. Publ'g Corp.*,
  563 F.3d 948 (9th Cir. 2009) ..............................................................................12

*Schofield v. Delta Air Lines, Inc.*,
  2019 WL 955288 (N.D. Cal. Feb. 27, 2019) ..................................................13, 19

*Schuchard v. Law Office of Rory W. Clark*,
  2016 WL 232435 (N.D. Cal. Jan. 20, 2016) .........................................................13

*Taylor v. Shutterfly, Inc.*,
  2021 WL 5810294 (N.D. Cal. Dec. 7, 2021) ........................................................14

*Thomas v. Dun & Bradstreet Credibility Corp.*,
  2017 WL 11633508 n.3 (C.D. Cal. Mar. 22, 2017) ..............................................13

*Vigil v. Hyatt Corp.*,
  2024 WL 2137640 (N.D. Cal. May 13, 2024) .......................................................13

*Williams v. Boeing Co.*,
  517 F.3d 1120 (9th Cir. 2008) ..............................................................................6

Rules

Federal Rule of Civil Procedure 23................................................................ passim

PLAINTIFFS' MOTION FOR FINAL APPROVAL
Case No.: 3:21-cv-01418-EMC-KAW

**MEMORANDUM OF POINTS AND AUTHORITIES**

**ISSUE TO BE DECIDED**

Whether the Court should grant final certification and approval of this proposed class action settlement, and whether it should find that class notice was conducted in accordance with the Court-approved notice plan and due process.

**INTRODUCTION**

This Court, on October 11, 2024, preliminarily certified a settlement class and approved a proposed settlement that establishes a non-reversionary, $27,500,000 common fund and injunctive relief for current and former California residents whose personal information was made available for sale through CLEAR between December 3, 2016 and October 31, 2024, along with substantial injunctive relief. ECF No. 259. The Court's Order set a claims deadline of December 6, 2024, which the Court later extended to December 27, 2024, to permit class members additional time to file claims. ECF No. 268.

Notice was completed consistent with the Court-approved notice plan. ECF No. 241 at ¶¶ 13-16; Declaration of Steven Weisbrot at ¶ 11. Ultimately, that notice was effective, reaching over 81% of potential class members and utilizing a variety of creative print and digital media methods. Weisbrot Decl. at ¶¶ 8-11, 14-33. In response to the class notice, approximately 134,325 class members submitted valid claims to receive money out of the settlement fund. *Id.* at ¶¶ 42-43. That yields a claims rate of 0.336%, which is less than anticipated at preliminary approval but still within the range that courts find acceptable at final approval. *Id.* at ¶ 42. Only 50 class members opted out, while none objected to the settlement. *Id.* at ¶ 41.

Because notice was successfully carried out consistent with Rule 23 and due process, the class reacted positively to the settlement, and the settlement overall is fair, reasonable, and adequate, the Court should grant final certification of the settlement class, and final approval of the settlement.

**BACKGROUND**

Given the stage of this litigation, the Court is well familiar with the circumstances that led to this case. *See* ECF No. 241 at 4-7 (setting out the history of this litigation); ECF No. 259

---

1

PLAINTIFFS' MOTION FOR FINAL APPROVAL
Case No.: 3:21-cv-01418-EMC-KAW

(granting preliminary approval); ECF No. 213 at 1-5 (Court's Order granting class certification walking through factual and procedural background). In short, this case concerns Thomson Reuters' operation of the CLEAR platform—where Thomson Reuters' customers can search for and review information about adults residing in California. ECF No. 241 at 4-7. Plaintiffs allege that Californians are largely unaware that Thomson Reuters uses personal information pertaining to them in this way. *Id.* Plaintiffs brought this case alleging that CLEAR violates Californians' right to control their personal information by allegedly selling access to 360-degree views of their lives, asserting that their privacy rights extended to the commercial appropriation and sale of information about them, even if that information was publicly available in disaggregated form. *Id.*

The parties reached this settlement agreement on a fully developed record after years of litigation. The Court has already resolved motion to dismiss briefing (ECF No. 54) and granted class certification (ECF No. 213), and the parties have completed fact discovery and most expert discovery. ECF No. 241-1 at ¶ 24. The parties mediated this case under the supervision of U.S. District Court Judge Layn Phillips (ret.), who, following protracted negotiations, put forward a mediator's proposal that both parties accepted. ECF No. 241-5 at ¶¶ 8-13. The Court preliminarily approved the settlement on October 11, 2024, and the parties now seek final approval.

## I. Terms of the Proposed Settlement

### A. Proposed Settlement Class

This Court preliminarily certified a settlement class defined as:

All persons who, during the Class Period, both resided in the state of California and whose information Thomson Reuters made available for sale through CLEAR.

ECF No. 259 at ¶¶ 5-6. "Class Period" means December 3, 2016 through October 31, 2024. *Id.*[2]

The proposed final settlement class is identical to the class certified by the Court at

[2] The class excludes officers and directors of Thomson Reuters, class counsel, Judge Edward M. Chen, and any members of Judge Chen's immediate family and judicial staff. ECF No. 259 at ¶ 5 n.1.

preliminary approval. *Id.* at ¶ 7.

**B. Settlement Fund**

The proposed settlement provides for a fund in the amount of $27,500,000. Settlement § IX. After payment of attorneys' fees and expenses to Class Counsel, payment of the settlement administration costs, and payment of service awards, the remaining balance will be distributed proportionally to all settlement class members who submitted valid claims. *Id.*

The settlement is non-reversionary, meaning Thomson Reuters will not retain any part of the settlement amount that is not paid out or distributed as part of the administration of the settlement for any reason. Settlement § IX. If any part of the settlement amount cannot feasibly be distributed to the class, the parties will jointly propose a *cy pres* recipient or recipients for this Court's approval. *Id.*

Plaintiffs have asked the Court to award each named Plaintiff up to $5,000 from the settlement fund in recognition of the time, effort, and expense they incurred pursuing this case, which ultimately benefited the entire class. *Id.* at § XII; ECF No. 264 at 12. The settlement agreement preserves the Court's supervisory authority to determine the appropriateness of any service award. Settlement at XII; ECF No. 264 at 12. Counsel have also petitioned the Court for an award of $6,875,000 in attorneys' fees, which is 25% of the $27,500,000 monetary fund, and reimbursement of $670,885.29 in litigation costs, from the settlement fund. ECF No. 264 at 4-12; Settlement at § XIII.[3] The settlement agreement also preserves the Court's supervisory authority to determine the appropriateness of any attorneys' fee or reimbursement of expenses. Settlement at § XIII. Finally, counsel here request the Court approve the reimbursement of a maximum of $545,000 to Angeion Group, Inc., for its reasonable notice and settlement administration costs, to be disbursed as those costs are incurred.

**C. Injunctive Relief**

The proposed settlement provides several different forms of prospective relief in the form of business practice changes that correspond to the practices giving rise to Plaintiffs'

---

[3] Plaintiffs' request for attorneys' fees, costs, and service awards are set out in ECF No. 264, and a proposed order awarding those fees is before the Court at ECF No. 264-4.

allegations. Settlement § XI.

Under the Settlement, Thomson Reuters has agreed to improve its data subject access request procedures for Californians—the means by which Californians can learn about, correct, and remove information about them from CLEAR. *Id.* Specifically, Thomson Reuters has agreed that it will delete certain locally hosted data that it is able to reasonably determine pertains to any Californian who submits a deletion request and verifies their identity. *Id.* It will not require the provision of a driver's license to verify Californians' identities when they seek to delete their data—although it will still do so for requests to *review* Californians' data, so as to adequately protect that data against third-party disclosure. *Id.* Under the settlement, Thomson Reuters will clearly disclose to Californians who seek to delete their data (1) what information they will be required to submit to verify their identity; (2) how that information will be used (and that it will not be made available through CLEAR); and (3) why additional information is necessary for validating a submission seeking to review CLEAR data. *Id.* These improvements to Thomson Reuters' disclosures and policies are significant changes that enhance Californians' ability to control the commercial use of information about them.

More still, under the Settlement, Thomson Reuters will share all verified data deletion requests from Californians with its third-party data licensors, asking them to treat each request as a verified opt out under the licensors' own deletion policies and to remove that Californians' data from any data flows, including APIs, provided to Thomson Reuters for use in CLEAR. *Id.* This is a sea change in Californians' ability to request removal of information about them from CLEAR and the commercial sources that feed into it. Thomson Reuters is unable to delete data that is returned to customers through its API feeds, so even when Californians successfully opt out of CLEAR, information about them could remain accessible through those sources. ECF No. 148 at 9. Without this settlement, the only way for California residents to request that their data be removed from these third parties' data flows would be to follow the threads to each of Thomson Reuters' data suppliers to submit individualized opt-out requests for each one, which would pose a huge burden to even the most engaged and privacy conscious Californian. But through the Settlement, with a single opt-out request (which, under the Settlement, will be

easier to find, understand, and have approved)—Californians can simultaneously request that certain information about them be removed from CLEAR, including from its APIs and from numerous other data sources, including several that they may never have learned about otherwise. Settlement § XI. This benefit to the class is achievable only through settlement.

Beyond these substantial changes to Thomson Reuters' opt-out processes, under the Settlement, Thomson Reuters will design and maintain a consumer-facing website to inform Californians about CLEAR. Settlement § XI. This will give Californians meaningful information about this product, the information it contains, the customers who use it, and how Californians can control the use of information about them. *Id.*

Thomson Reuters has also agreed to make a series of changes to how it operates CLEAR to incorporate principles of privacy by design. *Id.* These changes are directly responsive to allegations and expert testimony in this litigation and meaningfully address the privacy claims Plaintiffs make about CLEAR. Under the settlement, Thomson Reuters will make CLEAR's default settings more privacy protective—for example, the default CLEAR reports will exclude or limit information available about relatives, associates, licensed drivers, property owners, and neighbors of the report subject. *Id.* Similarly, Thomson Reuters will reduce the number of search results that show up by default when a customer runs a person search, narrowing the field of individuals whose personal information is made available to customers running broad searches. Settlement § XI. Thomson Reuters will also implement a narrow retention schedule for reports stored in customer's search history, to prevent the undue retention of personal information beyond what is necessary for the customer's legitimate purpose. *Id.* And, alongside these changes, Thomson Reuters will eliminate an in-platform prompt for users who run searches that retrieve no results. *See* Settlement § XI.

Finally, Thomson Reuters will improve its compliance protocols and oversight of its customers' use of CLEAR. *Id.* Under the settlement, Thomson Reuters will substantially increase the affirmative audits that it uses to investigate how and why its customers are using CLEAR data, even when those customers have not triggered a reactive misuse investigation. *Id.* And Thomson Reuters will annually review both the number of compliance investigations

that it has undertaken and the capacity of its workforce in order to adequately respond to those investigations, thus ensuring that it has devoted sufficient resources to monitoring its customers' use of CLEAR and the data available through it. *Id.*

These changes will take place within six months of Final Approval, and must be in place for four years, a length of time courts have found to be appropriate.  Settlement § XI.1; *In re Uber FCRA Litig.*, 2017 WL 2806698, at *2 (N.D. Cal. June 29, 2017) (one year); *O'Connor v. Uber Techs., Inc.*, 2019 WL 1437101, at *4 (N.D. Cal. Mar. 29, 2019) (two years); *In re NVIDIA Corp. Derivative Litig.*, 2008 WL 5382544, at *1 (N.D. Cal. Dec. 22, 2008) (three years); ECF No. 250 at 2-3 (collecting cases).

### D.  Release

In exchange for the benefits provided under the Settlement, the Plaintiffs and settlement class members will release specified parties, including Thomson Reuters and its current or former owners, shareholders, directors, employees, parents, direct and indirect subsidiaries, contractors, insurers, and affiliates, from all the claims asserted in this action as well as claims that were not asserted but could have been asserted because they are based on or related to the allegations in this action. Settlement § XVI; ECF No. 259 at ¶ 28. The release is appropriately limited under Ninth Circuit law to only those claims that are "based on the identical factual predicate as that underlying the claims in the settled class action." *Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010) (quoting *Williams v. Boeing Co.*, 517 F.3d 1120, 1133 (9th Cir. 2008); *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1287-88 (9th Cir. 1992)). To Plaintiffs' knowledge, there are no other cases that might be impacted by the settlement.  ECF No. 241-1 at ¶ 30.

### E.  Notice

Notice was provided to potential Class Members consistent with the Court-approved Notice Plan (ECF No. 259 at ¶¶ 14-15), using the advertisements (ECF No. 258) and Notice Forms (ECF Nos. 262-2, 262-3) approved by the Court (ECF Nos. 259, 263); Weisbrot Decl. at ¶¶ 6-33. Before November 22 and thereafter, consistent with the notice plan approved at preliminary approval, the settlement administrator ran digital banner ads through the Google Display Network, Social Media (Facebook and Instagram), and Google AdWords. Weisbrot

Decl. at ¶¶ 6-11. The campaign primarily targeted California, but also prioritized high-mover states, and included targeted media across all fifty states. *See* ECF No. 250 at 8. The settlement administrator also issued print notice in *USA Today*'s California regional edition. *See* ECF Nos. 250 at 8, 271 at 3; Weisbrot Decl. at ¶ 14. Over 73 million impressions were delivered, reaching an estimated 78.95% of potential class members. Weisbrot Decl. at ¶ 11. Class counsel promoted the settlement on the law firm's social networks, issued a press release, and sought interviews with news outlets to promote participation in the settlement. ECF No. 271 at 3.

After November 22, the settlement administrator updated the advertisements to include the $19-$48 class members could expect to receive, ran additional social media advertisements targeted towards the most successful prior placements, added video advertisements on YouTube, incorporated a sponsored listing and newsletter placement in *Top Class Actions*, hired a popular social media influencer to publicize the settlement on TikTok and Instagram, and made repeated personal outreach to widely circulated legacy media publications to cover the settlement. Weisbrot Decl. at ¶¶ 24-33. Class counsel also released additional press releases and continued their outreach through media and their networks. ECF No. 271 at 4.

With these additional efforts, the settlement administrator served over 76 million impressions reaching approximately 81.25% of potential class members an average of 3.24 times each. Weisbrot Decl. at ¶ 33. These figures do not include the sponsored listing on *Top Class Actions*, the social media influencer posting, or the press release, "which are difficult to measure in reach, but nevertheless serve an instrumental role in providing additional notice of the Settlement to potential Settlement Class Members." *Id.* For example, the social media influencer's postings received more than 1,000,000 views, *id.* at ¶ 30, and approximately 511 media outlets with a combined potential audience of 161.6 million visitors posted about the settlement. *Id.* at ¶ 29.

The notice program also included a case-specific webpage to host pleadings, to provide case updates, contact information for the settlement administrator, and other information, including a long-form notice in English, Spanish, and Chinese. Weisbrot Decl. at ¶¶ 15-16. Additional translations were available on the settlement website upon request. ECF No. 250 at

8-9. As of December 27, 2024, the settlement website has had approximately 5,013,529 page views, and 3,862,101 individual user sessions. Weisbrot Decl. at ¶ 17. The Settlement Administrator also established a toll-free number and post office box allowing class members to call or write for additional information about the Settlement, along with online support. *Id.* at ¶¶ 18-23. As of December 27, 2024, 156 phone calls were received, and the Settlement Administrator further corresponded with class members through email or chat (receiving approximately 6,125 emails and 1,082 pieces of mail from class members to date). *Id.*

In short, the notice plan was effective. *Id.* at ¶¶ 47-48. Notice is estimated to have reached 81.25% of potential class members an average of 3.24 times each. By the claims deadline, 134,325 class members submitted claims that the Settlement Administrator accepted as valid, yielding a claims rate of 0.336%.[4] The notice and notice plan is further described in the Declaration of Steven Weisbrot, and Court's Order Granting Preliminary Approval.

### F. Administration and Plan of Allocation

The claim form was clear, direct, and simple. ECF No. 250 at 12. All settlement class members who submitted valid, timely claim forms will each receive a pro-rata share of the net settlement fund. Settlement § X. While final claims processing may result in adjustments to the amount, current estimates are that each class member will receive $144.20 after payment of any Court-approved fees, expenses, administration costs, and service awards. Weisbrot Decl. at ¶¶ 42-43.

### ARGUMENT

### I. Certification of the Settlement Class Should be Finalized.

On July 31, 2023, this Court certified a litigation class. ECF No. 213 at 14. Then, after the parties agreed to a proposed classwide settlement, the Court granted their motion to preliminarily certify the settlement class based on findings that the settlement and proposed settlement class met the requirements of Rule 23, appointing Cat Brooks and Rasheed Shabazz as class representatives, and appointing Andre Mura and Geoffrey Graber as class counsel. ECF

---

[4] 46,493 claims are still undergoing validation. Weisbrot Decl. at ¶ 41.

No. 259 at ¶¶ 5-12. Since then, nothing has changed, and settlement class certification remains warranted.

## II. Final Approval of the Settlement is Warranted.

To approve a class settlement, a court must determine that the settlement is "fair, reasonable, and adequate." *In re Apple Inc. Device Performance Litig.*, 50 F.4th at 780 (quoting Fed. R. Civ. P. 23(e)(2)). At final approval, the Court examines many of the same factors it considered at the preliminary approval stage, while also evaluating the reaction of class members to the settlement. *Roberts v. AT&T Mobility LLC*, 2021 WL 9564449, at *3 (N.D. Cal. Aug. 20, 2021); *McLeod v. Bank of Am., N.A.*, 2019 WL 1170487, at *3 (N.D. Cal. Mar. 13, 2019) (Chen, J.).

"A proposed settlement that is 'fair, adequate and free from collusion' will pass judicial muster." *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 895 F.3d 597, 610 (9th Cir. 2018). District courts may consider a number of factors to determine whether a settlement agreement meets this standard, including: "the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement." *Id.* at 610 n.18 (quotation omitted).

The 2018 amendments to Rule 23(e) require the Court to consider additional overlapping factors as well. *Briseño v. Henderson*, 998 F.3d 1014, 1025-26 (9th Cir. 2021). These include whether: "(A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate; and (D) the proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(A)-(D). "These factors were not designed to displace any factor developed under each circuit's existing precedent, but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." *Elgindy v. AGA Serv. Co.*, 2024 WL 4634060, at *3 (N.D. Cal. Oct. 29, 2024) (cleaned up).

Ultimately, however, the factors are guideposts. "'The relative degree of importance to

be attached to any particular factor will depend upon . . . the unique facts and circumstances presented by each individual case.'" *In re Volkswagen*, 895 F.3d at 611 (citation omitted). "Deciding whether a settlement is fair is ultimately an amalgam of delicate balancing, gross approximations and rough justice," that is "best left" to the sound discretion of the trial judge. *Id.* (internal citation and quotation marks omitted).

For the reasons the Court set out in granting preliminary approval, ECF No. 259 at ¶¶ 3-4, and because class members have reacted positively to the settlement, the Court should find that the settlement agreement is fair, reasonable, and adequate, and grant final approval.

### A. Strength of Plaintiffs' Case

The claims at issue here involve Thomson Reuters' alleged collection of information about Californians, connection of those data into comprehensive profiles, and selling of access to those profiles to its customer base, all without Californians' knowledge and consent. Whether the harm to the public from making information about Californians available for sale through CLEAR without their consent is greater than the utility of allowing Thomson Reuters to sell access to that information will drive resolution of Plaintiffs' UCL claim. ECF No. 213 at 17-19. Similarly, whether Thomson Reuters' retention of the profits earned from that same practice is "unjust" is the central question of Plaintiffs' claim for unjust enrichment. *Id.* at 20. What data Thomson Reuters collected, how it connects those data into profiles, whether and how the company confirms the accuracy of that data, to whom it sells access to that data to (and for what purposes), the monitoring and oversight processes Thomson Reuters puts in place over its customers' use of these data, and the processes it offers Californians to exercise control over their personal information will all inform the resolution of both claims. If these legal theories were proven at summary judgment or trial, Plaintiffs could be entitled to injunctive relief under the UCL, and disgorgement of Thomson Reuters' net profits from its commercial use of Californians' information.

But in order to recover any monetary relief, Plaintiffs must prove that Thomson Reuters' retention of those net profits is unjust, and that they should be legally required to return those profits to Californians. The Court has explained that this issue will require delving into

"whether the beneficial uses of CLEAR in the aggregate outweigh the privacy harms." ECF No. 213 at 28-29. That inquiry here leaves much in the hands of the jury, with limited case law setting parameters around the jury's eventual determination. And for all of the reasons the Court considered and credited in granting preliminary approval, ECF No. 259 at 1, that inquiry is not without risk here. Indeed, the recent decision in *Ramirez v. LexisNexis Risk Sols.*, 2024 WL 1521448, at *1 (N.D. Ill. Apr. 8, 2024), dismissing similar claims against a competitor of Thomson Reuters, highlights that reasonable minds may differ as to whether consumers may recover for the corporate use of information about them in products like CLEAR. *See* ECF No. 241 at 18-24. And even were Plaintiffs to succeed on the merits of their unjust enrichment claim, factual and legal issues remain as to the amount of any monetary award. *Id.*

Similarly, Plaintiffs' UCL claim for injunctive relief requires Plaintiffs to have lost (or be at risk of losing) money or property to seek redress. Plaintiffs' theory, which this Court rightly accepted, is that Plaintiffs' personal data carries financial value, and that Thomson Reuters' appropriation of that data causes the class to lose that value. ECF No. 213 at 22-23. But courts faced with this same issue have gone both ways. *Hubbard v. Google*, 2024 WL 3302066, at *8 (N.D. Cal., July 1, 2024) (collecting cases); *see also Moore v. Centrelake Med. Grp., Inc.*, 299 Cal. Rptr. 3d 544, 538 (2022). Thomson Reuters is also certain to raise this issue on appeal—and while this Court's ruling is on solid ground, disagreement among district courts presents appellate risk.

For all these reasons, while aspects of Plaintiffs' claims are strong, Plaintiffs may face headwinds in recovering more (or any) monetary relief at trial or defending an award on appeal. For similar reasons, further litigation could extinguish Plaintiffs' entitlement to, and ability to negotiate for, injunctive relief. Against those long odds, Plaintiffs achieved excellent relief for Californians. Overall, then, this factor strongly supports final approval.

### B. Risk, Complexity, Costs, and Likely Duration of Further Litigation, and Risk of Maintaining Class Certification

This litigation is complex because it involves how a multinational corporate entity uses intricate technologies to compile and sell information about Californians, it is risky because Plaintiffs proceed with only two claims, each of which require balancing many factors arguably

to make new law, and it is expensive because it requires intensive work by qualified experts familiar with the data industry and digital privacy. Neither party is likely to accept a dispositive, adverse ruling without an appeal. The litigation has been intensive to date, and would only become more so, and increasingly costly, if litigation were to continue.

If this settlement is not approved, it is unlikely that further litigation would lead to a better settlement. This is evident for two reasons. First, the parties are operating with a fully developed record, including as to Thomson Reuters' maximum potential exposure. The parties negotiated in full light of those positions, and further litigation is unlikely to clarify or change either party's position here. Second, as Thomson Reuters argued in support of its 23(f) Petition, it views this case as a grave threat to its CLEAR business. Plaintiffs negotiated for substantial and meaningful injunctive relief that will respond directly to the harms Californians allegedly experienced because of CLEAR. Thomson Reuters will not negotiate to business-dismantling injunctive relief—and were the class to obtain such relief at trial, it has already indicated it will continue to contest that relief to the company's fullest extent.

For these reasons, further litigation is unlikely to meaningfully enhance the benefits obtained in future settlement negotiations. In contrast, costs will increase substantially if litigation continues through remaining expert discovery, *Daubert* motions, summary judgment, trial, and appeals. Plaintiffs have put forward preliminary reports by five merits experts, and Thomson Reuters has itself disclosed three (and two additional class certification experts). ECF No. 241-1 at ¶ 24. These experts will have considerably more work to do in preparing rebuttal and reply reports, and preparing for trial, of this complex case.

Plaintiffs do not see serious obstacles to maintaining class certification. This Court has already certified the class, and the Ninth Circuit has declined Rule 23(f) review. Even so, Thomson Reuters has vigorously contested class certification, and would likely do so again on appeal. Even a small risk of decertification weighs in favor of granting final approval, as settlement eliminates that risk. *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009); *In re Google Location Hist. Litig.*, 2024 WL 1975462, at *6 (N.D. Cal. May 3, 2024).

This settlement, by comparison, eliminates these risks, and offers "certain recovery in

PLAINTIFFS' MOTION FOR FINAL APPROVAL
Case No.: 3:21-cv-01418-EMC-KAW

the face of an uncertain legal theory." *Harbour v. California Health & Wellness Plan*, 2024 WL 171192, at *4 (N.D. Cal. Jan. 16, 2024). This factor therefore weighs in favor of settlement approval. *Id.*; *see Vigil v. Hyatt Corp.*, 2024 WL 2137640, at *4 (N.D. Cal. May 13, 2024) ("Generally, 'unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results.'" (citation omitted)).

### C. Amount Offered in Settlement

"To determine whether a settlement 'falls within the range of possible approval,' courts focus on 'substantive fairness and adequacy' and 'consider plaintiffs' expected recovery balanced against the value of the settlement offer.'" *Schuchard v. Law Office of Rory W. Clark*, 2016 WL 232435, at *10 (N.D. Cal. Jan. 20, 2016) (quoting *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007). "Immediate receipt of money through settlement, even if lower than what could potentially be achieved through ultimate success on the merits, has value to a class, especially when compared to risky and costly continued litigation." *In re LinkedIn User Privacy Litig.*, 309 F.R.D. 573, 587 (N.D. Cal. 2015).

The class benefits offered in this settlement—both monetary and injunctive relief—represent an excellent outcome for the class. To begin, the settlement establishes a cash fund of $27,500,000. That represents a substantial proportion of Plaintiffs' maximum recovery—well within the range courts in this district consider fair.[5] *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 256 (N.D. Cal. 2015); *In re MyFord Touch Consumer Litig.*, 2019 WL 1411510, at *10 (N.D. Cal. Mar. 28, 2019) (Chen, J.). This is particularly so where class members are not alleging actual damages. *Thomas v. Dun & Bradstreet Credibility Corp.*, 2017 WL 11633508, at *13 n.3 (C.D. Cal. Mar. 22, 2017). And it is even more reasonable in light of the fact that the amount was the product of a mediator's proposal following extensive negotiations before a retired federal District Court Judge. ECF No. 241-5 at ¶ 13; *Schofield v. Delta Air Lines, Inc.*, 2019 WL 955288, at *6 (N.D. Cal. Feb. 27, 2019) (Chen, J.).

---

[5] The Court has reviewed under-seal information detailing the maximum dollar value of Plaintiffs' potential recovery—and the resulting percentage of recovery this settlement offers—in connection with preliminary approval proceedings. ECF No. 239-2 at 26, 26 n.14.

After payment of notice and administration costs and any approved award of attorneys' fees, costs, and service awards, the remaining settlement fund will be distributed to the class (*i.e.*, "the net settlement fund"). Here, approximately 134,325 class members timely submitted claims for monetary relief. Weisbrot Decl. at ¶¶ 41-43. Based on the requested attorneys' fees, costs, service awards, and settlement administration expenses (including estimated expenses for distribution of funds), class members will each receive $144.20 — an amount that compares very favorably to similar privacy class actions. *See* Weisbrot Decl. at ¶ 42; ECF No. 241-1 at Ex. 2.

In addition, Plaintiffs have obtained extensive prospective relief. "It is appropriate for the Court, in assessing whether the class is benefited by the settlement, to take into account the injunctive relief obtained, even if the Court is unable to determine the exact monetary value of such relief." *Taylor v. Shutterfly, Inc.*, 2021 WL 5810294, at *6 (N.D. Cal. Dec. 7, 2021) (collecting cases); *In re TracFone Unlimited Serv. Plan Litig.*, 112 F. Supp. 3d 993, 1005 (N.D. Cal. 2015) (Chen, J.); *Allen v. Bedolla*, 787 F.3d 1218, 1225 (9th Cir. 2015). Injunctive relief here, while perhaps difficult to measure in precise dollar amounts, is appreciable given the benefits to California residents seeking to remove certain data from CLEAR or its suppliers.

Both in terms of monetary recovery and injunctive relief, this settlement compares favorably with settlements in similar consumer privacy cases, where parties plead claims for monetary relief based on commercial collection and use of their personal information. ECF No. 241 at 28-29 (collecting cases).

Finally, the amount of the settlement is fair in view of the claims released by Plaintiffs and the class. Each class member will release claims that were or could have been asserted in this action, and the release does not extend beyond the Thomson Reuters Released Parties. Settlement § XVI. Because the release mirrors those that have won approval in other similar cases, its scope supports the conclusion that the amount offered in this settlement is fair. *See Hesse*, 598 F.3d at 590; *In re Uber*, 2018 WL 2047362, at *3 (N.D. Cal. May 2, 2018) (Chen, J.); *In re Carrier IQ, Inc., Consumer Priv. Litig.*, 2016 WL 4474366, at *3 (N.D. Cal. Aug. 25, 2016) (Chen, J.); *Davis v. Yelp, Inc.*, 2022 WL 21748777, at *2 (N.D. Cal. Aug. 1, 2022) (Chen, J.).

1

### D. Plan of Allocation

2      Plaintiffs will allocate the net settlement fund on a pro rata basis to all class members

3  who submitted valid, timely claims. Here, approximately 134,325 class members timely

4  submitted valid claims, and will each receive an estimated $144.20 through the payment

5  method they selected in the claim form. Weisbrot Decl. at ¶¶ 41-42. That dollar figure utilizes

6  Angeion's estimated costs to finalize and distribute payments to class members ($545,000).

7  Weisbrot Decl. at ¶ 47. If there is any remainder that cannot be distributed to class members

8  (which the parties do not anticipate), the parties will jointly propose a *cy pres* recipient for the

9  Court's review.

10     ### E. Method of Distributing Relief

11     Rule 23(e) instructs that the Court consider the effectiveness of any proposed method of

12  distributing relief to the class, including the method of processing claims, as part of the fairness

13  inquiry. Fed. R. Civ. P. 23(e)(2)(C)(ii). This factor supports approval for several reasons.

14     For one, Angeion will distribute relief directly from the settlement fund to all class

15  members who timely submitted valid claims, using the method that class member chose. For

16  another, the claims process was not unduly demanding, burdensome, or oppressive. Claimants

17  were not required to submit proof that information about them was available through CLEAR,

18  but only attest under oath that they were an adult residing in California during the class period.

19     Finally, the claims process was set up to deter fraudulent claims and has appropriate

20  security for electronic payment methods. Angeion employs extensive fraud-detection

21  techniques, which proved highly necessary in this case. Weisbrot Decl. at ¶¶ 34-39; ECF No.

22  271. These techniques preserved as much of the settlement fund as possible for bona fide

23  claimants. The electronic payment walls, in turn, are operated by the payment systems

24  themselves, such as Zelle, and thus have advanced security in place. Class members were

25  simply directed to the platforms of these systems. Angeion did not receive any log in or

26  password information.

27     For all of these reasons, the method of distributing relief is reasonable and supports final

28  approval.

### F. Attorneys' Fees and Costs, and Service Awards

As set forth in Plaintiffs' Motion for Attorneys' Fees, Costs, and Service Awards, Plaintiffs seek attorneys' fees of $6,875,000, which is 25% of the monetary fund. ECF No. 264. As to costs and expenses, Plaintiffs seek reimbursement of $670,885.29 (excluding settlement administration costs, discussed below), an amount that is reasonable given the amount of litigation and expert work to date. *Id.* Lastly, Plaintiffs seek service awards of $5,000 for each of the Named Plaintiffs. *Id.* For all of the reasons set out in Plaintiffs' Motion, those requests are reasonable and appropriate. *Id.* A proposed order granting these awards is before the Court at ECF No. 264-4.

### G. Settlement Administration Expenses

Under the Settlement Agreement, Angeion Group, Inc. will be provided payment for its services out of the settlement fund. Settlement § IX.3. Here, Angeion's anticipated total costs of notice and settlement administration are $545,000. Weisbrot Decl. at ¶ 47. While slightly higher than the $484,119 previously estimated at preliminary approval (with details provided to the Court under seal at ECF No. 249-002 ¶ 9, Ex. A), the additional costs account for the reasonable claims stimulation and fraud prevention work incurred in administering this settlement. ECF No. 271. Plaintiffs thus seek the Court's approval to disburse a maximum of $545,000 from the settlement fund to reimburse Angeion for the reasonable costs of settlement administration, as those costs are incurred. Weisbrot Decl. at ¶¶ 46-47.

### H. Stage of the Proceedings and Extent of Discovery Completed

To settle a class action, the parties must have "sufficient information to make an informed decision about settlement." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998). Here, the parties did not settle until fact discovery was closed, and both parties had completed and exchanged their opening merits expert reports. Thus, the Settlement is informed by extensive knowledge of nonpublic facts related to Plaintiffs' allegations, facts that informed Plaintiffs' understanding of the claims and the risks of continued litigation.

This extensive discovery has provided Plaintiffs the basis for an informed evaluation of their claims, and the fairness, reasonableness, and adequacy of the Settlement. *See Uppal v. CVS*

*Pharmacy, Inc.*, 2015 WL 1089062, at *1 (N.D. Cal. Sept. 11, 2015). This factor, then, weighs in favor of granting final approval.

### I.    Support of Experienced Counsel

"The recommendations of plaintiffs' counsel should be given a presumption of reasonableness." *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008) (citation omitted). In fact, experienced counsel's judgment in this respect carries "great weight." *Ramirez v. Trans Union, LLC*, 2022 WL 17722395, at *5 (N.D. Cal. Dec. 15, 2022).

Plaintiffs' counsel are experienced in litigating complex class actions, including privacy class actions against major technology companies. Co-Lead Counsel Decl. at ¶ 36. They wholeheartedly endorse the Settlement as fair, reasonable, and adequate, based on their experience and familiarity with the strengths and risks of this case. *Id.* at ¶ 37. The Court, then, may credit counsel's recommendation that the Settlement warrants final approval. *See Linney v. Cellular Alaska P'ship*, Nos. C-96-3008 DLJ, 1997 WL 450064, at *5 (N.D. Cal. July 18, 1997), *aff'd*, 151 F.3d 1234 (9th Cir. 1998).

### J.    Views of Class Members

Both named Plaintiffs have submitted declarations supporting the Settlement. ECF Nos. 241-3, 241-4, 264-2, 264-3. Now, following notice to the class, the Court may also consider the reaction of other class members. *In re Carrier IQ*, 2016 WL 4474366, at *4. That reaction here is positive and supports final approval.

To begin, approximately 134,325 class members submitted claims to receive money out of the settlement fund. Weisbrot Decl. at ¶ 42. That yields a response rate of 0.336%—lower than the estimated 1-2.5% response rate, but well within the range that courts find acceptable at final approval. *Id.* (0.14% claims rate); *see also LaGorden v. Support.com, Inc.*, No. C 12-0609 JSC, 2013 WL 1283325, at *6 (N.D. Cal. Mar. 26, 2013) (0.17% claims rate); *In re Apple iPhone 4 Prods. Liab. Litig.*, No. 5:10-md-2188 RMW, 2012 WL 3283432, at *1 (N.D. Cal. Aug. 10, 2012) (0.16% to 0.28% claims rate). That is particularly so where, as here, there are other indicators that the class largely supports the settlement, including a low number of opt-outs (here, 50),

and a low number of objections (here, none).[6] Weisbrot Decl. at ¶¶ 44-45. *In re Carrier IQ*, 2016 WL 4474366, at *4. Overall, then, the class's reaction is sufficiently positive to support final approval.

While the number of claims is lower than projected, that "cannot be said to be the result of inadequate notice." *Id.* As further set out in the Weisbrot Declaration, "a substantial portion of the settlement class were likely exposed to the multi-faceted notice provided by the administrator." *Id.*; *see* Weisbrot Decl. at ¶¶ 33, 48-49. The parties provided the best notice practicable under the circumstances, and approximately 134,325 class members will receive meaningful financial recovery as a result, while the remainder of the class will continue to benefit from the settlement's injunctive relief. This factor, then, weighs in favor of final approval as well.

Plaintiffs are concurrently submitting a proposed Final Judgment, and a list of persons opting out is attached to the Weisbrot Declaration as **Exhibit M**. Weisbrot Decl. at ¶ 44.

**K. Governmental Participation is Not a Factor at Issue Here**

This factor is not at issue because there is no government participation here. *Betorina v. Randstad US, L.P.*, 2017 WL 1278758, at *9 (N.D. Cal. Apr. 6, 2017) (Chen, J.).

**L. No Signs of Collusion**

The Court should also analyze the three *Bluetooth* factors at this stage to seek out signs of collusion. *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011). Such signs include "when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund," disproportionate distributions of settlement funds to counsel, and

---

[6] On December 26, 2024, Class Counsel received an email from an individual reporting difficulty submitting a claim, and asking "class counsel not only for help with this but also to address the court regarding this issue[.]" Co-Lead Counsel Decl. at ¶ 40, Ex. 1. Class counsel is sharing this experience with the Court because this individual asked them to do so. *See id.* The settlement administrator has confirmed, however, that the website was properly working at all times, and has explained why certain individuals attempting to use the website to submit a claim may have received an error code, and the process for resolving such errors. Weisbrot Decl. at ¶¶ 34-39. The settlement administrator followed this process with this particular individual, and Angeion was able to successfully process this individual's claim. *Id.* at ¶ 40.

clear-sailing arrangements. *Id.*

As the Court found at preliminary approval, there are no signs of collusion here. ECF No. 259 at ¶ 3. First, settlement funds will not revert to Thomson Reuters under any circumstances. Settlement funds will go to class members, using the payment method those class members selected. Payments will be divided equally among class members, so all class members are treated equitably. The same may be said for the injunctive relief which admits no distinctions among class members. Second, there will not be a disproportionate distribution of the settlement fund to counsel. *Bluetooth*, 654 F.3d at 947. Nor is there any "clear sailing" agreement. *Id.* Class counsel has requested attorneys' fees of $6,875,000, or 25% of the settlement fund, and the Court retains supervisory discretion to approve those fees. *Bluetooth*, 654 F.3d at 947. Moreover, this settlement was the culmination of protracted discussions between the parties before a former federal District Court Judge. *See* ECF No. 241-5. "The assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive." *Schofield*, 2019 WL 955288, at *6 (Chen, J.). Lastly, there is no undisclosed agreement made in connection with the settlement proposal. Settlement § XXXI.

For all these reasons, there are no indications that the settlement is the product of collusion.

* * *

Considering all of these guideposts, the Court should finally conclude that the class representatives and class counsel have adequately represented the class, that the Settlement was negotiated at arms-length, that the relief provided for the class is adequate, and that the Settlement treats class members equitably relative to each other. Fed. R. Civ. P. 23(e)(2)(A)-(D). Thus, the Court should conclude that the proposed settlement is fair, reasonable, and adequate, and thus should grant final approval.

### III. Notice to the Settlement Class Comported with Rule 23 and Due Process

When it granted preliminary approval of the Settlement, the Court ordered a notice program it deemed the best notice practicable under this case's circumstances. ECF No. 259 at ¶ 14; *Low v. Trump Univ., LLC*, 881 F.3d 1111, 1120 (9th Cir. 2018) (notice need only be reasonably

calculated to reach the class in order to satisfy due process); *Chinitz v. Intero Real Est. Servs.*, 2020 WL 7042871, at *3 (N.D. Cal. Dec. 1, 2020) ("Notice does not have to be perfect—it must be the best notice that is practicable under the circumstances . . ..") (internal quotation omitted); *Beltran v. Olam Spices & Vegetables, Inc.*, 2023 WL 5817577, at *5 (E.D. Cal. Sept. 8, 2023) ("Importantly, notice to a class is not required to be perfect.").

The settlement administrator completed the notice program set out in the Court's Order, and that notice program was effective. Weisbrot Decl. at ¶¶ 8-13; ECF No. 271 at 5. Even still, the settlement administrator and class counsel undertook substantial additional claims stimulation efforts to maximize the visibility of the settlement for potential class members. Weisbrot Decl. at ¶¶ 24-33, 48-49. Through these efforts, notice reached over 81.25% of the potential class an average of 3.24 times each. Weisbrot Decl. at ¶ 33. Notice ran in print through *USA Today*, in digital ads across social media platforms Facebook and Instagram, in video ads on Youtube, in sponsored listings on *TopClassActions*, and in a video by a popular social media influencer on Instagram and TikTok. Weisbrot Decl. at ¶¶ 8-33.  A website, toll-free number, and P.O. box were available for Class Members to get additional information about the Settlement, along with live assistance on the settlement website. *Id.* at ¶¶ 15-23. The notice clearly and effectively communicated information about the Settlement. *Id.* at ¶ 16. The notice directed readers to the settlement website or toll-free number for more information and stated all required information without omitting significant facts Class Members need to understand their rights. *See id.*; Weisbrot Decl. at ¶¶ 15-23. Because the notice program was fully and timely carried out as required by the Court (indeed, additional efforts were taken to further stimulate claims, Weisbrot Decl. ¶¶ 24-33), and provides the best notice practicable under the circumstances, the Court should reaffirm its prior holding that the notice program satisfies the requirements of Rule 23 and due process.

## CONCLUSION

For the reasons just discussed, the Court should enter the proposed Final Approval Order, thus finally approving the proposed Settlement; finally certifying the proposed Settlement Class; determining that Plaintiffs' class notice program has been conducted in

PLAINTIFFS' MOTION FOR FINAL APPROVAL
Case No.: 3:21-cv-01418-EMC-KAW

accordance with the Court-approved notice plan and comports with Rule 23 and due process.

DATED: January 9, 2025                    Respectfully submitted,

                                          */s/ Andre M. Mura*

                                          Andre M. Mura (SBN 298541)
                                          Ezekiel S. Wald (SBN 341490)
                                          **GIBBS LAW GROUP LLP**
                                          1111 Broadway, Suite 2100
                                          Oakland, California 94607
                                          (510) 350-9700
                                          amm@classlawgroup.com
                                          zsw@classlawgroup.com

                                          Geoffrey A. Graber (SBN 211547)
                                          Karina G. Puttieva (SBN 317702)
                                          **COHEN MILSTEIN SELLERS & TOLL
                                          PLLC**
                                          1100 New York Ave. NW, Suite 800
                                          Washington, DC 20005
                                          Telephone: (202) 408-4600
                                          Facsimile: (202) 408-4699
                                          ggraber@cohenmilstein.com
                                          kputtieva@cohenmilstein.com

                                          *Attorneys for Plaintiffs and the Certified Class*

PLAINTIFFS' MOTION FOR FINAL APPROVAL
Case No.: 3:21-cv-01418-EMC-KAW